UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - x
                                :
UNITED STATES OF AMERICA
                                :
          - v. -                        S12 11 Cr. 576 (WHP)
                                :
JOSHUA MEREGILDO, et al.
                                :
          Defendants.
                                :
- - - - - - - - - - - - - - - x


**POST-HEARING MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA
IN OPPOSITION TO DEFENDANTS' MOTIONS TO SUPPRESS**


                              PREET BHARARA
                              United States Attorney for the
                              Southern District of New York
                              One St. Andrew's Plaza
                              New York, New York 10007

NOLA B. HELLER
ADAM FEE
SANTOSH ARAVIND
Assistant United States Attorneys
     - Of Counsel -

1

**INTRODUCTION**

The Government respectfully submits this post-hearing memorandum of law in opposition to (1) defendant Joshua Meregildo's motion to suppress physical evidence recovered from 681 Courtlandt Avenue, Apartment 5C; (2) defendant Melvin Colon's motion to suppress physical evidence recovered from 280-300 East 161st Street, Apartment 6U; and (3) defendant Nolbert Miranda's motion to suppress his post-arrest statements. The testimony of law enforcement witnesses at the hearing, which was held on September 5, 2012, established that the agents properly seized evidence incident to Meregildo's arrest and in plain view; that Colon's mother, Edilia Quian, gave voluntary consent for the agents to search her son's bedroom; and, that Miranda's post-arrest statements were not elicited in violation of *Miranda* v. *Arizona*, 384 U.S. 436 (1966), because Miranda knowingly waived his *Miranda* rights.

Because the record developed at the hearing does not support the defendants' suppression motions, Meregildo's and Colon's motions to suppress physical evidence and Miranda's post-arrest statements should be denied.

**BACKGROUND**

Special Agent ("SA") Janice Castillo has been employed with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") for approximately eight years. (Transcript of the

2

September 5, 2012 Suppression Hearing ("Tr.") 27).  She has received training at the ATF National Academy and at the federal law enforcement training center, and has received on-the-job training while an ATF Special Agent.  (Tr. 27-28).

SA Collins has been an ATF Special Agent for over five years.  (Tr. 137).  He has also received various types of training.  (Tr. 137).

The Record Relevant to Meregildo's Suppression Motion

On March 10, 2011, SA Castillo and her team were executing a search warrant at 2253 Haviland Avenue, Apartment J, in the Bronx, and were attempting to locate Meregildo, for whom they had an arrest warrant.  (Tr. 28-29).  After failing to locate Meregildo at the Haviland address, SA Castillo and her team traveled to different locations where they believed Meregildo might be staying.  (Tr. 29).  SA Castillo traveled to the home of Deborah Dixon at 3073 Park Avenue, Apt F, whose son Carl Madden provided SA Castillo with the phone number of an iPhone used by Meregildo.  (Tr. 30).  Later that day, agents visited 681 Courtlandt Avenue, Apartment 5, believed to be an apartment at which Meregildo's girlfriend resided.  (Tr. 31).  An older woman answered the door and indicated that Meregildo was sleeping in the back bedroom.  (Tr. 31-32).  SA Castillo, along with two law enforcement officers, entered the apartment and went to the back bedroom, where she observed Meregildo

3

sleeping on the bed.  (Tr. 32).  Meregildo was subsequently

placed under arrest.  (Tr. 32).

After Meregildo was handcuffed, SA Castillo observed a

pair of pants right next to the bed.  (Tr. 33).  SA Castillo

asked Meregildo if they were his pants, and Meregildo answered

in the affirmative.  (Tr. 33).  Before handing the pants to law

enforcement officers so that they could help Meregildo get

dressed, SA Castillo checked the pants' pockets and retrieved

Meregildo's New York State identification and a USB drive, which

she seized.  (Tr. 33).

SA Castillo then observed an iPhone and another

electronic device that she later learned was an iPod Touch.

(Tr. 34).  Those items were on a table or on the dresser,

approximately three feet from the bed.  (Tr. 34).  Again, SA

Castillo asked Meregildo if those items were his, and he said

that they were.  (Tr. 34-35).  SA Castillo seized those items

because she believed that the phones "held information and

evidence that pertained to this case."  (Tr. 35).  SA Castillo

and the other law enforcement officers did not seize any other

items, and no search was conducted other than one of the

officers looking for a firearm in and under the bed.  (Tr. 35-

36).  The Government later applied for, and received, a search

warrant to search the electronic items that were seized.  *See*

Def. Mot. Suppress, Exh. G.

The Record Relevant to Colon's Suppression Motion

On September 27, 2011, SA Castillo and other law enforcement officers were conducting a takedown as part of this case. (Tr. 36). SA Castillo subsequently learned that Colon had been arrested at an apartment belonging to co-defendant Dante Barber (Tr. 36-37). SA Castillo traveled to that apartment and observed Colon in handcuffs. (Tr. 37). SA Castillo also learned that a firearm had been recovered at Barber's apartment. (Tr. 37). Based on information from multiple cooperating defendants, SA Castillo believed that members of God's Favorite Children, the gang of which Colon was a member, kept multiple firearms in different apartments. (Tr. 37-38). Accordingly, SA Castillo traveled with two other agents to 280 East 161st Street, Apartment 6U, which SA Castillo believed was Colon's apartment, to see if she could locate any other firearms. (Tr. 37-38). SA Castillo believed that Colon lived at that residence based on her reviews of law enforcement databases and because Colon had previously given that address during previous arrests. (Tr. 38).

SA Castillo testified that after she knocked on the door, the door was opened by a female, later identified as Edilia Quian, Melvin Colon's mother. (Tr. 38-39). Ms. Quian allowed SA Castillo in the apartment, at which time SA Castillo identified herself and told Ms. Quian of the defendant's arrest

earlier that day.  (Tr. 39-40).  Ms. Quian was visibly upset.
(Tr. 40).  SA Castillo thereafter asked Ms. Quian to search the
apartment, and in response, Ms. Quian asked whether SA Castillo
had a search warrant.  (Tr. 40).  SA Castillo testified that she
did not have a search warrant for the residence; rather, she
testified that at the time she was seeking Ms. Quian's consent
to search the residence to look for firearms.  (Tr. 40).  After
SA Castillo informed Ms. Quian that she did not have a search
warrant, Ms. Quian refused to give consent for the agents to
search the apartment.  (Tr. 40).  SA Castillo then told Ms.
Quian that earlier that day, one of Dante Barber's parents had
consented to a limited search of their apartment, and so SA
Castillo asked Ms. Quian whether she would give consent to
search Colon's bedroom.  (Tr. 41).  SA Castillo also offered to
have Ms. Quian observe the search.  (Tr. 41).  Ms. Quian agreed
and showed SA Castillo to the bedroom.  (Tr. 41).  At the
bedroom, SA Castillo provided Ms. Quian with an ATF consent to
search form.  (Tr. 41; Gov't Ex. 1).  Ms. Quian read the form,
and then handed back the form to SA Castillo.  (Tr. 42-43).  SA
Castillo wrote "Only Melvin Colon's bedroom" on the body of the
form, and crossed out the rest of the body of the form.  (Tr.
42).  Ms. Quian signed the form, and SA Castillo and another ATF
agent serving as a witness, signed the form as well.  (Tr. 42).
SA Castillo gave a second copy of the form to Ms. Quian for her

6

records.  (Tr. 45).  SA Castillo testified that she never told Ms. Quian that she was going to get a search warrant because the agents did not have probable cause in order to obtain a search warrant for that location.  (Tr. 43).

During the search of Colon's bedroom, ATF agents recovered letters from other defendants addressed to Colon in a drawer and a pill bottle on the top of the dresser which contained a "hard rock substance." (Tr. 44-45).

At the hearing, Elidia Quian contradicted SA Castillo's testimony.  She stated that SA Castillo told her that an agent was on his way with a search warrant.  (Tr. 157-58).  She also testified that there were anywhere between five and ten agents present during the encounter.  (Tr. 155, 162).  Ms. Quian testified further that although she signed the consent to search form, she did not observe SA Castillo add the notation that only Colon's bedroom would be searched.  (Tr. 158).  Ms. Quian testified that she signed the consent to search form because she "assum[ed] the search warrant was on its way with the next agent." (Tr. 158).  Ms. Quian also testified that her copy of the consent form did not have that notation, but she did not produce her copy of the form at the hearing.  (Tr. 167-68).  Finally, Ms. Quian testified that she would do anything to help her son.  (Tr. 168).

The Record Relevant To Miranda's Suppression Motion

On November 10, 2011, SA Castillo and her partner, SA Collins, traveled to the Monticello Police Department in Monticello, New York, after learning that Nolbert Miranda had been arrested there. (Tr. 45-46, 139). Miranda had been a fugitive since September 27, 2011. (Tr. 46). SA Castillo and SA Collins drove to Monticello to transport Miranda back to the Southern District of New York for processing. (Tr. 46, 138). Miranda was handcuffed and placed in the backseat of the car. (Tr. 47). The agents also took over $2,000 that had been recovered from Miranda. (Tr. 47).

After 2:00 p.m., SA Castillo and SA Collins began driving back to New York City. (Tr. 48, 139). Initially, SA Castillo asked Miranda for pedigree information so that she could fill out intake forms for the United States Marshals Service. (Tr. 48). As she was filling out the form, Miranda began asking about the charges that he was facing and to which he could plead. (Tr. 48). SA Castillo pulled out an ATF *Miranda* advice and waiver of rights form. (Tr. 48-49; Gov't Ex. 2). At approximately 2:43 p.m., SA Castillo read the form to Miranda, who agreed to waive his rights. (Tr. 49-50, 143, 146). SA Castillo did not ask Miranda to sign the form because Miranda was handcuffed at the time. (Tr. 50, 150). SA Castillo noted on the form the time that the *Miranda* warnings were administered

8

and that she administered the *Miranda* warnings verbally.  (Tr. 50).  Miranda then made various statements to SA Castillo, including that he was surprised that he was not indicted earlier, that he sold crack cocaine, and that he had been shot several times.  (Tr. 50-51).  Miranda also refused to answer certain questions, including who shot him and who supplied him with crack cocaine.  (Tr. 51-52).  SA Castillo did not take notes of Miranda's statements because he did not want her to take notes.  (Tr. 52).

SA Castillo and SA Collins arrived at the Southern District of New York federal courthouse at approximately 4:00 p.m., and handed the defendant to the Marshals for processing.  (Tr. 53, 141).  Later, the two agents discussed Miranda's statements and SA Castillo drafted a report memorializing Miranda's statements. (Tr. 53).

## ARGUMENT

**I.   MEREGILDO'S MOTION TO SUPPRESS PHYSICAL EVIDENCE SHOULD BE DENIED BECAUSE THE EVIDENCE WAS PROPERLY SEIZED INCIDENT TO MEREGILDO'S ARREST, OR ALTERNATIVELY, WAS SEIZED IN PLAIN VIEW**

The testimony of SA Castillo at the suppression hearing demonstrates that Meregildo's arguments in support of his motion to suppress physical evidence should be rejected. Her testimony established that the electronic items at issue – the iPhone, iPod Touch and USB drive – were seized properly incident to Meregildo's arrest or, alternatively, that the items were seized because they were in plain view.

**A.   Legal Standard**

**1.   Search Incident To Arrest**

Under the "search incident to arrest" exception to the warrant requirement, a law enforcement officer may conduct a full search of an arrestee's person and areas within his immediate control and the arrestee's vicinity incident to a lawful custodial arrest. *United States* v. *Robinson*, 414 U.S. 218, 234-35 (1973). The exception derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations. *See id.* "The exception for searches incident to arrest permits the police to search a lawfully arrested person and areas within his immediate control." *Smith* v. *Ohio*, 494 U.S. 541, 543 (1990).

Courts have upheld the validity of searches incident to arrest in a variety of situations, even where the item searched has been out of defendant's reach or the defendant, as here, has been handcuffed. *See*, *e.g.*, *United States* v. *Nelson*, 102 F.3d 1344, 1347 (4th Cir. 1996) (allowing search of defendant's shoulder bag after agents had removed it from his body and taken defendant to another room for questioning); *United States* v. *Hernandez*, 941 F.2d 133, 135–37 (2d Cir. 1991) (allowing search between the mattress and box spring of a bed after suspects were handcuffed); *United States* v. *Fleming*, 677 F.2d 602, 607 (7th Cir. 1982) (allowing search of paper bags seized and searched after the defendants were handcuffed and placed under arrest).

### 2.   Plain View Doctrine

The "plain-view" doctrine presents an exception to the Fourth Amendment warrant requirement if three conditions are met: (1) "the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed"; (2) the incriminating character of the evidence was immediately apparent; and (3) the officer had a lawful right of access to the object seized. *Horton* v. *California*, 496 U.S. 128, 136–37 (1990).

11

B.   **Discussion**

The testimony at the suppression hearing established that the USB drive was seized incident to Meregildo's arrest. SA Castillo testified that shortly after the defendant was placed in handcuffs, she saw a pair of pants "right next to the bed" where Meregildo had been sleeping.  (Tr. 33).  After Meregildo identified the pants as his, SA Castillo checked the pockets of the pants and found the USB drive.  (Tr. 33).  She then gave the pants to other law enforcement officers who helped Meregildo get dressed.  Because the USB drive was found within Meregildo's immediate area of control, it was properly seized incident to his arrest.  The law is clear that law enforcement officers who enter a suspect's home with an arrest warrant have a duty to find clothing for the suspect to wear or to permit the suspect to do so.  *See United States* v. *DiStefano*, 555 F.2d 1094, 1101 (2d Cir. 1977) (allowing police officers to accompany the defendant to her bedroom to dress where, at the time she was placed under arrest, she was wearing a nightgown and bathrobe); *United States* v. *Chervin*, No. 10 Cr. 918 (RPP), 2011 WL 4373928, *4 (S.D.N.Y. Sept. 20, 2011) (stating that New York FBI policy and previous Second Circuit decisions require law enforcement to locate appropriate clothing for a defendant after arrest).  In the present case, Meregildo was in his bedroom in a state of undress when he was arrested.  (Tr. 32).  SA Castillo gave

12

Meregildo pants which he needed to be transported to the
Southern District of New York, and in so doing, properly seized
evidence contained in those pants. Evidence found in the course
of this duty to find clothing has been found to be admissible.
*See United States* v. *DiStefano,* 555 F.2d at 1097 (denying a
motion to suppress a quantity of currency that the defendant
removed from a pocket of her robe while she was getting
dressed); *United States* v. *Chervin*, 2011 WL 4373928 at *4
(denying a motion to suppress a cell phone found in the master
bedroom which agents entered to obtain clothing for the
defendant).

     The testimony at the suppression hearing also
established that the iPhone and iPod Touch were seized incident
to Meregildo's arrest. SA Castillo testified that those
electronic items were seized incident to the arrest insofar as
they were seized shortly after he was handcuffed. She testified
that the bedroom in which Meregildo was sleeping was small, and
that the electronic items were found approximately three feet
away from where Meregildo had been sleeping. (Tr. 32, 34).

     The fact that Meregildo was handcuffed at the time the
items were seized does not render the seizure unconstitutional.
In *United States v. Rodriguez-Alejandro*, 664 F. Supp. 2d 1320,
1344-46 (N.D. Ga. 2009), a district court denied a suppression
motion challenging the seizure of cell phones found in a

defendant's bedroom.  There, the court found that the phones were seized validly incident to the defendant's arrest and in plain view.  *Id.*  The court credited the officers' testimony that the phones were observed "contemporaneously with encountering and arresting" the defendant in the bedroom, even though the phones were seized approximately five minutes after the defendant was handcuffed.  *Id.* at 1347-48.  The court reasoned that:

> [T]he fact that [the defendant] had been handcuffed and removed from the bedroom when [the officer] retrieved the cell phones does not preclude finding that the phones were seized incident to his arrest as many courts 'have recognized that even when an arrestee is handcuffed, a search of the area that was within the defendant's immediate control when he was arrested is valid so long as it is conducted within a time span close to the arrest and while the defendant is still within the general proximity of the arresting officers.'"

*Id.* (citing *United States* v. *Massenberg*, 45 F.App'x 115, 120 (3d Cir. 2002).

The testimony at the suppression hearing also established that the iPod Touch and iPhone constituted incriminating evidence that was properly seized in plain view. Each of the factors set forth in *Horton* v. *California* was satisfied.  First, SA Castillo received consent to enter Meregildo's apartment to effectuate his arrest and was lawfully present when she seized the items.  (Tr. 31-32).  Second, she

14

testified that she believed that the iPhone and the item later determined to be an iPod Touch contained evidence of the crimes with which the defendant was charged.  SA Castillo testified on direct examination that she seized the items because the phones "held information and evidence that pertained to this case." (Tr. 35).  In response to a question from the Court as to why she asked Meregildo whether the phones were his, SA Castillo responded:

> We had learned with our investigation that a lot of these guys were either Twittering or they were on Facebook and they were posting a lot of information that pertained to our case.  When we were looking for Mr. Meregildo and this is information we received from cooperators – when we were looking for Mr. Meregildo and we found him at that location I saw the two phones and I asked him if they belonged to him.  That was our interest in the phones, because we believed it [sic] had pertinent information in the phones.

(Tr. 133).  Even though the iPhone and iPod Touch were common everyday items, the law is clear that if an agent believes that such items contain evidence of a crime, she has probable cause to seize those items.  *See, e.g.*, *United States* v. *Agbodjan*, __ F. Supp. 2d ___, 2012 WL 2552140, *3-*4 (N.D.N.Y. 2012) (holding that seizure of computer, iPhone, Blackberry and other items found in a residence was proper because the agent believed that

those items contained evidence of a crime.)[1]  Third, and finally, there was no question that SA Castillo had a lawful right of access to the object seized.

In sum, because the testimony at the suppression hearing established that the electronic items was seized incident to Meregildo's arrest and were found in plain view, the defendant's motion to suppress should be denied.

## II.  DEFENDANT COLON'S MOTION TO SUPPRESS PHYSICAL EVIDENCE SHOULD BE DENIED BECAUSE HIS MOTHER GAVE VALID CONSENT TO SEARCH THE BEDROOM

### A.   Legal Standard

Although warrantless searches of private property are generally presumed to be unreasonable, the law recognizes certain exceptions, including when the search is conducted pursuant to the consent of an authorized person.  *See Schneckloth* v. *Bustamante*, 412 U.S. 218, 219 (1973); *United States* v. *Lewis*, 386 F.3d 475, 481 (2d Cir. 2004) (where authorized party consents to search, "neither a warrant nor

---

[1]    Defense counsel at the suppression hearing focused on SA Castillo's questioning of the defendant as to whether the iPhone and iPod Touch were his, noting that such questioning occurred before Meregildo was administered *Miranda* warnings.  (Tr. 62-65).  However, SA Castillo also testified that she had information that another individual had given her information that Meregildo had an iPhone.  (Tr. 30).  Furthermore, the defendant's statement that the phone belonged to him was not testimonial in nature.  *See, e.g., United States* v. *Alvelo-Ramos*, 945 F. Supp. 19, 23 (D. Puerto Rico 1996) ("The first two questions regarding ownership of the car and the cellular phone were only incident to the search of the house pursuant to the warrant and were not directly related to the crime suspected. These questions were not likely to yield incriminating responses because the possession of a car and a cellular phone is entirely quotidian, and thus could not have been reasonably interpreted as indicia of criminal activity.")

probable cause is necessary"). "The Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force." *Schneckloth* v. *Bustamante*, 412 U.S. at 228. When the Government relies on consent to justify a warrantless search, as it does here, the Government bears the burden of proving by a preponderance of the evidence that the consent was voluntary. *See United States* v. *Snype*, 441 F.3d 119, 131 (2d Cir. 2006). Voluntariness is determined by assessing the "totality of all the circumstances." *United States* v. *Isiofia*, 370 F.3d 226, 230-31 (2d Cir. 2004). The "ultimate question presented is whether the officer had a reasonable basis for believing that there had been consent to the search." *Id.* at 230-31 (internal citations omitted). Courts have applied a variety of factors in determining whether consent was voluntary, including:

> (1) the consenting party's knowledge of his right to refuse consent; (2) whether the police used subtly coercive police questioning to elicit the consent; (3) the possibly vulnerable state of the consenting party; (4) the number of police officers on the scene; (5) whether the consenting party was under arrest and whether the arrest was effected through forcible entry, use of force, or display of weaponry.

*Mangino* v. *Incorporated Village of Patchogue*, 739 F. Supp. 2d 205, 245 (E.D.N.Y. 2010).

17

B.   __Discussion__

Here, the testimony at the hearing established by a preponderance of the evidence that Edilia Quian, the mother of Melvin Colon, gave voluntary consent for the ATF agents to search Colon's bedroom.  SA Castillo testified that initially she asked for permission to enter the home and to discuss the arrest of Colon, and that after Ms. Quian indicated that she wanted a search warrant, SA Castillo offered to search only Colon's bedroom, with Ms. Quian present.  (Tr. 39-41).  Ms. Quian agreed to that proposal.  (Tr. 41).  SA Castillo testified that she then handed Ms. Quian a consent to search form, which Ms. Quian read and signed, after SA Castillo indicated the search was just for Colon's bedroom.  (Tr. 41).  Ms. Quian herself testified that she read the consent form, which was admitted into evidence as Government Exhibit 1.  (Tr. 158).  There was no evidence in the record that SA Castillo ever threatened Ms. Quian, that any of the agents had their weapons drawn, or that SA Castillo used "subtle coercive questioning" to elicit the consent.  SA Castillo also testified that there were only three law enforcement officers present during the search and that Ms. Quian was cooperative during the encounter.  (Tr. 38, 45)

Although Ms. Quian offered a contradictory version of events when she testified at the suppression hearing, the

Government submits that the preponderance of the evidence establishes that Ms. Quian gave valid consent.  The key fact upon which the defendant apparently relies is that Ms. Quian claims that she gave consent to the search only because she was informed that another agent was coming with a search warrant. As an initial matter, even assuming that SA Castillo did inform Ms. Quian that another agent was coming with a search warrant, that does not necessarily mean that consent was involuntary. *See United States* v. *Lavan*, 10 F. Supp. 2d 377, 384 (S.D.N.Y. 1998) (noting that whether individual who gave consent was told that a search warrant was coming is one relevant factor in the Court's determination).  In fact, courts have repeatedly held that the mere fact that a defendant or third-party giving consent may have been told that the police would obtain a warrant in the absence of consent does not make the consent invalid.  *See United States* v. *Yu-Leung*, 51 F.3d 1116, 1119 (2d Cir. 1995) (defendant voluntarily gave consent to search his house despite the fact that the police told him that they would remain in his house until they received a search warrant if he did not consent to the search); *United States* v. *Calvente*, 722 F.2d 1019, 1023 (2d Cir. 1983) ("[A]dvising a person of the fact that a search warrant can be obtained does not constitute coercion."); *United States* v. *Amry*, No. 02 Cr. 612 (DLC), 2003 WL 124678, *4 (S.D.N.Y. Jan. 16, 2003) (finding that defendant

gave consent when he signed written form and noting that "even
if the agents had told defendant that they would search the
apartment regardless of whether or not he consented - a fact
which they contest - this would not invalidate the consent [the
defendant] gave to the search") (citations omitted).

Moreover, to the extent there is contradictory
testimony between SA Castillo and Ms. Quian, this Court should
find that SA Castillo testified more credibly than Ms. Quian.
During the hearing, Quian admitted that she had observed between
five and ten officers during the encounter.  (Tr. 155, 162).
She also stated that although she remembered that her form did
not include the notation, "only Melvin Colon's bedroom," she did
not bring a copy of her form to the hearing.  (Tr. 167-68).  Ms.
Quian is also biased, as she admitted that she would do anything
to help her son.  (Tr. 168).  Under these circumstances, the
Court should find that SA Castillo's testimony was more credible
than Ms. Quian's testimony.  *See United States* v. *Zapata-
Tamallo*, 833 F.2d 25, 27 (2d Cir. 1987) (affirming trial court's
denial of suppression motion and noting that trial court was
free to decide that agent's testimony that defendant gave valid
consent was more credible than the defendant's testimony);
*United States* v. *Porras-Quintero*, 07 Cr. 228 (RPP), 2007 WL
4531552, *8 (S.D.N.Y. Dec. 21, 2007) (same).

The Government submits that, given the totality of the circumstances, the testimony at the suppression hearing established that SA Castillo had a reasonable belief that Ms. Quian's consent to search her son's bedroom was freely and voluntarily given.

### III. MIRANDA'S MOTION TO SUPPRESS POST-ARREST STATEMENTS SHOULD BE DENIED

The defendant Miranda's motion to suppress his post-arrest statements should be denied because the uncontroverted testimony at the suppression hearing established that the defendant knowingly waived his *Miranda* rights before making inculpatory statements to the agents.

### A.   <u>Legal Standard</u>

In *Miranda* v. *Arizona*, 384 U.S. 436 (1966), the Supreme Court determined that "in order to combat [the pressures surrounding in-custody interrogations] and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored." *Id.* at 467.  Accordingly, "prior to the initiation of questioning," the government must inform a suspect of "the [government's] intention to use his statements to secure a conviction, and must inform him of his rights to remain silent and to 'have counsel present ... if [he] so desires.'" *Moran* v.

21

*Burbine*, 475 U.S. 412, 420 (1986) (quoting *Miranda*, 384 U.S. at 468-70).  Once a defendant is apprised of these rights, he may waive them "provided the waiver is made voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 444; *Moran*, 475 U.S. at 421 (quoting *Miranda*).

The waiver inquiry has two "distinct" components. First, a court must be satisfied that the relinquishment of rights was "knowing," which is to say that "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran*, 475 U.S. at 421. Second, it must have been "voluntary," such "that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.* "The question of waiver must be determined on the particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused." *United States* v. *Spencer*, 995 F.2d 10, 11 (2d Cir. 1993) (per curiam) (internal quotation marks omitted).

Although "the Government bears the burden of demonstrating a knowing and voluntary waiver, such a waiver need not be express." *United States* v. *Plugh*, 648 F3d 118, 127 (2d Cir. 2011). "Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of

the right to remain silent." *Berghuis* v. *Thompkins*, 130 S.Ct. 2250, 2262 (2010); *see also North Carolina* v. *Butler*, 441 U.S. 369, 373 (1979) ("[W]aiver can be ... inferred from the actions and words of the person interrogated."). This is because "the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." *Berghuis*, 130 S.Ct. at 2262; *see also United States* v. *Scarpa*, 897 F.2d 63, 68 (2d Cir. 1990).

## B.  Discussion

Here, the record at the suppression hearing established that Miranda knowingly and voluntarily waived his right to remain silent and consult with counsel both expressly and through a "course of conduct indicating waiver." *United States* v. *Plugh*, 648 F.3d at 127. SA Castillo testified that she read the standard ATF advice of rights form to Miranda, and that Miranda said "he understood his rights" and "wanted to talk" to the agents. (Tr. 49, 100). SA Collins further testified that SA Castillo read Miranda his rights before she asked him substantive questions. (Tr. 143). Thus, the clear testimony at the suppression hearing demonstrated that *Miranda* warnings were given to Miranda on November 10, 2011 before he made statements. There was no evidence of coercion, threats, or

trickery which would have improperly induced Miranda to speak with the agents.  Moreover, Miranda's affidavit – which contends that he refused to waive his rights - should not be credited. As the Defendant chose not to testify at the hearing, the declarations set forth in his affidavit are entitled to less weight than the testimony of the agents.  *See United States* v. *Al–Marri*, 230 F. Supp. 2d 535, 539 (S.D.N.Y. 2002) ("[T]his Court follows the lead of other federal courts in valuing the weight of live witnesses' testimony over the contents of a defendant's affidavit, and gives lesser consideration to [the defendant's] version of the facts.").

Furthermore, like in *Berghuis*, the defendant, with an understanding of his *Miranda* rights, acted in a manner "inconsistent with their exercise" by speaking to agents during the drive from Monticello to the federal courthouse in Manhattan.  As the record makes clear, Miranda knew his rights and selectively exercised those rights in response to questioning by SA Castillo.  For example, although Miranda stated that he had been shot in the past, he refused to speak about who had shot him.  (Tr. 52).  Miranda also refused to discuss who supplied him with crack cocaine, although he acknowledged selling crack cocaine. (Tr. 51).

Finally, Miranda's failure to sign a written waiver does not change the analysis.  Both SA Collins and SA Castillo

testified that they did not ask Miranda to sign a written waiver because he was handcuffed at the time.  (Tr. 50, 150).  As numerous courts have found, Miranda's failure to sign a written waiver is "not dispositive on the issue" to the voluntariness of his waiver.  *United States* v. *Spencer*, 955 F.2d 814, 819 (2d Cir. 1992); *see also North Carolina* v. *Butler*, 441 U.S. 369, 369 (1979) ("[E]xplicit statement of waiver is not invariably necessary to support a finding that defendant waived the right to remain silent or the right to counsel guaranteed by the *Miranda* case."); *United States* v. *Nussen*, 531 F.2d 15, 23 n.1 (2d Cir. 1976).[2]

Here, the consistent and credible testimony of SA Castillo and SA Collins established that defendant Miranda clearly and unequivocally waived his *Miranda* rights.  As such, the defendant's motion to suppress his post-arrest statements should be denied.

---

[2]     The Government contacted defense counsel for Miranda on September 17, 2012, about a testimonial stipulation regarding notes taken of an interview with SA Castillo, but did not hear back.  If defense counsel wants a stipulation, the parties will supplement the record.

## CONCLUSION

Based on the foregoing authority and the authority cited in the Government's pre-hearing brief, the Government respectfully submits that the defendants' motions to suppress should be denied.

Dated: New York, New York
       September 17, 2012

Respectfully submitted,

PREET BHARARA
United States Attorney

By: _____/s/_____
    Nola B. Heller/Adam Fee/Santosh Aravind
    Assistant United States Attorneys
    Tel.: (212) 637-2631/1589/1045