UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------x
                                         :
UNITED STATES OF AMERICA                 :
                                         :    S12 11 Cr. 576 (WHP)
            - v. -                       :
                                         :
JOSHUA MEREGILDO, et al.,                :
                                         :
                  Defendants.            :
----------------------------------------x


# GOVERNMENT'S BRIEF IN OPPOSITION TO
# DEFENDANTS' MOTIONS *IN LIMINE*


                              PREET BHARARA
                              United States Attorney for the
                              Southern District of New York
                              Attorney for the United States
                                   of America


NOLA B. HELLER
ADAM FEE
SANTOSH ARAVIND
Assistant United States Attorneys
     - Of Counsel -

## <u>TABLE OF CONTENTS</u>

I.    Background. . . . . . . . . . . . . . . . . . . . . . . . . 2

II.   The Government's Ballistics Evidence Is Reliable and No
      *Daubert* Hearing Is Required. . . . . . . . . . . . . . 19
      A.   Relevant Facts. . . . . . . . . . . . . . . . . . . 19
      B.   Applicable Law. . . . . . . . . . . . . . . . . . . 20
      C.   Discussion. . . . . . . . . . . . . . . . . . . . . 22

III.  The Government's Fingerprint Evidence Is Reliable and No
      *Daubert* Hearing Is Required. . . . . . . . . . . . . . 19
      A.   Relevant Facts. . . . . . . . . . . . . . . . . . . 19
      B.   Applicable Law. . . . . . . . . . . . . . . . . . . 20
      C.   Discussion. . . . . . . . . . . . . . . . . . . . . 22

IV.   Letters and Documents Recovered From the Haviland Avenue
      Apartment Are Admissible. . . . . . . . . . . . . . . . XX

V.    Meregildo's and Miranda's Aliases Are Relevant and
      Admissible and Miranda's Motion to Strike Introductory
      Language from the Indictment Should Be Denied. . . . . . XX

VI.   Miranda's Motion to Sever Should Be Denied . . . . . . . XX

VII.  Conclusion. . . . . . . . . . . . . . . . . . . . . . . XX

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------x
                                        :
UNITED STATES OF AMERICA                :
                                        :   S12 11 Cr. 576 (WHP)
        - v. -                          :
                                        :
JOSHUA MEREGILDO, et al.,               :
                                        :
                Defendants.             :
----------------------------------------x

## GOVERNMENT'S BRIEF IN OPPOSITION TO
## DEFENDANTS' MOTIONS *IN LIMINE*

The Government respectfully submits this memorandum of law in response to the pretrial motions *in limine* made by the defendants.  In particular, defendant Joshua Meregildo seeks: (1) to preclude ballistics analysis expert testimony from a detective from the New York City Police Department's Firearms Analysis Section on the grounds that it is insufficiently reliable; (2) to preclude fingerprint analysis testimony from an analyst from the New York City Police Department's Latent Print Analysis Section on the grounds that it is insufficiently reliable; (3) to preclude introduction of the Haviland Avenue documents as irrelevant; and (4) to strike references to Meregildo's alias "Killa" in the Indictment and during the trial.  Defendant Nolbert Miranda seeks: (1) to sever his trial from that of his co-defendants; (2) to strike alleged surplusage from the Indictment; and (3) to strike references to Miranda's alias

"Payday" in the Indictment.[1]  Defendant Earl Pierce moves to join in the motions *in limine* of his co-defendants.  Defendant Colon did not file motions *in limine*.  For the reasons that follow, each motion should be denied, and no evidentiary hearings are required.

## I.   BACKGROUND

The evidence at trial is described in detail in the Government's September 13, 2012 letter seeking to admit certain evidence of charged and uncharged crimes committed by the defendants and their co-racketeers (the "September 13 Letter"). Briefly, the evidence at trial will show that from at least in or about Spring 2010 up to and including September 2011, the members and associates of the Courtlandt Avenue Crew (the "CAC" or the "Enterprise"), including the defendants, committed, among other crimes, murders, assaults and attempted murders, crack cocaine and marijuana distribution, and firearms offenses.  The charges in the Indictment revolve around the Enterprise's schemes to murder rival gang members and others who were perceived as threats to the CAC; the assaults, attempted murders, and murders carried out by members of the CAC; the CAC's narcotics-trafficking business; and the numerous acts of violence and firearms offenses committed by the CAC's members for the

---

[1] Miranda's motion to strike surplusage was filed six days past the September 13, 2012 due date for motions in *limine*.

purpose of protecting the CAC and its narcotics distribution organization.  Below, the Government includes certain facts relevant to its response to the defendants' motions *in limine*.

## II.  The Government's Ballistics Evidence Is Reliable and No *Daubert* Hearing Is Required

Meregildo argues that the proposed ballistics testimony should not be admitted as evidence at trial because it cannot satisfy the standards of Rule 702, *Daubert* v. *Merrell Dow*, 509 U.S. 579 (1993), and *Kumho Tire Co.* v. *Carmichael*, 526 U.S. 137 (1999).  Meregildo also requests that a *Daubert* hearing be held to assess the admissibility and reliability of the proffered ballistics analysis testimony.  For the reasons set forth below, the Government respectfully submits that the evidence that the Government proposes to admit is both relevant and admissible under longstanding Second Circuit precedent and no pretrial hearing is required to admit the proffered evidence.

### A.   Relevant Facts

Detective Jonathan Fox of the New York City Police Department's ("NYPD") Firearms Analysis Section conducted five ballistics comparisons that will form the basis of his testimony at trial in this case.  The relevant comparison reports are attached as Exhibit A to this memorandum.  Specifically:

> 1.   On or about August 2, 2010, Detective Fox determined that shell casings found at the scene of the July 25, 2010 homicide of Jason Correa

3

positively matched to shell casings found at the
scene of the July 31, 2010 homicide of Carrel
Ogarro.

2.    On or about September 7, 2010, Detective Fox
determined that test fire shell casings from a
firearm recovered by the NYPD on September 6, 2010
positively matched to shell casings found at the
scene of the July 25, 2010 homicide of Jason
Correa.

3.    On or about September 7, 2010, Detective Fox
determined that test fire shell casings from a
firearm recovered by the NYPD on September 6, 2010
positively matched to shell casings found at the
scene of the July 31, 2010 homicide of Carrel
Ogarro.[2]

4.    On or about September 17, 2010, Detective Fox
determined that test fire shell casings from a
firearm recovered by the NYPD from the scene of a
nonfatal shooting occurring on September 13, 2010
positively matched to shell casings found at the
scene of the August 27, 2010 homicide of Delquan
Alston.

---

[2] Meregildo only references Detective Fox's anticipated
testimony on this comparison.  It should be noted that he will
testify about all five of the above-described matches.

5.    On or about September 28, 2011, Detective Fox
determined that test fire casings from a firearm
recovered by the NYPD on September 22, 2011
positively matched to(i) shell casings found at
the scene of a nonfatal shooting occurring on
September 8, 2011, and (ii) shell casings found at
the scene of the September 21, 2011 homicide of
William Shaw.

Among other qualifications, Detective Fox: (i) has been
qualified as an expert witness, including as an expert in the
microscopic examination of firearms, approximately 150 times in
state and federal courts; (ii) has been employed by the Firearms
Analysis Section of the NYPD for approximately eight years; (iii)
has received extensive training from the NYPD, including courses
in firearms operability analysis and microscopic analysis; (iv)
has passed proficiency exams given each year by the NYPD in
firearms operability and microscopic analysis; and (v) has been
engaged in the microscopic examination of firearms for
approximately five years, during which time he has examined and
opined on thousands of pieces of ballistics evidence.

During his proposed testimony, we expect Detective Fox to
testify about (i) his training, qualifications, and experience in
the field of firearms and ballistics examination; (ii) the
foundations of the field of firearms and ballistics examination,

including the operation of firearms, the effects of the
manufacturing process on firearms and ballistics evidence,
toolmark identification, and use of the comparison microscope;
and (iii) his opinions, based on his training and experience,
about the ballistics matches described above, and that those
opinions are based on the application of his training and
experience to the microscopic examination and comparison of the
relevant ballistics evidence and the toolmarks and ballistics
impressions present on that evidence.

**B.   Discussion**

Meregildo's motion contends that ballistics examination as a
whole is unreliable, and therefore inadmissible, and that the
Court should either preclude the testimony or have a hearing to
determine whether the testimony satisfies Rule 702, *Daubert* and
*Kumho Tire*.  The total exclusion of ballistics testimony has no
support in the case law, and no hearing is required to reach that
conclusion.

Rule 702 of the Federal Rules of Evidence provides:

> If scientific, technical, or other
> specialized knowledge will assist the trier
> of fact to understand the evidence or to
> determine a fact in issue, a witness
> qualified as an expert by knowledge, skill,
> experience, training, or education, may
> testify thereto in the form of an opinion or
> otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony
> is the product of reliable principles and
> methods, and (3) the witness has applied the
> principles and methods reliably to the facts
> of the case.

With respect to the admissibility of expert opinion testimony under Rule 702, the Supreme Court has adopted a two-step inquiry to determine "whether the reasoning or methodology underlying the [expert's] testimony is . . . valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert* v. *Merrell Dow*, 509 U.S. at 592-93. Before admitting such testimony, the district court must determine (1) that the proffered testimony is scientifically based and therefore reliable; and (2) that the proffered testimony will be relevant and helpful to the trier of fact. *See United States* v. *Kwong*, 69 F.3d 663, 668 (2d Cir. 1995) (*Daubert* standard requires that "the proffered scientific evidence is both relevant and reliable"). In *Kumho Tire Co.* v. *Carmichael*, 526 U.S. 137, the Supreme Court held that "the basic gatekeeping obligation" of *Daubert* applies to all expert testimony, including

7

from fields other than the physical or natural sciences. *Id.* at 147.

While the proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied, *see Daubert*, 509 U.S. at 593 n. 10, the district court is the ultimate gatekeeper.  The Federal Rules of Evidence assign to the court "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 597.  In *Daubert*, the Supreme Court set out a list of non-exclusive factors that the trial court may consider in determining whether an expert's reasoning or methodology is reliable: (1) whether the theory or technique used by the expert can be, and has been, tested; (2) whether the theory or technique has been subjected to peer review or publication; (3) the known or potential rate of error of the method used; (4) whether there are standards controlling the technique's operation; and (5) whether the theory or method has been generally accepted within the relevant scientific community.  *Daubert*, 509 U.S. at 593-94.

In *Kumho Tire*, the Supreme Court emphasized that *Daubert* is to be applied flexibly and that "*Daubert*'s list of specific factors," "neither necessarily nor exclusively applies to all experts or in every case."  *Kumho Tire Co.*, 526 U.S. at 141.  In fact, a "'review of the case law after *Daubert* shows that the rejection of expert testimony is the exception rather than the

rule.'" *Travelers Property & Cas. Corp.* v. *General Elec. Co.*, 150 F. Supp. 2d 360, 363 (D. Conn. 2001) (citing Fed. R. Evid. 702 Advisory Committee Notes, 2000 Amendments).  Indeed, the Second Circuit uses a particularly broad standard in determining the admissibility of expert opinion testimony under Rule 702.  *See, e.g.*, *Boucher* v. *United States Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (holding that testimony is to be admitted unless purely conjectural or based on totally unfounded assumptions).

In carrying out its gatekeeping function, the Court must keep in mind the Supreme Court's admonition in *Daubert* that, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert*, 509 U.S. at 596; *see also United States v. Barone*, 09 Cr. 91 (NRB), 2010 WL 2976502, at *1 (S.D.N.Y. July 14, 2010); *United States* v. *Monteiro*, 407 F. Supp. 2d 351, 359 (D. Mass. 2006); 4 Joseph M. McLaughlin, Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 702.02[5], at 702-20 (2d ed. 2005) ("Trial courts should be aware of the curative powers of the adversary system when faced with an objection that is solely on the basis of confusion.").  As one district court noted:

> *Daubert* does not require that a party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is correct.  As

9

> long as an expert's scientific testimony
> rests upon "good grounds, based on what is
> known," *Daubert*, 509 U.S. at 590, . . . , it
> should be tested by the adversary process -
> competing expert testimony and active cross-
> examination - rather than excluded from
> jurors' scrutiny for fear that they will not
> grasp its complexities or satisfactorily
> weigh its inadequacies.  In short, *Daubert*
> neither requires nor empowers trial courts to
> determine which of several competing
> scientific theories has the best provenance.
> It demands only that the proponent of the
> evidence show that the expert's conclusion
> has been arrived at in a scientifically sound
> and methodologically reliable fashion.

*Monteiro*, 407 F. Supp. 2d at 358 (internal citations omitted).

### 1.   Courts Have Uniformly Admitted Expert Ballistics Testimony Under Rule 702

The underlying principle of firearms identification is that each firearm will transfer a unique set of marks on bullets when ammunition is fired from that gun.  For decades, courts throughout the United States have admitted expert ballistics evidence premised precisely on this principle.  *See, e.g.*, *United States v. Hicks*, 389 F.3d 514, 526 (5th Cir. 2004) ("[W]e have not been pointed to a single case in this or any other circuit suggesting that the methodology . . .  is unreliable" and "the matching of spent shell casings to the weapon that fired them has been a recognized method of ballistics testing in this circuit for decades.").  By using a comparison microscope to compare ammunition test-fired from a recovered gun with spent bullets and shell casings from a crime scene, a trained and experienced

firearms examiner can determine whether the recovered ammunition was fired from that particular gun. *See Monteiro*, 407 F. Supp. 2d at 359 (*quoting* Erich D. Smith, "Cartridge Case and Bullet Comparison Validation Study with Firearms Submitted in Casework," 36 AFTE J. 157 (2003) for its finding that with respect to consecutively manufactured Ruger pistols "variations, combined with other imperfections and irregularities that occurred during the manufacturing process, result in unique, individual breechface marks that can be positively identified").

Every court to have addressed the admissibility of this type of ballistics analysis under *Daubert* has determined that the field of ballistics evidence, and the microscopic examination of ballistics evidence in particular, is the proper subject of expert testimony and is admissible under Rule 702 and the standards set forth in *Daubert*. *See, e.g., United States v. Willock*, 696 F. Supp. 2d 536, 568 (D. Md. 2010) ("[E]very federal court to have examined the issue in a written opinion . . . [has] concluded that [ballistic toolmark analysis] is sufficiently plausible, relevant, and helpful to the jury to be admitted in some form."); *United States v. Diaz*, 2007 WL 485967, at *5 (N.D. Cal. Feb. 12, 2007) (noting that "[a]t least 37 jurisdictions have approved [firearm toolmark identification] by appellate opinion" and "[n]o reported decision has ever excluded firearms identification expert testimony under *Daubert*."); *United States*

*v. Santiago*, 199 F. Supp. 2d 101, 111 (S.D.N.Y. 2002) ("The Court has not found a single case in this Circuit that would suggest that the entire field of ballistics identification is unreliable.") (Marrero, J.); *see also United States v. Sheffer*, 523 U.S. 303, 313 (1998) (contrasting polygraph evidence with more established, reliable evidence, such as ballistics); *United States v. Davis*, 103 F.3d 660, 672 (8th Cir. 1996) (upholding the use of firearms identification testimony to link bullets from a crime scene to a firearm associated with the defendant); *United States v. O'Driscoll*, 2003 WL 1402040, at *2 (M.D. Pa. 2003) ("[T]he field of ballistics is a proper subject for expert testimony and meets the requirements of Rule 702."); *United States v. Cooper*, 91 F. Supp. 2d 79, 82 (D.D.C. 2000).[1]  The use of ballistics evidence has, in fact, become so routine that its admissibility is more often presumed than litigated.

The defense brief does not and cannot cite a single case in which a court held the methodology employed in this case – microscopic comparison of spent shell casings – was not sufficiently reliable to be admitted as expert testimony under Rule 702.  Indeed, the very cases cited by the defense in support

---

[1] Nor is the Government aware of any state court that has precluded expert ballistics testimony. *See People v. Givens*, 30 Misc. 3d 475, 478, 912 N.Y.S.2d 855, 857 (N.Y. Sup. Ct. 2010) ("This Court was unable to find any cases where firearms and toolmark identification was found to be unreliable or no longer scientifically acceptable. Nor were there instances where the testimony was ruled to be inadmissible.")

of their argument against admissibility of ballistics pattern-
matching testimony (Meregildo. Br. 8-9) prove just the opposite.
Each of the cases on which the defendant relies ultimately
concluded that expert ballistics testimony *is* admissible and that
such testimony in fact rests on a sufficient foundation. *See,
e.g., United States v. Glynn*, 578 F. Supp. 2d 567, 574-75
(S.D.N.Y. 2008) (Rakoff, J.) ("[ballistics examination]
methodology has garnered sufficient empirical support as to
warrant its admissibility"); *Monteiro*, 407 F. Supp. 2d at 372
("The Court concludes that the methodology of firearms
identification is sufficiently reliable."); *United States* v.
*Diaz*, No. 05-Cr-167, 2007 U.S. Dist. LEXIS 13152, at *35-36 (N.D.
Cal. Feb. 12, 2007) (permitting ballistics expert to testify that
casings or bullets were fired from a particular firearm "to a
reasonable degree of ballistic certainty"); *United States v.
Green*, 405 F. Supp. 2d 104, 123 (D. Mass. 2005) (permitting
expert ballistics testimony with limitations and noting that
"precedent plainly points *in favor* of admissibility") (emphasis
in original)).

In *Glynn*, which defendant cites and refers to at length,
Judge Rakoff held a *Daubert* hearing and reviewed the relevant
literature at length. *See* 578 F. Supp. 2d 567. The Court found
that, although the science of ballistics identification "has not
been put to the rigorous testing that science demands, it has

been sufficiently well-documented to support a reasonable hypothesis of its validity." The Court added that while the "assumption that [the] unique characteristics of each firearm are to an appreciable degree copied onto some or all bullets and casings fired from that gun" is "never proven to a degree of scientific certainty, this assertion is both plausible and sufficiently documented by experience as to provide a good working assumption for most practical purposes." *Id.* Given these conclusions, Judge Rakoff permitted the Government's ballistics expert to testify about his conclusions that the casings and firearms in question constituted ballistics matches, in his opinion. The Court did limit the expert's characterization of his level of certainty as to his findings, ruling that the expert could only testify that his conclusions were "more likely than not." *Id.* at 574-75.

### 2.   A Hearing Is Not Required

The Second Circuit has made eminently clear that although the district court's gatekeeping function under *Daubert* requires the court to ascertain the reliability of a ballistics expert's methodology, it does not necessitate a separate hearing to do so. *United States v. Williams*, 506 F.3d 151, 161 (2d Cir. 2007). In *Williams*, the defendant moved for a pretrial *Daubert* hearing to challenge the government's expert ballistics testimony, contending that the government had yet to establish its

14

admissibility under Rule 702. *Id*. at 157. The district court
denied the motion without a hearing, citing several cases
upholding the use of ballistics expert testimony as reliable
under Rule 702. *Id*. On appeal, the defendant challenged the
district court's decision (1) denying him a *Daubert* hearing and
(2) failing to undertake an adequate inquiry into the reliability
of the government's expert's firearms identification methodology.
The Second Circuit rejected the defendant's contention that the
district court abused its discretion by denying his request for a
hearing, holding that the reliability of an expert's methodology
properly can be determined by the district court's consideration
of the use of ballistics expert testimony in other cases and by
ensuring that before expert testimony is presented to a jury, the
proponent of that testimony provides a foundation for the
witness's expertise including the witness's experience and
training. *Id*. at 161.

Likewise rejecting defendant's request for a *Daubert* hearing
prior to the admission of expert ballistics testimony, a district
court in the Southern District of New York noted that "a trial
judge is *not required* to hold an evidentiary hearing if the
parties have provided a sufficient basis for a decision." *United
States v. Santiago*, 199 F. Supp. 2d at 111 (Marrero, J.)
(emphasis added) (citing Weinstein's Federal Evidence § 702.02[2]

15

at 702-7 to 702-8 (2d ed. 2000)).   Judge Marrero also found as
follows:

> The Court has not conducted a survey, but it
> can only imagine the number of convictions
> that have been based, in part, on expert
> testimony regarding the match of a
> particular bullet to a gun seized from a
> defendant or his apartment.   It is the
> Court's view that the Supreme Court's
> decisions in *Daubert* and *Kumho Tire,* did not
> call this entire field of expert analysis
> into question.   It is extremely unlikely
> that a juror would have the same experience
> and ability to match two or more microscopic
> images of bullets.   In fact, in one recent
> opinion, the Supreme Court used the example
> of expert testimony on ballistics to provide
> a contrast to the marginal utility of
> polygraph evidence.   The Court stated
> "unlike expert witnesses who testify about
> factual matters outside the juror's
> knowledge, such as the analysis of
> fingerprints, ballistics, or DNA found at a
> crime scene, a polygraph expert can supply
> the jury only with another opinion, in
> addition to its own, about whether the
> witness was telling the truth."   *See United
> States v. Scheffer*, 523 U.S. 303, 312
> (1998).

*Id.*

      In February 2010, in *United States* v. *Hisan Lee*, 07 Cr. 03
(S.D.N.Y 2010) (Attached as Exhibit B), the Honorable Barbara S.
Jones considered defense counsel's request for a *Daubert* hearing
challenging expert ballistics testimony on substantially
identical grounds advanced here, including Professor Schwartz's
research and conclusions.   After thorough briefing, Judge Jones
rejected defense counsel's request, without a hearing, concluding
that the science of ballistics satisfied the threshold Rule 702

inquiry.  *See* Ex. B at 6.  Similarly, in *United States* v. *Khalid Barnes*, S9 04 Cr. 186 (S.D.N.Y. 2008) (Attached as Exhibit C), a case in which the defense submitted a presumably similar affidavit from Professor Schwartz, the Honorable Stephen C. Robinson found that a hearing is "unnecessary to properly fulfill [the Court's] gatekeeping function" because "ballistics evidence has long been accepted as reliable and has consistently been admitted into evidence."  *See* Ex. B at 6.  Finally, and most recently, in the October 2011 trial in *United States* v. *Krasniqi*, 10 Cr. 464, after a hearing on how submersion in water might have affected the ballistics analysis, Judge Holwell rejected a challenge by defense counsel to proffered testimony of the Government's ballistic expert, and, in an oral ruling, permitted the expert to testify about a match conducted pursuant to microscopic analysis.  Judge Holwell found that, "to the extent that the courts have continuously admitted this type of ballistic evidence, there is nothing about this ballistic evidence that leads me to believe that it should be treated differently." (*Krasniqi* Pretrial Hearing Tr., Oct. 31, 2011, at 72.) (Attached as Exhibit D.)

The holdings in *Williams*, *Lee, Barnes*, and *Krasniqi* are consistent with a long line of Supreme Court and Circuit Court decisions on the requirements for admission of proffered expert testimony.  *See, e.g.*, *Kumho Tire*, 526 U.S. at 152 (district

17

courts possess "latitude in deciding how to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability"); *United States v. Alatorre*, 222 F.3d 1098, 1102 (9th Cir. 2000) ("Nowhere . . . does the Supreme Court mandate the form that the inquiry into . . . reliability must take . . ."); *United States v. Crisp*, 324 F.3d 261, 268 (4th Cir. 2003) ("Under *Daubert*, a trial judge need not expend scarce judicial resources reexamining a familiar form of expertise every time opinion evidence is offered."); *United States v. Nichols*, 169 F.3d 1255, 1263 (10th Cir. 1999) (pre-trial hearing not required because "the challenged evidence does not involve any new scientific theory and the testing methodologies are neither new or novel"); *see also Santiago*, 199 F. Supp. 2d at 112 (denying *Daubert* hearing and noting that, at trial, Government must elicit from its ballistics expert his training, experience, qualifications, and testimony regarding the methods used); *United States v. Cooper*, 91 F. Supp. 2d 79, 82 (D.D.C. 2000) (denying defendant's request for pre-trial evidentiary hearing with respect to, among other things, fingerprint expert testimony); *Bank Brussels Lambert v. Credit Lyonnais (Suisse)*, 2000 WL 1694321, *1 (S.D.N.Y. Nov. 13, 2000) ("[T]he trial judge is not required to hold a hearing on the admissibility of expert evidence").  "This is particularly true if, at the time the expert testimony is presented to the jury, a

18

sufficient basis for allowing the testimony is on the record." *Williams*, 506 F.3d at 161.

For the same reasons set forth in *Lee*, *Barnes*, *Williams*, *Santiago*, and numerous other cases, there is no need for this Court to hold a *Daubert* hearing to determine the admissibility of expert ballistics evidence.  Consistent with the Second Circuit's holding in *Williams* that the reliability of an expert's methodology properly can be determined by the district court's consideration of the use of ballistics expert testimony in other cases, this Court should rely on the myriad opinions cited in this brief admitting expert ballistics testimony, several of which followed an in-depth review of the relevant academic literature, considered the opinions and conclusions of Professor Schwartz, and held lengthy *Daubert* hearings in which multiple experts testified.  *See, e.g., Monteiro*, 407 F. Supp. 2d at 351 (concluding that the underlying scientific principle behind firearm identification is valid after six-day *Daubert* hearing in which multiple witnesses testified, including an operations examiner for the forensic laboratories of the Bureau of Alcohol, Tobacco Firearms and Explosives, a quality manager for a state crime lab, a material science engineer, a scanning electron microscopist, and several firearms examiners, and the court examined extensive documentary evidence); *Diaz*, 2007 U.S. Dist. LEXIS 13152, at 485967, at *3 (concluding that ballistics

19

identification is reliable under *Daubert* after receipt of "voluminous literature items" and four-day *Daubert* hearing in which two firearms examiners testified).

### 3.   Ballistics Evidence Has Not Been Discredited

Defense counsel's reliance on academic studies, including, primarily, a National Research Council ("NRC") report, should not alter the Court's analysis.  Simply put, this academic research does not support a ruling that the Government's proffered ballistics testimony is inadmissible.  If anything, the literature and the case law on which the NRC report relies proves the proffered expert testimony *admissible*.

As previously mentioned, the underlying principle of firearms identification is that each firearm will transfer a unique set of marks on bullets and cartridge cases when ammunition is fired from that gun.  Patterns produced on bullets and cartridge cases from contact with barrels and firing pins can be microscopically compared to determine if they have originated from a common source.  The theory underlying firearms identification is that no two firearms will produce exactly the same microscopic features on bullets and cartridge cases, just as no two people share the same fingerprints.  *Diaz*, 2007 U.S. Dist. LEXIS, at *24 (citing Erich D. Smith, *Cartridge Case and Bullet Comparison Validation Study with Firearms Submitted in Casework*, 36 AFTE J. 130 (2004)).  Recent scientific studies have

demonstrated that the underlying principle that firearms leave unique marks on ammunition has continuing validity. *See, e.g.,* Smith, *supra*, at 130-31 (noting that studies have confirmed that tests have showed that consecutively manufactured gun barrels left unique marks on bullets fired through them); Amy C. Coody, *Consecutively Manufactured Ruger P-89 Slides*, 35 AFTE J. 157 (2003) (finding that with respect to consecutively manufactured Ruger pistols "variations, combined with other imperfections and irregularities that occurred during the manufacturing process, result in unique, individual breechface marks that can be positively identified."); *see also* Stephen G. Bunch and Douglas P. Murphy, *A Comprehensive Validity Study for the Forensic Examination of Cartridge Cases*, 35 AFTE J. 201 (2003); Francesco Vinci, Piazza Giulio Cesare, Carlo P. Campobasso, James A. Bailey, *Morphological Study of Class and Individual Characteristics Produced by Firing 2500 Cartridges in a .45 Caliber Semi-Automatic Pistol*, 37 AFTE J. 368 (2005); Robert J. Shem and Peter P. Striupaitis, *Comparison of 501 Consecutively Fired Bullets and Cartridge Cases From a 25 Caliber Raven Pistol*, 15 AFTE J. 109 (1983); Yoshimitsu Ogihara, *Comparison of 5000 Consecutively Fired Bullets and Cartridge Cases From a 45 Caliber M19111A1 Pistol*, 15 AFTE J. (1983); Shane J. Kirby, *Comparison of 900 Consecutively Fired Bullets and Cartridge Cases From a 455 Caliber Smith & Wesson Revolver*, 15 AFTE J. (1983).

21

The NRC Ballistic Imaging Report ("NRC Imaging Report") cited by the defendant simply does not contradict this well-established principle throughout the academic literature. The purpose of the report itself was to address "the feasibility, accuracy, and reliability, and technical capability of developing and using a national computerized database as an aid to criminal investigations[,]" NRC Imaging Report at ES-1, and not the validity or assumptions of firearms identifications. The NRC committee's charge was to determine the extent to which the toolmarks left on bullets and cartridge casings after firing a weapon can be captured by computer imaging technology. NRC Imaging Report at ES-1, 3. The committee that prepared the report was also asked to assess whether a ballistics computerized image databases would be feasible and operationally useful in generating leads for follow-up and further investigation. NRC Imaging Report at ES-3. The committee was not tasked with assessing the methodology of firearms identification and did not undertake any research to determine whether firearms toolmarks are unique. Thus, the authors of this report made no finding as to the actual uniqueness of firearms-related toolmarks.[2]

---

[2] There were no firearms and toolmark examiners on the committee that drafted the NRC Imaging report. The committee was essentially comprised of academics in the fields of public policy, computer science and the material sciences, as well as individuals from private industry. *See* NRC Imaging Report at FM-v. For reasons unexplained, active firearms and toolmark examiners were deliberately excluded. *See* NRC Imaging Report at FM-ix.

The defense brief points to the NRC Imaging Report's "finding" that the validity of the fundamental assumptions of uniqueness and reproducibility of firearms-related toolmarks has not yet been "fully demonstrated."  (Meregildo Br. at 10.)  But as acknowledged by the committee in its report, it was not the function of the committee and this report "to assess the general validity of firearms identification and toolmark examinations nor their admissibility in court proceedings."  NRC Imaging Report at 3-22.  Far from questioning the principles regarding toolmark uniqueness in firearms, the NRC committee indeed acknowledged the validity of that "baseline" assumption:

> There is a baseline level of credibility, however, that must be demonstrated lest any discussion of ballistics imaging be rendered moot – namely, that there is at least some "signal" that may be detected.  In other words, the creation of toolmarks must not be so random and volatile that there is no reason to believe that any similar and matchable marks exist on two exhibits fired from the same gun.  *The existing research, and the field's general acceptance in legal proceedings for several decades, is more than adequate testimony to that baseline level. Beyond that level, we neither endorse nor oppose the fundamental assumptions.*

NRC Imaging Report at 3-22-3-23 (emphasis added).  Finally, the report does not identify any new scientific studies that undermine the fundamental principle that in fact firearms leave unique markings on bullets and cartridge cases.  Thus, we submit, the defendant's reliance on this portion of the report does not

undermine the consistent and unbroken line of cases ruling that firearms identification evidence is admissible under Rule 702.

Whether or not characterized as "science" — as Rule 702 and the cases make clear, expert testimony is not limited to those disciplines universally deemed "science." *See Glynn*, 578 F. Supp. 2d at 573 (ballistics evidence admissible even though ballistics could not fairly be called a "science" on the theory that "unique characteristics of each firearm are to an appreciable degree copied onto some or all bullets and casings fired from that gun . . . is both plausible and sufficiently documented by experience as to provide a good working assumption for most practical purposes"); *Willock*, 696 F. Supp. 2d at 571 (admitting ballistic evidence and noting that "while, on the existing record, it may be debatable whether it is 'science,' it clearly is technical or specialized, and therefore within the scope of Rule 702").

In sum, there is no basis for the Court to preclude Detective Fox's testimony as a general matter, nor is any hearing necessary on the issue. The Government is unaware of a single federal case excluding ballistics testimony of this type on Rule 702's grounds, nor has the defendant cited any such case. To the contrary, the cases relied upon by the defendants have each found the testimony admissible. Therefore, the Government respectfully submits that the defendants' motion to preclude be denied.

24

4.    **The Particular Expert Testimony Offered by the Government is Admissible**

While the defendant challenges the wholesale admissibility of ballistics expert testimony, he does not challenge the particular ballistics evidence in this case.  The defendant has not pointed to any specific aspect of Detective Fox's proffered testimony that makes it unreliable.  Moreover, the Government respectfully submits that cross-examination (by counsel who, based on his motion, is familiar with the potential issues related to ballistics examination) as to the criticisms of ballistics analysis – will be more than adequate to alleviate the defendant's concerns.  Moreover, before asking Detective Fox to state his conclusions, the Government will elicit testimony about the methods used by Detective Fox in performing his ballistics analysis.  *See Santiago*, 199 F. Supp. 2d at 112 (rejecting need for *Daubert* hearing and noting that the reliability of the expert's testimony "can be answered through the foundation that the Government must establish before the Court accepts the [witness] as an expert witness, [including] . . . the methods he used to match the bullets with the guns in question.").  Indeed, defense counsel has each long had the opportunity and ability to conduct his own ballistics analysis, and, if properly notified, could call a ballistics expert to dispute Detective Fox's conclusions.  The adversarial process, including "vigorous cross-examination" and the "presentation of contrary evidence," will be

25

more than sufficient to address any criticism of ballistics testimony.  *See Daubert*, 509 U.S. at 596.

## III. The Government's Latent Print Evidence Is Reliable and No *Daubert* Hearing Is Required

Meregildo also argues that this Court should preclude the admission of fingerprint evidence against him.  As with ballistics evidence, discussed above, the total exclusion of fingerprint testimony has no support in the case law, and no hearing is required to reach that conclusion.

### A.   Relevant Facts

The Government expects Fingerprint Technician Annabelle Branigan to testify that she examined a document vouchered as evidence by the NYPD on March 21, 2012, and determined that a palmprint found on the document matched with the palmprint on file for defendant Meregildo.  This document (attached as Exhibit E), contains various rules and codes pertaining to the MacBalla set of the Bloods gang, of which Meregildo, Colon, and Terry Harrison, the deceased leader of the CAC were members.  Evidence at trial will be presented regarding Meregildo's and Colon's membership in the MacBalla set of the Bloods along with Harrison, and how such membership served to further strengthen the bonds of trust between those three men.

**B.   Discussion**

The caselaw pertaining to the general standards governing the admissibility of expert testimony is discussed above, with respect to Point I.

**1.   Latent Print Identification Testimony Is Reliable**

The underlying principle of fingerprint identification is that each individual's fingerprints are unique and permanent and that a positive identification may be made from fingerprints containing sufficient quantity and quality of detail.

> Fingerprints are left by the depositing of oil upon contact between a surface and the friction ridges of fingers. The field uses the broader term "friction ridge" to designate skin surfaces with ridges evolutionarily adapted to produce increased friction (as compared to smooth skin) for gripping. Thus toeprint or handprint analysis is much the same as fingerprint analysis. The structure of friction ridges is described in the record before us at three levels of increasing detail, designated as Level 1, Level 2 and Level 3. Level 1 detail is visible with the naked eye; it is the familiar pattern of loops, arches, and whorls. Level 2 detail involves "ridge characteristics"–the patterns of islands, dots, and forks formed by the ridges as they begin and end and join and divide. The points where ridges terminate or bifurcate are often referred to as "Galton points," whose eponym, Sir Francis Galton, first developed a taxonomy for these points. The typical human fingerprint has somewhere between 75 and 175 such ridge characteristics. Level 3 detail focuses on microscopic variations in the ridges themselves, such as the slight meanders of the ridges (the "ridge path") and the locations of sweat pores.

> *United States* v. *Mitchell*, 365 F.3d 215,
> 221 (3d Cir. 2004).

In the ACE-V fingerprint identification system, which stands for analysis, comparison, evaluation and verification, an examiner uses details from all three levels to match fingerprints to each other. *Id.* at 221-222.  In some jurisdictions outside the United States, a minimum number of corresponding points of details is required before a match will be declared.  *Id.*  The ACE-V system, however, does not require a specified number of matches.  Instead, examiners, "use a combination of quantity and quality:  If ridge characteristics are abundant, then the quality of Level 3 detail is unimportant; but a paucity of Galton points can be compensated for by high-quality Level 3 detail.  *Id.* at 222.  This provides examiners with a degree of flexibility to analyze fingerprints of various types and qualities.  *Id.*  For example, "latent fingerprints" are "partial prints like those found at crime scenes and often are invisible to the naked eye." *United States* v. *Baines*, 673 F.3d 979, 982 (10th Cir. 2009).  Latent prints often contain only a part of an individual's fingerprint.  *Id.*  In contrast, "rolled, "full," or "known," prints are taken under controlled circumstances, often for official use.  *United States* v. *Love*, No. 10 Cr. 2418, 2011 WL 2173644, at * 1, (S.D. Cal. June 1, 2011).  Thus, rolled prints may contain a greater quantity of characteristics for comparison.

Courts considering the admissibility of fingerprint examination under *Daubert* have routinely found find that such examination is the proper subject of expert testimony and is admissible under Rule 702 and the standards set forth in *Daubert*. See *United States* v. *Pena*, 586 F.3d 105, 110-111 (1st Cir. 2009); *United States* v. *Stevens*, 219 Fed. Appx. 108 (2d Cir. 2007); *United States* v. *Cruz*, 189 Fed. Appx. 725 (10th Cir. 2006); *United States* v. *Crisp*, 324 F.3d 261, 270 (4th Cir. 2003) (while not "scientific law," the principles underlying fingerprint examination "bear the imprimatur of a strong general acceptance, not only in the expert community, but in the courts as well" . . . "every circuit to have addressed the issue [of the admissibility of fingerprint evidence under Daubert] has concluded . . . that such evidence is property admissible.")(citations omitted); *United States* v. *Hernandez*, 299 F.3d 984 (8th Cir. 2002).  While "[n]umerous defendants have challenged the reliability of fingerprint evidence, [] courts have almost universally rejected these challenges.  Indeed, one of the few courts to cast serious doubt on the admissibility of fingerprint evidence granted a motion for reconsideration and vacated its prior ruling that such evidence was inadmissible." *United States* v. *Frias*, No. 01 Cr. 307, 2003 WL 296740, at * 1 (S.D.N.Y. February 11, 2003) (citing *United States* v. *Plaza*, 179 F.Supp.2d 492 (D.N.J. 2002), *vacated by* 188 F.Supp.2d 549 (D.N.J.

29

2002)).

## 2.   A Hearing Is Not Required

The Second Circuit has made eminently clear that although the district court's gatekeeping function under *Daubert* requires the court to ascertain the reliability of an expert's methodology, it does not necessitate that a separate hearing be held to do so.  *See Williams*, 506 F.3d at 161 (denying *Daubert* hearing with respect to ballistics testimony); *United States* v. *Stevens*, 219 Fed. Appx. 109 (upholding district court's denial of *Daubert* hearing on the reliability of fingerprint evidence because "such hearing is not required 'in ordinary cases where the reliability of an expert's methods is properly taken for granted'" (quoting *Kumho Tire*, 526 U.S. at 152)).  The holdings in *Williams* and *Stevens* are consistent with the long line of Supreme Court and Circuit Court case law on the requirements for admission of proffered expert testimony discussed above. Consistent with the Second Circuit's holding in *Williams* that the reliability of an expert's methodology properly can be determined by the district court's consideration of the use of expert testimony on the same area in other cases, this Court should rely on the myriad opinions cited in this brief admitting expert fingerprint testimony, several of which followed an in-depth review of the relevant academic literature as well as lengthy

*Daubert* hearings in which multiple experts testified. *See, e.g., Mitchell*, 365 F.3d 215.

### 3. Latent Print Evidence Has Not Been Discredited

Despite the overwhelming case law supporting the admissibility of fingerprint expert evidence, defendant claims that the Supreme Court's decision in *Melendez-Diaz* v. *Massachusetts*, 557 U.S. 305 (2009), and the contents of a 2009 Report entitled *Strengthening Forensic Science in the United States, a Path Forward*, (the "NRC Report") by the National Research Council ("NRC") mandates that fingerprint evidence be precluded.[1]

First, the defendant's claim that in *Melendez-Diaz* the Supreme Court "questioned the inherent reliability of [] fingerprint analysis," is a misstatement of *Melendez-Diaz*'s holding. (Meregildo Br. at 15.) *Melendez-Diaz* addressed whether, under the Confrontation Clause, the Government was required to offer testimony of an expert witness, or whether it was sufficient to offer a lab report demonstrating that a specified substance was cocaine. In holding that the testimony of a live witness was required, the Court referenced the NRC Report discussing certain problems in the forensic sciences as support for the notion that cross-examination of an expert was necessary in order to educate a jury on any such problems.

---

[1] The defendant also refers to this report as the "National Academy Report."

*Melendez-Diaz*, 129 S. Ct. at 2538.  The Court in no way held, as the defendant here suggests, that forensic experts, including fingerprint experts, should be precluded from testifying.  In this case, the Government intends to call a fingerprint expert to testify and the defendant will have a full opportunity to cross-examine that expert about any alleged weaknesses in fingerprint examination.  The defendant will have the chance to engage "[v]igorous cross-examination" of the defendant, which the *Daubert* Court determined in the appropriate way for a party to challenge evidence it believes to be "shaky."  *Daubert*, 509 U.S. at 596.  Because the defendant will have every opportunity to challenge the expert's testimony, *Melendez-Diaz* has no application here.  In addition, Meregildo has already given notice that he intends to call his own expert in latent print analysis; he will thus have an additional opportunity to challenge the testimony of the Government's expert.

Additionally, a number of courts have already considered the impact of the NRC Report on the admissibility of fingerprint evidence.  As one court has explained:

> Although the NAS report points out weaknesses in the ACE-V method, these weaknesses do not automatically render the ACE-V theory unreliable under *Daubert.* Instead, the weaknesses highlighted by the NAS report—the lack of specificity of the ACE-V framework and its vulnerability to bias—speak more to an individual expert's application of the ACE-V method, rather than the universal reliability of the method. Moreover, the

32

> issues raised in the NAS report are not new.
> For example, the concern that the ACE-V
> method involves subjective judgment and does
> not have a stringent framework has previously
> been analyzed at length. *See Mitchell,* 365
> F.3d at 235-241 (concluding the ACE-V method
> is reliable after analyzing it under each of
> the *Daubert* factors). Further, as previously
> noted, the NAS report is *not* a law reform
> proposal and its findings are not coterminous
> with whether forensic evidence in a
> particular case is admissible. Thus, while
> the NAS report may be fodder for cross-
> examination regarding the reliability of the
> ACE-V method in general, or may enlighten
> fact-specific challenges to particular
> applications of the method, it does not make
> a case for excluding testimony simply because
> it is based on the ACE-V method.

*United States* v. *Cerna*, No. 08 Cr. 730, 2010 WL 3448528, at *7
(N.D.Cal., Sept. 1, 2010). Indeed, the Government was unable to
find a single case in which a court precluded fingerprint expert
testimony on the basis of the NRC Report, and many courts have
specifically held that the NRC Report does not justify or require
preclusion of such testimony. *See United States* v. *Watkins*, 450
Fed.Appx. 511, 516 (6th Cir. 2011) ("Even if the 2009 NRC Report
had been available to the district court [it had not yet been
published at the time of trial], it would not have been an abuse
of discretion for the district court to permit expert fingerprint
testimony."); *United States* v. *Campbell*, No. 11 Cr. 460, 2012 WL
2374528, at * 5 (N.D.Ga April 19, 2012) ("Courts have rejected
[the] argument [that the NRC Report requires preclusion] and have
concluded that while there may be a need for further research

33

into fingerprint analysis, this need does not require courts to take the drastic step of excluding a long-accepted form of expert evidence and 'bedrock forensic identifier.'")(citations omitted); *United States* v. *Council*, 777 F. Supp. 2d 1006, 1012-1013 (E.D.Va. 2011) ("This is not to say that . . . the NRC Report [has] not usefully pointed out areas in which standards governing friction ridge analysis should continue to develop.  These critiques, however, are insufficiently penetrating to warrant the exclusion of [expert] testimony [regarding fingerprints]); *United States* v. *Aman*, 748 F. Supp 2d 531 (E.D.Va. 2010) (considering the NRC Report and nonetheless finding that "it can hardly be questioned that the ACE-V method has achieved widespread acceptance in the fingerprint examination community," and permitting expert testimony regarding fingerprint analysis); *United States* v. *Rose*, 672 F. Supp. 2d 723, 725-726 (D. Md. 2009) (finding that the NAS "Report itself did not conclude that fingerprint evidence was unreliable such as to render it inadmissible under Fed. R. Evid. 702" and even after the publication of the report, "fingerprint identification evidence based on the ACE-V methodology is generally accepted in the relevant scientific community, has a very low incidence of erroneous misidentifications, and is sufficiently reliable to be admissible under Fed. R. Ev. 702 generally and specifically"); *Love*, 2001 WL 2173644 at *4 (NAS Report's "call for additional

34

testing to determine the reliability of latent fingerprint analysis generally and of the ACE-V methodology in particular," did not preclude the admission of expert testimony regarding latent fingerprints).  Thus, the contents of the NRC Report neither require nor justify preclusion of expert fingerprint testimony.

The additional examples provided by Meregildo to support his claim that fingerprint evidence is unreliable do not have to do with the lack of a basis for fingerprint evidence – much less whether or not a fingerprint examiner's testimony would "assist the trier of fact," Fed. R. Evid. 702 – but rather have to do with errors made by the witnesses.  He emphasizes *Mayfield* v. *Gonzalez*, No. Civ. 04-1427-AA, 2005 WL 1801679 (D. Or. July 28, 2005), which is also discussed by the National Research Council. (Meregildo Br. at 18-19).  However, as the National Research Council recognized, the misidentification in that case did not arise from faulty science or methodology, but rather because "the examiners committed errors in the examination procedure and . . . the misidentification could have been prevented through a more rigorous application of several principles of latent fingerprint identification."  Office of the Inspector General, Oversight and Review Division, U.S. Department of Justice, 2006, *A Review Of The FBI's Handling Of The Brandon Mayfield Case*, 6.[2]  Finally,

---

[2]Available at
<http://www.justice.gov/oig/special/s0601/exec.pdf>.

the 2010 Baltimore County Circuit Court case of *Maryland* v. *Rose*,
cited as defendant's Exhibit D, is inapposite because it was
rendered in the context of a capital case; the Court noted at the
outset in that case that, because the death penalty was being
sought, it was applying a more rigorous standard to its scrutiny
of opinion testimony, explaining that "death is different."
(Def. Ex. D at 1-2.)

Meregildo has not offered any specific reason to discredit
Fingerprint Technician Branigan's findings in this case, other
than his general objections to the reliability of fingerprint
analysis.  Given the foregoing, his arguments should be rejected,
and the proffered testimony should be permitted without a
hearing.

### 4.   The Latent Print Evidence is Relevant

Meregildo also argues that the document in question should
be excluded on the grounds that it has "nonexistent or very
limited probative value," but is prejudicial and inflammatory.
(Meregildo Br. at 21.)  Meregildo asserts that any evidence
connecting his client to the Bloods gang has nothing to do with
the proof in this case.  To the contrary, as alleged above in the
factual recitation, the fact of Meregildo's membership in the
MacBalla Bloods, along with CAC leader Terry Harrison and co-
defendant Melvin Colon is a critically important fact for the
jury to hear.  The evidence will show that Harrison inducted both

Meregildo and Colon into the MacBalla Bloods.  The trust that developed as a result of this relationship is a significant reasons why Harrison saw fit to ask Meregildo and Colon each to commit murder on his behalf, and on behalf of the CAC. Additionally, the evidence will show that Meregildo and Colon each have attempted to carry on Harrison's traditions after Harrison's death in the MacBalla Bloods by inducting new members and perpetuating that gang's practices.  The document in question, which Meregildo attempted to pass to another CAC member while incarcerated in this case, demonstrates that practice.  The document therefore has significant probative value, and is important corroboration of the testimony to be offered by the Government's cooperating witnesses at the trial.

Moreover, the document's prejudicial impact is limited. Given that Meregildo is charged with extremely serious crimes, including murder and attempted murder.  The evidence regarding these crimes is significantly more inflammatory than the testimonial and documentary evidence regarding his various gang affiliations.  Accordingly, the admission into evidence of the MacBalla Bloods document will not cause any significant additional prejudice.

## IV.   Letters and Documents Recovered From the Haviland Avenue Apartment Are Admissible

On March 10, 2011, ATF agents conducted a court-authorized search of 2235 Haviland Avenue, where defendant Meregildo

resided.  (*See* Meregildo Br. at 2.)   During the course of the
search, agents recovered a number of items, including one round
of .38 caliber ammunition located near the area where Meregildo's
clothing and other personal effects were located in the living
room of the residence, dozens of pages of hand-written
correspondence between Meregildo and others, including letters to
various members of GFC concerning the group's drug- and gang-
related activities (collectively, the "Haviland Documents").

Meregildo argues that the Court should direct the Government
to identify prior to trial the particular documents seized from
Meregildo's residence that it intends to introduce at trial.
Specifically, Meregildo argues that the Haviland Documents "are
lacking in any probative value and irrelevant to the charges in
this case." (Meregildo Br. at 23.)   Meregildo is wrong, and
mischaracterizes the nature and contents of the Haviland
Documents.

First, the Government is under no obligation, at this time,
to identify the particular exhibits it intends to offer at trial.
The Government has complied with its disclosure obligations in a
timely manner, and Meregildo is therefore able to assess the
admissibility of any potential trial exhibits in advance of them
being offered.  With the instant motion, Meregildo has failed to
offer any persuasive basis as to why the Court would be unable to
rule on the admissibility of any particular document at the time

it is offered at trial; nor has Meregildo made any argument –
other than his conclusory assertion that all of the Haviland
Documents are "irrelevant" – offering a reasoned basis to
conclude that the documents would not be admissible at trial.
*See, e.g.*, *United States* v. *Falkowitz*, 214 F. Supp. 2d 365, 392
(S.D.N.Y. 2002) ("[S]uch an order is not required by statute and,
if considered at all, may rest within the district court's
discretion.  Many courts in this District, concerned by the
absence of controlling authority that clearly authorizes such a
pre-trial order, have declined to order production of an exhibit
list prior to trial.") (citing *United States* v. *Feldman*, 731 F.
Supp. 1189, 1200 (S.D.N.Y. 1990)); *United States* v. *Nachamie*, 91
F. Supp. 2d 565, 569-70 (S.D.N.Y. 2000) ("In the absence of any
controlling authority interpreting [Fed. R. Crim. P. 16] as
requiring this action, I cannot direct the Government, at this
time, to identify the documents it intends to offer in its
case-in-chief.")

   In any event, the overwhelming majority of the Haviland
Documents are, in fact, relevant and admissible in this case.
While there are certainly some documents reflecting non-pertinent
conversations between Meregildo and others, such as letters from
Meregildo's romantic interests, nearly all of the remaining
Haviland Documents constitute powerful direct evidence of
Meregildo's involvement in the charged racketeering enterprise,

and will be admissible if offered at trial. Specifically, among other items, the Haviland Documents contain the following:

- A document identified by a cooperating witness, who was formerly a member of GFC, as an "oath" which members of the GFC gang recited upon gaining membership and that includes the statement "I take this oath to ride and die for my goonz, loyalty & love is a must ... I go against everyone I don't trust, death b4 dishonor ogfc";

- A second document also identified by a cooperating witness, who was formerly a member of GFC, as an "oath" which members of the GFC gang also recited upon gaining membership and that includes a glossary of coded phrases used to communicate among members of the gang, including, for example, "Gun Love - Good Night";

- Over twenty letters dated on or after summer 2010 to Meregildo from current and former GFC members, including Meregildo's brother - who directed Meregildo, in several such letters, on how to "re-up" narcotics and narcotics proceeds so as to "double" his money, and to work with "T-Money" as soon as he "touch[es] down" again on Courtlandt Avenue - and various other individuals referencing "GFC" and "Killa's" efforts to organize and coordinate efforts among GFC's members;

- Over twenty additional letters dated prior to summer 2010, including as early as December 2007, that refer to, or describe, the background and origins of Meregildo's efforts to organize the GFC gang, including, for example, a July 17, 2009 letter to Meregildo, where an individual not named herein tells Meregildo that, even though he used to be a member of the "Y.G." crew - one of GFC's rival gangs operating in the Maria Lopez Houses in the Bronx - he now planned to join "G.F.C.," as well as other letters reflecting Meregildo's early associations with individuals who would later join GFC, such as Melvin Colon and Toshnelle Foster, among others;

- A hand-written address book containing names and phone numbers for various GFC members and associates, including names, addresses and phone numbers for at least eleven individuals whom cooperating witnesses will identify as GFC members and associates; and

- Over ten photographs depicting Meregildo and various GFC members and associates, including co-defendant Melvin Colon, several of which depict Meregildo, and others, making gang-related hand gestures.

Thus, there can be no serious dispute that the Haviland Documents contain plainly relevant evidence reflecting Meregildo's involvement in the charged racketeering enterprise – and, specifically, the GFC gang at the center of the enterprise – as well as the background and origins of GFC and Meregildo's associations with various other GFC members.

Accordingly, because Meregildo's request for an order directing the Government to specify the exhibits it intends to offer from among the Haviland Documents is both lacking in merit and based on a mischaracterization of the Haviland Documents, this prong of Meregildo's motion should be denied.

## V.  Meregildo's And Miranda's Aliases Are Relevant and Admissible and The Defendants' Motions to Strike Introductory Language From the Indictment Should Be Denied

Defendants Meregildo and Miranda seek to strike any references to their aliases from the Indictment and from trial as surplusage, on the ground that their inclusion will be either inflammatory or irrelevant.  (Meregildo Mot. at 23; Miranda Mot. to Strike at 1).  This argument is without merit.

It is well settled in this Circuit that the "standard for surplusage is exacting" and "only rarely is alleged surplusage stricken from the grand jury indictment." *United States* v. *Napolitano*, 552 F. Supp. 456, 480 (S.D.N.Y. 1982) (citing

41

authorities).  To meet that threshold, it is not sufficient that
the material merely be potentially inflammatory.  Rather, a
defendant must establish the challenged portions are "not
relevant to the crime charged." *United States* v. *Scarpa*, 913
F.2d 993, 1013 (2d Cir. 1990) (citation omitted).  If the
challenged portions are "admissible and relevant to the charge,
then regardless of how prejudicial the language is, it may not be
stricken." *Id.; see also United States* v. *Napolitano*, 552 F.
Supp. at 480 ("The determinative question in a motion to strike
surplusage is not the potential prejudice, but rather the
relevance to the allegation to the crime charged in the
indictment.").  Courts have explained that the inclusion of an
alias is relevant where witnesses or documents refer to a
defendant by his alias. *United States* v. *Esposito*, 432 F. Supp.
908, 911 (S.D.N.Y. 1976) ("[Defendants] are repeatedly referred
to by these aliases in wiretapped conversations; the aliases will
thus be relevant to the case and will constitute part of the
government's proof at trial."); *see also United States* v. *Butler*,
351 F. Supp. 2d 121, 125 (S.D.N.Y. 2004) (declining to strike
references to aliases in an indictment where relevant to the
anticipated proof at trial); *United States* v. *Rodriguez*, 734 F.
Supp. 116, 128-29 (S.D.N.Y. 1990), *aff'd*, 968 F.2d 130 (2d Cir.
1992); *United States* v. *Ianniello*, 621 F. Supp. 1455, 1479
(S.D.N.Y. 1985).  Moreover, "[e]ven if prejudicial ... aliases

and nicknames are proper in an indictment where they will be part of the government's proof at trial." *United States* v. *Persico*, 621 F. Supp. 842, 861 (S.D.N.Y. 1985) (denying motions to strike by Carmine Persico a/k/a "The Snake" and Frank Falanga a/k/a "Frankie the Beast").

Here, the inclusion of the defendants' aliases is appropriate both in the Indictment and at trial.  The Government anticipates that the evidence at trial will show that the defendants were known to their co-racketeers primarily by their nicknames.  In fact, several cooperating witnesses will testify that they know Nolbert Miranda only by his alias, "Payday." These witnesses do not have any other way to refer to Miranda other than by calling him "Payday."  Similarly, all of the cooperating witnesses know Joshua Meregildo primarily by his nickname, "Killa," and none refer to him as "Joshua."  It would be very difficult for these witnesses to testify naturally without referring to Meregildo as "Killa," because that is the name they used for him on a daily basis.  Accordingly, Meregildo's and Miranda's nicknames are relevant and should not be stricken.  *See United States* v. *Farmer*, 583 F.3d 131, 146 (2d Cir. 2009) ("Because several witnesses knew Farmer only as 'Murder,' it was probable that the name would be used occasionally, even if only accidentally."); *United States* v. *Hattaway*, 740 F.2d 1419, 1425 (7th Cir. 1984) (holding that

witness's use of gang nicknames was permissible, where gang members used nicknames in witness's presence and "forbidding [the witness] from using the[] names would have placed an undue burden on her testimony.")

Documentary evidence will also refer to the defendants by their nicknames.  For example, at trial, the Government will seek to introduce (1) Facebook evidence that refers to Meregildo only by his nickname, including photographs that refer to Meregildo as "Killa;" (2) evidence from Meregildo's iPhone, in which Meregildo refers to himself as "Killa" and others refer to him as "Killa;" (3) correspondence that refers to Meregildo as "Killa"; and (4) a tattoo on Melvin Colon's left arm with Meregildo's nickname "Killa," and specifying, "I am my brother's keeper."  (Meregildo has a similar tattoo with Colon's alias "Melly," with the same phrase.)  Given the multitude of evidence linking Meregildo with the name "Killa," it would be impossible to avoid using Meregildo's nickname at trial.

As for Miranda, his nickname "Payday," is far less prejudicial, if at all.  It is, however, just as relevant, because, as noted, numerous of the Government's cooperating witnesses know Miranda only by his alias.  While Miranda argues that the origin of his nickname has nothing to do with drug dealing, he can certainly advance that argument through cross-examination of the Government's witnesses.  Given that the jury

44

will hear and see multiple witnesses identify the defendants
through their aliases and other information linking the
defendants to their nicknames, the aliases in the indictment and
references to the aliases at trial are not prejudicial.

Finally, with respect to Meregildo's motion, the Government
is aware of the Second Circuit opinion in *United States* v.
*Farmer*, in which the Court overturned certain convictions when
the prosecutors repeatedly invoked the defendant's nickname -
"Murder" at trial.  The Court explained:

> But the main problem was not the admission of
> the nickname into evidence. Rather, it was
> the prosecutors' frequently repeated,
> gratuitous invocation of Farmer's nickname in
> their addresses to the jury, uttered in a
> context that, in effect, invited the jurors
> to infer that the defendant had earned the
> nickname among his gang colleagues as a
> result of his proclivity to commit murder-an
> inference corroborated by the government's
> evidence that he had yielded to that
> proclivity in the particular instances being
> tried. This is precisely what Rule 404(a) was
> designed to prevent.

Id. at 146-47.  The Government intends to heed the Second
Circuit's cautionary note in *Farmer* and will not gratuitously use
the name "Killa" in any of its jury addresses.

As for Miranda's motion to strike Paragraph 1 of the
Indictment, the introduction provides an accurate description of
the defendants and their criminal enterprise.  Contrary to the
defendant's argument that he is not "associated" with the
Courtlandt Avenue Crew, *see* Miranda Mot. to Strike at 2, the

45

defendant is in fact alleged to have been part of the
racketeering conspiracy alleged in Count Two and either "employed
by or associated with" the alleged racketeering conspiracy.
While the defendant may believe that it is "impossible" for the
jury to parse through the different charges, the Government
believes that the jury will be able to comprehend the plain
meaning of the words "among other things," in Paragraph 1, and
will be able to understand that Miranda is not alleged to have
committed murder or attempted murder.  Because Paragraph 1
provides an overview of the relevant criminal enterprise, the
defendant's motion to strike should be denied.  *See, e.g., United
States* v. *Scarpa*, 913 F.2d 993, 1013 (1990) ("In RICO cases,
courts have refused to strike allegations of organized crime
connections that 'serve to identify the enterprise' and the means
by which its members and associates conduct various activities.")

## VI.  Miranda's Motion To Sever Should Be Denied

At the conclusion of the last pretrial conference in this
case on September 5, 2012, the Court permitted defendant Nolbert
Miranda to supplement his previous motion to sever his case from
that of his co-defendants.  On September 14, 2012, the defendant
filed a supplemental memorandum of law in support of his
severance motion.

There is a strong presumption for trying defendants who are
indicted together jointly.  To rebut this strong presumption, a

46

defendant must show that he would be so prejudiced by joinder that he would be denied a fair trial.  Because Miranda has failed to meet this "extraordinary difficult" burden, his motion to sever should be denied.  *United States* v. *Casamento*, 887 F.2d 1141, 1149 (2d Cir. 1989).

### A.    Relevant Facts

Miranda is charged in Count Two of the Indictment with participating in a racketeering conspiracy, in Count Fifteen with participating in a conspiracy to distribute and possess with the intent to distribute "crack" cocaine and marijuana, and in Count Twenty-Eight with possessing, or aiding and abetting the possession of, firearms in connection with the charged narcotics conspiracy.  In each of those counts, Miranda is charged alongside his co-defendants, Joshua Meregildo, Melvin Colon, and Earl Pierce.

As noted in the Government's Enterprise letter, the Government intends to prove at trial that Miranda was a tantmember and/or associate of the Enterprise.  Among other things, the Government intends to prove, through the testimony of cooperating and law enforcement witnesses, and physical evidence, that:

- Miranda was a prominent dealer in crack cocaine on Courtlandt Avenue, and Miranda worked with members of the CAC, as well as Terry Harrison, a/k/a "T-Money," to sell crack cocaine.

47

- Miranda himself was shot on or about September 11, 2010, which shooting members of the CAC believed was committed by members of a rival drug crew defined in the Indictment as the "321 Organization." CAC members decided to retaliate against the 321 Organization following Miranda's shooting and Harrison's murder.

- On or about September 13, 2010, Earl Pierce, using a 9-mm firearm owned and provided by Miranda, shot at members of the 321 Organization, wounding a victim ("V-5").

### B.   Legal Standard

The Supreme Court has made plain that there is a "preference in the federal system for joint trials of defendants who are indicted together." *Zafiro* v. *United States*, 506 U.S. 534, 537 (1993); *see* Fed. R. Crim. P. 8(b). This preference reflects a settled precept in criminal law. Joint trials "play a vital role in the criminal justice system." *Richardson* v. *Marsh*, 481 U.S. 200, 209 (1987). They promote efficiency and "serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." *Id.* at 210. Joint trials of defendants indicted together also serve to "conserve prosecutorial resources, diminish inconvenience to witnesses, and avoid delays in the administration of criminal justice." *Id.* at 217 (Stevens, J., dissenting). Thus, even where joint trials invite some prejudice to defendants, "[t]he risks of prejudice attendant in a joint trial are presumptively outweighed by the conservation of time, money, and scarce judicial resources that a joint trial permits." *United States* v. *Jimenez*, 824 F. Supp. 351, 366

48

(S.D.N.Y. 1993).  The decision "whether to sever multi-defendant trials is committed to the sound discretion of the trial court and is 'virtually unreviewable.'"  *United States* v. *Harwood*, 998 F.2d 91, 95 (2d Cir. 1993) (internal citations omitted).

The presumption in favor of joint trials is so strong that the Second Circuit has stated that "[t]he principles that guide the district court's consideration of a motion for severance usually counsel denial."  *United States* v. *Rosa*, 11 F.3d 315, 341 (2d Cir. 1993).  A defendant seeking severance therefore shoulders the "extremely difficult burden" of showing that he would be so prejudiced by joinder that he would be denied a fair trial.  *United States* v. *Casamento*, 887 F.2d 1141, 1149 (2d Cir. 1989).  It is not enough for a defendant to show that he "may have a better chance of acquittal in [a] separate trial[]."  *Zafiro*, 506 U.S. at 540.  Instead, "a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."  *Id.* at 539; *see also United States* v. *Panza*, 750 F.2d 1141, 1149 (2d Cir. 1984) (explaining that prejudice must be "sufficiently severe to outweigh the judicial economy that would be realized by avoiding lengthy multiple trials").  Even in those rare instances where a defendant establishes a "high" risk of prejudice, however, "less drastic

measures, such as limiting instructions, often will suffice to cure any risk of prejudice." *Zafiro*, 506 U.S. at 539 (citing *Richardson*, 481 U.S. at 211); *see also United States* v. *Freyer*, 333 F.3d 110, 114 (2d Cir. 2003).

The presumption in favor of joint trials "is particularly strong where, as here, the defendants are alleged to have participated in a common plan or scheme." *United States* v. *Salameh*, 152 F.3d at 115. "[T]he cases are legion that there is a strong public interest in joint trials where, as here, the defendants are . . . charged in the same conspiracy." *United States* v. *Pirro*, 76 F. Supp. 2d 478, 483 (S.D.N.Y. 1999). The existence of a RICO conspiracy further underscores the "common plan or scheme" supporting joinder. *See, e.g., United States* v. *Dinome*, 954 F.2d 839, 843 (2d Cir. 1992) (evidence of acts committed by others in the RICO conspiracy relevant to the RICO charges against a defendant).

Even where evidence is admissible against only one defendant in a multi-defendant case, severance is not necessarily appropriate. The Second Circuit has repeatedly recognized that "the fact that evidence may be admissible against one defendant but not against another does not necessarily require a severance." *United States* v. *Carson*, 702 F.2d 351, 367 (2d Cir. 1983); *see also United States* v. *Losada*, 674 F.2d 167, 171 (2d Cir. 1982). Any spillover prejudice that may occur as a result

50

of trying defendants jointly - even those who are not charged
with the same offenses - is generally corrected by the Court's
instruction that the jury consider the guilt of each defendant
individually - an instruction that jurors are presumed to be able
to follow.  *United States* v. *Potamitis*, 739 F.2d 784, 790 (2d
Cir. 1984); *see also United States* v. *Lasanta*, 978 F.2d 1300,
1307 (2d Cir. 1992) ("[t]he district court countered any possible
spillover with specific instructions to the jury . . . that the
jury should consider the evidence separately against each
defendant").

## C.   Discussion

The defendant's key contention is that because his co-
defendants are charged with "multiple acts of murder and other
violent crimes," he will face spillover prejudice that will
deprive him of a fair jury trial.  (Miranda. Supp. Mem., at 1).

As an initial matter, the fact that the defendant is charged
with fewer crimes or that the quantum of evidence at trial favors
his co-defendants is insufficient, by itself, to warrant
severance.  *See United States* v. *Scarpa*, 913 F.2d at 1015.
Courts in the Second Circuit have routinely denied severance
where defendants charged with narcotics offenses are tried
alongside defendants charged with murder.  For example, in *United
States* v. *Chang An-Lo*, 851 F.2d 547 (2d Cir. 1988), two members
of a narcotics conspiracy were tried alongside a defendant

51

charged with murder.  The court explained that, "it is well
established that differing levels of culpability and proof are
inevitable in any multi-defendant trial and, standing alone, are
insufficient grounds for separate trials."  *Id.* at 557 (internal
quotation marks omitted) (citing *United States* v. *Carson*, 702
F.2d at 351).  Here, Miranda is not only charged with being a
member of the narcotics conspiracy, he is charged with being a
member of the racketeering conspiracy.  Moreover, the "inherent
nature" of RICO charges applicable in this case supports joinder.
*United States* v. *Locascio*, 357 F. Supp. 2d 536, 546 (E.D.N.Y.
2004).  As the Second Circuit in *United States* v. *DiNome*
explained:

> [T]he government must prove an enterprise and
> a pattern of racketeering activity as
> elements of a RICO violation. 18 U.S.C. §
> 1962(c). Proof of these elements may well
> entail evidence of numerous criminal acts by
> a variety of persons, and each defendant in a
> RICO case may reasonably claim no direct
> participation in some of those acts.
> Nevertheless, evidence of those acts is
> relevant to the RICO charges against each
> defendant, and the claim that separate trials
> would eliminate the so-called spillover
> prejudice is at least overstated if not
> entirely meritless.

954 F.2d at 843.  Thus, although Miranda's crimes may be less
serious than those committed by his co-defendants, those factors
do not warrant severance in the absence of some showing of unfair
prejudice.

The cases relied upon by the defendant in support of his severance motion are distinguishable.  Most of the cases cited by the defendant involved the severance of defendants who were *not* charged with racketeering violations from others who were charged with such offenses.  *See United States* v. *Locascio*, 357 F. Supp. 2d 536, 544-45 (E.D.N.Y. 2004) (granting severance in Gambino crime family case to four defendants who were not charged with RICO violations); *United States* v. *Bellomo*, 954 F. Supp. 630, 650-51 (S.D.N.Y. 1997) (granting severance in Genovese crime family case to only those defendants who were not charged with RICO violations); *United States* v. *Maisonet*, No. 97 Cr. 817 (DC), 1998 WL 355414, *4-*6 (S.D.N.Y. 1998) (granting motions to sever by two defendants who were not charged with RICO counts and motion to sever by attorney of the organization charged with obstructing justice, when co-defendants were charged with murder, attempted murder, use of firearms, and various narcotics offenses).  As noted above, Miranda is charged with a racketeering violation, and the proof at trial will establish that he was a member of the racketeering conspiracy.

Other cases cited by the defendant are similarly unavailing.  In *United States* v. *Gallo,* 668 F. Supp. 736 (E.D.N.Y. 1987), the court noted that there was a strong presumption in favor of joint trial in RICO actions.  However, the court noted that the charges against four of the defendants were fundamentally different than

the other racketeering defendants: "Their alleged offenses, consisting of Taft-Hartley violations and obstructions of justice, are different from the murders, robberies, and extortions prevalent in the rest of the indictment." *Id.* at 750-51.  Here, by contrast, the defendant is charged with serious narcotics and firearms offenses - just like his co-defendants.  Indeed, the narcotics-related proof against Miranda is more voluminous than that to be offered against any of his co-defendant.[3]

The defendant also cites the Court's opinion in *United States* v. *Gardell*, No. S4 Cr. 632 (WHP), 2001 WL 1135948 (S.D.N.Y. 2001), noting "the potential for unfair prejudice associated with the admission of uncharged crimes evidence" in the event of a multi-defendant trial, *see* Def. Supp. Mem. at 13*,* but but fails to note the Court's ruling denying the defendant's motion to sever.  In *Gardell*, this Court recognized that the "preference for a joint trial is strong, where, as here, the defendants are alleged to have participated in a racketeering enterprise and conspiracy." *Id.* at *7 (citing *Zafiro*, 506 U.S. at 537).  Further, the Court recognized that the jury could compartmentalize the distinct roles of the defendants. *Id.* at *11.  The Court also recognized that any potential for unfair

---

[3] The Government intends to introduce evidence from NYPD witnesses regarding four separate incidents during which Miranda possessed or sold crack cocaine in CAC territory during the time period of the charged conspiracy.

prejudice could be cured by a strong limiting instruction.  *Id.*
at *8.[4]

As noted above, the evidence at trial will show that Miranda
played an important role in the criminal enterprise.  He is not,
as described in the defendant's brief, a "bit player."  (Miranda
Supp. Mem. at 11.)  Rather, Miranda's prolific distribution of
"crack" cocaine, like the other CAC members' narcotics
trafficking activities, was the centerpiece of the criminal
enterprise; much of the violence involving the CAC and its rivals
in 2010 arose from disputes concerning control of drug-
distribution territory in the Bronx.  Furthermore, as alleged in
the Government's enterprise letter, although Miranda may not have
committed any acts of violence, the evidence at trial will show
that he possessed a firearm that was later used in a shooting

---

[4] The defendant also complains that the complexity of the
Indictment - which the defendant calls a "complex hydra,"
supports severance.  (Miranda Supp. Mem. at 7.)  This Court
rejected a similar argument in *United States* v. *Lino*, No. 00 Cr.
632 (WHP), 2001 WL 8356 (S.D.N.Y. 2001).  In *Lino*, the Court
addressed a securities fraud RICO action, finding that
"notwithstanding the length and multi-faceted nature of the
indictment, the core theory behind the securities fraud offenses
is not hard to comprehend..."  *Id.* at *24.  Here, similarly, the
racketeering charges in the Indictment are straightforward: the
defendants, as members and associates of the CAC, committed acts
of violence, including murders and attempted murders, and
firearms offenses, to protect the CAC and its narcotics
distribution organization.  The Court in *Lino* also noted that
"with proper cautionary instructions along with the marshaling of
evidence, there is no reason to believe that the jury will not be
able to segregate the evidence" against the defendants.  *Id.*
There is no reason to conclude that a proper limiting instruction
would not work here.

committed by defendant Pierce, and that after he himself was shot, CAC members sought retaliation against a rival organization.  In short, not only is Miranda an important player in the enterprise, his actions form an integral part of the narrative of the charged racketeering enterprise.

Finally, judicial economy supports the joinder of Miranda's trial with his co-defendants.  Even if the Court were to sever Miranda's trial from that of his indicted co-defendants, the Government would still prove at a trial against Miranda that he was a longstanding associate of the CAC, and that he possessed a firearm in furtherance of that drug trafficking activity. Proving these facts would involve calling most of the same cooperating witnesses as will testify at the instant trial, and many of the same law enforcement witnesses.  Because "[j]udicial economy is the primary factor to be considered by the district court" in evaluating motions to sever, the Court should avoid the possibilities of multiple trials involving the same evidence and witnesses.  *United States* v. *Jimenez*, 824 F. Supp. at 366.

## CONCLUSION

For all of the foregoing reasons, the Government respectfully submits that the Court should deny defendant Meregildo's and Miranda's motions *in limine*.

Dated:  New York, New York
        September 21, 2012

                    Respectfully submitted,


                    PREET BHARARA
                    United States Attorney

          By:  _____/s/_____
               Nola B. Heller
               Adam Fee
               Santosh Aravind
               Assistant United States Attorneys
               Telephone: (212) 637-2200

<u>CERTIFICATE OF SERVICE</u>

I, Nola B. Heller, Assistant United States Attorney, hereby certify that on September 21, 2012, I caused a copy of the attached Government's Response to Defendants' Motions *In Limine* to be sent via electronic notification (ECF) to all counsel of record in the above-captioned case.

By: _____/s/_____
    Nola B. Heller
    Assistant United States Attorney
    (212) 637-1589