CA4ZMER1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,

       v.                              11 CR 576 (WHP)

JOSHUA MEREGILDO, MELVIN
COLON, EARL PIERCE, and
NOLBERT MIRANDA,

           Defendants.

------------------------------x

                            New York, N.Y.
                            October 4, 2012
                            10:46 a.m.


Before:

            HON. WILLIAM H. PAULEY III,

                        District Judge


                  APPEARANCES

PREET BHARARA
    United States Attorney for the
    Southern District of New York
NOLA HELLER
ADAM FEE
SANTOSH ARAVIND
    Assistant United States Attorneys


WINSTON LEE
YING STAFFORD
    Attorneys for Defendant Meregildo

MITCHELL DINNERSTEIN
ANTHONY CECUTTI
    Attorneys for Defendant Colon

FLORIAN MIEDEL
AARON MYSLIWIEC
    Attorneys for Defendant Pierce

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

CA4ZMER1

APPEARANCES (Continued)


GARY BECKER
ALEX LESMAN
    Attorneys for Defendant Miranda

ALSO PRESENT:
Special Agent Patrick Collins, ATF
Paralegal Specialist Darci Brady

CA4ZMER1

(In open court; jury not present)

THE DEPUTY CLERK:  All rise.

THE COURT:  Good morning, everyone.  Please be seated.

Let's bring in the defendants.

(Defendants present)

THE COURT:  Are there any issues that counsel wish to raise before we bring in the jury?

MR. MIEDEL:  Your Honor?

THE COURT:  Mr. Miedel.

MR. MIEDEL:  I have one issue that we could take up before Mr. Folks continues testifying, so do it either now or then.

THE COURT:  All right.  You want to give us a quick, a one minute preview?

MR. MIEDEL:  Well, the one minute preview is simply, it's sort of an extension of the objection that I had yesterday to the testimony about -- by Mr. Folks about a statement that Mr. Miranda made.  And the government tried to cure it by saying without telling us who, you know, gave you the gun, and then went on and basically explained what happened.  And just going through the transcript, it's covered on pages 690, 692.

Just before that, your Honor, Mr. Folks testified about the shooting on September 13th, testified about Mr. Pierce using a silver and black 9-millimeter gun.  And then he asked -- right after that he was asked about a conversation he

CA4ZMER1

had with Mr. Miranda about that particular gun.

And, frankly, your Honor, it simply doesn't cure the problem of my inability to cross-examine Mr. Miranda by saying -- again without telling us who took the gun from him, "what did PayDay tell you about the gun? Answer: He had gave the gun, he had loaned the gun to somebody."

And then further on, your Honor, on page 693 the question is, "Again without telling us the identity of the person, the identity of the person he gave the gun to, what did he say, what did PayDay tell you about it? Answer: He said the person asked him for the gun like he needed it. He gave it to him."

There's no question in anybody's mind in the courtroom who he's talking about. I don't think that cured the problem of my inability to cross-examine. So I'd ask that portion of the direct be struck.

THE COURT: All right. I'll consider it and we'll discuss it later.

Is the Government's witness here?

MS. HELLER: Yes, she is, your Honor.

THE COURT: All right. Call her up. Let's bring in the jury.

Come right up and take a seat.

THE DEPUTY CLERK: Come to order. Jury entering.

THE COURT: Good morning, members of the jury. Thank

CA4ZMER1

you again for your punctuality.

As you can see, Mr. Folks is not on the stand at the moment, all right.  We're going to interrupt Mr. Folks' testimony to call another witness, who will be brief, but who has traveled to be here, and then we will resume with Mr. Folks' testimony.

This is all done to ensure an efficient presentation of the evidence to you, and for counsel, for the defendants and the government to accommodate each other and the Court.

So at this time I ask that the government call its next witness.

MS. HELLER:  Yes, your Honor.  The government calls Shannon Chance.

THE COURT:  All right, would you stand, please, raise your right hand.

 SHANNON CHANCE,

    called as a witness by the government,

    having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. HELLER:

THE COURT:  Please take a seat.  State your full name and spell your last name slowly for the Court Reporter.

THE WITNESS:  Shannon Chance, C-h-a-n-c-e.

THE COURT:  All right, you may inquire, Ms. Heller.

BY MS. HELLER:

CA4ZMER1                          Chance - direct

Q.   Good morning, Ms. Chance.

A.   Good morning.

Q.   For whom do you work?

A.   Facebook.

Q.   And where is your office located?

A.   In Menlo Park, California.

Q.   And what is your position at Facebook?

A.   I am a custodian of records.

Q.   And how long have you worked for Facebook?

A.   About a month.

Q.   What did you do before you worked at Facebook?

A.   Prior to Facebook, I worked at Microsoft as a custodian of records as well.

Q.   For how long?

A.   Three and a half years.

Q.   And what about prior to that?

A.   Prior to that I was at Yahoo where I was also a custodian of records since 2005.

Q.   So how long in total have you been a custodian of records?

A.   About seven years.

Q.   What is was your principal job or responsibility as a custodian of records?

A.   I respond to third party requests for user data.

Q.   And do you do anything else?

A.   And I testify as needed.

Q.  As you're doing now?

A.  Right, correct.

Q.  And you mentioned that you provide data in response to requests.  Who makes the requests that you respond to?

A.  Government entities.  Sometimes they're private parties as well.

Q.  And what forms do these requests take?

A.  Subpoenas, court orders and search warrants.

Q.  In your job as custodian of records for Facebook, are you familiar with Facebook's records?

A.  I am.

Q.  Have you reviewed Facebook records in connection with your testimony here today?

A.  I have.

Q.  All right.

            MS. HELLER:  Your Honor, may I approach?

            THE COURT:  You may.  And you need not ask permission either.

            MS. HELLER:  For any witness, your Honor?

            THE COURT:  For any witness.

            MS. HELLER:  All right.

Q.  I'm going to show you, Ms. Chance, what's been marked for identification as government exhibit 800 and ask you to take a look at that.  You could take it out of its sleeve if you want.  What is that, Ms. Chance?

A.   This is a disk that I reviewed yesterday, on October 3rd, 2012.

Q.   And based on your review of that disk, what is contained on the disk?

A.   The disk contains 14 PDF files that were produced in response to a search warrant we received in March of 2012.

Q.   And what court issued that search warrant?

A.   Federal U.S. District Court, Southern District of New York.

Q.   And how are you able to specifically recognize this disk as the disk you reviewed yesterday?

A.   I have my initials on it.

Q.   Prior to testifying here today, did you review each and every one of the files on that disk?

A.   I did.

Q.   And what did you do when you reviewed those files?

A.   I compared them to the copy of the records that we have on file that were produced in response to that search warrant.

Q.   And what was the result of that comparison?

A.   These are true and accurate copies of the records that we produced in response to that search warrant.

Q.   Now, were these records made at or near the time at which the information they reflect occurred?

A.   Yes.

Q.   And are these records kept in the course of Facebook's regularly conducted business activity?

A.   Yes.

Q.   And was it a regular practice of Facebook to make these records?

A.   Yes.

          MS. HELLER:  Your Honor, the government offers exhibit 800?

          THE COURT:  Any objection?

          MR. DINNERSTEIN:  No objection.

          MR. LEE:  I have no objection, your Honor.

          MR. MIEDEL:  No objection.

          MR. BECKER:  No objection, your Honor.

          THE COURT:  All right, government exhibit 800 is received in evidence.

          (Government's Exhibit 800 received in evidence)

          MS. HELLER:  Your Honor, if I may retrieve the exhibit.

Q.   Now, Ms. Chance, based on your review of the records, what types of records are they?

A.   The records include subscriber information, IP history for when the user logged into the account, and various activities on the account as well, and photos and messages.

Q.   For how many different accounts?

A.   14.

          MS. HELLER:  Your Honor, we would just request permission to publish one page of one of those accounts so that

Ms. Chance may explain the records?

THE COURT:  You may proceed.

MS. HELLER:  Ms. Brady, if we could please publish page one only of the Facebook account in folder eight, government exhibit 800.  All right.

Q.  Perhaps it's easier for you to look at your screen, Ms. Chance.

So looking at this page, can you explain first the information that's provided on the first three lines?

A.  So the target is, the number listed after the target is the unique identifier, that is the identifier for the account listed.

The date range is the date range that we pulled the records for.  The search warrant did have a date range specified in it.

And then after that the records begin alphabetically. So the About Me section is just what the user can enter about themselves on their Facebook page.

Q.  And what are some of the other categories that would be provided in this file?

A.  So IP history again will be further down, and photos, messages, the name, alternate name, the vanity if there was one, any wall posts.

Q.  And could you just tell us how many pages are in this particular record?

A.   This one looks like there's 3,089.

Q.   And are all the different records divided into different sizes, different numbers of pages?

A.   Correct.  Depending on the size of the account and how much activity was on the account.

Q.   Do these, each of these files contain the entire contents of each of these user's Facebook or is anything left out?

A.   They contain what we have readily available, just available at the time that we pulled the records.

Q.   And for that date range requested?

A.   For that date range.

          MS. HELLER:  All right.  No further questions.

          THE COURT:  Cross-examination?

          MR. DINNERSTEIN:  Yes, your Honor.

          THE COURT:  You may proceed, Mr. Dinnerstein.

          MR. DINNERSTEIN:  Thank you.

CROSS EXAMINATION

BY MR. DINNERSTEIN:

Q.   Good morning, Ms. Chance.

A.   Good morning.

Q.   I'm just going to ask you a few questions about the records and the subscription account information.  And you're familiar with that sort of material, is that correct?

A.   Correct.

Q.   Now, you mentioned on direct examination of a wall.  And

what is a wall?

A.   The wall is on the Facebook page where the subscriber can post their thoughts for the day or a link to a video or share a photo, that type of thing.

Q.   Can other people also put things on one's wall?

A.   Yes.

Q.   And is it also called -- what's that called?

A.   You could call it just posting on someone's wall or wall posts.

Q.   And when you get the material, those 3,089 pages for this particular individual, would items that other people put on also be part of those 3,089 pages?

A.   Yes.

Q.   So if someone wrote a message -- and what's a message by the way?  Is a message different from a wall?

A.   Well, we have messaging capabilities as well, so kind of like similar to an e-mail, for example.  If you wanted to just send a communication between two people or between a group of people, you could do that, or you could post on a wall, which is to an audience.

Q.   So if someone put some message, that message would also show up in these 3,089 pages, is that correct?

A.   Posted message on their wall?

Q.   Correct.

A.   It should, yes.

Q.  When you say it should, what is it -- does that mean sometimes it wouldn't show up on your records, is that correct?

A.  If we have the data, it will appear in the records, yeah.

Q.  Now, say somebody wants to delete a message, does one have the capability of deleting a message on their Facebook account?

A.  So a message, you mean post --

Q.  A post?

A.  -- on one wall?  Yes, they have that ability.

Q.  Would you be able to find or locate a deleted message?

A.  I don't know.

Q.  You don't know?

A.  It would depend on when we went in to pull the data, if it was still there.

Q.  Well, what would it depend on?

A.  The time, the timing.

Q.  Okay.  Would a deleted message be -- does Facebook have the capacity to find deleted messages?

A.  That again would depend.  We don't really know what data is available until we go to pull the records in response to the legal process.  So it may be there if it hasn't been fully removed yet.

Q.  And what does that mean, to be fully removed?

A.  The systems are quite complex on the Facebook system or the, yeah, system.  And if the wall post was removed by the user, but it still lived somewhere in the server because it

CA4ZMER1                         Chance - cross

hasn't been removed, then we may have it or may not.  It may be completely gone.

Q.  Are you familiar with the term neoprint?

A.  Yes, I am.

Q.  And what is a neoprint?

A.  A neoprint is the term -- it's actually an outdated term that we used to -- it's expanded subscriber content, basically.

Q.  Now, you said that you were the custodian of the records, is that correct?

A.  Correct.

Q.  Are there people who are more familiar with the idea of retrieving records than you would be?

A.  I don't understand your question.

Q.  Okay.  As a custodian, it's not your -- your responsibility is to come to court and to testify about the records that are obtained, is that correct?

A.  Correct.

Q.  And you check to see whether or not what is given to the court, like in government exhibit 800, is the same as what appears in your particular record, is that correct?

A.  That's correct.

Q.  And you actually got those records, because in this case the government provided you with a subpoena, is that correct?

A.  A search warrant.

Q.  A search warrant.  And as a result of it, you looked up

CA4ZMER1                          Chance - cross

what the search warrant indicated, is that correct?

A.   Correct.

Q.   Now, you mentioned that it was the government who could get these records, is that correct?

A.   Correct.

Q.   Now, could I get these records for someone else?

A.   I don't know.

Q.   Would there be any -- would Facebook provide me with records if I asked for them?

A.   I can't speak with any, you know, authority as to being able to provide records to a defense attorney.

Q.   That would be involved with the legal counsel of Facebook, is that correct?

A.   That's correct.

Q.   And they would make the determination whether I would be qualified to get the records, is that correct?

A.   Correct.

Q.   Also what is the -- do you know what the term "photo prints" mean?

A.   Yes.

Q.   And what is that?

A.   That's a, basically, taking -- it's just a term that Facebook uses to describe all of the photos within the user's account.

Q.   And would one also be able to delete photos from their

Facebook account?

A.   Yes.

Q.   And would, if one deleted the photographs, would Facebook be able to obtain those photographs that were deleted?

A.   I don't know that answer.

Q.   And that would be -- and who would know the answer?  Would there be somebody at Facebook who would know answer to that question?

A.   We don't have anyone that really -- that testifies about that.  Because, again, it will just depend on if the data is available at the time we pull the records in response to the legal process.

Q.   How about, could you tell the ladies and gentlemen of the jury what a private message is?

A.   Private message is a communication between two people, or it could be a group of people as well, so direct audience, specific audience.

Q.   Would you be able to locate private messages on the Facebook account?

A.   Yes.

          MR. DINNERSTEIN:  Excuse me, your Honor.

          THE COURT:  Take your time.

Q.   You said you didn't know anyone who could testify regarding getting information that has been deleted, is that correct?

A.   Correct.

Q.   Is there somebody who maintains the server who may have some information regarding that?

A.   I don't know.

Q.   Also, did you know whether -- excuse me just a second.

Could you tell us physically what you do once you receive either a search warrant or a subpoena to obtain records?

A.   So the custodian will evaluate the legal process, the subpoena, court order or search warrant to be sure it's valid, and then we have systems in place to pull the records, and then we provide those records and respond accordingly to the requester.

Q.   What does it mean to "pull the records?"  What does that mean?

A.   We have internal systems that we go and enter user ID, that unique identifier next to the target account and pull the, pull the data.

Q.   So that you take the data off this big computer in Facebook into some -- into a CD; is that what you do?

A.   It would actually be multiple computers, it wouldn't be one source, which is the challenge in saying if we have a, or do not -- do or do not have deleted information.  So that that's part of the complexity.

But, yes, it pulled the data from the multiple locations, produces it in a printable format such as a PDF,

CA4ZMER1                          Chance - cross

then we provide that PDF to the requesting agency.

Q.   What do you mean by "multiple locations"?

A.   So, again, Facebook is very complex.  So you have your wall and you have your main feed, and you have your photos and your videos and your messages, and the servers for all of those would be located in multiple locations.

Q.   So, for instance, would deleted messages be located in a different place from walls?

A.   It's possible, yes.

MR. DINNERSTEIN:  Thank you very much.  I have no further questions.

THE COURT:  Any further cross-examination?

MR. BECKER:  No, your Honor.

MR. LEE:  I do not, your Honor.

MR. MIEDEL:  No, your Honor.

THE COURT:  Any redirect examination, Ms. Heller?

MS. HELLER:  No, your Honor.

THE COURT:  All right, Ms. Chance, you're excused as a witness.  You may step down.

(Witness excused)

THE COURT:  Does the government now recall Mr. Folks?

MR. ARAVIND:  Yes, it does, your Honor.

THE COURT:  All right.

BERNARD FOLKS,

     called as a witness by the government,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

having been previously sworn, testified as follows:

DIRECT EXAMINATION

BY MR. ARAVIND:

THE COURT:  Gentlemen, would you bring out Mr. Folks, please.

You may be seated, Mr. Folks.

Mr. Folks, do you understand, sir, that you continue to be sworn as a witness under oath in this proceeding now on trial?

THE WITNESS:  Yes.

THE COURT:  Very well.

All right, members of the jury, we're going to return now to Mr. Aravind's continued direct examination of Mr. Folks. You may proceed.

MR. ARAVIND:  Thank you, your Honor.

BY MR. ARAVIND:

Q.  Mr. Folks, I want to ask you one question about the murder that you witnessed and you testified about yesterday.  You testified that you took money from the victim.  What happened to that money?

A.  I put it in my pocket, and next day I gave it to T-Money.

THE COURT:  And, Mr. Folks, just you can bend that microphone down so you can talk right into it, and everyone can hear you.

Q.  After you gave the money to T-Money, what happened then?

CA4ZMER1                        Folks – direct

A.   I don't remember.  We went our separate ways.

Q.   Did you keep any of the money?

A.   Yeah.

Q.   How much?

A.   Like 200.

Q.   Mr. Folks, I'm going to ask you some questions about your membership in gangs.  You testified yesterday that you were a member of the YGs.  What does the YG stand for?

A.   Young gunner.

Q.   When did you become a member of the YGs?

A.   It was, I was around 16.

Q.   Did you become a member of the YGs before or after you became a member of GFC?

A.   After.

Q.   How did you become a member of the YGs?

A.   I didn't have to do nothing.

Q.   Can you please explain to the jury how you actually became a member?

A.   I just wanted to be YG and I turned YG.

Q.   Were you invited by anyone?

A.   Yeah.

Q.   Who?

A.   GFC.

Q.   Were there any particular members of GFC that invited you to become a member of the YGs?

CA4ZMER1                          Folks - direct

A.   No.

Q.   Were you a member of the YGs at the same time you were a member of GFC?

A.   Yes.

Q.   For what period of time?

A.   When I was 16.

Q.   Did you ever stop becoming a member of the YGs?

A.   Yes.

Q.   Tell us why.

A.   We had beef with them, that's why.  We start having a beef, serious beef.

Q.   Please explain to the jury who was the beef between?

A.   GFC and YG.

Q.   If you know, which other GFC members were members of the YGs?

A.   Everybody.

Q.   You mentioned yesterday that you were a member of the bloods.  When did you become a member of the bloods?

A.   Around the same time, when I was 16.

Q.   Can you tell us how you became a member of the bloods?

A.   At first I had to fight couple people.

Q.   Who did you fight?

A.   Some older guys from Manhattan.

Q.   Who told you to do that?

A.   That was just procedure.

CA4ZMER1                    Folks - direct

Q.  Did you become a member of the bloods after that?

A.  Yes.

Q.  What are the other ways that people become a member of the bloods?

A.  It depends who you talk to.  Because like you have a fight, you could just somebody take a liking to you, just put you down.  It's all types of ways.

Q.  Were you ever invited to become a member of the bloods?

A.  Yeah.

Q.  By whom?

A.  T-Money.

Q.  To your knowledge, did T-Money make any other GFC member a member of the bloods?

A.  Yeah.

Q.  Who?

A.  Killa and Melly.

Q.  When you became a member of the bloods, were you --

        MR. LEE:  Could we have a time frame?

        THE COURT:  Would you try to fix a timeframe, Mr. Aravind?

Q.  Mr. Folks, I think you said you became a member of the bloods when you were about 16 years old.  And how old are you now, again?

A.  19.

Q.  So approximately three years ago when you became blood, did

CA4ZMER1                          Folks - direct

you become a member of a particular group of bloods?

A.   When I was 17, that's when I was with T-Money.

Q.   And what group of bloods did you get in?

A.   Mac Balla.

Q.   Who else were members of Mac Balla bloods?

A.   Me, T-Money and Killa.

Q.   Mr. Folks, from the time that you started being active on Courtlandt Avenue, did you ever use Facebook?

A.   Yes.

Q.   What was the name that you used to log onto Facebook?

A.   Akon Balla.

Q.   Mr. Folks, I want to ask you a little bit more about your prior crimes.  Before you were arrested on the gun charge that led to your arrest in Rikers Island, had you ever been arrested before?

A.   Yeah.

Q.   How many occasions?

A.   Couple.

Q.   Couple meaning two or more than two?

A.   More than two.

Q.   What have you been arrested for, Mr. Folks?

A.   Open container, rioting, attempted robbery, possession of a box cutter like that, stuff like that.

Q.   Were you ever arrested for assaulting anyone?

A.   Yes.

CA4ZMER1                          Folks – direct

Q.   What ages were you when you committed those crimes?  When
did you start committing crimes?

A.   I started committing crimes when I was young, like ten, 11.

Q.   What crimes did you commit when you were young, ten or 11?

A.   Petty crimes, like stealing from stores, stuff like that.

          MR. LEE:  I'm sorry, your Honor, could he repeat that?
I could not understand that.

          THE COURT:  Would the Reporter read back Mr. Folks'
answer.

          (Record read)

          MR. LEE:  Thank you, your Honor.

Q.   Mr. Folks, have you ever been arrested for a crime that you
did not commit?

A.   Yes.

Q.   What crime was that; what crimes?

A.   I don't remember that open container, that assault, that
attempt robbery.

Q.   Let's talk about that assault charge first.  Why did you
get arrested for assault?

A.   I wasn't immediately arrested at that time.  I got arrested
for something, something else, then when I was leaving the
bookings, I got picked up for that.

Q.   When was this, Mr. Folks?

A.   I don't remember the exact date.

Q.   Approximately how old were you?

CA4ZMER1                          Folks - direct

A.  I say like 16 I think.

Q.  You said that you didn't commit that assault.  Do you know exactly what you were charged with?

A.  I just knew assault, assault in the second I think it was.

Q.  Was there any particular crime that you committed, that you were alleged to have been committing that day?

A.  Cutting somebody face.

Q.  Did you in fact cut someone's face that day?

A.  No.

Q.  Had you assaulted someone that day that you got arrested?

A.  The day I have -- that day that I got arrested, no.

Q.  Had you been committing assaults around the time that you were arrested for cutting someone's face?

A.  Yes.

          MR. MIEDEL:  Objection, leading.

          THE COURT:  Overruled.

Q.  Tell us about those assaults or that assault.

A.  That particular day it was a party, um, Walters somewhere. I don't remember the exact spot.

Q.  Mr. Folks, again, please speak slowly and clearly into the microphone.

A.  That particular day it was a party somewhere on Walter Avenue.  I drove there with a couple of friends.  We drove over there.  As we going into the building, the party was cancelled. So I seen somebody go out I had a problem with in Harlem.  I

approached him.  I swung on him.  He ran away.  I'm chasing him.  His, one of his -- some kid that was with him hit me and ran.  I chased him and I couldn't catch him.  Walking back I'm mad now, I start assaulting a kid anybody I could see that was in my sight.

Q.  How many people do you think you hit that day?

A.  Like three, four people.

Q.  You mentioned that you were arrested for attempted robbery?

A.  Yeah.

Q.  What were you alleged to have committed that day?

A.  Nothing ain't happen that day.  We, we was just walking, a group of people, we just walking around.

Q.  Who were you walking with?

A.  GFC, people from Jackson, people from Highbridge, people from all over the Bronx.  We just walking around.

Q.  What happened?

A.  I remember we going into a store, me and like ten, 15 other people.  We just in the store.  Cop car pulled up and point out me.  And somebody else said -- some man came out the car, I don't know who he is, I didn't see his face, said me and the other kid supposed to have had threatened him, said we had a gun, we tried to rob him.

Q.  Had you threatened or tried to rob that individual?

A.  No.

Q.  Were you committing robberies around this time?

CA4ZMER1                    Folks - direct

A.   Yeah.

Q.   Mr. Folks, did you commit any crimes while you were on Rikers Island?

A.   Yes.

Q.   What crimes did you commit?

A.   I assaulted a couple people.  I got drugs into the jail.

Q.   What drugs did you try and get in the jail?

A.   Marijuana.

Q.   Did you succeed in getting marijuana into the jail?

A.   Yes.

Q.   Tell us how you did that?

A.   I had -- I used to call people over the phone and have them bring it to me, and I used to get it from other people in the building.

Q.   When was this, Mr. Folks?

A.   2011 from May, until I was transferred over here to the feds.

Q.   Were any of those assaults that you mentioned, gang related?

A.   Yeah.

Q.   Tell us what happened?

A.   One time it was with the YGs.  I had one of them in the same unit with me, but I was cool with him from the streets so I let him, I let him live with me.

Q.   Who was that person?

A.  Some kid from RPT named Bobby.

Q.  What does RPT stand for, if you know?

A.  River Park Towers.

Q.  Keep going, please continue.

A.  I let him live with me.  Then one morning he locked out with one of my, one of my friends from Brooklyn, one of my -- I put him GFC.

Q.  Who was that person?

A.  Some kid named GunPlay.

Q.  When you mean locked out, what do you mean by that?

A.  They do breakfast in the morning, it was only two come out do breakfast.

Q.  What does that mean, explain to the jury.

A.  Only two people come out in morning to do breakfast.

Q.  And then what happened?

A.  Either side, north or south side.  When he came out, the whole other side that was on the opposite side is YG.  They necessitate came over, they jumped him and Bobby watched them.

Q.  So who got jumped?

A.  The person that belonged to me from GFC.

Q.  GunPlay?

A.  Yeah.

Q.  What did you decide to do about that incident?

A.  I spoke about the situation with GunPlay, then I made a decision, the decision.  I told him he gone to have to get

CA4ZMER1                         Folks - direct

Bobby out the crib, he doesn't have to assault and get him out, pack him up to a different unit, he can't live with us no more.

Q. What happened?

A. He did what I said.

Q. Was there an assault?

A. Yeah.

Q. Tell us what happened, if you know?

A. GunPlay went up to him, to Bobby asked him, he asked him something, I don't really remember what it was. He assaulted him from there.

Q. Did you correct that assault?

A. Yes.

Q. Mr. Folks, at some point in time, were you arrested as part of a federal case?

A. Yes.

Q. After that arrest, did you decide to cooperate?

A. Yes.

Q. When was that?

A. After the hearing.

Q. Do you know what year that was?

A. 2012.

Q. How many months ago, if you remember?

A. Like four months ago.

Q. Did you subsequently plead guilty to any crimes in this case?

CA4ZMER1                    Folks - direct

A.   Yes.

Q.   What crimes did you plead guilty to?

A.   Being in a gang, possession of a firearms, assault, attempted murder and conspiracy to murder.

Q.   Mr. Folks, what is the maximum sentence that you face on the crimes that you pled guilty to?

A.   Life plus 60.

Q.   What does the 60 mean?

A.   It's additional to the life.

Q.   60 what?

A.   60 years.

Q.   Do any of the charges that you pled guilty to have a mandatory minimum?

A.   Yes.

Q.   What is that mandatory minimum term?

A.   60 years.

Q.   Mr. Folks, did you plead guilty to those charges pursuant to a plea agreement with the government?

A.   Yes.

Q.   Mr. Folks, I'm showing you what has been marked as government exhibit 3532Y.  Do you recognize that document?

A.   Yes.

Q.   What is it?

A.   Plea agreement.

Q.   Could you turn to the last page, Mr. Folks?  Did you sign

that last page?

A. Yes.

Q. Who else signed it?

A. My attorney.

Q. Who else?

A. And Prosecutor.

Q. Now, turning again to the question of what crimes you pled guilty to, did you also plead guilty to murder?

A. Conspiracy, yes.

Q. Did you enter into this plea agreement before or after you pled guilty?

A. Before.

Q. And in that agreement did you agree to cooperate with the government?

A. Yes.

Q. Are you testifying today, Mr. Folks, pursuant to that agreement?

A. Yes.

Q. Have you been sentenced yet for the crimes that you already pled guilty to?

A. No.

Q. Who is going to sentence you, Mr. Folks?

A. The Judge.

Q. Will anyone else decide your sentence?

A. No.

Q.  Mr. Folks, what is your understanding of your obligations under that plea agreement?

A.  Tell the truth, stay out of trouble, and to testify.

Q.  Are you also supposed to tell the government about your past crimes?

A.  Yes.

Q.  Does this agreement contain all of the promises that the government has made to you?

A.  Yes.

Q.  Now, if you comply with your obligations under the agreement, what is the U.S. Attorney's Office going to do?

A.  Write me a letter.

Q.  What's that letter called?

A.  5K.

Q.  Who does that letter get sent to?

A.  The Judge.

Q.  What is your understanding of what information will be included in that letter?

A.  My crimes, my testimony, um, and observation of me.

Q.  Has the government promised you what sentence you will receive if you cooperate?

A.  No.

Q.  Has anyone else made any promise as to what sentence you will receive?

A.  No.

CA4ZMER1                        Folks - direct

Q. Is the government to recommend a specific sentence?

A. No.

Q. Who will determine the sentence that you will receive?

A. The Judge.

Q. Is it your hope, Mr. Folks, to get a lower sentence because you cooperated?

A. Yes.

Q. If the government sends that letter, that 5K letter, would you still face the mandatory sentence of 60 years?

A. No.

Q. Simply because the Judge receives that letter, does the Judge have to sentence you to less prison time?

A. No.

Q. Mr. Folks, will the outcome of this case have any effect on whether the U.S. Attorney's Office will write that 5K letter to the Judge?

MR. BECKER: Objection.

MR. MIEDEL: Objection, your Honor.

THE COURT: Sustained.

Q. Mr. Folks, what do you understand will happen to your agreement if you do not tell the truth?

A. There won't be none.

Q. What will happen to the possibility of a sentencing reduction if you do not tell the truth?

A. I get the max.

CA4ZMER1                       Folks - direct

Q.  What will be the --

MR. LEE:  Objection, your Honor, to that last question as to the form.

THE COURT:  Overruled, and you're too late.

MR. LEE:  Thank you, your Honor.

Q.  If you do not tell the truth, what is the mandatory minimum sentence that you face?

A.  60 years.

MR. ARAVIND:  Your Honor, may I have just one moment?

THE COURT:  Yes.

Q.  Mr. Folks, what is your understanding if, does whether you get a 5K letter depend on whether any of these defendants are convicted in this case?

A.  No.

MR. ARAVIND:  Your Honor, the government offers government exhibit 3532Y?

THE COURT:  Any objection?

MR. LEE:  No objection, your Honor.

MR. MIEDEL:  Object to the redaction we discussed, your Honor.

MR. BECKER:  No objection, subject to the redaction discussion.

MR. DINNERSTEIN:  I agree with my colleagues, your Honor.

THE COURT:  All right.  Government exhibit 3532Y, as

CA4ZMER1                    Folks - direct

redacted, is received in evidence.

(Government's Exhibit 3532Y received in evidence)

MR. ARAVIND:  No further questions, your Honor.

THE COURT:  Cross-examination, Mr. Miedel.

MR. MIEDEL:  Thank you, your Honor.

CROSS EXAMINATION

BY MR. MIEDEL:

Q.  Mr. Folks, why do they call you Mr. 44?

A.  'Cause I shot that gun before.

Q.  I'm sorry?

A.  I shot that gun.

Q.  You shot that gun?

A.  Yes.

Q.  You like that gun, the 44, right?

A.  Yes.

Q.  I want to show you something that has been premarked as government exhibit 1101.  Mr. Folks, is that you?

A.  Yes.

Q.  Okay.

MR. MIEDEL:  Excuse me.  I'm sorry, your Honor.

Q.  Mr. Folks, is that a photograph of yourself?

A.  Yes.

Q.  Is that a fair and accurate depiction of the way that you looked at the time that photograph was taken?

A.  Yes.

CA4ZMER1                         Folks – cross – Mr. Miedel

Q.   Okay.

MR. MIEDEL:  Your Honor, I offer this exhibit, which is premarked as government exhibit 1101, as defendant Exhibit A.

THE COURT:  Well, let's just offer it as government exhibit 1101.

MR. MIEDEL:  All right, I'll offer it as 1101.

THE COURT:  Any objection?

MR. ARAVIND:  No objection, your Honor.

MR. MIEDEL:  May I publish it?

THE COURT:  All right, and let me just explain. Members of the jury, it doesn't matter whether an exhibit is called a government exhibit or a defendant's exhibit.  All that matters is whether it's received in evidence.  So think nothing of that.  It's only what's important is whether it's received in evidence.

And now government exhibit 1101 is received in evidence.

(Government's Exhibit 1101 received in evidence)

MR. MIEDEL:  Thank you.  May I publish it to the jury?

THE COURT:  You may publish it, Mr. Miedel.

But let me just ask a question of the government.  Do you have 1101 in an electronic format?

MR. ARAVIND:  Yes, we do, your Honor.

THE COURT:  So let's publish it in electronic format.

CA4ZMER1                    Folks - cross - Mr. Miedel

MR. ARAVIND:  Yes, your Honor.

THE COURT:  We have all this technology, let's use it.

MR. MIEDEL:  Thank you.

Q.  So, Mr. Folks, this is a picture of you, right?

A.  Yes.

Q.  And you're holding two guns in this photograph?

A.  Yes.

Q.  Is one of those a 44?

A.  No.

Q.  Can you tell us about the two guns that you're pointing at the camera; what are they?

A.  One is a 357.

Q.  Which one is that?

A.  The revolver.

Q.  And that's looking at the photograph, the one on the left?

A.  Yes.

Q.  What's the other one?

A.  I'm not sure.

Q.  That's a semiautomatic pistol, correct?

A.  Yes.

THE COURT:  Mr. Miedel, just try to get closer to the microphone, raise it a little.

MR. MIEDEL:  All right.

THE COURT:  Please.

MR. MIEDEL:  I'll try my best.

CA4ZMER1                      Folks - cross - Mr. Miedel

THE COURT:  Okay.

Q.  Now, you had a gun that you considered to be your own gun, correct?

A.  No.

Q.  No?

A.  No.

Q.  Isn't it true that you had a gun that you considered to be your own gun, a 40 caliber that you kept at Tay's apartment?

A.  It was everybody.  It wasn't my personal.

Q.  Okay.  You met a number of times with the government, correct?

A.  Yes.

Q.  And when I say you met with the government, that meant you sat in a room with these prosecutors or some of these prosecutors that are in the courtroom today, correct?

A.  Yes.

Q.  And also with agents from the ATF or the NYPD, correct?

A.  Yes.

Q.  And they interviewed you, right?

A.  Yes.

Q.  And that happened many times, right?

A.  Yes.

Q.  And one of those times was just this past July, July 13th, right?

A.  I don't remember the exact date.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Q.   But is it fair to say that you met with them in July?

A.   Can't say.  I don't remember.

Q.   All right.  But during one of those meetings with the prosecutors, you told them that you considered the 40 caliber automatic to be your gun, right?

A.   I don't remember.

Q.   You don't remember telling them that?

A.   No.

Q.   Do you remember telling them that you considered that your gun, but you kept it in Tay's apartment?

A.   I don't remember.

Q.   You remember something special about that gun, the 40 caliber?

A.   It had a beam on it.

Q.   A laser beam, right?

A.   Yes.

Q.   And you don't remember whether you told the prosecutors that, during one of these meetings, that you considered that to be your gun; that's what you're telling us today?

A.   I don't remember.

Q.   All right.  Now, a gun that -- well, Mr. Folks you used -- you have used that gun with the laser beam, right?

A.   Yes.

Q.   And when you say "laser beam," it's a laser sight, correct?

A.   Yes.

Q.   All right.  And when you activate that laser sight, it essentially aims the laser at the target that you want to shoot at, right?

A.   Yes.

Q.   Okay.  Do you still have that laser pointer up there with you?

A.   No.

Q.   Here you go.  Could you just turn on that laser pointer and aim it at the screen, please?  Okay, just keep it on the screen for a minute.  Is it fair to say that laser site on the laser beam on the gun was similar to that that created a dot at the target?

A.   I wouldn't know.  It was never used.

Q.   You never used that?

A.   No.

Q.   Okay.  Mr. Folks, how's it feel to take a loaded gun, point it at another human being, and pull the trigger?

         MR. ARAVIND:  Objection, your Honor.

         THE COURT:  Overruled.

A.   Could you repeat that again?

Q.   How does it feel to take a loaded weapon, point it at another human being, and pull the trigger?

A.   It's a lot of feelings.

         Sometimes, sometimes I feel good about it, sometimes I be confused, sometimes I wouldn't even want to do it.

BY MR. MIEDEL:

Q. Sometimes you feel good about it?

A. Yes.

Q. It feels good to pull the trigger and shoot at another human being?

A. At a time.

Q. When was the very first time that you took a loaded gun and shot at another human being?

A. At Maria Lo.

Q. That was back in 2008, 2009, right?  Or 2009?

A. I don't remember the exact year.

Q. Around when you were 16?

A. Yes.

Q. A lot of things happened to you when you were 16, right?

A. A lot of things.

Q. And that was the time that you went over there and that's when you had the .44, right?

A. Yes.

Q. The one you got from Mud?

A. Yes.

Q. And that's how got your name, because you had that .44 and you shot at people, right?

A. Yes, shot it at one person.

Q. That .44 is a big gun, correct?

A. Yes.

CA43MER2                    Folks - cross - Mr. Miedel

Q. Now, you fired that gun you said, what, four times?

A. Yes.

Q. You were aiming it at another person, right?  Another human being?

A. Yes.

Q. How far away were you from the person you were shooting at?

A. Like a half a block away.

Q. There were other people around, right, on the street?

A. There was nobody.  It was late at night, real late.

Q. He was the one single person?

A. Yes.

Q. How many of you were there?

A. A lot.

Q. Like, can you give me an estimate?

A. Like 15.

Q. So there were 15 of you, right?  That's what you just said?

A. Yes.

Q. You were not the only one who had a gun, correct?

A. Yes, I was.

Q. You were the only one in that entire group that had a gun?

A. Yes.

Q. They picked you to fire at this guy, right?

A. I chose myself.

Q. You chose yourself?

A. Yes.

CA43MER2                    Folks – cross – Mr. Miedel

Q. Okay. All 15 of you were there, and there was one single person over from Maria Lopez, right?

A. Yes.

Q. And was that a YG?

A. Yes.

Q. You took that gun and you aimed it at that person and you fired it, right?

A. Yes.

Q. Not once, right?

A. Yes.

Q. Not twice, right? Four times?

A. Yes.

Q. Did you feel bad about doing that?

A. No.

Q. It felt good?

A. Yes.

Q. It gave you a sense of power?

A. At the time.

Q. That's not the only time you shot at people at Maria Lopez, right?

A. One other time.

Q. Right. You went back again in April of 2011, right?

A. I don't remember the date.

Q. It was about a month before you got arrested for the gun, right?

CA43MER2                    Folks - cross - Mr. Miedel

A.   I wouldn't say a month.  Probably a couple of months.  I'm not sure.  It was 2011 though.

Q.   Okay.  You got arrested in May of 2011, right?

A.   Yes.

Q.   And it was either a month or two before that, right?  Some time in 2011?

A.   I'm not sure how many months it was.  It was some time in 2011.

Q.   All right.  This time what kind of gun did you have?

A.   A .380.

Q.   How many of you were there this time?

A.   Five.

Q.   And how many people were you shooting at?

A.   A couple.

Q.   When you say "a couple," what do you mean?

A.   It was like five people.

Q.   What time of day was it?

A.   Like three, four in the afternoon.

Q.   Three, four in the afternoon?

A.   Yes.

Q.   It was light out?

A.   Yes.

Q.   There were people walking around on the street, right?

A.   Yes.

Q.   There are cars driving down the road?

A.   Yes.

Q.   People pushing their strollers, right?

A.   Yes.

Q.   There are little kids on the street, right?

A.   Yes.

Q.   How many shots did you fire that time?

A.   Like eight.

Q.   Eight shots?

A.   Yes.

Q.   In the afternoon?

A.   Yes.

Q.   You didn't care who you hit, did you?

A.   I cared.

Q.   Really?

A.   Yes.

Q.   How did you care who you hit?

A.   Because I was shooting at a certain direction.

Q.   How far away were you from the people you were shooting at?

A.   Across the street.

Q.   Across the street?

A.   Yes.

Q.   So you were on one sidewalk on -- what was the street?
Morris?

A.   Yes.

Q.   And you shot across the way to the other sidewalk on the

other side of Morris?

A. Yes.

Q. Okay. Cars driving by, right?

A. Not up that -- where -- where it happened at is cars only go up the block, and there wasn't none.

Q. But you said -- but it was in the afternoon, there are lots of people around, and you fired across an entire street, right?

A. Yes.

Q. It wasn't like you were standing 2 feet away from the person you were shooting at. You were shooting 40, 50, 60 feet away?

A. I don't know how far away.

Q. Whatever the width of the street is, right?

A. Yes.

Q. Did you feel bad about that shooting?

A. No.

Q. You felt good about it, right?

A. Yeah.

Q. You testified yesterday about the shooting that took place a couple days after T-Money died, right?

A. Yes.

Q. And that one you shot at String Bean?

A. T.

Q. I'm sorry. You shot at T, right after he walked past you, after he ran past you, right?

CA43MER2                          Folks – cross – Mr. Miedel

A.   Yes.

Q.   You tried to shoot him in the back?

A.   Yes.

Q.   When you had the .40, right?

A.   Yes.

Q.   The one with the laser?

A.   Yes.

Q.   You weren't using the laser?

A.   No.

Q.   So, about a month or two, or after you did the second shooting at Maria Lopez, on the day you got arrested, you shot your gun again, right?

A.   Repeat that question?

Q.   On the day you got arrested for the gun, May 21, 2011, that's the day you got arrested, right?

A.   The 20th or the 21st.

Q.   Okay.  That day, you shot at another person, right?

A.   Yes.

Q.   So, you were on a party bus, right?

A.   Yes.

Q.   You were drunk and you were high, correct?

A.   Yes.

Q.   You ended up with a gun, right?

A.   Yes.

Q.   What gun was it?

CA43MER2                    Folks – cross – Mr. Miedel

A.   A .40.

Q.   Different .40 than the one you used to shoot at T, right?

A.   Yes.

Q.   And you're walking around, and you heard shots, and so you just popped off, right?

A.   Yes.

Q.   You just started firing?

A.   Yes.

Q.   At a person?

A.   Yes.

Q.   You didn't know who it was, right?  Not until later, right?

A.   Yes.

Q.   At the time that you shot, you didn't know who you were shooting at, right?

A.   No.

Q.   It could have been anybody, right?

A.   Yes.

Q.   Turns out it was your friend, right?

A.   Yes.

Q.   You didn't care, did you?

A.   I did not know.

Q.   Well, at the time you were shooting, you didn't care who you were shooting at, correct?

A.   Yes.

Q.   By the way, the first time you went to Maria Lopez to shoot

your .44, right?

A.  Yes.

Q.  Remember that?  Earl Pierce wasn't there, right?

A.  I'm not sure.

Q.  You were with a bunch of young kids, right?  You were 16?

A.  It was all ages.

Q.  Okay.  You said there were 15 people there, right?

A.  Approximately.

Q.  Okay.  And you don't remember all the people there, right?

A.  No.

Q.  Now, earlier today you told us a little bit more about the times you've been arrested, correct?  You remember that?

A.  Yes.

        MR. MIEDEL:  Sorry.  Just one moment, your Honor.

        THE COURT:  Take your time.

Q.  In 2009, so, three years ago, you were, what, 16, 17, 16?

A.  Yes.

Q.  Okay.  You were arrested on 161, right?

A.  I'm not sure.

Q.  Remember being with a bunch of people in the food court?

A.  Yes.

Q.  Okay.  And you guys were causing a big -- I guess were causing some trouble, and you all got arrested?

A.  Yes.

Q.  Okay.  A bunch of you were arrested that day and charged

with like riot or something; you remember that?

A.   Yes.

Q.   Another bunch of people were arrested with you, correct?

A.   Yes.

Q.   For example, Aubrey Pemberton was arrested with you, right?

A.   I'm not sure.

Q.   You don't remember if he was there?

A.   Uh-uh.

THE COURT:  The court reporter can only take a yes or a no answer.  So what is your answer to the last question?

THE WITNESS:  No.

THE COURT:  Thank you.

Q.   I'm going to show you something that is marked for identification as 3532-C.  Just take a look at that.

Mr. Folks, is it fair to say that's a police report of the time you were arrested?

A.   Yes.

Q.   Can you take a look at the second page and the names of people that were arrested and see if that refreshes your recollection?

MR. ARAVIND:  Objection.

Q.   As to whether -- of who some of the people were that you were arrested with?

MR. ARAVIND:  Objection, your Honor.

THE COURT:  Overruled.

MR. ARAVIND:  Your Honor, the defendant said -- the witness said he didn't know.  Not that he didn't remember.

THE COURT:  No.  He said he didn't remember. Overruled.

Q.  After having looked at that, does it refresh your recollection that Aubrey Pemberton was arrested with you?

A.  Yes.

Q.  And Hassan Brito?

A.  Yes.

Q.  Dante Barber?

A.  Yes.

Q.  Okay.  Earl Pierce wasn't arrested with you, right?

A.  No.

Q.  Those people that you were arrested with that day, those were all GFC people, right?  Or many of them at least?

A.  If -- some of them, yeah.

Q.  Earl Pierce wasn't GFC, right?

A.  No.

Q.  All right.  So then, remember testifying yesterday?  You remember that, right?

A.  Yes.

Q.  You sat in that stand yesterday, okay.  You remember being asked this question and giving this answer:

"Q.  Did you ever get arrested for committing a robbery?

"A.  No."

And then being asked again:

"Q. Mr. Folks, were you ever arrested for any type of robberies or stealing any items when you were younger?

"A. No."

Do you remember those questions or giving those answers yesterday?

THE COURT: Would you provide a page and line number, please.

MR. MIEDEL: I'm sorry. It's page 608.

THE COURT: Line number?

MR. MIEDEL: Five through six, and 21 through 23.

Q. Remember being asked those questions and giving those answers?

A. Yes.

Q. That wasn't true, right?

A. The question -- you asked me was I convicted, right? Repeat it?

Q. I'll repeat it. You were asked twice by Mr. Aravind yesterday, Mr. Folks.

"Q. Did you ever get arrested for committing a robbery?" And you answered "no" twice. You remember that?

A. I don't remember.

Q. Let me show you what I'll mark as for identification as page number 608 of the transcript.

MR. MIEDEL: Is that okay, your Honor?

THE COURT:  Just show him a page of the transcript. You don't have to mark it as anything.

MR. MIEDEL:  All right.

THE COURT:  Okay.

Q.  Just take a look at those highlighted sections on that page.  Do you remember now being asked those questions and giving those answers?

A.  Yes, I see it.

Q.  Do you remember that now?

A.  Yeah.

Q.  That wasn't true, right?  Because you were in fact arrested for robbery, correct?

A.  Yes.

Q.  You got arrested for robbery when somebody told the police that you and another guy pretended to have a gun and took, what, their cell phone, right?

A.  Attempted to take it.

Q.  Tried to take the cell phone.  Charged with robbery, right?

A.  Attempted robbery, yes.

Q.  Attempted robbery.  You are still going to court on that case, right?

A.  I was supposed to go to trial before this federal case.  I ain't hear nothing about it.

Q.  That day when you got arrested for that attempted robbery and you were with a bunch of people, right, and one of those

CA43MER2                    Folks - cross - Mr. Miedel

other people was Walter Aponte, right, Walt?

A.  I don't remember.

Q.  Are you telling us that you were falsely accused?  You are an innocent man of that?

A.  Yes.  The description was a black man --

Q.  Mr. Folks --

A.  Yes.

        MR. ARAVIND:  If he could just answer the question that's asked to him.

        MR. MIEDEL:  It was non-responsive, your Honor.

        THE COURT:  It's cross-examination.  I'm overruling the objection.  Put a question to the witness.

        MR. MIEDEL:  Thank you.

Q.  In April of 2011, you were arrested for slashing somebody in the face, right?

A.  Yes, that's what was said.

Q.  And you were arrested, charged, indicted, for cutting somebody in the face with, what, a box cutter?

A.  They just said cut in the face.

Q.  Okay.  The person required 50 stitches on their face, right?

A.  I don't know.

Q.  That person picked you out and said you were the one who did it to him, right?

A.  I don't remember that.  All I remember is coming out the

CA43MER2                    Folks – cross – Mr. Miedel

booking from -- I don't know what I was in book for, I don't remember.  They said I have a warrant, I have to wait for somebody else to pick me up.  They picked me up and took me into a room and said the case was dismissed.  I don't know nothing about it.  They asked me if I did it, I told them I didn't.  And that's it.  It was dismissed.  I didn't see no judge for it or nothing.

Q.  Are you saying the slashing has been dismissed?

A.  Yes.

Q.  So you said that you were charged with slashing somebody in the face but you didn't do that, right?  That's what your testimony is?

A.  Yes.

Q.  You used to carry a box cutter with you everyday, right?

A.  Yeah, yes.

Q.  A box cutter is an instrument that has a razor blade on it, right?

A.  Yes.

Q.  It's used for cutting?

A.  Yes.

Q.  And slashing, right?

A.  Yes.

Q.  In fact, you got arrested for carrying a box cutter one time, right?

A.  Yes.

CA43MER2                        Folks – cross – Mr. Miedel

Q.   When you didn't have a box cutter with you, you carried a
kitchen knife with you, right?

A.   Yes.

Q.   A big kitchen knife?

A.   Small.

Q.   A small kitchen knife.  Used to cut apples with?

A.   Yes.

Q.   You were using it to cut apples?

A.   You said can it be used to cut apples.

Q.   What were you using it for?

A.   For protection.

Q.   I see.  In fact, you almost never left the house without
some sort of protection, right?

A.   Yes.

Q.   Either a box cutter or a knife or a gun, right?

A.   Yes.

Q.   You testified earlier today that you were also a Blood,
right?

A.   Yes.

Q.   And you said that you became a Blood when you were about
16, right?

A.   Yes.

Q.   And you were 16 in 2009, right?

A.   Yes.

Q.   You didn't meet T-Money until 2010, right?

A.  Yes.

Q.  So you were a Blood before you met T-Money, right?

A.  Yes.

Q.  And you had to fight your way into the Bloods, right?

A.  Yes.

Q.  So you said you fought some old dudes from Harlem; is that what you said?

A.  Yes.

Q.  Tell us about that.  What was that like?

A.  I had to fight a couple older dudes.  Once I would finish with that --

Q.  How old?

A.  I'm not sure.

Q.  Like 25?

A.  Older 20s.

Q.  Older 20s?  Old dudes?

A.  Yeah.

Q.  You had to beat them up basically in order to get in, right?

A.  I had to just protect myself.  Not just sit there and get beat on.

Q.  Okay.  Did you have to rob people or anything like that in order to get in the Bloods?

A.  No.

Q.  Now, you got arrested in May of 2011 for the gun, right?

CA43MER2                       Folks - cross - Mr. Miedel

A.  Yes.

Q.  And starting that day, you were at Rikers Island, right?

A.  Yes.

Q.  And when did you come over from Rikers Island to federal custody?

A.  I'm not sure.

Q.  Well --

A.  When I came to stay was after my 19th birthday.

Q.  I'm sorry.  Can you say that again?

A.  Once I turned 19, I think it was the next day or two days after that, either the 31st or the 1st, in between.

Q.  Of -- when is your birthday?

A.  May 30.

Q.  Okay.  So May 30 of this year, a day or two after that you came into federal custody.  Is that what you are saying?

A.  Yes.

Q.  From May of 2011 until May of 2012, you were at Rikers Island?

A.  Yes.

Q.  You said that you got in a lot of fights there, right?

A.  Not a lot.  A couple.

Q.  A couple?

A.  Just a couple.  Two, one, two.  A couple.

        MR. MIEDEL:  One moment, your Honor.

Q.  Do you remember meeting with prosecutors just a couple of

CA43MER2                      Folks - cross - Mr. Miedel

days before the trial started last week?

A. Yes.

Q. Remember they asked you about the fights that you got into at Rikers Island?

A. Yes.

Q. Remember telling them that you got into fights approximately seven times at Rikers Island?

A. Yeah. After that I told them I consider a fight when somebody hit you back.

Q. Oh, so, you don't count when you just hit them and they don't hit back?

A. Yes.

Q. Okay. You told us this morning that you had ordered -- you ordered this guy Bobby, right?

A. Yes.

Q. To be beaten up by a guy named Gun Play, right?

A. Yes.

Q. Bobby was sort of your friend for a while, right?

A. Yes.

Q. Even though he was YG, you let him live with you because you like him, right?

A. Yes.

Q. You had no trouble ordering Gun Play to beat him up, right?

A. Nah.

Q. To assault him?

CA43MER2                      Folks - cross - Mr. Miedel

A.   No.

Q.   Did he get injured?

A.   No.

Q.   You also assaulted somebody in the visiting area, right?

A.   Yes.

Q.   Visiting area at Rikers Island, that's where family members and friends go to see people who are locked up at Rikers?

A.   Yes.  But where it happened at is when you're done with the visits, where you change your clothes back on to leave.

Q.   Did you get arrested for that?

A.   No.

Q.   Did you get arrested for an assault at Rikers Island?

A.   Yes.

Q.   Tell us about that.

A.   Some kid said I broke his jaw.

Q.   Was the kid lying?

A.   Yes.

Q.   So, you got arrested for an attempted robbery, but you said that wasn't you, right?

A.   Yes.

Q.   You got arrested for a slashing, you said that wasn't you?

A.   Yes.

Q.   And you got arrested for breaking some kid's jaw in Rikers Island and you said that wasn't you?

A.   Yes.

Q.  People get into fights -- fights are fairly common at Rikers Island, right?

A.  Yes.

Q.  In fact, you alone got in a bunch of time fights over time, right?

A.  A couple fights.

Q.  A couple of fights, not including the ones where they didn't fight back, right?

A.  Yes.

Q.  Normally people don't get arrested and charged with felony assault if they get into a fight at Rikers Island, right?

A.  Yes, they do.

Q.  It's not a common practice.  Not every time they get in a fight, they get charged by the Bronx DA's office with a crime, in your knowledge?

        MR. ARAVIND:  Objection, your Honor.

        THE COURT:  Overruled.  If he knows.

Q.  Right?

A.  Repeat that question?

Q.  To your knowledge, not every single time somebody gets into a fight at Rikers Island do they get charged with felony assault by the DA's office.  Right?

A.  Only if it's serious.

Q.  You got charged by the DA's office, right?

A.  Yes.

THE COURT:  Mr. Miedel, is this an appropriate place to take a short recess?

MR. MIEDEL:  Perfect.

THE COURT:  Members of the jury, we're going to take a short recess.  Keep an open mind, come to no conclusions, don't discuss the case.  We'll be back in a few minutes and we'll continue to 1 o'clock and take our luncheon recess.  Please recess the jury.  Everyone remain seated.

(Jury excused)

(Continued on next page)

CA43MER2

THE COURT:  The marshals may escort Mr. Folks out.

(Witness not present)

THE COURT:  Are there any issues that counsel wish to raise?

MR. MIEDEL:  Your Honor, I just have a procedural point.  At a certain point during my cross-examination, I'm going to ask if it's okay with the Court to have my paralegal come in to operate the video for about 10 minutes or so.  And the government's paralegal has agreed to switch places with her for that period of time.  So if it's okay with you, if she can come in that period of time and remain sitting there or go back out.

THE COURT:  Any --

MR. FEE:  We think it's a poor choice, but we have no problem with it, of course.

THE COURT:  I'm sure that the government will respond to any specific direction you have if you want.

MR. MIEDEL:  I know, but I've already worked with her on the points of the video so --

THE COURT:  All right.  Does the government consent to --

MR. ARAVIND:  Yes, your Honor.

THE COURT:  Okay.  The defendants may be escorted from the courtroom.  Everyone is to remain seated.

We'll reconvene in 10 minutes.

CA43MER2

(Recess)

(In open court; jury not present)

MR. ARAVIND:  Your Honor, there may be one issue to raise before the jury enters.

THE COURT:  What's that?

MR. ARAVIND:  Defense counsel has indicated to us that they intend to play certain of the prison calls that we referenced in the direct examination from when Mr. Folks was in Rikers.  Our view is that's plainly excluded under Rule 608(b) which prohibits the use of extrinsic evidence to prove specific acts of conduct.  So it is the government's position that those calls should not be played.  Certainly defense counsel can cross-examine Mr. Folks about those specific acts.  But, we would certainly advocate strongly against playing those calls in open court.

THE COURT:  What's entailed in these calls?  What's described?

MR. ARAVIND:  Your Honor, what Mr. Folks testified to is that he committed certain acts, crimes, while he was in jail.  He attempted to smuggle drugs, marijuana, into the jail, and he also assaulted individuals including a gang assault.

So, your Honor, we would strongly oppose playing those calls.  Certainly defense counsel can inquire of Mr. Folks -- who, as I note for the record, is now present.

MR. DINNERSTEIN:  Your Honor, may we address this at

CA43MER2

another time when Mr. Folks isn't here?

THE COURT:  Well, I'm going to bring the jury out and we're going to proceed.

MR. MIEDEL:  It's not going to be happening before lunch.

THE COURT:  Okay.  Good.

(Continued on next page)

(Jury present)

THE COURT:  Members of the jury, we'll resume now with Mr. Miedel's continued cross-examination of Mr. Folks.  You may proceed, Mr. Miedel.

MR. MIEDEL:  Thank you.

BY MR. MIEDEL:

Q.  How old were you when you started selling drugs?

A.  I think I was 16.

Q.  Same year, 16, right?

A.  Hmm-hmm.

Q.  Is that a yes?

A.  Yes, yes.

Q.  You started selling drugs because you wanted to buy sneakers, right?

A.  Yes, I wanted to have my own money and provide for myself.

Q.  To -- I'm sorry.  To buy sneakers, right?

A.  Provide for myself, provide for my little sister.

Q.  Mr. Folks, was one of the reasons you sold drugs because, specifically, you wanted to have sneakers?

A.  No.

Q.  "No"?  That's your answer?

A.  I don't remember saying -- I don't remember that.

Q.  Okay.  Let's go back to that same time that you met with the prosecutors and the agents in the room in this building. You remember in the summer, this past summer, in July 1 of

CA43MER2                     Folks – cross – Mr. Miedel

those times that you met with them, okay?  Do you remember

telling the prosecutors at that time that you started selling

drugs because you wanted sneakers?

A.  I don't remember.

Q.  You don't remember that?

A.  No.

Q.  In your drug dealing, you always worked essentially for

people, right?

A.  Yes.

Q.  You never had enough money to run your own business,

correct?

A.  Nah.  No.

Q.  So first you sold for a guy named Weezey, right?

A.  Yes.

Q.  And that was like a job, right?  You worked for him?

A.  Yes.

Q.  Okay.  He gave you the drugs, you sold them, you gave him

the money, and he gave you a cut.  Is that fair?

A.  Yes.

Q.  After Weezey got arrested, then you started selling for

Satan, right?

A.  Yes.

Q.  Same deal; you work for him?

A.  Yes.

Q.  So, he gave you the drugs, you sold them, you gave him the

CA43MER2                    Folks – cross – Mr. Miedel

money, he gave you a cut, right?

A.  Yes.

Q.  You weren't in gangs with those guys, right?

A.  No.

Q.  You were just working with them?

A.  Yes.

Q.  Then, then you sold for T-Money, right?

A.  Yes.

Q.  Same deal, right?

A.  Yes.

Q.  But you also had a personal relationship with T-Money, is that right?

A.  Yes.

Q.  You were very close, correct?

A.  Yes.

Q.  He was like a father or a big brother to you?

A.  Yes.

Q.  Your relationship was based on the fact that you were close, right?  You weren't in a gang together, right?

A.  Yes, we was.

Q.  Well, but you were close.  He was like a father figure to you, right?

A.  Yes.

Q.  That's what you cared about him?

A.  Yes.

CA43MER2                    Folks – cross – Mr. Miedel

Q.  You did things that he asked you to do because you cared

about him, right?

A.  I sold drugs, yeah.

Q.  I'm sorry?

A.  I sold drugs for him.

Q.  You did that because, in part, because you cared about what

he thought of you, right?

A.  Yeah.

Q.  And you liked him?

A.  I did that for me.  Whatever I –- our relationship was

really, it ain't have nothing to do with me selling drugs for

him.

Q.  The relationship, none of that had to do with you selling

drugs; that was purely for you to make money, right?

A.  Yes.

Q.  Okay.  You were selling drugs for T–Money out on Courtlandt

Avenue, right?

A.  Yes.

Q.  And around the area, right?

A.  Yes.

Q.  And you said that there were other people out there selling

drugs also, right?

A.  Yes.

Q.  And selling drugs for T–Money, you said, right?

A.  Yes.

CA43MER2                    Folks – cross – Mr. Miedel

Q.  But, you never worked with Ski Box, right?

A.  Nah.  We hustled together.

Q.  You never worked with him?

A.  No.

Q.  Now, in addition to T-Money and Weezey and Satan, you also had a drug thing going with your aunt and uncle, right?

A.  Nah.

Q.  Doesn't ring a bell?

A.  Nah.

Q.  Do you remember getting drugs from your aunt and taking them up to Binghamton with your uncle?

A.  Say that again?

Q.  Do you remember getting drugs from your aunt and taking them to Upstate New York and selling them up there?

A.  No.

Q.  That doesn't ring a bell?

A.  No.

Q.  You considered yourself to be, as you testified many times, a member of GFC, right?

A.  Yes.

Q.  And Aubrey Pemberton was GFC, right?

A.  Yes.

Q.  Hassan Brito, that's, what, 12 or 13?

A.  Yes.

Q.  Which one is it?

A.  12.

Q.  12, okay.  And 13 is his brother?

A.  Yes.

Q.  What does GFC stand for?

A.  God Favorite Child.

Q.  God's Favorite Child?

A.  Yeah.  God's Favorite Children, same thing.

Q.  Did you ever hear the term "Goonies From Courtlandt"?

A.  People used to say different things, but that wasn't really the meaning.

Q.  You were all around the same age, right?  You were all like 18, 19, 20 when you were in GFC or earlier.  You were younger too, right?

A.  Yes.

Q.  And you said that you have a tattoo of GFC?

A.  Yes.

Q.  Earl Pierce wasn't GFC, right?

A.  No.

Q.  He didn't hang out with you guys on a regular basis, right?

A.  Yeah.

Q.  He lived in 681, right?

A.  Yes, yes.

Q.  Lived right on Courtlandt?

A.  Yes.

Q.  He's older, from a different generation, right?

CA43MER2                       Folks - cross - Mr. Miedel

A.   Yes.

Q.   Do you have an aunt who lives in Atlanta?

A.   No.

Q.   Do you have an aunt named Boo Boo?

A.   No.

Q.   Okay.  You have a lawyer, right?

A.   Yes.

Q.   His name is Avi Moskowitz?

A.   Yes.

Q.   Do you like him?

A.   Yes.

Q.   You trust him?

          MR. ARAVIND:  Objection, your Honor.

          THE COURT:  Sustained.

Q.   Well, Mr. Folks, you made a very, very, very big decision
in this case, right?  You made the decision to plead guilty?

A.   Yes.

Q.   You made the decision to plead guilty pursuant to a
cooperation agreement with the government, right?

A.   Yes.

Q.   Who helped you make that decision?

          MR. ARAVIND:  Objection.

A.   Me.

          THE COURT:  Overruled.

Q.   Who?

A.  Myself.

Q.  And your lawyer, right?

A.  It was up to me to think about what I was going to do.

Q.  Right.  But your lawyer gave you advice about how this whole proceeding worked, right?

MR. ARAVIND:  Objection, your Honor.

THE COURT:  Sustained.

MR. MIEDEL:  Can we approach for a second?

THE COURT:  No, it's not necessary.

Q.  You pled guilty pursuant to a cooperation agreement with the government, right?

A.  Yes.

Q.  And the charges that you pled guilty to, they have a mandatory minimum sentence of 60 years, right?

A.  Yes.

Q.  60 years in prison?

A.  Yes.

Q.  How old are you now?

A.  19.

Q.  So that means that would you get out of jail when you were 79 years old, right?

A.  Yes.

Q.  That's your understanding, right?

A.  Yes.

Q.  If you don't get this cooperation agreement, if this

CA43MER2                    Folks – cross – Mr. Miedel

cooperation agreement falls through, you're getting at least 60 years, right?  That's the least that the judge can give you, correct?

A.  Yes.

Q.  That's your understanding of it?

A.  Yes.

Q.  Which means that the best you could possibly hope for is you get out when you were almost 80 years old?

A.  No.

Q.  Assuming the cooperation agreement falls through.

A.  If it does not fall through.

Q.  If -- okay.  I know.  We'll get to that in a minute.

        If it does fall through and you don't get your cooperation agreement with the government, your understanding is that the best possible sentence you could hope for is 60 years, right?

A.  Yes, if it don't go through.

Q.  If it doesn't go through?

A.  Yes.

Q.  You saw that signing this cooperation agreement with the government was your only possible way out of getting at least 60 years, right?

A.  Yes.

Q.  The only way to get your life back?

A.  Yes.

CA43MER2                    Folks - cross - Mr. Miedel

Q.  The only way to see your family on the outside, right?

A.  Yes.

Q.  The only way to maybe have children someday, right?

A.  Yes.

Q.  When you decided to do this, to plead guilty pursuant to the cooperation agreement, you had some idea of what you thought you might get, right?  No promises, but you had some idea of what you might get if this went well, right?

A.  Just a lesser sentence.

Q.  What, 59 years would be okay with you?

A.  Just a lesser sentence.

Q.  You're telling us today, you're telling us that you had no sense whatsoever what your sentence might be less than 60 years?

A.  Just a lesser sentence.  That's all.

Q.  So, in your mind, right, the sentence could be 59 years, right?

A.  It's up to the judge.  It can be anything.

Q.  Right.  We understand that that's what your testimony is. My question to you is, in your own mind, what do you think you're going to get?

A.  I don't know.  I just hope to be home one day.

Q.  You just hope to be home one day?

A.  Yes.

Q.  Before you entered into a cooperation agreement with the

CA43MER2                    Folks - cross - Mr. Miedel

government, were you offered a different plea agreement at any time?

A. Can you be more specific?

Q. Did your lawyer ever talk to you about a different plea agreement?

        MR. ARAVIND: Objection, your Honor.

        THE COURT: Sustained as to form.

Q. Did you get --

        THE COURT: Don't inquire into the privilege.

        MR. MIEDEL: Okay.

Q. Were you offered a plea agreement to plead guilty to some number of reduced charges, for example, before you ever entered into the actual cooperation agreement?

A. I don't remember.

Q. That's not something you would remember?

A. I don't remember.

Q. You consider yourself to be an intelligent person?

A. I'm not the smartest person in the world; I'm not the dumbest.

Q. I guess, is it fair to say it doesn't take a brilliant person to plead guilty to -- you don't have to be brilliant to plead guilty to a mandatory minimum sentence of 60 years if you think you're only going to get a year or two off, right? Why would you do that?

A. Repeat that question again?

CA43MER2                    Folks - cross - Mr. Miedel

Q.  Why would you plead guilty to something that could get you a life sentence, right?  If you in your mind thought, well, best maybe I can get 59 years, I would be okay with that.

A.  I was hoping --

MR. ARAVIND:  Objection, your Honor.  It calls for speculation.

THE COURT:  Overruled.

A.  I was just hoping I would be home when I'm young still.

Q.  When you're young still?

A.  Yes.

Q.  So, you're hoping you would get home sometime before you turned 30, for example, right?

A.  Yes.

Q.  And you're 20, now, right?

A.  19.

Q.  Sorry, I should know that.  So that's 10 years, right?

A.  From 19 to 30.

Q.  12 years, right?

A.  It's 11 years.

Q.  11 years.  You're hoping to get 11 years or less, right?

A.  I'm hoping to get, yes, 11 or less.

Q.  11 or less?

A.  I'm just hoping to get anything below the minimum of 60 years.  Still be home when I'm young.

Q.  I know.  But you just said you considered -- you were

hoping to get a sentence that would get you out before you're 30, and that's 11 years, right?  You just said that?

A.   What I'm hoping for, I would want to go home.

Q.   Right now?

A.   ASAP.

Q.   ASAP.  You been locked up at the MCC since June 1st or so of this year, right, until you moved to GEO, correct?

A.   Around that time, yeah, one of those.

Q.   So let's break that down for a second.  MCC stands for what?

A.   Metropolitan Correctional Center.

Q.   What is that?

A.   A federal prison.

Q.   Where is it?

A.   Manhattan.

Q.   Right next door to the courthouse, right?

A.   Yes.

Q.   You were there from May 31 or June 1st until about 2 weeks ago, right?

A.   Yes.

Q.   So basically through the entire summer?

A.   Yes.

Q.   All right.  And you did not sign this cooperation agreement with the government until a couple of weeks ago, right?

A.   It's not true.

CA43MER2                    Folks - cross - Mr. Miedel

Q.  Well, you pled guilty to the charges, right?

A.  Yes.

Q.  And that guilty plea -- one second.  That guilty plea took place on September 13, right?

A.  Yes.

Q.  So, I guess three weeks ago?

A.  Yes.

Q.  And you signed that cooperation agreement right before the guilty plea, right?

A.  I signed the plea agreement before the guilty plea.

Q.  The cooperation agreement.

A.  Plea agreement.

Q.  Okay.  Fine.  Plea agreement.  It's fair to say that you did it sometime in September, right?

A.  Yes.

Q.  Okay.  So, you were at the MCC in June?

A.  Yes.

Q.  You were in MCC in July?

A.  Yes.

Q.  And August?

A.  Yes.

Q.  Okay.  And the MCC is filled with other federal prisoners, right?

A.  Yes.

Q.  People in the MCC talk, correct?

CA43MER2                    Folks - cross - Mr. Miedel

A.  Yes.

Q.  They talked about what kind of sentences people are getting, right?

A.  Speak about everything.

Q.  Everything.  Including what kind of sentences people are getting, right?

A.  Yes.

Q.  They talk about people who are going to trial, right?

A.  Yes.

Q.  They talk about people who are testifying at their trials as cooperators or snitches, as they're known in the street, right?

          MR. ARAVIND:  Objection, your Honor.

          THE COURT:  Overruled.

A.  Repeat that?

Q.  They talk about people who are testifying at those trials as cooperators, right?

A.  Yes.

Q.  Then, you see by people coming back from court, what kind of sentences people are getting, right?

A.  Yes.

Q.  So you had some -- you saw people who are coming back from court who are being sentenced in federal court, correct?

A.  Yes.

Q.  People who were cooperators, right?

CA43MER2                    Folks - cross - Mr. Miedel

A.   Yes, I seen.

Q.   You've seen it, right?

A.   Yes.

Q.   And the GEO?

A.   Yes.

Q.   That's a private jail in Queens, right?

A.   Yes.

Q.   There are a lot of cooperators in that jail, right?

A.   Yes.

Q.   Everyone knows that?

A.   Yes.

Q.   So, those people talk to you and you talk to them, correct?

A.   We don't discuss our cases.  I don't discuss my case with other people.

Q.   You don't discuss your case with anybody?

A.   No.

Q.   All right.  But other people discuss their cases with you, right?

A.   I don't pay attention.  I don't want to hear about nobody else case.  I tell them that right then and there.

Q.   At least at the MCC, people are talking about all kinds of things, including the sentence they are getting?

A.   People, yes.

Q.   You had a sense of what kind of sentences cooperators were getting, right?

A.  Yes.

Q.  And that gave you some sense of what you might get, right?

A.  Like I said, I didn't really pay attention to it.  A lot of -- everybody lies.  So they could have just been talking just to talk.

Q.  Well, it seems to me that -- let me ask you this.  Isn't it of great concern to you what you're going to get?

A.  Is it a concern?  Yes, it is a concern.

Q.  It's probably the most important thing that you can think about right now, right?

A.  Yeah.

Q.  Wouldn't it be something you would be interested in hearing, what other people got who went before you?

A.  I don't want to hear what other people say.  I'm not interested in what other people say.

Q.  You're not interested in that?

A.  Not interested.

Q.  Okay.  Who is Bernard Williams?

A.  My father.

Q.  Where is he now?

A.  MCC.

Q.  He's at the MCC?

A.  Yes.

        THE COURT:  Just get a little closer to the mike.

        MR. MIEDEL:  Sorry.

CA43MER2                    Folks - cross - Mr. Miedel

Q.  So he's a federal prisoner?

A.  Yes.

Q.  You were there with him, right?

A.  No.  We was in the same building.  We never was in the same unit.

Q.  You saw each other at certain times, didn't you?

A.  I saw him one time.  My whole life.

Q.  One time in your whole life?

A.  Yes.

Q.  When you saw him, did you talk about your case?

A.  No.

Q.  So, Mr. Aravind asked you a series of questions this morning about what your responsibility was as far as the cooperation agreement is concerned, right?

A.  Yes.

Q.  You kept saying, "I just have to tell the truth," right?

A.  Yes.

Q.  Who decides what the truth is?

A.  I mean, I -- I tell the truth.  It's up to them if they believe me or not.

Q.  Them right there?

A.  Yes.

Q.  Those three people, Mr. Aravind, Ms. Heller, Mr. Fee?

A.  Yes.

Q.  They decide what the truth is, right?  Whether they believe

you or not?

A.  Yes.

Q.  It's not the judge, correct?

A.  I feel it's everybody.  Everybody who's listening.

Q.  Who gets to decide whether you get your cooperation agreement?

A.  I think it is them.

Q.  It's them, right?

A.  Yes.

Q.  So even if, for example, you're telling the truth, but for some reason they don't believe you, you are out of luck, right?

A.  Yes.

Q.  Because they decide.  Right?

A.  Yes.

Q.  On the flip side, if you're lying but they happen to believe you, you get your agreement, right?

A.  Yes.

Q.  So in order for you to get your 5K letter, which is your ticket, right, your golden ticket, for you to get that letter, they have to believe you, right?

A.  That would be up to the judge.

Q.  No, no, no.  The question about whether they're going to write you a 5K letter depends on whether they believe you, right?

A.  Yes.

Q.  Okay.  Now, they approached you about becoming a cooperator, right?

A.  It was brought to my attention at a time.  At a point I denied it.

Q.  Sorry?

A.  I denied it.

Q.  But they approached you and they asked you if you wanted to become a cooperator?

A.  I don't exactly remember who asked me.

Q.  Somebody asked you?

A.  Somebody asked me.

Q.  All right.

A.  Somebody brought it to my attention.

Q.  That they wanted you to cooperate, correct?

A.  Yes.

Q.  That's because they needed you, right?

A.  I'm not sure, I don't know.

Q.  You started cooperating in May of 2012, right?

A.  I don't remember.

Q.  Well, the very first meeting you had with these prosecutors was on May 1st, 2012, isn't that right?

A.  I don't remember.

Q.  Would I be wrong if I told you that was the date?

A.  I can't say.

Q.  All right.  But, most of the people charged in this case,

including Mr. Pierce, they were arrested back in September of 2011, right?

A.  I don't remember when.  I wasn't on the streets.

Q.  But you've heard about it, didn't you?

A.  I just got arrested.  That's when I knew.  I don't remember the exact date of that.

Q.  You said you were GFC, right?

A.  Yes.

Q.  You claim that some of these other people here are GFC, right?

A.  Yes.

Q.  You were close with some of these people.  You were close with Aubrey Pemberton, right?

A.  Yes.

Q.  And you were close, you said, with Melvin Colon, right?

A.  Yes.

Q.  You heard about when these people got arrested, right?

A.  When I got arrested.

Q.  When did you get arrested?

A.  Days -- I'm not sure how many days afterwards, but after. I was already on the Island.  I was already on Rikers Island.

Q.  Let's go back.  You got arrested for the gun on May 31 of 2011, correct?

A.  Yes.

Q.  You got -- you were on the Island, Rikers Island, right?

A.  Yes.

Q.  And then at some point, a little bit after they got arrested, you got arrested by the Feds?

A.  Yes.

Q.  But you stayed at Rikers Island for a while?

A.  Yes, I was going back and forth to court.

Q.  Okay.  And at that point you knew that they had been arrested, right?

A.  Yes.

Q.  That was well before you started cooperating, right?

A.  Yes.

Q.  You knew what people were being charged with, right?

A.  Yes, later on I found out.

Q.  Okay.  You knew that Earl Pierce and Meregildo were charged with this shooting of T, right, on September 13, 2010?

A.  Yes.

Q.  Okay.  And once you started -- well, and you knew, you assumed, right, that the government believed them to be guilty, right?

A.  I ain't know what to think.

Q.  Well, the government arrested them, right?

A.  Yes.

Q.  Was it fair to say that you assumed that they believed they were guilty, right?

A.  I don't know what they believed.

BY MR. MIEDEL:

Q.  All right.  You also, when you were approached about cooperating, at some point became aware that the government was interested in charging Earl Pierce with the murder of Jason Correa?

A.  Repeat that?

Q.  I'm sorry, strike that.

    At some point after you started, when you started cooperating, you became aware that the government wanted to charge Earl Pierce with participating in the shooting that T-Money did that you were part of, right?

A.  I didn't know that was -- I don't know what was going to happen.

Q.  You didn't know he was going to shoot him, is that what you're saying?

A.  That's not, that's not the same question you just asked me.

Q.  When you say "I didn't know what was going to happen," what do you mean?

A.  From the question you just asked, did they think that he was guilty of shooting him.

Q.  Okay.  All right.  So on September 13th, 2012, about three, four weeks ago, you pled guilty, correct?

A.  Yes.

Q.  And you pled guilty in a courtroom, right?

A.  Yes.

CARZMER3                      Folks - cross - Mr. Miedel

Q.   And you were with your lawyer, right?

A.   Yes.

Q.   And the prosecutors, or at least some of them were there, right?

A.   Yes.

Q.   And Judge Pauley was there, right?

A.   Yes.

Q.   Do you remember that proceeding?

A.   Yes.

Q.   And the Judge asked you a lot of questions, right?

A.   Yes.

Q.   And after he asked you a lot of questions, there came a point when he asked you about what you were actually pleading guilty to, right?

A.   Yes.

Q.   And what you actually did to make you be guilty of these charges, right?

A.   Yes.

Q.   And your lawyer wrote out for you what you were supposed to say, right?

A.   Yes.

Q.   And you knew that you had to say certain things in order for the guilty plea to be accepted by the Judge, right?

A.   It was the charges.  At the time I didn't remember all the charges.

Q.  I understand.  But my question is, you knew that you had to say certain things that you did in order for the Judge to accept your guilty plea, right?

A.  Say what charges that I've committed.

Q.  Yes.  You had to say what you did?

A.  Yes.

Q.  Before the Judge could accept your guilty plea, right?

A.  Yes.

Q.  Okay.  And you also knew that the government had to accept what you said in court in order for you to get your cooperation agreement, right?

A.  Yes.

Q.  Because in order to get you a deal, you had to plead guilty, right?

A.  Yes.

Q.  And in order to plead, in order to plead guilty, you have to say or admit certain things that you did, right?

A.  Yes.

Q.  So it's very important what you said about those charges, correct?

A.  Yes.

Q.  At a certain point the Judge asked you about this murder, right, with T-Money?

A.  Yes.

Q.  And at that point when he asked you about that, you spoke,

CARZMER3                          Folks – cross – Mr. Miedel

you said the things that you said were not written down by the lawyer, right?

A.  Yes.

Q.  Right?

A.  Yes.

Q.  And among the things that you said when the Judge asked you about talking to him about what you did that day, you said, I didn't know what was going to take place, correct?

A.  Yes.

Q.  Because you had no idea that somebody was going to get shot, right?

A.  Yes.

Q.  And then do you remember when you said that the Judge asked you, do you remember this question.

        MR. MIEDEL:  And this is page 36 of the guilty plea, which is 3532Z, as in zebra.

        THE COURT:  Thank you.

Q.  Do you remember being asked this question by the Court: "With respect to the murder of Jason Correa, did you understand when you went into that building that T-Money had a firearm and that he was going to shoot Correa?"  And you answered, "No, for the reasons we were just on the avenue, it was right next to the precinct.  I didn't expect anyone to have a gun on them, period, in front of the cops."

        Do you remember saying that?

A.   Yes.

Q.   And at that point your lawyer took you aside, right?

A.   I don't remember.

Q.   I'm going to show you a page from the transcript, page 38, see if that refreshes your recollection.  I'm sorry, it's 36. Can you just take a look at that highlighted portion?  You see the part I just read?

A.   Yes.

Q.   And do you see what happens right after that?

A.   Yes.

Q.   Okay.  Do you remember your lawyer asked to speak with you for a minute, right?

A.   I see it, but I still don't remember.  I see it there.

Q.   All right.  Your lawyer talked to you for a minute, and then you went back to answering the questions for the Judge, right?

A.   Yes.

Q.   And you start talking about the incident again, right?

A.   Yes.

Q.   And you said, "I didn't know anything was going to happen," again; right?

A.   I'm not sure.

Q.   All right.  Let me show you the page again, see if it refreshes your recollection.  The bottom of the page.

A.   I see what you're saying.

CARZMER3                    Folks - cross - Mr. Miedel

Q.  And so at that point you had another discussion with your lawyer off the record, do you remember that?

A.  I remember speaking to him a couple of times.

Q.  You spoke to him five times during that guilty plea; you remember that.

A.  I remember speaking to him a few times.

Q.  And the reason that you had those discussions is because you weren't saying the things that you needed to say to get the guilty plea, right?

MR. ARAVIND:  Objection, your Honor.

THE COURT:  Overruled.

A.  I wasn't being real specific.

Q.  Well, when you said "I didn't know he had a gun, I didn't know it was going to take place," that's not being specific? That's being very specific, correct?

A.  That was the truth.  I ain't know.

Q.  That was the truth, right?

A.  Yeah.

Q.  You didn't know and you didn't know if he had a gun, you didn't know what was going to take place, correct?

A.  Yes.

Q.  But that wasn't good enough to get your guilty plea, right? That's why your lawyer took you aside every time, right?

MR. ARAVIND:  Objection, your Honor.

THE COURT:  Sustained.

Q.  So following that -- now we're on page 37 -- you talk about this conversation that between Earl Pierce and T-Money, right? And you said, I didn't have no understanding --

MR. ARAVIND:  Objection, your Honor.  We would object to him reading parts of the plea transcript into the record.

Q.  Is it true that you --

THE COURT:  Yes, sustained.

MR. MIEDEL:  Okay I'm rephrasing, your Honor.

Q.  Is it true that you said, "I didn't have no understanding of it?"

MR. ARAVIND:  Objection, your Honor.

THE COURT:  Sustained.

Q.  And following one of your several discussions with your lawyer off the record, did you then subsequently say, "I understood what they were saying;" remember that?

A.  I don't remember.

Q.  You want to take a look at page 37, see if it refreshes your recollection?

(Handing)

Q.  Remember saying that?

A.  I see what it says, but I still don't remember.

Q.  I'm sorry.

A.  I see what it say on the paper, but I don't remember.

Q.  After several discussions with your lawyer, you finally -- is it true that you finally said that you did understand that

something bad was going to happen; right?

A.   Yes.

Q.   Okay.  You didn't say that the first time you were asked about it, correct?

A.   No, no.

Q.   Or the second or third or fourth.  You said it after the fifth discussion with your lawyer, right?

A.   I don't know after how many discussions.

Q.   But several discussions, you said earlier, right?

A.   Yes.

Q.   And you understood, it was your understanding that there are certain things you had to say in order for the Judge to get you to accept your guilty plea, right?

MR. ARAVIND:  Objection, your Honor, asked and answered.

THE COURT:  Yes, sustained.

MR. MIEDEL:  Your Honor I don't know what your plans are for lunch, but this would be a good breaking point if --

THE COURT:  Fine.

Members of the jury, we're going to take our luncheon recess now.  Keep an open mind, come to no conclusions, please don't discuss the case among yourselves or with anyone else. We're going to resume at 2:00 o'clock.  Have a good lunch.

Please recess the jury.  Everyone is to remain seated in the courtroom.

CARZMER3                         Folks – cross – Mr. Miedel

THE DEPUTY CLERK:  Come to order, jury exiting.

(In open court; jury not present)

THE COURT:  Mr. Folks may be escorted from the courtroom.

Are there issues that counsel wish to raise?

MR. BECKER:  If I may, your Honor.  Before Mr. Folks resumes his testimony, Mr. Aravind moved to exclude from evidence the playing of a CD Rom that contains phone calls that Mr. Folks made from Rikers Island, on the grounds that it was not admissible I think pursuant to Rule 608 of Rules of Evidence, and I'd like to be heard on that.  And I don't know if the Court wants to hear it now or after lunch or whatever the Court pleases, but I would like to be heard on that.

THE COURT:  All right, I'll hear you now.

MR. BECKER:  Thank you.

Your Honor, to put this in context, you may recall the other day I raised the issue of a CD Rom being turned over to the government to us containing statements by Mr. Folks, and I wasn't clear whether it was Giglio material or 3500 material. And your Honor directed the parties to confer about it, and we did, and the government confirmed that it was Giglio material. And it is Mr. Folks committing crimes on the telephones at Rikers Island discussing trying to smuggle drugs into the prison and other things.

And the defense would like to present this Giglio

material in it's clearest form, which is the playing of the recordings so the jury can actually hear the evidence.

THE COURT:  Why do the defendants want to bring these prison calls in?

MR. BECKER:  Because they impeach him, and that's why it's Giglio material.  They show that even after he's been arrested, he is continuing to commit crimes; even after he's been arrested, that he is incorrigible.

THE COURT:  But isn't that prohibited under 606(b)?

MR. BECKER:  Well, I'm not moving for admission under 608.  I believe that it is admissible under a variety of other rule of evidence, which I'll cite to the Court.  It is, it was certainly statements against his penal interest.  They're not exceptions to the hearsay rule.  They're statements against his penal interest.  They are subjecting him to criminal liability.  He's a witness and he's stated them.

THE COURT:  He's admitted it.

MR. BECKER:  I understand.  And his statements that he made are against penal interest.  They are also are admissions --

THE COURT:  He's admitted it on the stand.

MR. BECKER:  I understand.  The government is entitled to present the evidence of his crimes its way and, respectfully, I think the defendants are entitled to present evidence of his crimes in what we think is a more complete way,

and a more instructive way and more probative way.

THE COURT:  How does that extrinsic evidence bear on his credibility?

MR. BECKER:  Well, the Government has provided it as Giglio material, so they presumably agree that it bears on credibility.  But -- and I agree that it bears on his credibility.  Because this is a guy who is on this witness stand and is telling the jury implicitly, and perhaps explicitly maybe on redirect, that he has now signed an agreement with the government and he has found his way and he's being truthful and he's not going to commit any more crimes, he's going to do all the right things, your Honor.  And yet when he was arrested and put in jail and promised that he wouldn't commit any more crimes, he went about committing more crimes.  And the Government elicited it.  And so even if it would have otherwise been not permitted, they certainly opened the door to it.  He didn't -- I think we could all agree clearest evidence of his criminal conduct is his own words.  It was his words that constituted the crime.

MR. DINNERSTEIN:  Your Honor, may I interject on this point?  I think, your Honor, the reason that it does get in is because the best evidence is his words; it is what he said.

The government, during their presentation of this, tried to sanitize it.  When you listen to what is on the CD, it creates an impression of Mr. Folks different from the

impression that the government wished to create.  So I think, your Honor, that as to the best evidence we should be able to play the tape, and I think that's really what it comes down to. The reason the government is so vehement about trying to keep this out is because the way he behaved on that tape is quite different from the way he behaved on the witness stand.

So I think, your Honor, for the jury to have a full picture of who Mr. Folks is, they need to hear the tape.

MR. ARAVIND:  Your Honor, the reason why the government is so vehement about this point is because it is plainly prohibited by Rule 608(b), which says, except for criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness conduct in order to attack or support the witness' character for truthfulness.  But the Court may, on cross-examination, allow them to be inquired if they are probative of the character for truthfulness or untruthfulness of the witness.

Your Honor, this rule speaks clearly to this.  These defense lawyers can ask whatever they, the questions they want to about those crimes that Mr. Folks committed while he was in Rikers.  And let me just make clear, that he committed those crimes in 2011 before he was charged in federal case, but -- sorry -- before he started cooperating in the federal case.

Your Honor, the rules clearly speaks to this issue, extrinsic evidence is prohibited and the government stands by

its earlier view these calls should not be played.

MR. BECKER: Your Honor, respectfully, extrinsic evidence rule as Mr. Aravind referring to is at least sought to introduce, for example, prison records from Rikers Island confirming that he had engaged in this conduct. What we're seeking to offer for the jury is it's not extrinsic evidence of the conduct. It is the conduct, the conduct itself is what we want to present to the jury. It's not extrinsic, your Honor. It's the evidence.

Furthermore, Rule 608 does not trump the best evidence rule. This is the best evidence of, essentially, what we're seeking to prove, nor does it trump the other Rules of Evidence that I cited to the Court. It is a party admission. It is evidence offered by one party against another, and it is considered a party admission your Honor under Rule 801(d)(2)(b) which says that a party admission is when the statement is offered against the party and is, B, a statement of which the party has manifested an adoption or belief it's true.

So the government is the adverse party and they have manifested an adoption or belief in its truth, and we are offering it.

And it is also, as I said, your Honor most clearly, a statement against penal interest. We're not trying to offer extrinsic evidence of this statement. We're trying to offer the statement.

MR. ARAVIND:  Your Honor, Mr. Folks is not on trial in this case.  And the reason why we have Rule 608(b) is precisely for these scenarios.  The government is not the party, and Mr. Folks is not the party.

Your Honor, the rule speaks of this.  We're happy to provide you with case citations after lunch, but we don't need to -- we feel because the rule clearly speaks to this, it's not admissible and, therefore, the hearsay rules don't apply.

THE COURT:  All right.  I'll see you all at 1:55.

MR. MIEDEL:  Your Honor?

MS. HELLER:  I'm sorry, your Honor, one witness schedule issue.

THE COURT:  What's that?

MS. HELLER:  It's that we do have Officer Guzman, who is leaving tomorrow morning out of the country for about two weeks.  So if defense counsel think that by, say, 4:30 -- the testimony on direct is probably only about ten, 15 minutes -- if by 4:30 they might be finished with cross, then we don't have to take her out of order; otherwise we would request to do so any convenient time in the afternoon.

THE COURT:  All right.  Look, given that it's the luncheon recess, Mr. Miedel, do you have any objection to the government putting this witness, Ms. Guzman, on for ten minutes immediately after lunch?

MR. MIEDEL:  Well, I don't know.  Maybe it would make

more sense to let me finish my cross and then put her on before other defense counsel go on.

THE COURT:  That's fine.

MR. MIEDEL:  I would think maybe another half-hour or so.

THE COURT:  All right.  That's fine.

MR. MIEDEL:  And I do have one legal issue which I can raise after lunch, on the privilege issue.

THE COURT:  Fine.  You'll raise it after lunch.

MR. MIEDEL:  Okay.

THE COURT:  All right.  Because I have another matter on that I have to attend to now, I'm going to ask first everybody remain seated.  The defendants will be escorted from the courtroom.

THE DEPUTY CLERK:  Those in the back, find a seat.

THE COURT:  All right, we'll take a very short recess. Clear the well as quickly as you can.

THE DEPUTY CLERK:  All rise.

(Luncheon recess)

(Continued on next page)

CA43MER4

AFTERNOON SESSION

1:55 p.m.

(in open court; jury not present)

THE COURT:  Good afternoon.  With respect to the government's objection to the defendants' introduction of jailhouse tapes, defendants wish to introduce this testimony, that is Folks' conversations involving smuggling contraband into a prison facility, among other things, in order to impeach Folks.

Rule 608(b) clearly precludes that.  Under Rule 608(b), extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness.

Notwithstanding Rule 608(b)'s prohibition, defendants argue that this evidence should be admitted as an admission against penal interest and under the best evidence rule.  Rule 804(b)(3) provides that under certain circumstances, where a hearsay declarant is unavailable, testimony that would otherwise be barred as hearsay may nevertheless be admitted.  Rule 801(d)(2) provides that a statement made by a party opponent is not hearsay.  But even if the statement is not hearsay, it may still be barred as impermissible extrinsic evidence, and it's not a statement by a party opponent.

Finally, the best evidence rule, which is defendants' last in its trifecta of arguments, concerns the authenticity of

CA43MER4

evidence and has nothing do with Rule 608(b) strictures.

Accordingly, the government's objection is sustained. We can bring out Mr. Folks at this time.

MR. MIEDEL:  Your Honor, I did have an application which I mentioned beforehand before lunch.

THE COURT:  About privilege?

MR. MIEDEL:  Yes.

THE COURT:  Go ahead.  We'll hold off for a moment.

MR. MIEDEL:  Your Honor prevented me from asking anything relating to advice that Mr. Folks' lawyer may have given him concerning the cooperation.  I assume because you believe that it is covered by the attorney-client privilege.  I don't believe that's the law in the Second Circuit.  In the Second Circuit, my understanding of the law is -- and I have pulled a couple of cases -- that what the client tells the lawyer is privileged.  But what the lawyer tells the client is privileged only if it somehow reveals something that was privileged from the client.

In this case, I would have asked about whether, based on his lawyer's experience, his lawyer advised him what he believed a realistic expectation would be about what sentence he would get.  Because the fact is, that's exactly what happens every single day.  This is, negotiations about cooperation agreements involve three different parties.  The government, the client, and the lawyer.  And the lawyer provides advice

CA43MER4

about what that means.  Otherwise, really what we're left with is this sort of whitewashed sense that the client, that the cooperator has absolutely no clue whatsoever what he might get, when he's had extensive conversations with his lawyer about what happens in the Southern District, what particular judges do in particular cases.  Without promises or guarantees, that's understood, but he provides an expectation.  And that is not privileged.  That is not confidential.

THE COURT:  He's already testified as to what his expectation is.

MR. MIEDEL:  But he pulled it out of thin air, right?  The fact is that his lawyer undoubtedly gave him some sense of what he could expect.  That is not covered by the privilege.  And that's why I wanted to ask about it.  I have cases --

THE COURT:  What's the case you've got?

MR. MIEDEL:  Your Honor, if I may.

THE COURT:  Just tell us on the record what the case is so we can call it up on Westlaw while we're sitting here.

MR. MIEDEL:  I will.  The case was clearly discussed is actually a case from the Eastern District, 278 FRD 321.  The case name is Torres v. Toback, Bernstein & Rice.  And on page three of the --

THE COURT:  That's not the case you just handed up to me.

MR. MIEDEL:  I gave you two cases I thought.  On

CA43MER4

page --

THE COURT:  Okay.  Now I've got it.

MR. MIEDEL:  On page three of that opinion, the column on the right near the bottom, the Court says, "The Second Circuit has reiterated on numerous occasions that like most privilege, the attorney-client privilege should be strictly confined in the narrowest possible limits underlying its purpose."  And then following some citations it says, "Thus, unlike the New York State law regarding privilege, only communications by the client qualify for protection."

The case, if you go on to the next page, cites to a Second Circuit case called In Re Six Grand Jury Witnesses, and I gave you that one as well.  On page six of that opinion, in the second paragraph, the Court says that -- in this particular case, In Re Six Witnesses, concerned the case where the client was a corporation.  The Court said, "Where the client is a corporation as here, the privilege expends to communications between a lawyer and his or her client, both information provided to the lawyer by the client, and professional advice given by an attorney that discloses such information."

So, the Court says, first of all, it seems to apply only in the case where the client is a corporation, and secondly, even in that instance, it only applies where what the attorney says discloses some confidential information.

It seems fairly clear that, at least based on that,

CA43MER4

the rule or the law in the Second Circuit seems to be that the privilege covers what the client tells the lawyer and not vice versa. Unless, for example, the client says something like "I killed somebody" and the lawyer says "Well, I would advice you not to tell the government about that." That obviously would be covered by the privilege because it reveals something that the client told him. But here, we're talking about advice that the lawyer is giving based on his experience --

THE COURT: That might be subject to the crime fraud exception.

MR. MIEDEL: Maybe it's a bad example.

THE COURT: And therefore not privileged.

MR. MIEDEL: That's a bad example.

THE COURT: Do you have any other Second Circuit case you want to give me? Because, quite frankly, a case from the -- Magistrate Judge Pohorelsky is a fine judge, but he doesn't grade my papers, and his opinion is not in any way binding on me.

MR. MIEDEL: I know it's not binding, but he relies on the Second Circuit opinion that I gave you. And I think it certainly can be inferred from that opinion what the Second Circuit considers the rule to be.

THE COURT: Let me hear from the government.

MR. ARAVIND: We were just handed these case as well. I think even a cursory review of these two cases show they are

CA43MER4

completely distinguishable.

In the Torres v. Toback case, the issue there is it is not a criminal case.  It's one party trying to seek to admit the retainer agreement between a firm and a client.  And it has nothing to do with criminal law whatsoever.

The case that is cited there, the Second Circuit's case, is a criminal case, but it, again, it addresses only the question of attorney-client privilege with respect to corporations.  And again, this is at page six of that opinion, the Second Circuit says "Where the client is a corporation, as here, the privilege extends to communication between a lawyer and his or her client, both information provided to the lawyer by the client and professional advice given by the attorney that discloses such information."

Your Honor, I think both these cases are completely distinguishable.  And your Honor, as this Court is aware, the conversations that happen between lawyers and clients can't be completely extricated to the extent that Mr. Folks could testify about the statements he gave to his lawyer and the lawyer giving him statements.

THE COURT:  Right.  Mr. Miedel wants to dissect.

MR. ARAVIND:  That's correct, your Honor.

THE COURT:  And it can't be done.  I'll look at these cases further, but I'm sustaining objection to inquiry into of what I regard as privileged communications.  If you want to

CA43MER4

revisit the subject after lunch and see if you get a different answer from the witness about what his understanding was before he agreed to cooperate and took his plea, about what his sentence was going to be, you can do that.

MR. MIEDEL: Well, can I say based on conversations with your lawyer what was your understanding of what your sentence would be?

THE COURT: You can ask him did you get any understanding before you took your plea from anyone about what your sentence might be.

MR. MIEDEL: Okay. Just for the point of clarification, obviously, it makes no difference whether it is a criminal case or a civil case as to the attorney-client privilege. There is no distinction that the privilege is somehow more involved in a criminal case than in a civil case. Thank you.

THE COURT: All right. Let's bring in Mr. Folks and the jury.

(Continued on next page)

CA43MER4

(Jury present)

THE COURT:  Good afternoon, members of the jury.  I said yesterday it wouldn't happen again, but here it is, it's happened again.  Don't fault the attorneys.  Believe it or not, I have other matters that I have to attend to, other than this trial.  And so, there were other matters that I had to attend to over the luncheon recess in this courtroom.  Don't blame any of this on counsel or any of the parties.

We're going to resume now with Mr. Miedel's continued cross-examination of Mr. Folks.  You may proceed.

MR. MIEDEL:  Thank you.

BY MR. MIEDEL:

Q.  Mr. Folks, I wanted to ask you a few questions about the murder by T-Money, okay?  That day you said that you were hanging out on Courtlandt Avenue and around 156th Street, correct?

A.  155.

Q.  155.  It was early afternoon or so?

A.  Yes.

Q.  You were in front of the store?

A.  Yes.

Q.  You were with T-Money, right?

A.  Yes.

Q.  And also with Au Dog, right?

A.  I don't remember him being there.

Q.   You don't remember him being there?

A.   Nah.

Q.   At this point, before Earl Pierce came up to speak with T-Money, you had no idea that T-Money had a gun, right?

A.   No.

Q.   And you had no idea that anybody was planning to do anything, right?

A.   Yes.

Q.   Can you speak up, please?

A.   I said yes.

         THE COURT:  Just pull the microphone down a little bit and talk right into it.

Q.   You testified yesterday that Earl and T-Money had a conversation, but you couldn't really make out what they were saying, right?  Or you weren't paying attention to what they were saying, right?

A.   Yes.

Q.   And then at some point Earl left and walked home, right?

A.   Yes.

Q.   Because home for him was 681 Courtlandt Avenue, right?

A.   Yes.

Q.   He'd come from the store because he had a juice, right?  He was carrying a juice or a drink of some sort, right?

A.   I don't know what was in his hand.

         MR. MIEDEL:  Can we play the video at 20:44.

THE COURT:  Just this is what exhibit?

MR. MIEDEL:  I'm sorry.  This is 125, government's 125A.

THE COURT:  Thank you.

(Video playing)

Q.  Okay.  Can we stop it right there.  That person in the white T-shirt, are you saying that's Earl Pierce?

A.  Yes.

Q.  And he's carrying something in his hand, right?

A.  Yes.

Q.  And that's, well, it's hard to see on the big screen.  You don't have a screen in front of you, right?

A.  I can see it.

Q.  It looks like a bottle, right?

A.  Something.

Q.  Okay.  Shortly afterwards, you said T-Money said to you come on, let's go.  Something like that?

A.  Yeah.  He told me to come with him.

Q.  Come with him.  And he also said that to Au Dog, right?  Aubrey Pemberton?

A.  I don't remember Au Dog being there.

Q.  You don't remember him being there at all?

A.  No.

MR. MIEDEL:  Let's play the video a little forward, okay.

(Video playing)

Q. The person on the right-hand side walking between the cars, that's T-Money, right?

A. Yes.

Q. Keep playing. Okay, stop.

Those two people right there, that's you and Aubrey Pemberton, correct?

A. Yes.

Q. You're walking next to each other?

A. Yes.

Q. You came from the same location, right?

A. Yeah.

Q. You're telling us you don't remember him being there?

A. I don't.

Q. Okay. T-Money walked -- what we're looking at here on this video, right, is an entrance to 681 Courtlandt Avenue, right?

A. Yes.

Q. So, T-Money walked toward the entrance of 681, right?

A. Yes.

Q. Which we can't see on the camera, I mean on the video, right?

A. Yes.

Q. And you and Aubrey Pemberton walking next to each other walked toward the entrance, correct?

A. Yes.

CA43MER4                      Folks - cross - Mr. Miedel

Q.  You don't live in the building, right?

A.  No.

Q.  Au Dog doesn't live in the building, right?

A.  No.

Q.  T-Money doesn't live in the building?

A.  No.

Q.  Earl Pierce does live in the building?

A.  Yes.

Q.  You testified that when you got inside the lobby, Earl
Pierce took the left stairs, right?

A.  Yes.

Q.  His apartment was on the second floor, right?

A.  I'm not sure.  The second or third.

Q.  Second or third?  So no real reason to take the elevator,
right?

A.  No.

Q.  He lived with his girlfriend Wendy, right?

A.  I don't know who apartment it is.

Q.  Didn't you say you'd been there before?

A.  Yeah, I been there before.

Q.  Wasn't it Wendy's apartment?

A.  She used to be there.  I'm not sure who apartment was it.

Q.  Okay.  Do you know a guy named Chuckie?

A.  Nah.

Q.  You don't know a guy named Chuckie?

A.  No, not that I know of.

Q.  Do you know Wendy's brother?

A.  No, no.

Q.  You don't know?

A.  No.

Q.  Okay.  Do you know her nephew Justin?

A.  Nah.

Q.  You never heard them.  All right.  So, all right.  You testified that after the shooting, I'm sorry.  Strike that.

You testified yesterday that after the shooting, you and T-Money went up the stairs, correct?

A.  Yes.

Q.  And that T-Money supposedly passed off the gun to Earl Pierce, right?

A.  He did.

Q.  Okay.  And you testified that, well, were you asked -- let me ask you this.  I guess on yesterday's transcript page 650, were you asked this question and did you give this answer:

"Q.  Did you see what Ski Box did with the gun?

"A.  No."

A.  Yes.

Q.  Okay.  On one of the many meetings you had with the government, isn't it true that you told them then that you actually saw him go into an apartment?

A.  I'm not sure.

Q.  You're not sure what?

A.  That I told them that.

Q.  Because the truth is you didn't see him; you didn't see what happened, right?  Is that what your testimony is?

A.  I'm not sure.

Q.  Okay.  Let me ask you again.  Isn't it true that in one of the meetings that you had with the government, specifically the first meeting you had with the government on May 1st, 2012, you told them that you saw him going into an apartment?

A.  I do not remember.

Q.  You don't remember.  Okay.  And yesterday, you testified that when asked what did you see Ski Box do anything with the gun, you said no.  Right?

A.  Yes.

Q.  Okay.  Let's play the video at 21:07.  21:00:07.

          (Video playing)

Q.  Okay, stop.  Two people in white T-shirts came out, right? You saw that?

A.  Yes.

Q.  Okay.  And your testimony yesterday was that the first one was Mr. Pierce, right?

A.  Yes.

Q.  And that the second one was somebody named Levi?

A.  Yes.

Q.  Okay.  Could you keep playing it.

CA43MER4                    Folks - cross - Mr. Miedel

        (Video playing)

Q.  Okay, stop.  Now, the person on the right is Mr. Pierce you say?

A.  Yes.

Q.  The person on the left you say is Levi?

A.  Yes.

Q.  And what's Levi's real name?

A.  I don't know.

Q.  Okay.  But you know Levi pretty well?

A.  Yeah.

Q.  And the person who you say is Levi is wearing shorts; you can tell that?

A.  Yes.

Q.  Do you know who the kid is in the middle?

A.  No.

Q.  All right.  Can we skip to 21:06.  I think it's on the other video.  21:06 and 21.

        (Video playing)

Q.  You see this person coming toward the camera there?

A.  Yeah.

Q.  Stop please.  That's Devin Parsons, right?

A.  Yes.

Q.  So Devin Parsons was around here too that night?

A.  Yeah.

Q.  Okay.  And now could we go to 21:15:51.

(Video playing)

Q. You see the person walking toward the video there -- stop.

A. Yeah.

Q. That's Levi, right?

A. I don't know who that is.

Q. You don't recognize that as Levi?

A. Nah.

Q. Okay. Now, these recordings, they were taken from a video coming from a surveillance camera that's posted outside of 681 Courtlandt, right?

A. Yeah.

Q. That's an NYPD surveillance camera, right?

A. Yes.

Q. In fact, there is a big sign that says "NYPD surveillance," right?

A. Yes.

Q. It's right outside the building, right?

A. Yes.

Q. So it's obvious to anyone who walks by and looks up and sees it?

A. Yes.

Q. Okay. So, Mr. Folks, your testimony is that T-Money shot Jason Correa, correct?

A. Yes.

Q. And that you were with him when it happened, right?

CA43MER4                    Folks - cross - Mr. Miedel

A.  Yes.

Q.  You took the person's money?

A.  Yes.

Q.  So you were a part of it, right?

A.  Yes.

Q.  Then you got arrested and you got charged with that crime, right?

A.  Yes.

Q.  You were charged with a murder?

A.  Conspiracy to murder.

Q.  Conspiracy to murder.  Right?

A.  Yes.

Q.  Conspiracy to murder means you could get a life sentence in prison, right?

A.  Yes.

Q.  And a life sentence in prison in the federal system means life, right?  That's your understanding?

A.  Yes.

Q.  You don't get out early on parole, anything like that. It's life in prison, right?

A.  Yes.

Q.  You come out in a box if you get that?

A.  Yes.

Q.  Now, you told the government, right, that you didn't really know what was going to happen, right?

A.   Yes.

Q.   You told them you didn't know that T-Money had a gun?

A.   Yes.

Q.   You told them that you didn't know anyone was planning to murder Jason Correa, correct?

A.   Yes.

Q.   You told them that you never touched the gun, right, that day?

A.   I'm not sure if I told them that or not.

Q.   You didn't touch the gun that day, right?

A.   No.

Q.   You didn't tell them, you didn't tell the government that you actually took the gun after T-Money used it and brought it out of the building, right?

A.   Because I didn't.

Q.   You didn't tell them that either?

A.   No.

Q.   Okay.  You are aware that T-Money talked to other people about what happened, right?

A.   I don't know who he spoke to.

Q.   Are you aware that he told people that you carried the gun out of the building?

A.   I didn't carry no gun out of the building.

Q.   Are you aware that he told other people that?

A.   I don't know what he told other people.

Q.   All right.

A.   I ain't never hear that until just now.

Q.   But all those things that you didn't know was going to happen, that you didn't know he had a gun, all those things, those weren't enough to keep you from being charged with murder, right, or conspiracy to murder, correct?

A.   Yes.

Q.   You had to give them something else, right?

A.   Give who something else?

Q.   The government.  You had to give them something else to try to get you from out under this mess?

A.   I just told them the truth about the situation.

Q.   Well, you couldn't testify about T-Money, right?

A.   No.

Q.   That's because he's dead.  Right?

A.   Yes.

Q.   And it was just you and T-Money in that stairwell, right?

A.   And the victim.

Q.   Well, and the victim, yes.  And you couldn't testify about T-Money, right?

A.   Yes.

Q.   And you were stuck with a conspiracy to murder charge, right?

A.   Yes.

Q.   There was only one way out, wasn't there?

A.   One way --

Q.   One way to avoid a life sentence or a mandatory minimum 60 years, right?

A.   No.

Q.   Well, that one way was to cooperate, right?

A.   That was one of the ways.

Q.   Could you name another way of getting out from under it?

A.   I could have testified or I couldn't have.  I could have cooperated or I could not have cooperated.

Q.   If you hadn't cooperated, you would have gotten at least 60 years in prison, right?

A.   Yeah.

Q.   Okay.  By the way, you were locked up at the MCC for about three months or so, correct?

A.   Yes.

Q.   One of the people you were locked up there was Aubrey Pemberton, Au Dog, right?

A.   Yes, at a point.

Q.   At a point.  I think you already mentioned this before, but he was a good friend of yours, right?

A.   Yeah.

Q.   You hung out together, right?

A.   Had the same relationship like everybody else.

Q.   Well, I'm sure you were closer with some people than with others, right?

A.   I had the same relationship.

Q.   You had the same relationship with every single person?

A.   Yeah.  I was cool with Aubrey.

Q.   Were you friends with him?

A.   Yeah, with everybody.

Q.   All right.  And as you can see from the video, he was with you that day?

A.   Yeah.

Q.   Okay.  T-Money asked both of you to come with him to go into the building, right?

A.   He asked me.  I don't remember Au Dog being there.

Q.   Au Dog just followed you?

A.   He could have been there.  I ain't never say he wasn't.  I said I don't remember him being there.

Q.   Right.  But, you are saying that T-Money asked you and not anyone else to come with him into the building, and yet we see on the tape you walking right with him, right?

A.   Yeah.

Q.   So I'm asking you, are you saying that Aubrey Pemberton simply was following you and hanging around for no reason?

A.   I don't remember him being there.

Q.   All right.  While you were at the MCC with Aubrey Pemberton, you talked about the case, right?

A.   No.

Q.   Isn't it true that you specifically talked about this night

CA43MER4                    Folks – cross – Mr. Miedel

with him?

A.   It's not true.

Q.   It's not true?

A.   Not true.

Q.   Isn't it true that you told Aubrey Pemberton that you didn't remember anything about this night?

A.   Not true.

Q.   Not true?

A.   Uh–uh.

Q.   You sure about that?

A.   Positive.

Q.   Okay.  Let me just ask you a couple of questions about this shooting that took place a couple of days after T–Money got killed.  All right.  Now, on that day you had the .40 caliber, right?

A.   Yes.

Q.   And that's the gun that you said you threw in the garbage, right?

A.   Yes.

Q.   Which you think the police might have found, right?

A.   Yes.

Q.   Which means that there was a way that they might have been able to connect you with that shooting, right?

A.   Yes.

Q.   Either from fingerprints or DNA or something, right?

A.   Yes.

Q.   You testified that Earl Pierce shot this guy T from close up, right?

A.   Yes.

Q.   Okay.  Are you aware that T has testified that he doesn't know who shot him?

A.   I don't know what -- what that man said.

Q.   Are you aware of that?

A.   I don't know what that man said.

Q.   Okay.

A.   I'm not aware.

Q.   Now, since you left the gun behind -- well, when you left the gun behind, you really wanted to get that gun back, right?

A.   To tell the truth, I wasn't worried about it.

Q.   Well, oddly, you testified yesterday that you called your friend not once but twice to go retrieve it, right?

A.   Yeah.  That was way after the fact though.

Q.   Well, wasn't it a couple hours after the fact?

A.   Yes, a long time after.

Q.   Okay.  You wanted to get it back because you didn't want the gun to be found, right?

A.   It really didn't matter.

Q.   You just testified that you realized that by leaving the gun behind, the police could connect you to it?

A.   I said they could have connected, yeah.

Q.  Weren't you concerned about that?  You didn't want to get arrested, right?

A.  No, of course not.

Q.  Okay.  So, that's why you wanted to retrieve the gun, right?

A.  It didn't matter that I could get it or not.  I wasn't worried about it.

Q.  You weren't worried about getting the gun even though you thought that if the police found it, they might connect you to it, right?  That's what you're telling this jury?

A.  Yes.

Q.  Okay.  We talked about earlier today, I think that when you started cooperating, you already knew that Earl Pierce had been charged and Mr. Meregildo had been charged with this particular incident, right?

A.  What incident are we talking about?

Q.  The shooting of T.

A.  Yes.

Q.  So when you were starting to cooperate, this was a perfect place for you to offer what's called substantial assistance, right?

A.  I just told about the situation what happened.

Q.  Well, you looked at your cooperation agreement, correct?

A.  I had -- that was before.  I seen that when I first got -- through my hearings, through that whole process before the

cooperation.

Q.   At some point your lawyer showed you your cooperation agreement that he wanted you to sign with the government?

A.   That was way after.

Q.   I'm not asking when it was.  At some point you looked at it?

A.   Yes.

Q.   You read it.

A.   Yes.

Q.   You told the judge you read it.  Right?

A.   Yes.

Q.   What the agreement asks is for you to provide what's called substantial assistance to the government.  Correct?

A.   Yes.

Q.   If you provide substantial assistance to the government, they decide that they believe you, you will get the agreement, right?

A.   Yes.

Q.   When you started cooperating, you knew that Earl Pierce had been already been charged with this shooting of T, right?

A.   Me too.

Q.   What?

A.   I was charged with it too.

Q.   Later on.  But when you first started cooperating, when you first started cooperating, you knew that he was charged with

it.  That was my question.

A.  Yes.

Q.  Okay.  When you were arrested, did you know that Devin Parsons was cooperating?

A.  It was rumors.  It was said.

Q.  Lots of people were talking about that, right?

A.  Yeah.

Q.  So, you thought that there was a decent chance that Devin Parsons had already told the government about all kinds of stuff, right?

A.  Yeah.

Q.  By the time that you got into the room with these three prosecutors, right?

A.  Say that again?

Q.  By the time you got into the room with these three prosecutors, you already knew or thought or suspected that Devin Parsons had been cooperating for quite a while, right?

A.  Yes, I heard that he was.

Q.  Yeah.  And you also knew or believed that whatever you told the government had to match what Devin Parsons told them, right?

A.  I don't know what Devin told them.  I told them what I was -- what I participate in, what I've done, and what I was charged with.

Q.  Yeah.  But you heard that Devin Parsons had been

cooperating for quite a while, right?

A.   Yes, but --

Q.   And you knew that in order for you to get a benefit from the government, they had to believe you, right?

A.   I just had to tell the truth.

Q.   Well, if you tell something different than what they've heard from other people, they might not believe you, right?

A.   If -- that's up to them.

Q.   It's up to them, correct?

A.   Yes.

Q.   All right.  Mr. Folks, as we've discussed a couple of times, if this agreement that you have with the government falls apart, if it gets torn up, you know you automatically get at least 60 years in prison, correct?

A.   Yes.

Q.   That's -- that's the rest of your life basically?

A.   Yes.

Q.   And that's a horrible thought for you, right?

          MR. ARAVIND:  Objection.  Asked and answered.

          THE COURT:  Overruled.

Q.   That's a horrible thought for you, right?

A.   Yes.

Q.   You would do anything to avoid that fate, right?

A.   Nah, I wouldn't do anything.

Q.   You wouldn't do anything?

CA43MER4                    Folks - cross - Mr. Miedel

A.  No.

Q.  Well, would you lie to avoid that fate?

A.  No.

Q.  So let me get this straight.  You shot at people, right?

A.  Yes.

Q.  And in fact you testified that you liked it, right?  It felt good?

A.  I said -- I said it felt good.  I said a couple things how it made me feel.

Q.  Yeah.  So you shot at people?

A.  Yes.

Q.  And you didn't have a sentence of at least 60 years in prison hanging over your head in order to persuade you to shoot at people, right?

A.  No.

Q.  You sold drugs, right?

A.  Yes.

Q.  And you didn't have a sentence of at least 60 years hanging over your head to persuade you to sell drugs, right?

A.  No.

Q.  You participated in a murder, right?

A.  Yes.

Q.  And you certainly didn't have the threat of 60 years hanging over your head in order to do that, right?

A.  No.

Q.  You just did them, right?  For whatever reasons you did them, you did them, right?

A.  Yes.

Q.  And you want these people to believe that despite being willing and having done all the things that I just listed, shooting, murder, drugs, robberies -- we didn't even talk about that -- despite being willing to do all those things, the one thing you wouldn't do to get yourself out from a life sentence is lie?

A.  I wouldn't lie and I ain't murder anybody.

Q.  You didn't murder anybody?

A.  No.  Never.  Nobody.

Q.  So one thing you wouldn't do is lie; that's your testimony?

A.  Yes.

MR. MIEDEL:  That's all.  Thank you.

THE COURT:  All right.  Members of the jury, we're going to interrupt Mr. Folks' testimony again now before we get to any other cross-examinations by the defense counsel and redirect by the government.  We're going to take another witness who needs to travel and will be unavailable for a lengthy period of time.

So I'm going to ask Mr. Folks to be escorted back to his holding cell.  And would the government call its next witness.

(Witness excused)

CA43MER4

MS. HELLER:  Yes, your Honor.  Thank you.  The government calls Officer Catherine Guzman.

(Witness sworn)

THE DEPUTY CLERK:  Take a seat.  Please state your full name, spell your last name for the record.

THE WITNESS:  Police Officer Catherine Guzman, G-U-Z-M-A-N.

THE COURT:  Ms. Heller, you may inquire.

MS. HELLER:  Thank you, your Honor.

CATHERINE GUZMAN,

     called as a witness by the Government,

     having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. HELLER:

Q.  Good afternoon.

A.  Good afternoon.

Q.  Could you do me a favor and speak directly into the microphone.  It is a big courtroom.

THE COURT:  You are going to do me that same favor.

MS. HELLER:  I will promise, your Honor.

THE COURT:  Thank you.

Q.  What do you do for a living?

A.  I'm New York City police officer.

Q.  Where do you currently work?

A.  School Safety Division, Uniformed Task Force.

CA43MER4                    Guzman - direct

Q. How long have you been with the NYPD?

A. 19 years.

Q. Tell us what your current responsibilities are as a school safety officer.

A. We patrol in the schools, we try and foster a good relationship with the students, and give lectures and provide a safe learning environment.

Q. How long have you been doing that?

A. One year.

Q. What about before that, where were you stationed?

A. I was stationed at Police Service Area 7.

Q. How long were you at Police Service Area 7?

A. Approximately five and a half years.

Q. From when to when?

A. From February 2006 up until October 2011.

Q. Where were you stationed during your other years with the NYPD?

A. I worked in Florida in 2005.

Q. What about your other years in NYPD?

A. I worked in P.S.A. 8.

Q. Another public service area?

A. That's correct.

Q. What is a public service area?

A. It is a police service area. It's a portion where police officers work out of the Housing Bureau.

CA43MER4                     Guzman - direct

Q.   Just briefly can you tell the jury where P.S.A. 7 where you were from 2006 to 2011, where that is geographically?

A.   It's in the southwest Bronx.

Q.   What were your responsibilities as an officer working at P.S.A. 7?

A.   I worked midnight patrol.

Q.   What does that mean?

A.   We work from 11:15 to 10 to 8 in the morning patrolling the area, answering the 911 calls that came over the radio.

Q.   Any particular parts of the Public Service Area 7 vicinity that you patrolled?

A.   Primarily the 40 Precinct and the 42 Precinct.

Q.   Any particular areas within those precincts?

A.   The South Bronx.  Housing development.

Q.   The housing developments there?

A.   Yes.

Q.   When you were patrolling, were you in or out of uniform?

A.   In uniform.

Q.   On foot or in a vehicle?

A.   Sometimes both.

Q.   Were you working alone or with a partner?

A.   A partner.

Q.   Directing your attention to July 31 of 2010.  Were you on duty that day?

A.   Yes, I was.

CA43MER4                         Guzman – direct

Q.   What hours were you working?

A.   We were working 11:15 by 10 to 8 tour.

Q.   Let's just be clear.  What day did you start -- when we are talking about July 31, what day do you start that specific shift?

A.   It was Friday, 11:15, going into Saturday, 7:50 in the morning.

Q.   What was the date of Friday, was Friday the 30th?

A.   Yes.

Q.   So Friday the 30th into Saturday the 31st?

A.   Yes, ma'am.

Q.   Okay.  Who was your partner that day?

A.   Sergeant Persaud.

Q.   Were you in a car or on foot?

A.   I was in a car.

Q.   Who was driving the car?

A.   I was.

Q.   Did you respond to any locations during the early morning hours of that shift?

A.   Yes.

Q.   Can you describe to the jury what happened?

A.   We were in the rear of the police service area in the parking lot, and we heard shots.  So we immediately went into the police vehicle, drove up the wrong way where the shots came from, drove up into the walkway, and we observed a male lying

CA43MER4                     Guzman - direct

on the floor.

Q. All right. So slow that down a bit. About what time was it that you heard the shots?

A. Approximately 5:45 in the morning.

        MS. HELLER: Ms. Brady, if we can put in put up what's already in evidence as Government Exhibit 1200.

Q. So Officer Guzman, if you could look at that exhibit and first actually I'm going to hand you a laser pointer. Just using that pointer, could you first show us all where you were when you heard the shots.

        Actually, if you can point at the big screen so we can all see where you're pointing.

A. Oh, okay.

Q. You have to actually point it at the screen in order to -- thank you.

A. Okay. We were approximately over here.

Q. So you're indicating Melrose Avenue and about --

A. 156.

Q. 156th Street. Where was that again what location?

A. That was the rear of Police Service Area Number 7.

Q. You heard the shots. When you hear the shots, did you have any sort of sense of what direction they were coming from?

A. I drove generally in the vicinity that I heard them.

Q. So now could you using the pointer show the jury which way you drove.

A.   We were here, and I drove up the wrong way on 156, crossing Courtlandt -- make a right on Courtlandt Avenue and going directly into the walkway of that development here.

MS. HELLER:   All right.   Then, I think we could put up to get a closer view, please, Ms. Brady, Government Exhibit 1202.   Great.

Q.   So, Officer, if you could now using the pointer show us as you were approaching this development -- and what is this development?

A.   This is Melrose Jackson.

Q.   Right.   Okay.   So, if you could just move the pointer. Show us where you drove.

A.   Made the right turn here.   Made a quick left, drove up to the walkway, and observed the male lying here in this area.

Q.   When you say the walkway, is that a street that cars usually drive on?

A.   No, just used for pedestrians.

Q.   About how long did it take you to drive that way?

A.   30 seconds.

Q.   So when you reached that location, did you get out of your car?

A.   I did.

Q.   What about the sergeant?

A.   He did also.

Q.   Could you describe to the jury exactly what happened after

you got out of the car?

A.  We observed the male lying on the floor.  He was bleeding. He wasn't moving.  We looked around, see if anybody was out. We called EMS.  And --

Q.  I'll stop you right there.  So you saw a male that you said was lying on the floor.  Can you point on this exhibit with the pointer again where you saw the person lying.

A.  Right around here.

Q.  Indicating the walkway to the south of building 300 is it?

A.  Right.

Q.  All right.  I'm now going to show you what's been marked for identification as Government Exhibit 245.  Ask you to take a look at that picture and tell me if you recognize the area that's depicted in it.

A.  Yes.

Q.  What area is that?

A.  That's the left side of 300 East 158.

Q.  Is it a fair and accurate depiction of the area as you know it in your role as a patrol officer who patrolled that area?

A.  Yes.

          MS. HELLER:  The government would offer 245.

          THE COURT:  Any objection?

          MR. LEE:  No objection.

          MR. DINNERSTEIN:  Just a moment, your Honor.

          MR. LEE:  Actually, your Honor, if I may, I'd like to

withdraw that for a moment please and voir dire briefly.

THE COURT:  Yes.  But do your voir dire from the podium.

MR. LEE:  Thank you, your Honor.  I apologize.  I apologize for that.

BY MR. LEE:

Q.  Officer, I'd ask you to look at Government Exhibit 245.

THE COURT:  The podium means with the microphone.

MR. LEE:  I'm sorry.  Yes, your Honor.

Q.  Officer, I'd ask you to look at Government Exhibit 245, please.

A.  Yes, sir.

Q.  That photograph appears to have been taken in the daytime?

A.  Yes.

Q.  This photograph does not depict -- does this Government Exhibit 245 depict accurately how that sidewalk may have looked on July 31, 2010, at about 5:45 a.m. in the early morning or -- does it?

A.  Yes.

Q.  Do you know what time of the day this photograph was taken?

A.  Probably at --

Q.  Government Exhibit 245?

A.  No, sir, I don't.

Q.  Does it look like to you, based on your experience walking and patrolling that area, how bright that sidewalk would look

at 5:45 a.m.?

A.  Maybe a little bit dimmer.

Q.  It would be darker than what's depicted in Government Exhibit 245, correct?

A.  Yes.

Q.  And does Government Exhibit 245 reflect in any manner whether or not there may have been any lights, like pole lights or streetlights in that vicinity?

A.  Yes.

Q.  Are there any in that area?

A.  Yes.

Q.  Can you see them in the photograph?

A.  I do not.

Q.  So, that area that's depicted in Government Exhibit 245, you cannot see any streetlights there?

A.  Not in this photo.

Q.  In that photo you don't see any other things that would be illuminating that sidewalk, like lights off of a building or anything like that, correct?

A.  No.

Q.  Now, do you know what time of the year this government exhibit, when that photograph was taken?

A.  No, sir.

Q.  Do you know whether you can see that in the exhibit there are leaves in the trees, right?

A.  Yes.

Q.  And does it look to you like that's the way the trees in that area may have been on July 31, 2010, that there were trees?

A.  Yes.

Q.  Perhaps shadows being cast by the trees?  Do you see that in Government Exhibit 245, correct?

A.  I do.

Q.  But you do believe it is brighter than it would have looked like when you arrived at that scene at 5:45 on July 31, correct?

A.  Correct.

Q.  Okay.

MR. LEE:  I have no objection, your Honor.  And thank you.

MR. DINNERSTEIN:  I have no objection, your Honor.

MR. MIEDEL:  No objection.

MR. BECKER:  No objection.

THE COURT:  Government Exhibit 245 is received in evidence.

(Government's Exhibit 245 received in evidence)

MS. HELLER:  Your Honor may we publish Government Exhibit 245, please?

THE COURT:  You may.

MS. HELLER:  May we put it on the Elmo.

BY MS. HELLER:

Q. All right. So Officer Guzman, what view are we looking at here? If you can just explain that to the jury since they didn't have the benefit when you were looking at it just now.

A. This is the walkway when we drove up to -- it's to the left of 300 East 158. I positioned my car behind the male who was lying on the ground.

Q. Can you point with the pointer where the car was.

A. Approximately in this area.

Q. What about where you saw the male lying on the ground?

A. In this area, a little bit further up.

Q. Okay. Now, when you arrived at the location where the body was, did you see anyone in the vicinity when you got there?

A. No.

Q. About how long did you arrive there after you had heard the shots?

A. About one minute.

Q. What were the lighting conditions when you arrived there?

A. It was just about dawn.

Q. So, was there any light?

A. Some -- the sun was about to come up.

Q. I believe Mr. Lee asked you about artificial light. Any artificial light?

A. Some lights from the apartments.

Q. Were there streetlights? Any lights on the path?

CA43MER4                     Guzman - direct

A.   Not that I remember.

Q.   When you looked to see if you saw anyone, did you feel you were able to adequately see your surroundings?

A.   Yes.

         MR. LEE:  Objection, your Honor.

         THE COURT:  Overruled.

Q.   All right.  So, did there come a time when you approached the man that you saw lying on the ground?

A.   I did.

Q.   Can you describe to the jury exactly what you saw.

A.   I observed the male lying on the ground.  He was bleeding. I asked him his name.  I asked him who did this.  His leg responded by moving when he heard my voice, but nothing else.

Q.   Other than seeing his leg moving, was there any other way you could tell he was alive or dead?

A.   I seen his chest moving up and down.

Q.   What was the first thing you did?

A.   Called for EMS.

Q.   After you called for EMS, what was the next thing you did?

A.   Surveyed the area, tried to provide some crime scene.  Then went into the ambulance.

Q.   Just first talking about surveying the area.

A.   Yes.

Q.   What did you do to survey the area?

A.   Looked around, see if there is any unauthorized persons

CA43MER4                         Guzman - direct

running from the scene.  Seeing if anyone was looking out of the windows.

Q.  Did you see anyone?

A.  I did not.

Q.  About how long did it take for an ambulance to arrive?

A.  A few minutes.

Q.  When you say "a few," if you can give us a rough estimate?

A.  Four.

Q.  What happened when the ambulance arrived?

A.  They came.  They treated the male.  And they transported him, taking him back into the ambulance to the hospital.

Q.  How long were they there with him on that walkway about?

A.  Six, seven minutes maybe.

Q.  And then they put him in the ambulance?

A.  Yes.

Q.  Where did you go?

A.  In the ambulance with him.

Q.  Why?

A.  To protect the evidence.

Q.  What evidence?

A.  Whatever may have been on his person.

Q.  Was that part of your job?

A.  Yes.

Q.  What about the sergeant?

A.  He stayed behind.

CA43MER4                        Guzman - direct

Q.  Was the victim, if you remember, was the victim alive when you got with him into the ambulance?

A.  I don't recall.

Q.  About what time did the ambulance leave the scene?

A.  A few minutes after six.

Q.  In the morning?

A.  Yes.

Q.  Where did the ambulance go?

A.  We went to the Lincoln Hospital emergency room.

Q.  About what time did you get there?

A.  6:07 in the morning.

Q.  How do you remember that so specifically?

A.  An odd number.

Q.  Did you record that somewhere?

A.  Yes.

Q.  Where did you record it?

A.  In my memo book.

              (Continued on next page)

Q.  So what happened once you arrived at the hospital?

A.  The male was taken into the emergency room, treatment room. I stayed outside, and the doctors were inside working with the male.

Q.  About how long did you wait?

A.  About an hour.

Q.  And what happened then?

A.  After that, he, the doctor came out and gave me his personal belongings.

Q.  Did you learn what happened to the victim?

A.  He passed away.

Q.  Did you learn his name?

A.  Yes.

Q.  What was his name?

A.  Carrell Ogarro.

Q.  So you said the doctor passed you his personal items?

A.  Yes.

Q.  And what did you do with those items?

A.  We took them back -- I took them back to my command, PSA Seven to voucher them.

Q.  What items were they?

A.  Some personal items, clothes, a wallet, contents of the wallet, money.

Q.  Why did you take those items?

A.  To voucher them for safekeeping.

Q. About how long were you at the hospital in total?

A. About an hour.

Q. Where did you go after you left the hospital?

A. I went quickly back to the scene for approximately five minutes.

Q. What did you do, if anything, at the scene?

A. Just get back in touch with my Sergeant. And he directed me to go back to the precinct to begin vouchering.

Q. What did you see at the scene when you got there?

A. Detectives, more police personnel.

Q. So after five minutes at the scene, you went where?

A. Back to my command, PSA Seven.

Q. What did you do at PSA Seven?

A. I prepared the complaint report, the report and began vouchering.

Q. What does it mean to voucher something?

A. It's a process that we use to take an individual's personal property, safeguard it.

Q. And what did you do when you vouchered?

A. We list it on a voucher, it's a preprinted form. We list them, and then we safeguard them.

Q. What did you voucher with respect to Mr. Ogarro's death?

A. His clothing, money and a wallet, and the contents of the wallet.

Q. Did you voucher any other evidence from the crime scene?

A.  No.

Q.  What did you do after you finished vouchering and doing your paperwork?

A.  I went to the Bronx morgue.

Q.  Why did you go there?

A.  To identify the male I observed lying on the ground.

Q.  Is that part of your responsibilities?

A.  Yes.

Q.  Why, do you know why it's part of your responsibilities?

A.  It's to confirm the male that I saw lying on the ground was the same male that is now -- was in the morgue.

Q.  What happened once you were at the morgue?

A.  I observed the body.

Q.  And what was your conclusion, if any?

A.  It was the same male.

Q.  Did you have any further involvement with this murder after you identified the body?

A.  No.

        MS. HELLER:  No further questions, your Honor.

        THE COURT:  Cross-examination?

        MR. LEE:  Yes, your Honor.

CROSS EXAMINATION

BY MR. LEE:

Q.  Officer Guzman --

A.  Yes.

Q.   -- you stated you recovered some money from the body?

A.   I believe it was in his wallet.

Q.   And you vouchered that?

A.   Yes, sir.

Q.   Would that be something that would be reflected in your voucher, that there was money in his wallet?

A.   Yes.

Q.   Do you have, right now, a clear certain recollection about whether or not there was money on his person?

A.   Yes.

Q.   Well, would it refresh your recollection if you looked at the property voucher that you submitted in connection with this?

A.   Yes, sir.

Q.   And that's V516F.

         (Handing)

Q.   Now, am I correct that your protocol would be that if there had been indeed money inside the wallet, that that would have been itemized as a separate item in the voucher, correct?

A.   Yes.

Q.   And now having looked at that, do you believe that perhaps there was not money on the person when you searched the body?

A.   No.

Q.   Does that refresh your recollection, that when you did fill out the voucher of every single item taken off of the body, you

did not list any money; is that correct?

A.   There was one other voucher.

Q.   There would be a separate voucher?

A.   Yes.

Q.   Okay.  That would explain -- and that would explain the absence of money being listed on this voucher, correct?

A.   Yes.

Q.   Okay.  And now as far as you stated that you were the first officers on the scene, correct?

A.   Yes.

Q.   Do you recall how much time passed before other police personnel, besides you and your partner, came onto the scene?

A.   I do not.

Q.   Can you give an estimate, to the best of your ability; was it more than 20 minutes?

A.   No.

Q.   Was it --

A.   It was less than five.

Q.   And did they come from the PSA station as you?

A.   Yes.

Q.   So they came from the same direction, is that accurate?

A.   I don't recall.

          MR. LEE:  I have no further questions.  Thank you.

          MR. DINNERSTEIN:  I have a few questions, your Honor.

          THE COURT:  Go ahead, Mr. Dinnerstein.

MR. DINNERSTEIN:  Thank you.

CROSS EXAMINATION

BY MR. DINNERSTEIN:

Q.  Good afternoon, Officer Guzman.

A.  Good afternoon, sir.

Q.  You said now that you are working in a safety patrol, is that correct?

A.  A school uniformed task force.

Q.  School uniformed task force.  And how long have you been working in that school uniformed task force?

A.  One year.

Q.  Did you volunteer to work in such a task force?

A.  Yes, sir.

Q.  And that was after working in the housing projects for a number of years, is that correct?

A.  Yes, sir.

Q.  And how long had you worked in the housing projects prior to volunteering for that task force?

A.  Approximately 17 years.

Q.  So it would be 17 years in the South Bronx, is that correct?

A.  Portion of it, yes.

Q.  And what was the portion working in the South Bronx?

A.  From February 2006 till October 2011.

Q.  You've been in the South Bronx for about five and a half or

CA4ZMER5                    Guzman - cross - Mr. Dinnerstein

six and a half years?

A.  Yes, sir.

Q.  And before working in the South Bronx, where did you work?

A.  I worked as a Deputy Sheriff in the Palm Beach County Sheriff's Office.

Q.  In Florida?

A.  Yes, sir.

Q.  Would it be fair to say that the job you presently have with the task force is an easier job than working in the housing project?

A.  Yes.

Q.  Is that the reason you chose to volunteer for that job?

A.  No.

Q.  No?  You were looking for something different?

A.  A little bit normal, hours.

Q.  Would you say the work is a little more normal too?

A.  That's hard to define.

Q.  That's hard to define?  Thank you very much.

A.  It's different.

          MR. DINNERSTEIN:  I have no further questions.

          MR. MIEDEL:  No questions, your Honor.

          MR. BECKER:  No questions, your Honor.

          THE COURT:  Redirect examination?

          MS. HELLER:  Just one question, officer.

REDIRECT EXAMINATION

CA4ZMER5                         Guzman - redirect

BY MS. HELLER:

Q.  Which is, do you remember how much money was found on Mr. Ogarro when you vouchered it?

A.  I believe it was approximately $3.

MS. HELLER:  No further questions.

THE COURT:  Anything further, Mr. Lee?

MR. LEE:  Nothing, your Honor.  Thank you.

THE COURT:  Mr. Dinnerstein?

MR. DINNERSTEIN:  No, your Honor.

THE COURT:  All right Officer Guzman, you're excused as a witness, ma'am.  You may step down.

THE WITNESS:  Thank you.

(Witness excused)

THE COURT:  Would the Marshals bring out Mr. Folks at this time?

(Bernard Folks resuming the witness stand)

THE COURT:  Cross-examination, Mr. Lee.

MR. LEE:  Thank you, your Honor.

CROSS EXAMINATION

BY MR. LEE:

Q.  Mr. Folks --

A.  Yeah.

Q.  -- you stated on direct examination by Mr. Aravind yesterday that when you were about 15 or 16 years old, you would rob people of their phones, correct?

A.  Yes.

Q.  And today when Mr. Miedel questioned you, you told him that you were always carrying either a box cutter or a knife; right?

A.  Yes.

Q.  You didn't testify and mention that when Mr. Aravind questioned you the first day, did you?

A.  I don't remember.

Q.  You remember whether or not at that time when he first asked you, that you told him that you were carrying a knife cutter and a box all the time?  You didn't mention that, did you?

A.  I don't remember.

Q.  Now, but you did, right?  You were carrying a knife cutter, a box cutter or a knife on you all the time, right?

A.  Yes.

Q.  And you also responded, you said for protection; that's what you said, right?

A.  Yes.

Q.  But every time you robbed people of phones, you also had a box cutter on you, right, or a knife?

A.  Lot of times, yeah.

Q.  And when you robbed these people, if it was necessary to protect yourself from these people who you were robbing, you would have used that knife cutter, box cutter and knife on them if you had to to protect yourself, right?

A.   Yes.

Q.   And you have used a box cutter to cut people or a knife to cut people before, right?

A.   No.

Q.   Well, you stated that there was a time when you were charged with cutting somebody at a party and it wasn't you, right?

A.   No.

Q.   Well, was it you?

A.   It wasn't.

Q.   It was not, that was a mistake.  But that's not the first time.  That occurred in about December 9th, 2010.  Do you remember that?

A.   I don't remember the date.

Q.   You remember that it was in December of 2010?

A.   No, I don't remember.

Q.   You remember it was in the winter?

A.   I don't remember.

Q.   But wasn't there in fact a separate time in April 10, 2011, you were arrested and charged with assault in the 1st degree for cutting somebody in the face with a knife; isn't that correct?

A.   I don't remember.

Q.   You don't remember that this other time that occurred at about 9:45 at night?  You remember at that time you were

charged with cutting someone on the face with a knife causing a laceration to their face; do you remember that?

A. No. That got to be the same thing you were just talking about, same incident.

Q. You believe it was the same incident?

A. Yes.

Q. Now, the incident that I am questioning you about right now, additional incident, do you recall that it occurred inside of Two East 169th Street?

A. I don't remember.

Q. You don't remember a separate incident like that?

A. No.

Q. Now, there were also times when -- and you were arrested for it November 22nd, 2009. You had robbed a person of their phone. But you, during the course of that robbery, you threatened to shoot them by acting like you had a gun in your pocket, is that correct?

A. That's what was said. It never happened.

Q. And that was what was said by who?

A. That was in the report.

Q. And so it was said to the police by the person who got robbed, right?

A. Yes, I think so.

Q. Well, the police weren't there when you robbed this person, or tried to rob them, correct?

A.  I ain't try to rob anybody.

Q.  Well, my question to you is this:  That's what they said.
You said that that's what the police said, right?

A.  Yes.

Q.  Now, is it a fair statement by me that the police are just
repeating what the victim said?

A.  Yes.

            MR. ARAVIND:  Objection.

            THE COURT:  Sustained.

Q.  Okay, so in fact --

            THE COURT:  The answer is stricken.  Begin again.

            MR. LEE:  Yes, your Honor.

Q.  So is it your recollection that in connection with the
case, it was the victim who was saying that you had threatened
this person and faked or acted like you had a gun in your
pocket, correct?

A.  Yes.

Q.  Okay.  And now, when you were robbing these people when
you're 15 or 16 years old, how many times did you do that?

A.  Once -- I say like once a week for like two months.

Q.  So that at least is once a week, we'll say four weeks in a
month, sometimes more than once a week?

A.  No.

Q.  What would -- withdrawn.

            Now, how did you select or determine who it was that

you would rob?

A.   Like I said before, if I would like see something laying down or like they have a string attached to the phone hanging out their back pocket, I snatch it and run.

Q.   You would snatch it.  Did you target people who you thought it would be easy to rob the phones from?

A.   No.

Q.   Did you choose to rob phones from women?

A.   No.

Q.   Did you not care who you robbed the phones from?

A.   To tell you the truth, it didn't matter.

Q.   So as far as you were concerned, when you were scoping out a victim, if you saw a 6-foot two athletic man who looked like he could kick your butt, you would, nevertheless -- it didn't matter to you, you would try to snatch his phone; is that what you're telling us?

A.   Yes.

Q.   Or if it was an old elderly person or a woman, it wouldn't make a difference, you would select your person arbitrarily, right?

A.   Something like that I wouldn't get involved in it.

Q.   And so you had -- you said something like that you wouldn't get involved in.  What does that mean?

A.   The elderly woman, I got a lot of respect for.

Q.   So when you act like you have a gun in your pocket that

you -- is that something that you do to try to scare someone so that they won't resist?

A.  I never acted like I had a gun in my pocket.  I won't even confront -- like if I was trying to take somebody phone, I wouldn't confront them face-to-face.

Q.  Excuse me?

A.  I would never, a victim I would never speak to them face-to-face or like if we got our contact with each other, like if they know what is going on, I would not go after it.

Q.  Now, when you -- did you ever have a problem with any of these victims when you snatched their phones?

A.  No, I ain't know none of them.

Q.  These people that you snatched their phones were from, when you did that, were they shocked?

A.  I ain't even stay long enough to see the reaction on their face.

Q.  You didn't stay long enough.  Were they scared?

A.  I was snatching and running.

Q.  Now, you snatch and run.

Now, did you ever think about how these people felt, that someone had come up to them and just taken their phones from them?  Did you ever think about how they felt about that after that occurred to them?

A.  No.

Q.  It never occurred to you that these people would be

terribly frightened that something like this would happen to them while they were just walking on the street; did you ever think about that?

A. No.

Q. It never occurred to you at all that these people might be for a long time just even frightened to even walk the streets any more because somebody like you came and just took a phone out of there hand?

A. At the time I didn't think it was that serious, 'cause I wasn't like I was threatening them, harming them, pulling a weapon out in front of them. I would just snatch, snatching and run.

Q. So you didn't think it was a big deal to do that to them?

A. No, I didn't think so.

Q. And when you did do it, you did it so that you could have a phone, correct; so that you could have a phone and --

A. Yes.

Q. Correct? And you did it so that you could have a phone to sell, right?

A. Yes.

Q. So you get some quick money, right?

A. Yes.

Q. And to you this wasn't a big deal what you were doing to them, and it was just for a phone, right?

A. Yes.

Q. Now, you said that these things that you were doing when Mr. I think Miedel was questioning you, said you did it for your sister, right?

A. Said what the money that I made, I, however I made it, I would provide for my sister also.

Q. Okay. So, in other words, to you snatching the phone or selling drugs, that's all right if it's to help you and your sister, right?

A. I never said it was all right.

Q. But does it make it all right -- you answered Mr. Miedel when he's asking you about you doing these things, you said it was because for -- one of the reasons was for your sister, right?

A. I said, like I said before, when I got the money I used it for myself and I helped my sister.

Q. And Mr. Miedel asked you, did you use it sometimes to buy sneakers?

A. Yes.

Q. So it was worth it to run up on these people, scare them, take their phones, for a sneaker, right; that was okay with you, right?

A. I ain't look at it just for no sneakers.

Q. But sometimes, you've told me, that you did do this and it resulted in you getting a pair of sneakers, right?

A. Money went to a lot of different things.

Q.   But it also went to sneakers?

A.   I purchased sneakers with some of the money before.

Q.   Okay.  You didn't always use it to, to get medicine that you needed, right?

A.   No, I used it --

Q.   It wasn't important so that you could buy medicine, right?

            MR. ARAVIND:  Your Honor, if he could just answer the question.  I think Mr. Lee's been interrupting Mr. Folks.  Mr. Folks is in the middle of answering that question.

Q.   Sometimes --

            THE COURT:  I'm not sure he was, but go ahead, Mr. Lee.  Wait till the witness finishes.

Q.   Now.  So now here -- now, you said that it was to help yourself and your sister.  And you love your sister?

A.   Yes.

Q.   And you were doing things perhaps that were harmful to these people you're stealing the phones from, but it would help your sister at least because you could help her, right, with the money that you got; right?

A.   I helped her with the money I have.

Q.   The money that you got from doing these things to other people would at least help your sister sometimes, right?

A.   Going to a lot of different things, but yeah, I help her.

Q.   Lot of things that you care about, including your sister, right?

A.   Yes.

Q.   So as long as it helps you or something you care about, the fact that it hurts somebody else, that didn't matter to you, did it?

A.   At the time I didn't look at it like it was hurting anybody else.  I figured they got money, they could get another one. So it really wasn't a problem.

Q.   So you think that someone like your sister that you love, would you like it if some strange man while she's just walking on the street, comes and snatches her phone out of her hand and runs away, would you want that to happen to your sister?

A.   No.

Q.   Because you love her, right?

A.   Yeah.

Q.   But it's okay if it's happening to somebody else other than you or your sister, then it's okay, right?

A.   I never said it was okay.

Q.   Well, you said that you didn't think about that you were harming other people, right?

A.   I ain't considered it as -- I didn't really think of it as I was really harming them.  I never said what I did was right.

Q.   And you didn't think it was right you said, right?  And you didn't think -- right?

A.   Yes, I made some --

Q.   You didn't think you were harming them, right?

A.  No, not really.

Q.  But then when I asked you, well, would you like that to happen to your own sister, would you want somebody to harm her like that?

A.  No, but it can happen.

Q.  It can happen.  But would you want that to happen to your sister who you love?

A.  Not at all.

Q.  Because it's harming her, right?  You don't want don't her to be harmed, right?

A.  I don't know how she would feel.

Q.  You think she would like it?

A.  She won't like it.

Q.  So, therefore, as long as it's happening to somebody other than you or someone that you love like your sister, it's okay; right?

A.  It's not okay.

Q.  Okay.  But in this instance your didn't think about it at all, right?

A.  No.

Q.  Okay.  So what about your grandmother, is your grandmother still alive?

A.  Yes.

Q.  Mr. Folks, do you love your grandmother?

A.  Yes.

Q.  I want to ask you -- and you wouldn't want things, bad things to happen to her, right?

A.  Not at all.

Q.  Is it not a fact that there was a time when you even had a problem with her, it was in February 20th, 2010, something to do with a cell phone; right?

A.  No.

Q.  Well, you don't recall an incident, you were about 16 years old, you went over to your grandmother's house and a whole incident occurred, right?

A.  Yes.

Q.  Why don't you tell us what happened with your grandmother at that time?

A.  We had an argument.  She had friends over.

Q.  I'm sorry, could your speak a little bit slower?

A.  Me and my grandmother had an argument.  She had some friends over, so I didn't want to -- I ain't -- I ain't feel right taking my anger out on her, so there was a male, an older male.  Me and my grandmother got into altercation while she had friends over.  I ain't feel right yelling at my grandmother, screaming, so I took anger out on a male friend that was there.

Q.  And what was the argument over?

A.  I don't even remember to tell you the truth.

Q.  Didn't have something to do with you trying to steal something from her?

A.   Not at all.

Q.   Maybe stealing something from her guests or her friends?

A.   No.

Q.   You don't recall that?

A.   No.

Q.   But you do recall being angry at that time at your grandmother's house, right?

A.   Yes.

Q.   Do you remember being so angry that you took, was it your grandmother's TV and you threw it?

A.   I did not take no TV and throw it no TV.

Q.   You didn't damage her TV; you didn't throw it?

A.   No.

Q.   You didn't take her microwave and throw it and break it?

A.   The microwave I did break.  Later on I paid for it.

Q.   Okay, well let's -- we can talk about that.  But you're at your grandmother's house, this is the house she lives at.  What did you do with the microwave?

A.   I took my anger out on the microwave.  I broke the microwave.

Q.   How did you break it?

A.   I don't remember if I hit it with something or object or knock it on the floor, but I remember breaking it.

Q.   So you -- did you accidentally knock it over?

A.   Whatever.  How I broke it, it was on purpose.

Q.  You don't recall, but that you threw her TV?

A.  No, not at all.

Q.  And any officer who writes on a complaint that you threw the TV, would be lying?

A.  That would be whatever she told the officer.

Q.  Oh, so now it's that's what she told the officer?

A.  I don't know if she told the officer that or not, but.

Q.  Okay, but --

A.  You wrote whatever you saying.

Q.  3532I.  I'll ask you to look at this.  You don't have to do anything.  I'd ask you to read this first, and then just tell me when you're finished reading it.

        (Pause)

Q.  Have you had a chance to read that?

A.  Yes.

Q.  Now, does that help you remember that your grandmother told --

        MR. ARAVIND:  Objection, your Honor.

Q.  -- the police that you threw her TV?  Do you recall that?

        MR. ARAVIND:  The witness already testified that he did not throw the TV.

Q.  Does that refresh your recollection to see it in writing like that?

A.  It says a couple things right here that's not true.

Q.  Mr -- okay.  Now --

THE COURT:  Next question.

MR. LEE:  Yes, your Honor.

Q.  So how old is your grandmother?

A.  I don't even know.

Q.  Is she over 80?

A.  No.

Q.  Now, so if, Mr. Folks, your grandmother were to tell the police that you threw the TV, she would be lying; is that what you're saying?

MR. ARAVIND:  Objection.

THE COURT:  Yes, sustained.

Q.  Now, did you also, in addition to breaking her microwave, did you take eight glasses smashing them on the floor?

A.  I do not remember that either.

Q.  So you don't remember that, right?

A.  No.

Q.  And if your grandmother had told the police -- do you know if she told the police that you did that?

A.  If it says it right there, if she told them that, that's what she said.

Q.  And if she did tell them that, as it says she, would be a liar, wouldn't she, your grandmother?

A.  I would say that, yes.  She told a lie.

Q.  She's telling a lie to the police about how you got angry and threw these glasses on the ground, right?

CA4ZMER5                    Folks – cross – Mr. Lee

A.   That, yes.

Q.   Okay.  And now, you are known, are you not, for someone who has a pretty bad temper, right?

A.   Yeah, I have a bad temper.

Q.   You do?

A.   Yes.

Q.   You don't stand down to anything, right?  That's how you were so easily accepted, because people said you don't back down, you never stand down for anything, right; that's your reputation?

A.   I just don't, don't let people do whatever they want to do to me or say to me.  I stand up for myself.

Q.   You stand up for yourself?

A.   Yes.

Q.   Meaning you watch out for yourself, right?

A.   No.  Meaning that I'm just not vulnerable to anybody.

Q.   Now getting back before that you didn't think about what you were doing to other people when you snatched their phones. It was nothing personal against those people, right?

A.   Not at all.

Q.   There's nothing particular.  You just wanted to get some money, right, from selling the phones?

A.   I just wanted to get the phone.

Q.   So you were willing to do these things to those people as long as it helped you get a little money, right?

A.   I was not willing to hurt, really hurt anybody, kill

anybody, stab anybody.

Q.   Did I say that you tried to kill these people --

A.   No.

Q.   -- when you took their phones?

A.   Not at all.  But you said I would have did anything.

MR. ARAVIND:  Your Honor, again if Mr. Folks can just

be allowed to answer the question.

MR. LEE:  I'll ask it again, your Honor.

THE COURT:  All right, Mr. Lee.

Q.   Did I ask you whether or not you tried to kill people when

you were snatching their cell phones?

A.   No.  But you also all saying like I'm willing to do

anything to get the phones, and I'm just naming a couple

things.  That could be anything.

Q.   Well, you're willing to snatch people's phones in order to

get some quick money, right?

A.   Yes.

Q.   And how much would you sell these phones for?

A.   When I used to do it, I -- it depends if the phone was new

phone or just came out, I would get anywhere from like 50 to

100, 200.

Q.   50 up to 200?

A.   Yes.

Q.   You were willing to do this to those people, right?

CA4ZMER5                    Folks - cross - Mr. Lee

A.  Yes.

Q.  Snatch their phones?

Now let's talk about where you are now, sitting in that chair, Mr. Folks.

You were willing to do these things to people for 200 bucks at most just so you can get some money, right?

A.  Before, yes.

Q.  Right now you're in a situation where your life's on the line really, right?

A.  Yes.

Q.  And would you be willing, when something like that is at stake, not 200 bucks, but more like your life, would you be willing to do something like come here and do what you got to do to take care of yourself?

A.  What I'm doing right now, I'm just telling the truth admitting to things that I did, admitting things that I did with anybody else.

Q.  Well, you admit that $200 is not on the line here.  Your life is on the line here, right?

A.  No, that's why I would not --

Q.  Yes or no; is that true?

A.  That's why -- yes, it is.

Q.  And you answered Mr. Miedel, 200 bucks are not on the line here.  60 years mandatory minimum is on the line here, right?

A.  Yes.

Q.   And you know very well how what your arrangement is with the prosecution, right?  You know very well what your arrangement is with them, what your agreement is, right?

A.   Yes.

Q.   And I'm not going to repeat too much what Mr. Miedel says, but you have to testify, right?

A.   Yes.

Q.   Can you refuse to testify?

A.   Yes.

Q.   You can refuse -- under your agreement you can say to the government, I ain't gonna testify?

A.   Yes.

Q.   You can choose who you testify against?

A.   Depending on how I feel, I could do whatever I want in the situation.  It depends.  It's just the result of my actions.

Q.   Okay.  So you can choose not to testify; is that what you're telling us?

A.   Yes.

Q.   Now, why don't you just, you admit that you -- you pled guilty to committing crimes in front of Judge -- in front of the Judge, right?

A.   Yes.

Q.   And that's the crimes for which you're facing a sentence, right?

A.   Yes.

Q.  Now, why don't you just, you admit you're guilty?  Why don't you just plead guilty to something that you admitted to doing and do your time?  Why don't you just do your time?

A.  Part of my agreement, this is, this is part of my agreement to testify.

Q.  Okay, so let me just finish my question.  I have said to you, Mr. Folks, why don't you, if you're a standup guy, why don't you just take your plea to something that you admitted you did, and just do your time for what you did; why don't you do that?

A.  Repeat that question, please.

Q.  Why don't you just plead guilty as you've done because you're guilty, and just do the time that you're supposed to do?  Why won't you do that?

A.  I pled guilty and I'm not -- I don't want to sit in jail for the rest of my life.

Q.  That's not acceptable, you're not going to take it.  You're not going to do the time that you're supposed to do for what you admit that you've done, right?

A.  It's up to the Judge if I'm going to do the time or not.

Q.  Well, you said you have a choice.  You don't have to cooperate?

A.  I don't have to, but it was my choice to cooperate.

Q.  It was your choice?

A.  Yes.

Q.  And I asked you, why don't you just do the time?

A.  'Cause I'm not -- I can't sit --

Q.  You can't, right?

A.  Yes.

Q.  You can't do it.  You are just not going to do that time.
You can't do it, right?

A.  No, not life in jail.

Q.  It just -- and, well, and you've decided you're not going
to go to trial.  You pled guilty because you are guilty, right?

A.  Yes.

Q.  And during your times that you're in the jail, you said
that people in the jail, inmates, they don't talk to each other
about their cases?

A.  Everybody do their own different thing.  I'm not, I'm not
everybody.  What I do, it's totally different what everybody
else do.

Q.  Okay.  Now we'll talk about you right now.  You're saying
that you, you don't talk to people about your case, right?

A.  No.

Q.  And the reason is, it's not a good idea, is it?

A.  No, bad idea.

Q.  And why is it a bad idea?

A.  Can't trust nobody.

Q.  You can't?

A.  You shouldn't trust anybody.

Q.  So anybody who is in jail facing serious time that they can't do, they'd be crazy to talk to other people about their business, right?

A.  Yes.

Q.  Because you never know what people are going to do with what you say.  And if somebody were to say, you know, Bernard Folks, he was in jail and he admitted to me that he did something, they'd be liars, wouldn't they?

MR. ARAVIND:  Objection, your Honor.

THE COURT:  Yeah, sustained.

Q.  Now --

THE COURT:  Mr. Lee, is this a good place to take a short recess?

MR. LEE:  Sure, your Honor, sure.

THE COURT:  Members of the jury, we're going to take a short mid-afternoon recess.  Keep an open mind, come to no conclusions and don't discuss the case.  Please recess the jury.

THE DEPUTY CLERK:  Come to order.

THE COURT:  Everyone can remain seated.

THE DEPUTY CLERK:  Jury exiting.

(Continued on next page)

(In open court; jury not present)

THE COURT:  Mr. Folks may be escorted out.

The defendants may be escorted out.

Any issues that counsel want to raise?  All right. We'll reconvene in ten minutes.  Everyone's to remain seated until the defendants are escorted out.

All right, we'll reconvene in ten minutes.

MR. FEE:  Thank you, your Honor.

THE DEPUTY CLERK:  All rise.

(Recess)

(In open court; jury not present)

THE DEPUTY CLERK:  All rise.

THE COURT:  Everyone may be seated.  Let's bring in the defendants.

Are there any issues counsel wish to raise?

MR. ARAVIND:  Not from the government, your Honor.

THE COURT:  All right, you may bring in the witness.

THE DEPUTY MARSHAL:  Yes, your Honor.  He'll be right down.

(Witness resuming the witness stand)

(Continued on next page)

CA4ZMER5                    Folks - cross - Mr. Lee

THE DEPUTY CLERK:  Come to order, jury entering.

THE COURT:  Members of the jury, we'll resume now with Mr. Lee's continued cross-examination of Mr. Folks.

You may proceed, Mr. Lee.

MR. LEE:  Thank you, your Honor.

Q.  Mr. Folks, you've been incarcerated in Rikers for about many months, and you've been also incarcerated in a federal jail also, correct?

A.  Yes.

Q.  Prior to coming here yesterday and today to testify, right?

A.  Yes.

Q.  And did you ever have conversations with other inmates about going to trial on this case?

A.  No.

Q.  Have other inmates ever expressed to you what they thought about going to trial --

MR. ARAVIND:  Objection, calls --

Q.  -- had you heard?

MR. ARAVIND:  Objection, calls for hearsay.

THE COURT:  Yes, sustained.

Q.  In all your prior cases in which you were arrested, you never faced any sort of a jail sentence like you're facing in this case, correct?

A.  Correct.

(Continued on next page)

BY MR. LEE:

Q.  And in those cases, did you plead guilty?

A.  To one.  To one.

Q.  To one.

A.  Yes.

Q.  And you were guilty?

A.  Yes.

Q.  But in those cases, you, in that case, excuse me, you were willing to do or receive the sentence that the law required you to receive, right?

A.  Yes.

Q.  But you've never been in as much trouble as you are in this case, right?

A.  Yes.

Q.  And when you finally first learned that you would be facing federal charges, you realized you were in much more serious trouble than you've ever been in your life, right?

A.  Yes.

Q.  And you decided that cooperation was the only way out, right?

A.  After a while.

Q.  To avoid getting a mandatory sentence that you must get on the charges that you pled guilty to, right?

A.  To avoid spending the rest of my life in jail.

Q.  Now, you stated that you met T Harrison or T-Money in 2010,

correct?

A.  Yes, around that time.

Q.  Around that time, correct?

A.  Yes.

Q.  And you were around 16 at the time, right?  About?

A.  16, 17.

Q.  16 or 17?

A.  Yes.

Q.  And you stated that after meeting Mr. Harrison, there came a time when you started selling for T-Money, correct?

A.  Yes.

Q.  And you started selling marijuana for T-Money, correct?

A.  Yes.

Q.  And you stated that while you were selling for T-Money, you sold with a person named Dev who is known as Devin Parsons, correct?

A.  Drugs I was selling, Dev was not selling.

Q.  Excuse me?

A.  The drugs I was selling, Dev was not selling.

Q.  But he was selling for T-Money?

A.  Yes.

Q.  You were selling for T-Money?

A.  Yes.

Q.  Walt, that's Walter Aponte, he was selling for T-Money?

A.  No.

Q.  He was not?

A.  No.

Q.  Was he selling on the strip, 152nd to 158th Street on Courtlandt?

A.  I don't recall Walt selling any type of drugs.

Q.  You call him Au.  That's Aubrey Pemberton.  He was selling for --

A.  I call him Au.

Q.  That's Au Dog?

A.  Au.

Q.  You call him Au or just Au Dog?

A.  Au Dog.

Q.  You called him Au Dog.  He was selling for T-Money, right?

A.  Yes.

Q.  And 13, his name is Enrique Brito, he was selling for T-Money?

A.  Yes.

Q.  And Capo, he was selling for T-Money, right?

A.  Yes.

Q.  Did you ever see Meregildo, Joshua Meregildo, sell for T-Money?

A.  No.  I ain't see Meregildo deal any drugs.

Q.  You also saw -- was Anthony Crocker selling for T-Money?

A.  Yes.

Q.  And was Carlos Villafranca, maybe you know him as Carlos,

CA43MER6                    Folks - cross - Mr. Lee

was he selling for T-Money?

A. No.

Q. He was part of GFC?

A. Yes.

Q. But he was not selling for T-Money?

A. No.

Q. And Javon Jones, that's the same as Capo, right?

A. Yes.

Q. Now, am I correct that T-Money controlled a street that's called -- they called it the strip? Did you ever hear that term, Mr. Folks?

A. Yes, I heard that term before.

Q. Was that on Courtlandt Avenue, between 152nd and 158th Street approximately?

A. Yes.

Q. That's where you would be selling at, that location?

A. Yes.

Q. You were there you stated every day?

A. I said every day or every other day I would be with them, everybody else while they were selling.

Q. So everybody was at that location, does it the strip --

A. Yeah, we call it the strip.

Q. You call it the strip? So when I ask you about something called the strip, you know what I'm referring to?

A. Yes.

Q.   That's that area on Courtlandt from about 152nd to 158th, correct?

A.   Yes.

Q.   And in fact, am I correct that Au Dog, he was the biggest money maker, wasn't he, for T-Money?

A.   No, he wasn't.

Q.   Well, he was selling a lot, wasn't he?  A lot, he was frequently out there on the strip selling, right?

A.   Yeah.

Q.   And you were frequently out there, right?

A.   Yes.

Q.   And who was the biggest seller for T-Money?

A.   14.

Q.   14?

A.   Yes.

Q.   So all these people are out there selling for T-Money, correct?

A.   Yes.

Q.   And they're making money for T-Money, right?

A.   Yes.

Q.   And T-Money's benefiting because he has all these people selling for him and he's getting a kickback or a percentage, right?

A.   Yes.

Q.   And T-Money, he would be there a lot or all the time on the

strip?

A.  He be there at times.

Q.  He would be there watching the operation?

A.  No, he had sales on drugs too.

Q.  Now, so, you stated that you did not finish high school, right?

A.  No, I didn't.

Q.  You went up to the 10th grade?

A.  I finished the 10th.

Q.  You finished 10th and then you didn't finish, right?  So, did you go to the same high school with Joshua Meregildo?

A.  No.

Q.  So you don't know any of his classmates or the people that he knows from his high school, correct?

A.  I'm not sure who he know.  I don't know if we know the same people.

Q.  You said --

A.  From school.  I don't know if we know the same people from school.

Q.  The people that he would hang out with in connection with the high school, you don't know who they are, right?

A.  No.

Q.  And you said that you joined GFC because it gave you -- did you say it gave you love, it made you feel safe, right?

A.  Yes.

Q.  And but, am I correct, you told me that people like Carlos, they did not sell for T-Money?

A.  No.

Q.  But they were GFC?

A.  Yes.

Q.  You told me people, there were other people like Walt, he didn't sell for T-Money, but he was GFC, right?

A.  Yes.  GFC is GFC.

Q.  So GFC, you don't have to sell drugs for T-Money to be a member of GFC, right?

A.  No.

Q.  And you said at the bird cage there would be meetings of GFC.  Is that what you said?

A.  Yes.

Q.  Now, the bird cage, is that like an area where the basketball court is?

A.  Yes.

Q.  It's right there in the Melrose Jackson Houses area?

A.  Jackson.

Q.  It's right there in the middle of it, right?

A.  Yes.

Q.  And am I correct that when you said that GFC would meet at the bird cage sometimes?

A.  Yes.

Q.  They would hold meetings.  When the prosecutor asked you

CA43MER6                    Folks - cross - Mr. Lee

questions, you said that you hold meetings there?

A.  I said meetings would be held there.

Q.  Okay.  And now, at these meetings -- at that time, did you attend meetings there at the bird cage?

A.  Yeah, I been to a couple.

Q.  Just a couple.  But there were more than a couple of meetings, right?

A.  I been to -- I been to a lot of meetings.

Q.  Well, is a couple what you mean when you say a lot or is a couple two?

A.  When I said a couple, I mean it could be two, it could mean more than two.

Q.  Well, can you give me -- all right.  Now, these meetings, you said, they are on the basketball court, right?

A.  Yes.

Q.  Now, people when they are at the basketball court during these meetings, are they also shooting hoops and playing basketball?

A.  Yeah.  People are doing whatever they felt like doing.

Q.  They are not sitting down -- withdrawn.  And people maybe hanging out, playing music during these meetings?

A.  Yeah, they be people around playing basketball.  People doing whatever they feel.

Q.  People, maybe not GFC, they're shooting some hoops and playing some music also?

A.   Not us.  We would be talking.  And whoever around, if they hear, they hear.

Q.   If they hear --

A.   We don't be talking about anything that's crazy.

Q.   When you say you're not talking about anything crazy, you mean you're not talking about committing crimes?

A.   Yeah, we don't be discussing that.

Q.   You wouldn't be discussing that at these meetings, right?

A.   It will happen at a point, but not in the open like that.

Q.   Maybe at these at the basketball court during these meetings, people maybe smoking some marijuana sometimes?

A.   Yeah.

Q.   Maybe drinking sometimes?

A.   Yeah.

Q.   Hang out in general, right?

A.   Yeah.

Q.   And there is no set time; the meetings occur any time, right?

A.   No.

Q.   And playing dice maybe, fooling around, everything?

A.   Yeah.  People do a lot of different things.

Q.   So you weren't a regular at the meeting.  Right?  Sometimes you were there, sometimes you weren't, right?

A.   Yeah.

Q.   Really, if you were interested in going out there and

CA43MER6                          Folks - cross - Mr. Lee

hanging out, then you would be at the meeting, right?

A.   Yeah.

Q.   Okay.  And there wasn't -- if you don't attend the meeting,
there ain't no punishment, like there ain't no rule, like
mandatory you got to be there, right?

A.   No.

Q.   Now, T-Money had an arrangement with the people who work
for him, if they sold for him, they would get a cut, right?

A.   Yes.

Q.   Now, and you stated that T-Money in the beginning he was
nice to you, he would give you some money to help you out,
right?

A.   We always had a good relationship.

Q.   Excuse me?

A.   We always had a good relationship.

Q.   Yes.  What I meant to ask was early in your relationship,
am I correct you stated that he had given you some money,
right.  Helped you out?

A.   I said later on.

Q.   Maybe I can clarify if I had a chance.  He started out
giving you money to be nice to you, and then you decided you
wanted to earn your money by selling, correct?  That's what you
said?

A.   I said when we first met it was strictly, it was just
business.  Then later on we got to know each other.  From there

if I had any problems with money or if I wanted to purchase anything, if I had a certain amount, I needed more, I would ask him.

Q.   Okay.  So your relationship was good that if you were in a financial bind or you were having hard times, he would help you out, he'd give you some money?

A.   Yeah, he help me out.

Q.   Did T-Money ever pay you to go shoot somebody, the Maria Lopez crew?  Did he ever promise you like a deal, like I'll pay you to go shoot the Maria Lopez crew?  Did he ever do that?

A.   No, I ain't even heard about him paying anybody to go do anything.

Q.   And isn't it a fact that T-Money, do you recall even when he would ask you to come along and do something, I mean, you do it, not because he's going to pay you, right?  You go along with him because you want to help out, right?

A.   You saying a lot of different things.  Can you just --

Q.   Sure.  Okay.  Now, it is a fact, is it not, that T-Money, he doesn't have to pay anybody to ask them to help him out, right?

A.   Repeat your question?

Q.   Were people doing things for T-Money because perhaps they were a little bit frightened of him?

          MR. ARAVIND:  Objection, calls for speculation.

          THE COURT:  Sustained.

Q.  Were you sometimes doing things at T-Money's request because you were frightened of him?

A.  Not at all.  The only thing I did with T-Money was sell drugs.

Q.  You remember in connection with when you pled guilty, that you said that when you followed T-Money to where he asked you to go, you felt like you had to go, you couldn't say no to him. Do you recall saying that to the judge when you pled guilty?

A.  What I said, I said -- yeah, I felt I had to go with him because, prior to that, when it was an attempt on his life I had ran away.

Q.  So you didn't go with him because he offered you to pay money?

A.  Not at all.

Q.  It was you felt like -- all right.  I want to just ask you something about -- withdrawn.

I want you to think back to September 13, 2010. That's the date that you said that you went to 321 East 158th Street, right?

A.  Yes.

Q.  That's the date --

A.  153rd Street.

Q.  153 Street.  That's the date that you, you had a .40 in your hand, and you shot at people, right?

A.  Shot at one person.

Q.  You stated that this was after T-Money had been killed, right?

A.  Yes.

Q.  And you were close to T-Money and you were angry, right?

A.  Yes.

Q.  And you believed that people connected to the 321, the Luchie group, that they were somehow behind the killing of T-Money, right?

A.  Yes.

Q.  So, you were going to get back at them, right, for doing that by T-Money?

A.  I spoke about it.  But nothing really was planned for anything to happen between us.  Because at the time I was staying in the building with all -- in building 321 where everybody, so I had a relationship with them.  So me having problems with them wasn't really on my mind.  At the end of the day, whatever happened in the afternoon, at nighttime I still go in that building to go home and go to sleep.

Q.  Well, you did shoot at people that you knew were 321 people, correct?

A.  That day, yes, I shot at that one person.

Q.  On September 13, right?

A.  Yes.

Q.  You shot at one person.  And that person you know him as T?

A.  Yes.

Q.  And his name is Joseph Tarean?

A.  I don't know his name.

Q.  You know him as T?

A.  Yes.

Q.  And you know him to be a 321 person?

A.  Yes, he hangs out there, yeah.

Q.  You shot at him, right?

A.  Yes.

Q.  And he was with another person TA; you know him, Terrence Williams?

A.  TA from my knowledge is not from Courtlandt.

Q.  But did you shoot at another person that you know him as TA?

A.  No.

Q.  He was there with two other people?

A.  Was who there with who?

Q.  T.

A.  T was with three other people.

Q.  With three other people?

A.  Yes.

Q.  And they when you looked at them, they're 321 people, right?

A.  Two of them wasn't.  Just one other person.

Q.  The reason you shot at T was because he was 321, right?

A.  No.  Because in the moment, that's what I was told to do.

Q.  At the moment, you shot at T, right?

A.  Yes, after I was told.

Q.  And T you believed was responsible for killing T-Money, right?

A.  No, I never said he was responsible.

MR. LEE:  Excuse me, your Honor.

THE COURT:  Take your time.

Q.  Now, you stated that Meregildo on September 13 called you on the phone, right?

A.  Yes.

Q.  And you stated that you were at the apartment of Dante Barber, right?

A.  Yes, in building 321.

Q.  And you were there with Dev Parsons, right?

A.  Yes.

Q.  And you stated that Meregildo was asking you to bring him a gun?

A.  Yeah.

Q.  Now, you've stated that the GFC, as far as you knew, had lots of guns, right?

A.  Yes.

Q.  And you stated that anybody who wanted to get a gun would be able to get one?

A.  Yes.

Q.  Meregildo, he called you to get him a gun, right?

A.   Yes.  To bring it down.

Q.   To bring it down to him you say?

A.   Yes.

Q.   Meregildo asked you to get it for him?

A.   Yes.

Q.   You stated there was 10 guns available to anybody in the GFC if they wanted it, they could have access to it.  Is that correct?

A.   I said it was a lot of guns.

Q.   You said there was a lot of guns?

A.   Around, yes.

Q.   Around.

A.   And I put a number 10 on it.

Q.   Excuse me?

A.   And I said like it was around like 10 or more.

Q.   10 or more?

A.   Yeah.

Q.   For people who wanted it, right?

A.   Yeah.

Q.   And then you stated that Dev Parsons was with you, and he came with you, right?

A.   Yes.

Q.   Now, he came down, you had one gun, right?

A.   Yes.

Q.   Did Dev Parsons get a gun?

A.   No.

Q.   Was Dev Parsons, according to you, part of GFC?

A.   Yes.

Q.   Was he someone who, if he wanted to, he could get a gun?

A.   Yes.

Q.   No problem, right?

A.   No problem.

Q.   So he came with you, and you went down, and, you say, you
met with Mr. Meregildo, right?

A.   Yes.

Q.   And after Mr. Meregildo had asked you to get him a gun,
what happened to that gun?  Did he take it?

A.   After he told me to bring the gun down --

Q.   Did he take it, yes or no?

A.   No.

Q.   In fact, he didn't take it from you.  You -- he didn't take
it when you offered it to him.  You put it in your waistband.
Right?

A.   Yeah.

Q.   So, now, you, according to your testimony, you have the gun
in your waistband?

A.   Yes.

Q.   And Mr. Meregildo has nothing.  He's totally unarmed,
right?

A.   Yes.

Q. And now at some point, according to you, you go and you meet up with other people, and you and Dev, when you meet up, you say Mr. Pierce and Mr. Meregildo are there, right?

A. Yes.

Q. Now, at that point, during the entire time, from the moment you first met Mr. Meregildo, until after the shooting and fleeing, Mr. Meregildo never had a gun in his hand?

A. Since when?

Q. Since the time that you came down with Dev Parsons, you stated that he did not take a gun from you, right?

A. No, he didn't.

Q. And Dev Parsons didn't go and get a second gun, didn't go get a third gun, right?

A. No.

Q. And then you said that everybody went to the front of 321 eventually, right?

A. When we went to Harlem and we came back.

Q. When you went to Harlem?

A. Yes.

Q. So you didn't go right away to 321.  So, during that time, did Mr. Meregildo go anywhere to try to obtain a gun?

A. No.

Q. So, he remained unarmed when you went to Harlem, right?

A. Yes.

Q. And Mr. Parsons, he didn't go along, did he?

A.   No.

Q.   He did not have a gun?

A.   No.

Q.   He never made an effort to get a gun, did he?

A.   No.

Q.   And did he ever express to you or to anyone that he certainly was not going to go along since he was unarmed?  Did he ever say that to you?

A.   No.  I told him --

Q.   I asked you, yes or no.  Did he ever say that to you?

A.   No.

Q.   And he left?

A.   Yes.

Q.   He decided he was not going to go, correct?

A.   I told him I'm going.

Q.   You told him you're going?

A.   Yeah.

Q.   And he told you he was not going?

A.   He walked home.  He ain't say no words.

Q.   Okay.  And he was there when you received a call from Meregildo as you say, right?

A.   Yes.

Q.   And then, the three of you, you say, go to the front of 321 eventually after going to Harlem, right?

A.   Yes.

Q.  And you're saying that when you were going to 321 East 153rd Street, did you know how many people from 321 you might encounter in front of 321?

A.  No, and I wasn't worried about it.

Q.  Well, you weren't worried about it, you had a .40 in your waistband, right?

A.  Yeah.

Q.  And when you were going to 321, did you have any idea whether would you see four people or even 10 people from 321 in front of that building?

A.  No, and it didn't matter to me.

Q.  And you didn't know how many dozens might be there in the front of 321 with each of these people, did you?

A.  No, and it ain't matter.

Q.  And it didn't matter to you.  Did you feel that -- and it didn't matter to you because you were armed, right?

A.  That's not the reason.

Q.  Well, if you go to 321, whether it's three people with guns or 10 people guns, it don't matter to you, right?

A.  No.

Q.  And in front of 321, if they shoot, you can shoot back, right?

A.  Yes.

Q.  And you did shoot that day with your gun, right?

A.  Yes.

Q.   And you stated that Mr. Meregildo went with you to 321, right?  Right?

A.   He came to 321 to pick me up.

Q.   Well, when you were in front of 321 shooting at these people, was Mr. Meregildo with you or not?

A.   Yes.

Q.   He was with you?

A.   Yes.

Q.   Okay.  So he did go with you to 321.  Right?

A.   When we came back.

Q.   That's right.  When you came back.  And at the time of the shooting, you're telling the jury he was in front of 321 with you, right, when you were shooting?

A.   When I started shooting, yeah, I eventually was in the middle.

Q.   Yes, I'm asking you, when you were shooting at the people at 321, you're saying that Mr. Meregildo was with you?

A.   Yes.  I shot at one person.  He was with me.

Q.   Unarmed?

A.   Unarmed.

Q.   By you, right?

A.   Yes.

Q.   And you say that people are shooting back?

A.   That person -- the person did not shoot back until -- way after.

Q.  And prior --

MR. ARAVIND:  Your Honor, can he finish answering the question?

THE COURT:  Let him finish.

MR. LEE:  Yes, your Honor.

THE COURT:  Thank you.

Did you finish?

THE WITNESS:  Yes.

THE COURT:  Okay.

Q.  Prior to getting to 321, did Mr. Meregildo ever express concern to you that -- you stated he never made any effort to try to get a gun, right?

A.  No, except for when he called me downstairs to bring it to him.

Q.  And you took that gun that you brought down to Meregildo, correct?

A.  I brought it down, yes.

Q.  After the shooting, did something happen to Dante Barber?

A.  Yes.

Q.  Dante Barber, he's the person whose apartment you came from prior to going to the shooting, right?

A.  Yes.

Q.  And am I correct that this person, Dante Barber, he was a person who, he basically stored guns in his apartment, right?

A.  Yeah, guns was kept there.

Q.  Guns were kept there; more than one, right?

A.  Yes, on occasions.

Q.  Well, wasn't that his responsibility?  He was the person, he kept guns in his apartment.  Wasn't that his job, keeping guns in his apartment?

A.  It wasn't his job.  If they just so happen to be left there, it was left there.  Whoever was there with him or if he was by hisself was accountable for them.

Q.  Based on your experiences, oftentimes there were multiple guns kept at his apartment, right?

A.  Yeah, at times it would be.

Q.  At times.  On that day, he's with you at the time that you say you get a call from Mr. Meregildo, right?

A.  Yes.

Q.  Now, after the shooting on 321, what happened to Dante Barber?

A.  I wasn't around.  I heard he got assaulted.

Q.  He got assaulted by who?

A.  By the same people.  321.

Q.  So after the day of the shooting, this person Dante Barber is stabbed by these people.  He is stabbed with an ice pick by the 321 people, right?

A.  I don't know what he got stabbed with.  I wasn't around.

Q.  But the 321 people did it to him you believe, correct?

A.  Yes, that's what I heard.

Q.   So the 321 people, after this shooting, they stab Dante Barber, right, correct?

A.   That's what I heard, yes.

MR. BECKER:  Objection.  Sounds like pure hearsay.

MR. LEE:  May I have a moment, your Honor?

Q.   Now, people, as far as you knew, was anybody else hurt by 321 at that time when they stabbed Dante Barber?  Just him?

A.   I don't -- I don't know.  I was not there.

THE COURT:  Mr. Lee, with respect to Mr. Becker's objection, I'm going to sustain it.  I'm striking the witness's answer to the last question that that's what he heard.  Unless you want to establish who he heard it from.

Q.   Now --

MR. LEE:  I understand, your Honor.

Q.   Now, do you know that Walter Aponte has pled guilty, correct?

A.   I don't know what he did.

Q.   You don't know that?

A.   I don't know.  I never speak to him.  I ain't see him.

Q.   You don't know that Walter Aponte is cooperating?

A.   I don't know.

Q.   Have you heard anybody tell you that?

MR. ARAVIND:  Objection.  Calls for hearsay.

THE COURT:  Sustained.

Q.   Do you know whether Aubrey Pemberton is cooperating?

A.   That's -- I heard it.

Q.   Do you know that Devin Parsons is cooperating, correct?

A.   I heard it too.

Q.   As you've been asked, if they're cooperating, there's no need for you to testify against them because they're not going to trial, correct?

        MR. ARAVIND:  Objection, your Honor.

        THE COURT:  Sustained.

Q.   As far as going to this 321, was anybody else as far as you know called to go to the 321 building?

A.   What do you mean?

Q.   Well, besides the people that you say went, did anybody else get called to go there?

A.   Called to go to 321?

Q.   Yes.

A.   For what reason?  I don't understand what you are trying to say.

Q.   There was no reason to call anybody as far as you know?

A.   For who to call anybody?

Q.   I'll withdraw it.

        Now, you've stated that there came a time, maybe a couple of days, that there came a time that you stated that Mr. Meregildo told you that he had killed someone?

A.   Yes.

Q.   Now, and he -- were there any witnesses to this when he

said that to you?

A.  I remember him telling me.  If anybody was around, I don't know.  I don't remember.

Q.  Did Dev Parsons ever say to you that he had murdered somebody with Mr. Meregildo?

MR. ARAVIND:  Objection.  Calls for hearsay.

THE COURT:  Sustained.

Q.  Did Mr. Aponte ever admit to you or say to you that he had killed somebody with Mr. Meregildo?

MR. ARAVIND:  Objection.  Calls for hearsay.

THE COURT:  Sustained.

MR. LEE:  Your Honor, as co-conspirators, it's probably not hearsay.

THE COURT:  All right.

MR. ARAVIND:  Your Honor, I don't understand.  They're not a party opponent.

THE COURT:  No.  They're alleged co-conspirators.  Right?  It's not hearsay if it's said in furtherance of the conspiracy.

Q.  You stated --

THE COURT:  So if you want, you can put the questions to him again.  Okay.

MR. LEE:  I'll withdraw it and I'll go in progression, your Honor.  I can do that.

THE COURT:  All right.

Q. You've stated that you heard -- you believe that Dev Parsons is cooperating, right?

A. That's what I heard. I don't know.

Q. Well, that's what you heard. Did Devin Parsons ever -- withdrawn.

You didn't testify yesterday or today that Devin Parsons ever admitted to you that he killed someone with Meregildo, did he?

A. He never told me that.

Q. And Walter Aponte. You never testified -- he never -- that he told you that he had killed somebody with Mr. Meregildo, correct?

A. No.

Q. He never told you that?

A. He never told me that.

Q. Now, Dev Parsons, he's one of the people that you would see -- in fact, he was in the apartment with you that date when you were with Mr. Dante Barber on September 13, right?

A. Yes.

Q. And he's one of the people who sold for T-Money a lot, right?

A. Yeah.

Q. And he's one of the people that you would see all the time, right?

A. Yes.

CA43MER6                    Folks – cross – Mr. Lee

Q.   And he's one of the people that you were close to, right?

A.   Yes.

Q.   And but he's someone who never said that to you, right?

A.   No.

Q.   Now, you know, prior to your joining GFC, where were you living?

A.   3050.

Q.   When you were about 16 or 17?

A.   At that time, I was already out of foster care, but I used to still stay with my old foster mother.  I was just going back and forth.

Q.   So I guess you stated on your direct you were bouncing around?

A.   Yes.

Q.   But eventually, you joined GFC because you felt it would just make you feel good, like there was a family.  Is that what you said?

A.   Yes.

Q.   Not because -- and at that time, you were not joining to sell drugs.  You were joining because you like to be part of that group, right?  It felt safe and you respected each other, right?

A.   Yes.

Q.   So, but you realize now that your testimony here is going to be something upon which Mr. Meregildo may be convicted of a

very serious crime, right?

A. Yes.

Q. You're testifying against one of these people that you say were part of a group that provided you love and you all respected and cared for each other, right?

A. Yes.

Q. And, well, if you could speak to Mr. Meregildo, would you say to him, listen, it's nothing personal?

MR. ARAVIND: Objection, your Honor.

THE COURT: Sustained.

Q. Well, it's nothing personal against Mr. Meregildo, right?

MR. ARAVIND: Objection, your Honor.

THE COURT: Sustained.

Q. Well, you're testifying here because that's the only way you're going to get out of jail as soon as possible, right?

A. Anything could happen.

Q. Yeah. And you have nothing against Mr. Meregildo personally, right?

MR. ARAVIND: Objection, your Honor.

THE COURT: Sustained.

Q. You're just doing, is it fair to say you're just doing what you have to do to take care of yourself, right?

A. I'm making my own decisions.

Q. And this means that you're doing what you think is right for you, right?

CA43MER6                     Folks - cross - Mr. Lee

A.   I'm making my own decisions.

Q.   Is that what it means, "making your own decision"?  You're doing what's right for you?

A.   Yes.

Q.   And for your sister?

A.   For me.  This don't have nothing to do with nobody but me.

Q.   Nobody but you.  If it hurts somebody else, as long as it's right for you, it's okay?

A.   I don't -- intend to hurt anybody else.  I'm just telling the truth.

Q.   Well, you're watching out for yourself here, right?  Right?

A.   Yeah, I admit to what I've done.

Q.   You are not here just to tell the truth for the sake of telling the truth.  You are going to get something back, right?

A.   It's not definite.  It's not for sure.

Q.   That's because you haven't even received a 5K letter yet, have you?

A.   No.

Q.   So, that's something that you're hoping to get after you testify at trial against Mr. Meregildo, right?

A.   That's the risk I'm willing to take.

Q.   Well, it's not guaranteed that you will get your 5K letter, right?

A.   No.

Q.   And that's the 5K letter we've been talking about that will

let you be sentenced to less than the mandatory minimum?

A. Yes.

Q. And it's not guaranteed because you don't know if the prosecution is going to even write it for you, right?

A. No.

Q. Right now, as you sit there, you don't know whether they're going to do it for you, do you?

A. No.

Q. It's only going to occur after you testify here on their behalf, correct?

A. I'm not for sure after this or whenever trial is done.

Q. But it's certainly not going to occur until you have testified here on their behalf, right?

A. At a point it going to happen.

Q. Yes, at a point. After today and after you finish testifying, right?

A. I think so, yes.

Q. Right.

        MR. LEE: I have no further questions, your Honor.

        THE COURT: Mr. Dinnerstein?

        MR. DINNERSTEIN: Yes, your Honor.

CROSS-EXAMINATION

BY MR. DINNERSTEIN:

Q. Mr. Folks, you say you are now 19, is that correct?

A. Yes.

CA43MER6                       Folks - cross - Mr. Dinnerstein

Q.   You turned 19 on May 30 of this year, is that right?

A.   Yes.

          THE COURT:  Go for the mike.

          MR. DINNERSTEIN:  Okay.

          THE COURT:  Thanks.

          MR. DINNERSTEIN:  I don't get accused often of not being able to be heard.

          THE COURT:  It's a very big courtroom.

          MR. DINNERSTEIN:  Okay.

Q.   Now, Mr. Folks, you were born on May 30 of 1993, is that correct?

A.   Yes.

Q.   You said, sir, that you started being in the GFC when you were between 15 and 16, is that correct?

A.   Yes.

Q.   So when you were 15, it was May 30 of 1998, is that correct?

A.   No, that's not correct.

Q.   Well, when did you turn 15, sir?

A.   May 30, 2005.

Q.   You turned -- you're right.  You're right.  So, May 30 in 2005, actually you turned 12.  Isn't that correct, sir?

A.   No.

Q.   Well, you were born in 1993, right?

A.   Oh.  2008.

Q.  In 2008 you turned 15, right?

A.  Yes.

Q.  In 2009, on May 30, you turned 16, right?

A.  Yes.

Q.  When did you join GFC?

A.  When I was around those -- it was between them ages, around age 15 or 16.

Q.  15 or 16.  So you joined GFC in May of 2008 at the earliest right?

A.  I don't remember the exact time between those ages.

        MR. ARAVIND:  If the witness could finish his answer.

Q.  Did you finish the answer, Mr. Folks?

A.  Yes.

Q.  So you joined GFC in May -- sometime in 2008, right?

A.  It's when I was 15 or 16, going on that age.

Q.  Okay.  You were not in GFC in 2007, is that correct?

A.  No.  I don't think so.

Q.  Because you were 15, 16 when you joined it, right?

A.  I think so, around them ages, yeah, I would say.

Q.  In 2008, did you see Melvin Colon?

A.  I don't remember.

Q.  Did you ever see Melvin Colon?

A.  Yes.

Q.  When?

A.  We used to go to middle school together.  After all of

that, I ain't see him for a long time.

Q. You knew him from middle school, right?

A. Yeah.

Q. And actually he was older than you, isn't that correct?

A. Yeah.

Q. He was about a year older than you?

A. Yes.

Q. And he actually did pretty well in school, right?

A. I don't know how he did in school.

Q. You didn't too well in school, did you?

A. I was -- I was -- I was good in school.

Q. You were good in school?

A. In that time, yeah.

Q. I see. Now, what school was that?

A. Huh?

Q. What school was that?

A. I.S. 151.

Q. You knew him from I.S. 151, is that right?

A. Yes.

Q. Did you hang out together then?

A. On the basketball court. We played basketball together.

Q. Actually, Mr. Folks, you didn't play much basketball, isn't that correct?

A. I played a lot of basketball.

Q. Isn't it correct that you were a very lousy basketball

player?

A.   That's false.

Q.   You were a really good basketball player?

A.   I considered myself good.

Q.   You considered yourself.  How about the other kids; did they consider you good or did they think you were lousy?

MR. ARAVIND:  Objection, your Honor.

THE COURT:  Sustained as to form.

Q.   Do you think that the other people thought you were a good basket ballplayer?

A.   Yeah.

Q.   Isn't it a fact, sir, that the only time you ever got to play is when there weren't enough kids to play?

A.   That's not true.

Q.   And Melvin, he was a very good basketball player, isn't that right?

A.   Yeah, he got -- he played too.

Q.   He was a lot better than you, right?

A.   He could play too.

Q.   No.  I'm saying he was a lot better than you.  Isn't that right?

A.   I wouldn't say so.

Q.   You were as good as he was?

A.   Yes.

Q.   Be a good basketball player was important in your

community, isn't that correct, sir?

A.  My community a lot of things were going to happen.

Q.  I asked you, sir, if you were a good basketball player, you got some status in the community, isn't that correct?

A.  Can you -- can you repeat that question?

Q.  Do you know what "status" means?

A.  Explain it to me, please.

Q.  Sure.  Do you know what reputation means, to have a big reputation?

A.  Yes.

Q.  Okay.  If you were a good basketball player, did you have a bigger reputation than somebody who was a lousy player?

A.  Yes.

Q.  So it was important to be good in basketball in your community, isn't that correct?

A.  I had my feelings about it.  I took it -- I took it serious at the time.

Q.  You took basketball seriously, right?

A.  Yes.

Q.  You wanted to be really good at basketball, right?

A.  Yes.

Q.  In fact you weren't, right?

A.  I was good.

Q.  Were you as good as Mel?

A.  Yes.

CA43MER6                    Folks - cross - Mr. Dinnerstein

Q.  You were better, right?

A.  I wouldn't say I was better than anybody.  But we was -- we was at the same level.

Q.  The same level as you, right?

A.  Yes.

Q.  So it's now your testimony, sir, that you met him at school, and you met him on the basketball courts.  Is that correct?

A.  I met him at school and we got to know each other from playing on the basketball courts.

Q.  And you would play with a lot of kids, right?

A.  A lot of kids.

Q.  A hundred kids maybe sometimes?

A.  A lot of kids.

Q.  How many is a lot?

A.  There is only a certain amount of people allowed to play on one court at a time.

Q.  I understand.  It's five on five, right?

A.  Yeah.

Q.  And there is how many courts?

A.  Only one court that was in the schoolyard.

Q.  There is a court in the schoolyard; there is also a court in Jackson, right?

A.  We wasn't hanging together outside of school.

Q.  So the only time you would see him to play basketball was

CA43MER6                    Folks - cross - Mr. Dinnerstein

in the schoolyard like during recess, is that correct?

A.  Yeah, at that time we was going to middle school.

Q.  And there would be a lot of kids out there playing
basketball during recess, right?

A.  Yes.

Q.  Other than playing basketball during recess, you didn't
play basketball with him, is that correct?

A.  Not -- in the street, no.

Q.  You didn't go to wherever he lived.  You didn't know where
he lived, right?

A.  At the time, no.

Q.  You weren't really friendly with him.  You were just
somebody who would play during recess at I.S. 151.  Is that
correct?

A.  Yes.

Q.  And then all of a sudden, you didn't see him.  Is that
correct?

A.  Yes.

Q.  And then you decided you were going to join GFC, right?

A.  No.

Q.  You didn't decide that?

A.  That was way later on down the line.

Q.  It was way later after you saw him, after playing
basketball at I.S. 151, that you decided you would join GFC,
right?

A.  Yes.

Q.  That was because it was a friendly place that had a lot of love, is that correct?

A.  Repeat that?

Q.  It was the reason you wanted to join it was because this was going to be your family, is that correct?

A.  I felt that way after.

Q.  After you joined it?

A.  Yes.

Q.  After you joined GFC, there must have been a lot of kids that you were hanging out with, is that correct?

A.  Yeah, yes.

Q.  How many?

MR. ARAVIND:  Your Honor, I don't think Mr. Folks heard the question.

Q.  How many kids were in GFC that you were hanging out with?

A.  At the time even though I was GFC, I wasn't hanging out with everybody that was GFC.  To me I don't care if you're GFC when I first met.

Q.  Isn't GFC supposedly part of your family?

A.  Yeah.  But at that time, even though I was GFC, I still had to, like, know people.  Not just, oh, you GFC.  You considered my family, no.  I feel about you, you still have to earn that.

Q.  The question I asked you is how many people are in GFC?

A.  The truth be told, it's not even an exact number.  I don't

know.

Q.   Was it more than a hundred?

A.   At the time?

Q.   Yeah.

A.   At the time, no.  It was a good -- from my knowledge it was like 25 to 30.

Q.   How many of those people do you know their name or their nickname?

A.   I know -- I know a lot -- a couple of names, yeah, a lot of they names.

Q.   Tell us some of the names that you knew.

A.   Me.  Melly.  Killa.

Q.   Wait a minute.  Melly, when you joined GFC, wasn't around.  You just told us that.

A.   Yeah, I just told you he wasn't around, but he was GFC.

Q.   When did he join GFC?

A.   I don't know when he joined GFC.

Q.   How do you know he joined GFC?

A.   I knew he was in GFC when we were in school together.

Q.   When you were in elementary school?  I mean junior high school, he was in GFC?

A.   Yes.

Q.   Is that what you are telling us?

A.   Yes.

Q.   Did you ever hear of the name Get Fresh Crew?

A.  Yes.

Q.  So, you heard the name Get Fresh Crew?

A.  Yes.

Q.  What did that mean?

A.  That was like -- other -- other ways, like, other saying for GFC.

Q.  So that's a GFC, that's God's Favorite Children, and there is a GFC that is Get Fresh Crew, right?

A.  Yes.  Yes.

Q.  And the GFC that was Get Fresh Crew was before 2008, is that correct?

A.  Get Fresh Crew and GFC was not like -- that's just what somebody say.  I don't know how to really explain it, but --

Q.  What do you mean you don't know how to explain it?

A.  GFC is GFC.  But what them three letters, you can make up whatever you want to say.  Good Fried Chicken.  God Favorite Child.  Whatever you want to say.

Q.  And that's what people did who were members of some organization called GFC?  They could call it -- it could be whatever they wanted it to be, right?

A.  That's just playing around.  You can say anything.

Q.  What's playing around?

A.  Say, like, giving it its own name.

Q.  Okay.  What's its own name?

A.  GFC.

Q.  What does it mean?

A.  God Favorite Children.

Q.  When did you learn about God's Favorite Children?

A.  I always heard about it.

Q.  I'm talking about, sir, when you were in elementary -- when you were in junior high school at I.S. 151, you heard about Get Fresh Crew.  Is that correct?

A.  I heard about God Favorite Children.

Q.  What?

A.  I heard about God's Favorite Children.

Q.  I understand that.  But you also heard about Get Fresh Crew, right?

A.  Ain't no such thing as Get Fresh Crew.

Q.  Maybe there's no such thing as God's Favorite Children.

        MR. ARAVIND:  Objection.  I'm not sure if that's a question or not.

        THE COURT:  Do you want to put a question to the witness.

Q.  Okay.  You say, sir, there is such a thing as God's Favorite Children and you were a member of it, right?

A.  Yes.

Q.  And you say at least 25 or 30 people were also members, right?

A.  Yes.

Q.  And you know the names of how many of those 25 or 30

people?

A.   A lot of them.

Q.   How many?

A.   A lot of them.

Q.   Tell us?

A.   Majority of them.

Q.   Tell us the names, sir.

A.   At the time it was me, Melly, Killa, Young Mel, Vic, Baby, Tay, Buck, Juntao, 13.

Q.   Anybody else?

A.   Aubrey.  I'm not sure if I said that.  Dev.  K Off.  Murder Mel.  Gonna.

Q.   Now, are all those people, you say all those people are in GFC, right?

A.   Yes.

Q.   Okay.  And were all those people committing crimes?

A.   I don't know what they was doing on their own personal time.

Q.   I see.  So sometimes some of the people who were in GFC were living law-abiding lives.  Is that your testimony, sir?

A.   I don't know what they was doing with their lives.  I can't say what they was doing.

Q.   You don't know whether they were involved in criminal activity or not, is that your testimony, sir?

          MR. ARAVIND:  Objection.  Asked and answered.

THE COURT:  Overruled.

A.  Only the people that I knew personally, and I knew what they was doing.

Q.  Sir, you just went through a whole bunch of names, right? Those people you say are in GFC, right?

A.  Yes.

Q.  Were all those people involved in criminal activity since you knew them?

A.  You saying all of them.  Not all of them.

Q.  So some of them were not involved in criminal activity?

A.  Yes.

Q.  Which ones weren't?

A.  I could say like Buck.

Q.  Hulk?

A.  Buck.

Q.  Bulk?

A.  Buck, B-U-C-K.

Q.  Buck.  Okay.  He wasn't involved in criminal activity?

A.  Uh-uh.

Q.  But he was in GFC?

A.  Yes.

Q.  Anybody else?

A.  At the time, 12.

Q.  12?

A.  Young Mel.

Q.   I'm sorry?

A.   12, Young Mel.

Q.   Young Mel?

A.   Yes.

Q.   How old was Young Mel?

A.   I don't know.

Q.   Was he younger than you?

A.   Nah.  He was older than me.

Q.   He was older than you?

A.   Yes.

Q.   So Young Mel was older than you?

A.   Yes.

Q.   How old were you?

A.   Young.

Q.   What?

A.   Younger than Young Mel.

Q.   I understand that.  How many years old were you?

A.   I'd say a year or two.

Q.   A year or two?

A.   Yes.

Q.   What does that mean?

A.   A year.

Q.   You were a --

A.   A year or two years younger than him.

Q.   You started being in this organization when you were 16,

CA43MER6                    Folks - cross - Mr. Dinnerstein

right?

A.    15, 16, around that, them ages.

Q.    You were arrested in February 6 of 2009, you remember that?

A.    No.  Refresh my memory.

Q.    Okay.  Do you remember -- 3532-C.  Remember being arrested in February of 2009?

A.    I remember this incident, yes.

Q.    Okay.  You were arrested not by yourself, but with a lot of other people, isn't that correct?

A.    Yes.

Q.    Now, tell me if these guys were in GFC or not, the people you were arrested with.

      Talese Knight, was he a GFC?

A.    No.

Q.    Victor Montanez, was he in GFC?

A.    Yes.

Q.    Brandon Bermed, was he in GFC?

A.    I don't know who that is.

Q.    Do you remember somebody named Bernard there or Brandon or anything like that?

A.    Bernard is me.  I don't know who Brandon is.

Q.    What?

A.    Bernard is me.  I wouldn't know who Brandon is.

Q.    You're Bernard Folks, right?

A.    Yes.

Q.  Do you remember somebody named Norrice Turner?

A.  Yes.

Q.  Was he GFC?

A.  At the time, no.

Q.  Jharo Eligio, was he in GFC?

A.  Yes.

Q.  Aubrey Pemberton, he was in GFC, right?

A.  Yes.

Q.  Shawn Deloatchi, was he in GFC?

A.  I don't know who that is.

Q.  You don't know one way or the other about him, right?

A.  About Shawn?

Q.  Yeah.

A.  I don't know who that is by that name.

Q.  Dante Barber, was he in GFC?

A.  Yes.

Q.  Bernard Folks, you were in GFC, right?  Right?

A.  Yes.

Q.  Duvall Morgan.  Was that person in GFC?

A.  No.

Q.  Hassen Brito, he was in GFC, right?

A.  Yes.  You can say that, yeah.

Q.  What do you mean you can say that?  I can't say.

A.  Yeah, he was GFC, yes.

Q.  Delajhi Joyner, what about him; was he in GFC?

A.  No.

Q.  So the people you were arrested with in February of 2009, some were members in GFC and some of them were not.  That's your testimony, right?

A.  Yes.

Q.  So the significance of being in GFC and committing crimes, that doesn't seem to be one, is that correct, sir?

A.  Can you repeat that?

Q.  There isn't any connection between being a criminal and being in GFC, isn't that correct, sir?

A.  Can you repeat that one more time?

Q.  I'll rephrase it.

A.  Yes.

Q.  You commit crimes with people in GFC, right?

A.  Yes.

Q.  And you commit crimes with people who are not in GFC, right?

A.  Yeah, I committed crimes with people.

Q.  This particular crime, half a dozen of these people aren't in GFC, isn't that right, sir?

A.  Yes.

Q.  So, the fact that you are in GFC doesn't mean a blessed thing as to whether or not you would commit crimes with them, isn't that correct, sir?

A.  I didn't just go around committing crimes all the time.

CA43MER6                    Folks - cross - Mr. Dinnerstein

And I don't necessarily got to chill with GFC all the time.

Q.  I understand, sir.  Because some of the crimes you commit you do it by yourself, right?

A.  I never did anything by myself.

Q.  Well, you just talked about -- you talked about before how you went into the, what is it, the shopping mall, and go in there and steal cell phones, isn't that right?

You didn't steal them in the shopping mall?

A.  I snatched them, yeah, yeah, I snatched them in the mall before.

Q.  When you did that, were you by yourself or were you with some other guys?

A.  Yeah, I was with other people.

Q.  You mean there were other people stealing one cell phone too?

A.  No, they would just be with me --

Q.  I'm sorry.  Are you finished with your answer?

A.  No.

Q.  Finish.

A.  At the time, it was just be me and one other.  I wouldn't need a whole crowd of people to come with me.

Q.  What did the other person do?

A.  I just feel better with another person there.

Q.  You mean it was like friendly to have somebody else there with you?

A.  I don't know what it was to tell you the truth.  I just felt better with somebody else there with me.

Q.  Did he help you participate in the stealing of the cell phones?

A.  He ain't help participate.  He was just with me.

Q.  I see.  So he was just hanging out, and you would go and do your thing, right?

A.  Yeah.

Q.  And he wasn't involved in what you were doing, isn't that correct, sir?

A.  He was there with me.

Q.  What?

A.  He was there with me.  I take the phone and I run and he'd run with me.  That's about it.

Q.  Did you give him any money?

A.  Not at all.

Q.  Because you were the one who was the thief, right?

A.  Yes.

Q.  He was just simply there, and you decided you were going to be a thief then.  Is that correct, sir?

A.  I just, yeah, I stole.

Q.  Hmm-hmm.  Now, you also were arrested in November of 2009, isn't that correct, sir?

A.  I don't know.  Refresh my memory.

Q.  Sure.  This is 3532-E I believe.  Is that you?

A. Yeah, I see it.

Q. Yeah.

MR. DINNERSTEIN: Now, your Honor, do you want to break? This will take me just a few minutes then we can break after this, or we can break now, whatever you want.

THE COURT: If it's two minutes, we'll go two or three minutes.

Q. Sir, that time you were arrested with 25 other kids, right?

A. Yes, a lot of people.

Q. A lot of other people, right? Were they in the GFC?

A. Some was, some wasn't.

Q. Okay. So it didn't matter to you when you are out there committing crimes with whether they are in GFC or not, isn't that correct, sir?

A. Repeat that question, please.

Q. First Melvin Colon wasn't with you, right, when you were arrested with 25 other people?

A. No. No.

Q. Now, some of the 25 other people that you were arrested with on that occasion, in November 22 of 2009, at a little bit after midnight, on that date, some of those people were in GFC and some of those people were not in GFC. Is that your testimony sir?

A. Yes.

Q. Out of the 25, how many were in GFC? And I'll bring it up

to you.  We won't go through each of the names.

THE COURT:  He's looking at what, 3532?

MR. DINNERSTEIN:  E.  Thank you, Judge.

A.  I see the only names I recognize is me and one other.  Me and one other person, so it would be two people.

Q.  Two people in GFC, and 23 people who are not in GFC.  Is that your testimony, sir?

A.  Two that I know they names, only two of the names that I know of being GFC.

Q.  And the others are not to your knowledge, right?  As you sit there, these people who you claim is your family, is that right, sir?

A.  I do not know the rest of their names, so I can't say whether they're GFC or not.

Q.  You don't think the people in your family you would know their names?

A.  This wasn't no real family.  So --

Q.  Didn't you say when the prosecutor was asking you questions, that this was like a family to you?

A.  It was like a family.  It was not a real family.

Q.  Well, your family, sir, a real family, you would know the people's names, isn't that right, sir?

A.  Can I finish my answering the question before you go and on to the next one?

Q.  Sure.

A.   Now, can you repeat your question?

Q.   Which question do you want to hear?

A.   The last one.  That you wouldn't let me finish.

Q.   Can it be read back, please?

        THE COURT:  Madam court reporter, would you read back the last two questions.

        (The record was read)

A.   Like I was saying, it wasn't no real family.  So it really didn't matter if I knew they real government names or not.  As long as I knew what I call them as, that was okay with me.  As far as going into background checks who your family is, who they family was, who -- what they real names, they family names, I wasn't really concerned or not.  As long as I knew what to address them by, what they go by.

Q.   Of those 25 people that are in front of you, how many of those people did you know their nicknames or some name for?

A.   Only me.  Hold on, I got --

        MR. ARAVIND:  Objection, your Honor.  I think this calls for speculation.  He may not know the government names.

        THE COURT:  Overruled.

A.   I got to look at them over.

Q.   Sure.

        MR. ARAVIND:  We have also an additional objection, that this piece of paper is not in evidence.

        THE COURT:  It doesn't have to be.  It only has to be

if he's going to be reading from it.  He hasn't been asked to from it, Mr. Aravind.

A.   Including myself, I know five people.

Q.   How many of those five people are in GFC?

A.   Only me and one other.

Q.   Of the people that you don't know, I presume none of those are in GFC, is that correct?

A.   It's possible.  I don't know they government names.

MR. DINNERSTEIN:  I think this might be a good time to stop.

THE COURT:  Members of the jury, we are going to recess now until tomorrow morning.  Remember tomorrow being Friday we will sit from 10 a.m. until 1 p.m.  And then you'll be off for the afternoon.  We will take a short break as we customarily do in the morning tomorrow.  And I'll try to have some snack for you.

Keep an open mind, come to no conclusions, don't discuss the case.  Have a great trip, safe trip home, and a great evening.  Please recess the jury.

(Jury excused)

(Continued on next page)

CA43MER6

THE COURT:  Mr. Folks may be escorted from the courtroom.

Are there any issues that counsel wish to raise?

MR. DINNERSTEIN:  Your Honor, just one.  The next area that I'm going to go into addresses the issue with him being at Mrs. Keon's home and then after that she's dying to come back in here.  So I would ask if I can do that and then she can come into the courtroom after that period of cross-examination is done.

THE COURT:  I see no reason why she can't.  Does the government have any objection to that?

MR. FEE:  We have no objection to her returning after that point.  I would like to note for the record, it's been reported to the government by law enforcement in the audience that she has been present for some of today's testimony.  I don't know what portions she was here for or not.

THE COURT:  First of all, it was reported to me, and as soon as it was brought to my attention, my deputy spoke with her, went out, spoke with her discretely, and she left the courtroom.  I can tell you that she was not here during any portion of the testimony that might bear on her testimony, if she in fact is called as a witness.

MR. DINNERSTEIN:  Okay.

MR. FEE:  Thank you.

THE COURT:  Any other matters that counsel wish to

CA43MER6

raise?

MS. HELLER:  We would ask if defense counsel are able to give us some estimate so we can know how many witnesses to bring to court tomorrow.

THE COURT:  A fair point.  About how much more cross-examination do you think you have, Mr. Dinnerstein?

MR. DINNERSTEIN:  I would think about an hour; 45 minutes to an hour.

THE COURT:  All right.  And Mr. Becker?

MR. BECKER:  I anticipate that I will probably have an hour.  Maybe less.

THE COURT:  All right.

MR. BECKER:  Hopefully less.

THE COURT:  Who might the government be calling tomorrow then?

MS. HELLER:  Well, I think we anticipate calling Dr. Landi from the Medical Examiner's Office.  And then there is a civilian witness as to who we've already given 3500 materials pursuant to your Honor's order.  That witness does have a travel issue, was supposed to leave New York State at the end of the day tomorrow.  We will consult with that witness and see if the witness is able to stay over the weekend, given their time estimates, and we'll update everyone on that later tonight.

THE COURT:  All right.  Any other issues?

CA43MER6

MR. MYSLIWIEC:  Your Honor, it pertains to the civilian witness testimony tomorrow and relates to the 3500 material.

THE COURT:  Go ahead.

MR. MYSLIWIEC:  Is the Court in possession of a copy of that?  It's 3549.

THE COURT:  Just hold on one second.  Now I am.

(Continued on next page)

CA4ZMER7

MR. MYSLIWIEC:  Yesterday, during some -- I raised this because yesterday during some of the questioning of Mr. Folks on direct, the Prosecutor asked questions like, do you know whose gun that was, as opposed to have you seen that gun before, where have you seen it, who had it, so a question that potentially would invite a hearsay response because it wouldn't be a basis of knowledge that's obvious that's part of the question.

In light of that, if you look through the 3549, 3500 material, you'll see that there are a lot of instances where it looks like there's hearsay testimony that this witness might be asked questions about, depending on how the government decides to go about the direct examination.  And so I thought I would raise it for the Court now.

For example, if you look at the handwritten notes 3549D specifically, if you look at the third paragraph -- and there are a number of examples on this page, in fact all five -- but Goya, a guy from Courtlandt, called this witness after Jason was killed, that might not be hearsay because it's just about the call occurring.  Goya knew Jason and was friends with O.  They asked him for guns to shoot up the house. Essentially, this witness may testify about Goya telling her that he was ordered to shoot up her house, in retaliation for the murder.  Goya, as far as I understand, is not part of this conspiracy.  He's part of the other group I think that was

CA4ZMER7

managed by O. And so her testifying about anything that Goya said would be hearsay, it wouldn't be covered by the 801(d)(2) exception. And I would just object in advance of her testimony about the Prosecutor asking questions about things like that.

And similarly, you know, there are some rumor issues throughout this 3500 material things, like this witness told the police, and it's in one of the DD5 documents, that she heard Earl did the Correa shooting.

MS. HELLER: Your Honor, I'm sorry, I didn't mean to interrupt, but rather than have Mr. Mysliwiec recount the entire contents of the 3500, which is somewhat sensitive, I would just state the Government certainly is aware of the hearsay rules. We haven't even begun our direct examination. And the parties are free, the defendants are free to object if the government attempts to elicit hearsay.

As the Court knows, as defendants know we are obligated to turn over all Jencks Act materials, which is statements of the witness made to the government, the government is in possession of. And so these are Jencks Act materials. This is in no way outline of what the direct examination's going to be of this witness.

MR. MYSLIEIEC: I'll accept --

THE COURT: Yes. People in the gallery can be excused at this time if they wish to leave the courtroom. Thank you Officer.

CA4ZMER7

MR. MYSLIEIEC:  I understand that, your Honor.  The reason I brought it up now is because yesterday there was some questions that were clearly hearsay kind of questions on the front end, and rather than have these statements come out in any way at all, and then objection registered, I just wanted to put the Court on notice as to some of this material.

THE COURT:  All right.  We're all on notice about it.  Thank you, Mr. Mysliwiec.

Now, on the Facebook questions; specifically what I see is the narrow question of Facebook's motion to quash.  I assume all parties have seen Facebook's response.  Does anyone wish to be heard with respect to the motion to quash?

All right.  I have some questions for counsel on the larger Facebook issue that is raised.  But on the narrow question presented by Facebook's motion, I am prepared to rule.

The defendant, the defendant Colon issued a subpoena to Facebook to produce the content of a user's account because a government witness may have used the account.  Non-party Facebook moves to quash that subpoena.

The Stored Communications Act prohibits Facebook from divulging a user's communications to private parties including criminal defendants.  18 U.S.C. Section 2702 A, one, two, and Section 2702(b)(1) through eight.  Under the Stored Communications Act, only a government entity such as the Prosecutor or law enforcement officer can compel disclosure.

CA4ZMER7

The Stored Communications Act defines a government entity as a "department or agency of the United States or any state or political subdivision thereof." 18 U.S.C. Section 2711 (4). Within the meaning of the Stored Communications Act, the judiciary is not a government agency. C.F. United States versus Tracey, 108 F.3d, 473 at 476 (Second Circuit, 1997). There the Second Circuit held specifically and I quote, "The judiciary is not a department or agency of the United States." See also United States versus Maui, 552 F. Supp. 2nd, 679, at 680) N.D. Ohio, 2008). There the District Judge observed "The judiciary cannot obtain a court order under section 2703(d)." Because this Court is not a government agency within the meaning of the Stored Communications Act, it cannot compel Facebook to disclose user information.

Defendants argue in passing that the Stored Communications Act is unconstitutional because it violates their Sixth Amendment rights. But it strikes this Court that the defendants can vindicate these rights by serving a subpoena directly on the government witness, and thus avoiding a constitutional issue.

For the foregoing reasons, the non-party Facebook's motion to quash is granted.

As I've indicated, there is this larger issue that the defendants have raised, and so I would like the defendants to consider the following issues. I'd like the parties to

CA4ZMER7

consider them and be prepared to address them, either here in court or in a submission to me.  Specifically for the defendants, what legal authority stands for the proposition that Facebook posts made by a cooperator that are not actually in the Government's possession, but could have been, constitute Giglio or Jencks Act material; 2nd, how does the government stance that requiring this disclosure would be "precedent setting," comport with its later statement that "we believe we do not have any ability to access the contents of the Morse account and that we have discharged our Giglio and Jencks Act duties with respect to the Morse account."  That appears on page three of the Government's September 28th letter to the Court, leaves me scratching my heed; third, what legal authority can the parties provide that the deleting the relevant recommend Facebook posts, constitutes obstruction of justice by a cooperator; and, fourth, what remedy, if any, is available and appropriate to impose if the Facebook posts do constitute Giglio or Jencks Act material; 5th, what authority, if any, would require the government to provide individual number one's information so that he or she could be subpoenaed.

And, finally, under the terms of the cooperation agreement, was Parsons under the Government's control?  I think I'd like some legal authority addressing these questions, something beyond the just the factual arguments that the parties made in their last submissions.  A memorandum of law or

CA4ZMER7

a letter submission on the law is supposed to contain some law. That's what I need.

Anything further?

MR. DINNERSTEIN:  Yes, your Honor.  The question I have is, you indicated that I should subpoena Parsons.  May service to the government be sufficient to subpoena Parsons under the circumstances of this case?  Since I obviously have no access to Parsons, I'm asking the Court for --

THE COURT:  It strikes me that that's the only practical solution.  I'll deputize the government, sir, after they receive they receive your subpoena.

MR. DINNERSTEIN:  Thank you, Judge.  I'll have a subpoena for them tomorrow.

MR. BECKER:  Your Honor, may I just confer with Mr. Dinnerstein on that precise thing?

THE COURT:  Thank you.

MR. BECKER:  And actually with other counsel.

(Pause)

MR. BECKER:  Your Honor, after conferring with counsel, I have nothing to add.

THE COURT:  All right.  Well, I do have something to add to my comments.  Mr. Dinnerstein, until I get some legal authority from the parties on the questions that I've posed, hold off on serving the subpoena on Parsons, who likely won't be able to get the information either because of where he is,

CA4ZMER7

and so it comes down to individual number one. So let's clear the legal moraine here first, all right. I'm not calling it a morass, just a moraine.

MR. DINNERSTEIN: Can we have till Tuesday to deal with the legal issues?

THE COURT: Right.

MR. DINNERSTEIN: Okay.

THE COURT: All right, anything further? All right. Everyone remain seated. The defendants should be removed immediately from the courtroom.

Have a good evening. I have another matter on.

THE DEPUTY CLERK: All rise.

(Adjourned to October 5th, 2012 at 10:00 a.m.)

INDEX OF EXAMINATION

Examination of:                                    Page

SHANNON CHANCE

Direct By Ms. Heller . . . . . . . . . . . . . . 724

Cross By Mr. Dinnerstein . . . . . . . . . . . 730

BERNARD FOLKS

Direct By Mr. Aravind . . . . . . . . . . . . . 738

Cross By Mr. Miedel . . . . . . . . . . . . . 754

CATHERINE GUZMAN

Direct By Ms. Heller . . . . . . . . . . . . . . 851

Cross By Mr. Lee . . . . . . . . . . . . . . . 867

Cross By Mr. Dinnerstein . . . . . . . . . . . 870

Redirect By Ms. Heller . . . . . . . . . . . . 872

Cross By Mr. Lee . . . . . . . . . . . . . . . 872

Cross By Mr. Dinnerstein . . . . . . . . . . . 927

GOVERNMENT EXHIBITS

Exhibit No.                                    Received

 800    . . . . . . . . . . . . . . . . . . . . 728

 3532Y   . . . . . . . . . . . . . . . . . . . 754

 1101    . . . . . . . . . . . . . . . . . . . 755

 245    . . . . . . . . . . . . . . . . . . . . 860