CBR3MER1

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    UNITED STATES OF AMERICA,

 4              v.                        11 CR 576 (WHP)

 5    JOSHUA MEREGILDO, MELVIN
      COLON, EARL PIERCE, and
 6    NOLBERT MIRANDA,

 7              Defendants.

 8    ------------------------------x

 9                                       New York, N.Y.
                                         November 27, 2012
10                                       10:05 a.m.

11
      Before:
12
                      HON. WILLIAM H. PAULEY III,
13
                                         District Judge
14

15                          APPEARANCES

16    PREET BHARARA
           United States Attorney for the
17         Southern District of New York
      NOLA HELLER
18    ADAM FEE
      SANTOSH ARAVIND
19         Assistant United States Attorneys

20
      WINSTON LEE
21    YING STAFFORD
           Attorneys for Defendant Meregildo
22
      MITCHELL DINNERSTEIN
23    ANTHONY CECUTTI
           Attorneys for Defendant Colon
24
      FLORIAN MIEDEL
25    AARON MYSLIWIEC
           Attorneys for Defendant Pierce
```

CBR3MER1

1

2                              APPEARANCES (Continued)

3

GARY BECKER
4  ALEX LESMAN
          Attorneys for Defendant Miranda
5

ALSO PRESENT:
6  Special Agent Patrick Collins, ATF
Paralegal Specialist Darci Brady
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CBR3MER1

```
 1                (In open court; jury not present)
 2                THE COURT:  Good morning to everyone.  The jury is now
 3      all here.  Are there any matters counsel want to raise before
 4      we turn to Mr. Miedel's closing argument?  Any issues?
 5                MR. MIEDEL:  No issues.  I think we're having some
 6      technical issue that hopefully should be resolved in a second.
 7      But other than that, we're good.
 8                THE COURT:  All right.  Once again, Mr. Miedel, the
 9      same rules will apply to you as have applied to others
10      yesterday.  As soon as you tell me that the technical issue is
11      solved well, we can queue up the jury and bring them out.
12                MR. MIEDEL:  Thank you.
13                THE COURT:  I don't think the sunshine is going to be
14      a problem for any counsel delivering a closing today.
15                MR. MIEDEL:  I think we're ready, your Honor.
16                THE COURT:  All right.
17                (Jury present)
18                THE COURT:  Good morning, members of the jury.  Thanks
19      again for your efforts to get here on time and on a day when
20      the weather is a little bit challenging.  We're going to
21      continue with closing arguments this morning.
22                Remember, as I told you yesterday, closing arguments
23      are not evidence.  They're argument by counsel about what they
24      believe has been proved or not proved in this case.
25                At this time, members of the jury, I ask that you give
```

CBR3MER1

1    your undivided attention to Florian Miedel, Esq., as he

2    delivers his closing argument on behalf of the defendant Earl

3    Pierce.

4         MR. MIEDEL:  Thank you, your Honor.

5         Good morning.  So, they teach you in trial lawyer

6    school that you should start a closing argument with a bang, so

7    I hope you don't hold it against me when instead I am agoing to

8    start my closing argument with a discussion about you.  Your

9    role.  And about the absolutely crucial role that you play not

10   only in the trial, but in the criminal justice system as a

11   whole.

12        You have an extraordinarily difficult task.  You have

13   listened and listened and listened for almost eight weeks now.

14   You have heard about various acts, people, places.  You've

15   heard from six cooperators, and I can only imagine that after

16   all this time it's hard to keep track of what everybody said.

17   Soon you're going to be asked to take on this extraordinarily

18   difficult task of deciding whether the government has proven

19   the guilt of these four young men beyond a reasonable doubt.

20   And you're going to have to dig through your memory, try to

21   remember how you felt about a particular witness, what you

22   thought about their demeanor, how you thought that they

23   answered the questions.  You're going to have to try to figure

24   out who you believed and who you didn't believe.  You are going

25   to have to try to reconstruct events that happened more than

CBR3MER1                          Summation - Mr. Miedel

1    two years ago.  You're going to have to make sense out of the

2    jumble of testimony, evidence, and also of the absence and lack

3    of evidence.  I don't envy you.

4           But, at the same time, we selected you because we have

5    confidence that you will take on this awesome responsibility

6    with seriousness, with focus, with impartiality.  We have

7    confidence that you will do what is right, not what is

8    convenient.  Not what is easy.

9           Your decision is going to affect these young men for

10   the rest of their lives.  And apart from having and raising a

11   child perhaps or choosing a spouse, this decision, this

12   decision of yours is going to be the most important decision

13   that you will ever make about another person.

14          So, with that in mind, I'm going to make certain pleas

15   of you.  First and foremost, and you've heard this before but

16   it cannot be repeated enough.  This is not one trial.  This is

17   four trials.  You must determine whether the government offered

18   actual proof beyond a reasonable doubt, and you must determine

19   that for each individual defendant separately.  The evidence

20   has to be analyzed separately.

21          Mr. Mysliwiec and I are concerned about one person,

22   and one person only.  That's Earl Pierce over there.  And we

23   need you, and more importantly he needs you, to consider the

24   evidence as to him separately.

25          Second, you must trust our system, because that's the

only way we can trust you.  And what do I mean by that?  What I
mean is you must follow the legal instructions from the judge
when he gives them to you tomorrow, whether you like them or
not.

For example, Mr. Pierce didn't testify.  Now, you may
have wanted to hear from him.  But Mr. Pierce did not testify
because under our system, the government must prove a person's
guilt beyond a reasonable doubt.  A person doesn't have to
prove his innocence.  And if you think about that for a second,
that makes total sense, doesn't it?  How hard is it to prove
one's innocence?  How hard is it to prove that something didn't
happen?  How hard is it to prove a negative?

That kind of burden shouldn't be on an individual
person who is being charged with the most serious crimes there
are by the United States government.  And our founders made
clear when they wrote the Constitution that that burden should
not fall on the individual.  It falls on the accuser; it falls
on the government.  So, in deciding not to testify, Mr. Pierce
relied on you to hold up your end of the bargain which is to
follow the law.

The same thing applies to the charges in this case.
Okay.  They're complicated.  It's 22 counts.  When you see the
verdict sheet, you may feel overwhelmed.  You may feel tempted
to throw up your hands and say this is too hard to work through
every element of every charge.  You have to take that task

1    seriously.  You have to take your time.  As long as it takes.

2            Some of these charges are interconnected.  You'll see,

3    for example, just as an example, count 22, which is gun

4    possession in furtherance of the drug conspiracy, you'll see

5    that in order to find anyone guilty of that, you first have to

6    find the person guilty of participating in the narcotics

7    conspiracy.  First you have to see whether the government has

8    proved that count, the narcotics conspiracy.  It doesn't matter

9    whether you agree with that or not, right.  So, for example,

10   you may find that somebody had a gun, but not that they

11   participated in the narcotics conspiracy.  That means you have

12   to vote not guilty, even if you think, oh my God, that person

13   is getting away with having a gun.  It's crucial that you

14   follow the law.  Because everyone in this courtroom and beyond

15   expects and relies on that, and we know that you will.

16           All right.  Let me turn to the case now.  Earl Pierce

17   is charged in 11 of the 22 counts.  But really, those 11 counts

18   are spread over essentially four different factual scenarios.

19   First, did the government prove beyond a reasonable doubt that

20   he committed or aided and abetted in the murder of Jason

21   Correa.  Second, did the government prove beyond a reasonable

22   doubt that Earl Pierce participated -- that he shot or tried to

23   kill Tarean Joseph on September 13, 2010.  Third, did the

24   government prove beyond a reasonable doubt that Earl Pierce was

25   involved in the narcotics conspiracy, the charged narcotic

1    conspiracy.  Not did he sell drugs, but was he involved in that

2    charged narcotics conspiracy.  And fourth, did the government

3    prove beyond a reasonable doubt that the racketeering

4    enterprise, first existed, and second that he was actually part

5    of the racketeering enterprise.  We'll talk through each one of

6    those in turn.

7         So what is the actual evidence that the government

8    presented against Earl Pierce?  What were the broad categories

9    of evidence that the government presented?  Mr. Fee yesterday

10   gave you a very comprehensive discussion about the evidence

11   with a very pretty PowerPoint presentation that I cannot hope

12   to match.  He talked about witnesses, physical evidence, guns,

13   pictures, Facebook, everything, right.

14        You know what?  When it comes to Earl Pierce, there is

15   really only one category of evidence, and that's cooperators.

16   Against Earl Pierce -- and again, I remind you, I'm only

17   talking about Earl Pierce -- that is the only category of

18   evidence that exists.

19        Why do I say that?  Well, let's start with physical

20   evidence, okay.  We know obviously there is no fingerprint

21   evidence linking Earl Pierce to anything in this case.  We know

22   there is no DNA evidence linking Earl Pierce to anything in

23   this case, to the guns, to the drugs, to crime scenes, nothing.

24   Right.  And that's not for lack of looking.  We heard from the

25   police officers that they took -- swabbed his DNA and they

CBR3MER1                    Summation - Mr. Miedel

1  tried to match it against evidence that they found on the

2  scene, but there was no such match.  There is no hair or fiber

3  or anything like that.  We didn't hear anything about that.

4  There were three or four guns that were recovered in this case,

5  right.  And were any of them found on Earl Pierce?  Were any of

6  them found in his apartment, in his girlfriend's apartment?

7  No.  Of course they weren't.

8       He's charged in the drug conspiracy, right, and

9  Mr. Fee made a big deal about how strong the evidence was on

10  that.  Was there a single bag of drugs, crack, marijuana,

11  whatever, linked in any way to Earl Pierce?  Were any drugs

12  found in his apartment, in his girlfriend's apartment, on him?

13  Was he ever arrested for selling drugs during the course of the

14  conspiracy?  Did a single undercover police officer come in and

15  say, oh yeah, during the summer of 2010 we bought drugs from

16  Earl Pierce.  An informant, did an informant come in and say I

17  went in and made a buy with Earl Pierce?  No.

18       What other physical or non-testimony type of evidence

19  is there?  Well, over the course of the trial, the government

20  showed you a series, a bunch of photographs, right.  Photos

21  from Facebook accounts, from USB memory sticks, from computer

22  hard drives, right.  People showing off with guns, people

23  making gang signs, people with cash, people with drugs.  GFC

24  parties.  And all of those photos, all of those photos, Earl

25  Pierce appears precisely one time.  Smiling.  That photo was

1    found in Joshua Meregildo's hard drive or USB stick.

2         Okay. So what? They know each other. There is no

3    dispute about that. And I bet you if you looked at all the

4    photos, the hundreds and hundreds of photos that were seized

5    from Joshua Meregildo, I'm sure there would be photos of people

6    he knew well, people he didn't know well, acquaintances,

7    friends, whoever.

8         Does this photo prove anything? Does it show Earl

9    Pierce holding a gun or pointing at cash or pointing a finger

10   at his tattoo, anything like that? Is he found in any group

11   photo? And remember, there are lots of group photos that the

12   government showed you. Is he found in any of those? No. Why?

13   We know why. Because every single witness in this case told

14   you he's not GFC, he's not OGFC, he's not YG, he's not Mac

15   Balla. Or to paraphrase Mr. Fee's clever little jazz example,

16   he wasn't in T-Money's band.

17        The government also showed you lots of videos, right.

18   Videos of people rapping, talking trash, video -- there was I

19   think one video of Mr. Miranda doing pullups. And did you see

20   Earl Pierce in any video? None. None whatsoever. Why?

21   Because he wasn't GFC, he wasn't OGFC, he wasn't YG, and he

22   wasn't Mac Balla, right?

23        Does his name appear in any of the other documents

24   that the government submitted? Well, supposedly one time. In

25   the iPod, out of this book of Joshua Meregildo's there is a

1    reference to a Ski. Okay. That's it. There is no dispute

2    that they know each other, but that's not clear that's even

3    him.

4            Are there any other categories of evidence that the

5    government brought you? Well, there was a whole lot of

6    discussions about tattoos, remember that? Agent Collins came

7    in and he showed you all the different tattoos that people had,

8    and the cooperators talked about their tattoos and how they

9    were important and what they meant. What about Earl Pierce?

10   What are his tattoos? How are they related to this criminal

11   enterprise? We didn't hear a peep about that from the

12   government. We had to introduce his tattoo. And what does his

13   tattoo say? His tattoo says Ski Box. His nickname. Does his

14   tattoo say GFC, or OGFC, or YG, does it say T-Money, does it

15   say MIP T-Money? No. It says Ski Box. That's it.

16           So, we've got no fingerprints, no DNA, no hair and

17   fiber, no guns, no drugs ever recovered from him or his

18   apartments, no tattoos, one single photo of him smiling, and a

19   possible phone number in an address book. Overwhelming.

20           What about non-cooperator witnesses? Well, there were

21   two of them who testified about Earl Pierce or said something

22   about him at least. That was Maria Ortiz, the sister of Earl's

23   then girlfriend, Wendy, and of course Ms. Perez, Jason Correa's

24   mother. I'm going to talk about their testimony a little bit

25   later. But in brief, Maria Ortiz said nothing in this case

CBR3MER1                    Summation - Mr. Miedel

1    that alone without more proves any of the 11 charges.  You'll

2    see that her testimony is only useful to the government if you

3    believe Bernard Folks.  I'm going to have a lot more to say

4    about Bernard Folks in a few minutes.  And Iris Perez, Jason

5    Correa's mother, she was his mother.  Sympathetic figure, and

6    we feel badly for her about what happened.  But did she add to

7    the evidence in this case?  No.

8            So, the only category of evidence against Earl Pierce

9    are the cooperators.  How do I plan to proceed?  Well, first

10   I'm going to start talking generally about -- and hopefully

11   briefly -- about each of the cooperators.  And then I'm going

12   to get into the four factual specific crimes that the

13   government has charged Earl Pierce with.  The Correa murder,

14   the Tarean Joseph shooting, the drug conspiracy, and the

15   racketeering enterprise.  All right.  So let's go in order.

16           Bernard Folks.  I imagine that this may be the very

17   first time, at least for some of you, I hope, that you've

18   encountered a person like this.  A person like this.  A robber,

19   a drug dealer, a shooter.  This may be the only time you've

20   ever encountered a person who admitted that shooting people

21   felt good.  Remember that?  He talked about going over to Maria

22   Lopez with his big .44 gun and aiming at people and shooting at

23   people.  And I asked him how did that feel, do you feel bad

24   about that?  He said no.  I said, well, did it feel good?  He

25   said yes, it did.

1          What kind of person feels that way?  A person who has

2     no compassion, no empathy, no conscience, and no guilt.  A

3     person who feels good about shooting other people is capable of

4     anything.  And you must realize that.  A person who shoots off

5     his gun tries to kill others, shoots across an avenue in the

6     middle in the bright light of an afternoon with women and

7     strollers and children walking on the street.  Does anyone

8     doubt, does anyone doubt that a person like that is capable of

9     lying when it suits him?

10          And that probably is the most telling thing that

11    Bernard Folks said during his testimony.  At the end of my

12    cross-examination I asked him, would you lie to get out from

13    under a 60-year mandatory minimum sentence?  And he said no.

14    Really?  If he had said yes, of course.  I'd lie, I'd rob,

15    steal and cheat too, but the fact is I didn't lie here.  Well,

16    that might be believable.  But, a guy who wouldn't and didn't

17    hesitate to shoot people, a guy who robbed people on a daily

18    basis, a guy who ordered people to be beaten up in jail,

19    wouldn't lie?  Come on.  And that lie is just so patently

20    absurd that it casts a shadow on all of his testimony.

21          Mr. Lee on cross-examination asked him a legitimate

22    question.  He said, look, if you are just here to tell the

23    truth and admit to what you did and accept responsibility, why

24    didn't you plead guilty?  Why become a cooperator?  And again,

25    once again, Bernard Folks' answer was telling.  He said I can't

1    sit in jail for the rest of my life.  That's at page 892.  I

2    can't.  That's right.  And that's why he will do whatever it

3    takes, whatever is necessary, to make sure he doesn't spend the

4    rest of his life in prison.

5         You know, Bernard Folks is the guy the government

6    relies on most in its case against Earl Pierce.  He's the one,

7    the only one, the only witness who claims that Earl Pierce knew

8    something about the Correa shooting in advance, or at least he

9    suggests it, and we'll talk about that more.  He's the only one

10   who claims that Earl Pierce shot face to face at Tarean Joseph

11   on September 13, 2010.  He's the key, he is the lynchpin to the

12   government's case against Earl Pierce on the two most serious

13   charges that he faces.

14        They want you to trust him.  Ladies and gentlemen, can

15   you?  Would you trust Mr. 44 with anything in your personal

16   life?  Would you trust him with your wallet?  Would you trust

17   him with your house keys?  Would you trust him with your

18   infant?  Would you trust him with your child's liberty and

19   freedom?  I imagine not.  Well, Earl Pierce is somebody's son.

20   And I don't think his mother would trust Bernard Folks with her

21   son's liberty either.  Please keep that in mind as you think

22   about his testimony.

23        The next witness, the next cooperating witness was

24   Aubrey Pemberton.  The thing that struck me about Aubrey

25   Pemberton at least was just how selective his memory was.  If

1    he didn't want to talk about something, he just said I don't

2    know.  I don't remember.  Take a look at this section of

3    cross-examination that Mr. Dinnerstein did about the meetings

4    that Pemberton had with the government.  This is from

5    approximately two pages of transcript.  There has got to be a

6    dozen maybe more answers of I don't know, I don't recall, I

7    have no idea.  And that's the kind of witness the government

8    wants you to rely on.

9           And Pemberton's callousness, lack of feeling, empathy,

10   compassion, they were no different than any of these other

11   guys, right.  These guys are all emotionally and morally dead.

12   Which means that lying, falsely blaming somebody else, it meant

13   nothing.

14          What was Aubrey Pemberton's response to the question

15   how did it feel to shoot people?  Was it I feel badly or was it

16   I didn't think about it at the time, but now as I've had time

17   to reflect on it, it feels bad.  No.  His answer was I don't

18   know.  I haven't thought about it.  Those are the words of

19   somebody who has no regard for any other person but himself.

20   How did he respond to questions about why he kept shooting,

21   kept committing crimes.  He said if I didn't get caught, I

22   figured it was all right.  That's on page 1859.  But then, he

23   did get caught.  So he had to find a different way out.

24          We also know that Aubrey Pemberton is willing to say

25   what he thinks the government wants to hear.  How do we know

CBR3MER1                    Summation - Mr. Miedel

 1    that?  Well, let's look at this transcript.  This is page 1892.

 2    So what's going on here.  He's asked during your allocution,

 3    and what that means is when he pled guilty, you said you were a

 4    member of the Courtlandt Avenue Crew.  Yes.  Right.  And then

 5    Mr. Mysliwiec asked him a bunch of questions about GFC and OG

 6    and Mac Balla and everything.  And he points out there wasn't a

 7    Courtlandt Avenue Crew, right?  That's just a name that the

 8    government made up.  Right, that's true.  But you came into

 9    court and you said you were a member of that crew.

10          Why would he say that?  That's what he figured the

11    government wanted to hear.  It wasn't true.  What he was doing

12    was working his 5K letter.  Working it.

13          Okay.  Next we have Devin Parsons.  Now, I'm not going

14    to waste a lot of words on Devin Parsons.  Because Devin

15    Parsons may be the coldest, most remorseless murderer I have

16    ever come across.  Killing people, shooting them in the head

17    for no reason meant absolutely nothing to him.  And he didn't

18    just shoot people, right, he finished them off.  He pumped

19    bullets into defenseless people as they were lying on the

20    ground injured.  That takes a special kind of sadism.

21          Perhaps most disturbing, perhaps most disturbing was,

22    right, that he shot and killed a friend.  A guy that he hung

23    out with the entire day, chilling on Courtlandt Avenue, joking

24    around.  And then at the end of the night, he shoots him in the

25    head and in the body without any feeling whatsoever.  I don't

 1  know about you, but I found that testimony chilling.

 2          But what I also find chilling, to be frank, is that in

 3  its fixation to get convictions in this case, the government

 4  has gone to bed with somebody like Devin Parsons.  Get into bed

 5  with them.  They offered him a deal.  They promised to write

 6  him a glowing 5K letter.  They promised to help him if he has

 7  any problems with the state or local officials.  They give him

 8  the hope and the expectation that even though he murdered two

 9  people and tried to kill, what, he said 10 other people?  He'll

10  be out soon.  He would be playing basketball in Italy.

11          Not only that, but they let him get away with smoking

12  marijuana in jail, keeping an illegal cell phone in jail.

13  That's violating -- not that's not only violating prison rules,

14  that's breaking the law.  He's committing crimes.  Do they

15  care?  He's in direct violation of the cooperation agreement.

16  Not only that, he posts on Facebook that he's cooperating.

17  That has got to be the cardinal rule of cooperation.  You don't

18  talk about that.  It endangers people.  It endangers

19  investigations.  And he does it.  What happens to him?

20  Nothing.  He will get his 5K letter.

21          And what does that tell somebody like Parsons?  It

22  tells him that the terms of the cooperation agreement, they're

23  not worth the paper they're printed on.  He can do what he

24  wants.  And so he did.  He lied.  He lied.  And nothing

25  happened to him.  Nothing will happen to him.  He's going to

1    get his 5K letter and he'll be fine.

2           But just because the government will give him his 5K

3    letter doesn't mean that you have to believe him.  Parsons is a

4    cold, compassionless sociopath who acts only in his best

5    interest.  There is no question about that.  We cannot trust

6    somebody like that, and the fact that the government is asking

7    us to trust him, that is chilling.

8           Next we have Carlos Villafranco.  And what was notable

9    about Carlos Villafranco, I think, was that we had a chance

10   with him to sort of get a glimpse behind the curtain.  What do

11   I mean by that?  Unbeknownst to him, Carlos Villafranco was

12   recorded on the phone talking to a friend of his.  And what did

13   he say to them?  He said I'll be out in five years or less.

14   This is from a man who is facing up to 145 years in prison.  He

15   says, yeah, I'll be home in five years or less.  What does that

16   tell you?  What does that tell you?  That tells you that these

17   guys, these cooperators, have a lot more than hope that they're

18   going to do well.  They have an expectation.  It goes beyond I

19   just have to tell the truth and I hope I do well.  I hope I get

20   a good sentence.

21          Like the others, Carlos Villafranco had a history of

22   lying to protect himself, right.  He lied about his names when

23   he was arrested.  He lied to the feds in his proffer sessions

24   in order to protect his girlfriend.  Of course, let's not

25   forget the craziest thing of all about Carlos Villafranco.  He

CBR3MER1                    Summation - Mr. Miedel

1    comes in and he's going to meet with the prosecutors and the

2    agents, right, he's having these proffer sessions, and he's

3    talking about people in the neighborhood, and he is trying to

4    think about how to cooperate, right.

5                    (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        MR. MIEDEL:  And what is happening at the same time

2    he's doing that?  He's robbing banks.  At the same time he's

3    meeting with the prosecutors, he's robbing banks.  How crazy is

4    that?  And what happens to him?  Do the prosecutors say:  "You

5    can't be robbing banks and be a cooperator, that's insane"?

6    Nothing happens to him.  He got his cooperation agreement, he

7    testified at this trial, and he'll get his 5K letter.

8        So it really can't be any clearer that Carlos

9    Villafranco has no hesitation or even kind of a tiny hesitation

10   to lie in court.  Whether it's to federal agents or to federal

11   prosecutors, he has no problem doing that.

12       All right.  Moving on, Anthony Crocker.  Except for

13   the jailhouse informant Maurice Hagen, Anthony Crocker was the

14   government's last cooperator; right?  And he was sort of

15   brought in to tie up loose ends.  Now isn't it interesting,

16   isn't it just a wonderful coincidence that -- for the

17   government, at least -- that Anthony Crocker just happens to be

18   everybody's confessor?  Everybody apparently, according to him,

19   had this sort of urge to tell him their darkest secrets.  Or so

20   he would have you believe.  Now mind you, this is a guy who

21   said he was afraid in some ways because he thought that people

22   might have been blaming him for T-Money's death, but at the

23   same time he claims that Earl Pierce, supposedly T-Money's good

24   friend, told him about all kinds of stuff that was relevant to

25   the government.  Told him about the Correa murder, told him

Cbr1mer2                        Summation - Mr. Miedel

about the September 13th shooting.  And never mind, by the

way, that these conversations supposedly took place at the MDC,

in the federal detention center, in front of other people,

including, who?  Aubrey Pemberton.

Now Aubrey Pemberton testified on this stand for three

days.  Did you hear him say once that he heard these

conversations between Crocker and Pierce, where Pierce

confessed to participating in the Correa murder or the shooting

of September 13th?  No.

And what's interesting about Crocker is, he didn't

actually see anything himself.  Did you notice that?  He wasn't

present for the Correa murder, he wasn't present for the

September 13th shooting, he wasn't there for the Alston

murder or the Ogarro murder, he wasn't there for most of the

Maria Lopez shootings.  So what?  But he certainly testified

about all of that:  I heard this, I heard that, I heard Hump

say that SB did X.  Members of the jury, that's not evidence.

That's repeating rumors.  That's repeating the word on the

street.  So what do we have with Crocker?  We have trial by

gossip; right?  Trial by rumor.  And that's supposed to be

evidence?  That's supposed to be proof beyond a reasonable

doubt?

Last but not least, of course, there was Maurice

Hagen.  Now I admit, he was -- he was a smooth dude.  He

couldn't be shaken; right?  He couldn't be ruffled.  He was

good.  He stuck to his story no matter what.  But what struck

me about him, and maybe it struck you too, he was just a little

too smart, too clever, too manipulative to play as dumb as he

did.  What do I mean by that?  Remember he claimed that after a

year in federal lockup, he decided to cooperate?  He claimed

that he didn't really know how it worked, he didn't know what

he would be facing, he didn't know what cooperation really was

about, he didn't know the difference between good 5K letters

and better 5K letters.  And even though every other cooperator

ultimately conceded that, he had difficulty even admitting that

the government decides whether he gets a 5K letter.  He wanted

us to believe that he was going into that cooperation process

blind.  Now maybe that would be believable for some guys.  But

Maurice Hagen?  He's not one of them.  He was a leader, a

natural leader, remember?  He had been in charge of half of the

Bloods organization in Newburgh.  That's -- that was a huge

organization.  Remember he testified that 50 people had been

arrested, members of the Bloods in Newburgh, just a few months

earlier before he -- or before he'd gotten out of jail?  There

were lots of others out there.  And he was in charge of half of

them.  And he also talked about, when he got out of jail, he

thought that the Bloods organization was too lax; right?  He

was there to impose some discipline on them, make sure they

were going to meetings.  He decided if people were plates.

Remember that, plates?  A new term.  People who needed to get

Cbr1mer2                    Summation - Mr. Miedel

1     hurt, beaten up, maybe killed.  He decided whether rival drug

2     dealers had to be attacked.  He was a boss and he was smart,

3     decisive, manipulative.  And we're supposed to believe that

4     this person, after spending almost a year in federal lockup,

5     wouldn't know exactly what the deal was, wouldn't know exactly

6     what cooperation meant, what it meant to get a 5K letter, how

7     to improve your 5K letter?  How to get the best 5K letter you

8     can get?  Come on.

9             Just a couple more thoughts about this topic before I

10    leave it.  Ms. Heller is going to get up and she's going to

11    give a rebuttal later today, and I expect that she'll probably

12    talk about the defense lawyers attacking the credibility of the

13    cooperators, and she's going to say:  "You know what, we don't

14    get to pick our witnesses; right?  Who else do criminals hang

15    out with but other criminals.  We're stuck with these guys.

16    But that doesn't mean they're not telling the truth."  Here's

17    my response to that, ladies and gentlemen.  Offering excuses

18    for why you don't have evidence is not the same thing as

19    evidence.  It's like saying, "Well, the reason we don't have

20    fingerprints in this case is because it's really hard to get

21    fingerprints."  Okay.  Maybe it is, maybe it isn't.  But that

22    doesn't mean it's proof.  It's an excuse.

23            She may say that -- she may also say that, you know,

24    "These defense lawyers, they want to have it both ways.  You

25    know, they want you to not believe the cooperators when it

Cbr1mer2                    Summation - Mr. Miedel

1  suits them and -- and believe -- believe them when it doesn't."

2  But you know what, that argument is wrong on two points.  One,

3  as I want to tell you in a second, I don't think you should

4  believe any of them, period.  Reject their testimony out of

5  hand.  Second, it's obvious that people like that, cooperators,

6  are much more likely to lie about something against somebody --

7  against one of these four defendants, than not; right?  Why?

8  Because they have a job to do and they know it.  They have to

9  get the 5K letter.  Doesn't help them to say, "Well, Pierce

10  didn't have anything to do with this."  Doesn't help them to

11  say Earl Pierce had nothing to do with the Correa murder.  How

12  does that help?  Doesn't.  So if Ms. Heller makes that

13  argument, I just want you to keep that in mind.

14         So what it seems like in this case, at least as far as

15  Earl Pierce is concerned, the government, instead of doing

16  what's traditional police work, instead of doing legitimate

17  investigation, instead of determining if there are forensics or

18  witnesses or whatever, they just said, "We have these guys

19  here, these cooperators.  That's good enough; right?"

20         And, you know, sometimes you may have thought -- you

21  may have listened to them and you thought, it sounds like that

22  person is probably being honest; right?  He's getting all this

23  bad stuff he did off his chest.  He's confessing.  Like why

24  would he lie about that?  Well, to make that assumption, ladies

25  and gentlemen, I think would be a huge mistake, and here's why.

Cbr1mer2                    Summation - Mr. Miedel

1    Being a cooperator is strategic and it's calculating.  It

2    involves making a really important and difficult decision in

3    your own life; right?  And the most important realization that

4    you make as a cooperator -- and if Maurice Hagen had been

5    honest, he would have told you this -- is that your cooperation

6    is worthless and it doesn't help you one bit unless you provide

7    substantial assistance against somebody else.  You can confess

8    all you want, you can get all the bad stuff off your chest.  It

9    doesn't mean a red cent unless you can turn that against

10   somebody.  That's the point.  The government doesn't care about

11   your confession.  The government doesn't care about that.  They

12   care about what you have to say about somebody else.  Help them

13   make new arrests, help them prosecute people, help them get

14   convictions.  And so this calculation a cooperator makes is,

15   what can I say about others that helps me?  How can I sink

16   others so that I can swim?  And don't you think that lying goes

17   into that calculation?  So frankly, as I just said, I feel that

18   you should not believe anything these cooperators say, frankly.

19   Just out of principle.  They are so loathsome and have so

20   little regard for anything meaningful, such as life and truth,

21   just as a matter of principle, I think you should say:  You

22   know what, I refuse to convict a young man of murder and of

23   these other serious charges based on nothing but these words of

24   cooperators.  And you will hear the judge's instruction.  He's

25   going to tell you that when you consider the testimony of

1    witnesses, you can choose whether to believe some of it or to

2    reject all of it if you don't believe some of it.  Up to you.

3           And so I think that's what you should do.  But just in

4    case you decide not to do that, at least at the beginning, let

5    me go on to the substantive acts that Earl Pierce is charged

6    with.  Because if you look at those carefully, I believe you'll

7    reach the same conclusion, that the evidence doesn't exist, let

8    alone rise to proof beyond a reasonable doubt to prove that he

9    committed those crimes.

10          All right.  As I mentioned to you at the beginning,

11    there are four basic categories, and I'm going to start with

12    the Correa murder.  The question is whether the government has

13    proved to you beyond a reasonable doubt that Earl Pierce

14    murdered or aided and abetted the murder of Jason Correa, and

15    that sort of conduct covers a number of different charges.

16          I'm going to break my discussion of the Correa murder

17    into three parts: about what happened on Courtlandt Avenue

18    before the murder, about what happened inside the lobby of 681

19    Courtlandt Avenue, and then what happened after the murder.

20          So as I said to you earlier, the primary witness here

21    is Bernard Folks.  And we've already talked about the more

22    general reasons why he should not be believed and why your

23    verdict shouldn't be based on someone like him, but let's get

24    into the specifics because the details -- the devil is in the

25    details, right, as they say.  And you will see that the details

Cbr1mer2                         Summation - Mr. Miedel

1     reveal that Bernard Folks is not telling the truth.

2            First, let's talk about this supposed -- supposed

3     motivation for the murder, this sort of conspiracy or whatever

4     that led up to the murder, this alleged agreement that the

5     government actually hasn't proved beyond a reasonable doubt.

6     Folks testified that he's hanging out on 155th Street with

7     T-Money. He remembers it's just the two of them. 155th and

8     Courtlandt. He remembers it's just the two of them, they're

9     together, hanging out, talking, being together. And he says

10    they're together for quite awhile. And I asked him, What does

11    awhile mean? He says, well, at least half a hour. I say, At

12    least half an hour? He said yes. That's his testimony; right?

13    He says that's where he was; he was hanging out with T-Money.

14           Now by the way, notably, that's not how Mr. Fee

15    described it yesterday. He said Bernard Folks was up and down

16    Courtlandt, in and out of the projects, doing his thing,

17    selling drugs. And why does he say that? That wasn't his

18    testimony. You see that. Why did he say that? Because he's

19    got a problem. The problem is the videotape, which I'm going

20    to show you in a minute. And so he tried -- he tried, Mr. Fee,

21    he tried to put a whitewash of, you know, figure out a way to

22    suggest that maybe Folks was just sort of around and not what

23    he said he was, which was on the corner of 155th and

24    Courtlandt.

25           Anyway, Folks says that he's hanging out with T-Money.

Cbr1mer2                         Summation - Mr. Miedel

1     At some point Mr. Pierce comes up to him, and Pierce and

2     T-Money have some sort of conversation that he overhears a

3     little bit of, and I'll talk to you about that specific snippet

4     of conversation in a minute.  And he says then shortly after

5     that -- right after that, actually, he says that Mr. Pierce

6     walked off, wandered off toward his building, 681 Courtlandt,

7     and right after that, T-Money says to him, Bernard Folks, "Come

8     on with me," and they head towards 681.  Remember, that was

9     Bernard Folks' testimony.  And that version of what he said,

10    that would be great; right?  If it were true.  If it had

11    happened like that.  But it didn't.

12            How do we know that?  Well, thank goodness we have the

13    videotape.  Let's go to the videotape now.

14            This is a view from the camera at 155th Street

15    looking uptown toward 156th Street.  And you note the time is

16    2041, which is military time for 8:41 p.m.

17            Okay.  So let's play that.

18            (Video displayed)

19            MR. MIEDEL:  Now see those two guys walking on the

20    sidewalk and -- okay, stop.

21            Those are Pemberton and Folks.  That's what the

22    witnesses told us.  Pemberton, Folks.  And if we just sort of

23    back that up, we can see where they're coming from.

24            See, they're walking on the sidewalk, and they're

25    coming from -- see, they're coming from the corner, the corner

Cbr1mer2                    Summation - Mr. Miedel

1  of 156th Street.  They seem to be coming actually from west,

2  from Melrose or from the projects up there somewhere.  Okay.

3  It's Pemberton and Folks walking together.

4           And let's go to the next one.  Now this is a view --

5  same camera but facing into the projects at 155th Street, and

6  if we play that.

7           (Video displayed)

8           MR. MIEDEL:  Here they are, the two of them, walking

9  together, just the two of them.  Okay.

10          Now they're together, they're not with T-Money,

11  they're not with Earl Pierce, they're not with anyone else.

12  And that's, as you note the time, 2042.

13          All right.  Let's go to the third camera view.

14          Now this is from the camera that's in front of 681

15  Courtlandt and it's looking up north, up Courtlandt Avenue.

16  And I'm just going to go back a couple of minutes.  You see now

17  it's 2039.  So it's about three minutes before we saw

18  Pemberton, Folks.  And let's play that.

19          (Video displayed)

20          MR. MIEDEL:  Now these two guys that are coming toward

21  us here, walking on the sidewalk, we know who they are.  The

22  person in the front is Jason Correa and the person with him is

23  somebody else who Bernard Folks identified as Earl Pierce's

24  cousin.

25          Okay.  And while I'm here, let me address something

 1    that Mr. Fee said yesterday.  He said repeatedly that Earl

 2    Pierce's cousin brought Jason Correa into 681.  An insinuation.

 3    He didn't say what it meant or what he meant by that, just that

 4    he brought him there.  Let me be clear.  There is not a shred

 5    of evidence in this case that anyone brought Jason Correa to

 6    the building.  No one said it, and you know what, let's look --

 7    we looked at the video.  Does that look like Jason Correa is

 8    being brought to 681?  The two guys are slowly strolling on

 9    Courtlandt Avenue, Jason Correa is ahead of this other person,

10    and they're walking into the building together slowly.  Just

11    sort of forward that till they disappear.

12            Does that look like he's being brought?  Looks like --

13    more like the other guy's being brought.

14            This sort of sense of, ooh, somebody brought him to

15    the building, almost suggesting like, oh, it was a plan, he

16    would be brought here.  That's ridiculous.  It may be wishful

17    thinking on the government's part, but there's no evidence, not

18    a shred of it, that supports that.

19            There was also some testimony, by the way, from Jason

20    Correa's mother about Jason Correa being scared to be on the

21    block, afraid of walking, afraid of 681 Courtlandt.  Well, that

22    doesn't look like anybody's scared to be on Courtlandt.  Slowly

23    strolling, he's on the phone, he's talking to people.

24    Certainly not scared to go into 681.  So all I can say is,

25    thank goodness we have the video.

Cbr1mer2                    Summation - Mr. Miedel

1            All right.  Let's move forward a couple minutes,

2   couple minutes later to 2044 and play that.

3            (Video displayed)

4            MR. MIEDEL:  By the way, this is now two minutes,

5   about, after we see Pemberton and Folks coming down from

6   156th Street.  That person in the white T-shirt, that's Earl

7   Pierce, and if you look at -- if you look at the screen, or if

8   you look at this video in the deliberation room later, you'll

9   see he's drinking something as he's walking.  Not sure that

10  looks like somebody who's about to commit a murder.

11           And if you keep playing it, the person walking in the

12  white T-shirt between the cars right now, heading towards the

13  sidewalk, that's been identified as T-Money, and then he's

14  being followed very closely by our friends Pemberton and Folks.

15  Pemberton and Folks still together; right?  They were together

16  two minutes earlier, 2042 on the video, and this is now exactly

17  2045.  They were together at 2042 coming from Jackson Houses

18  somewhere, they sort of disappear from camera view for about

19  two minutes, and then together again they walk into 681

20  Courtlandt.

21           Now the strange thing about this is, Folks has some

22  sort of amnesia about Pemberton.  Folks claims he doesn't

23  remember Pemberton being there.  Don't you think that's

24  strange?  He testified that T-Money was only talking to him, he

25  doesn't remember Pemberton being there, I showed him the video,

Cbr1mer2                      Summation - Mr. Miedel

1    he's like, oh, yeah, that's Pemberton.  He's clearly with him.

2    They're clearly together.  I mean, if anybody's together, it's

3    those two guys; right?  So what's going on?  He seems to have

4    mysteriously erased Pemberton from his story.

5          So, ladies and gentlemen, what are we left with here?

6    We're left with Folks' story about being with T-Money for half

7    an hour and just chilling and talking and Pierce coming up and

8    then T-Money following -- and then following T-Money into the

9    building.  Well, that's just not true.  We know it's not true

10   because it's two minutes where maybe a conversation could have

11   happened.  How can you possibly trust Bernard Folks beyond a

12   reasonable doubt on that?  And what can the government say?

13   Believe Folks?  No, you've got to believe Folks.  Don't believe

14   what's in front of you on the video.

15         Now this conversation, supposed conversation that

16   Folks remembers a couple years after the incident, I guess the

17   conversation that supposedly took place in those two minutes

18   that they were out of camera view.  Now you've got a

19   conversation that is, for the government, the entire case, what

20   comes to the claim that Earl Pierce was somehow involved in the

21   aiding and preparation and participation of the murder of Jason

22   Correa.

23         So what does Earl Pierce, according to Bernard Folks,

24   actually say?  He says: "Yes.  Ski Box had told him, like, he

25   just said:  My cousin wouldn't have let him live."

1           "My cousin wouldn't have let him live."

2           Okay.  So the government's like, let me ask that

3   again.  So we're onto the next page now, page 647.  It says,

4   this time again:  "It was just his words that, my cousin

5   wouldn't let him live."

6           "My cousin wouldn't let him live."  What does that

7   mean?  What is that supposed to mean?  Is that supposed to have

8   some significance?

9           Well, apparently the government was troubled by that

10  too, because on redirect, they asked Bernard Folks about it

11  again.  What happened this time?  The answer was, to the

12  question of:  "What words did he use?"  He said, "They were,

13  let him live.  He's with my cousin, let him live.  My cousin's

14  with him, let him live."

15          Now that, ladies and gentlemen, is supposed to be the

16  hatching of a plan to kill him?  That doesn't even make sense.

17  I mean, let's assume for a moment that they're actually talking

18  about Jason Correa, and we have no actual evidence of that

19  because Bernard Folks, he didn't know what was going on; right?

20  He testified that he had no clue what was supposed to happen.

21  But let's assume for a second, for the sake of argument, that

22  those words have something to do with Jason Correa.  That's

23  supposed to be aiding and abetting in a murder?  I mean, I'm

24  sorry, ladies and gentlemen.  Are we living in some sort of

25  ultimate universe where "let him live" means "kill him"?  That

Cbr1mer2                         Summation - Mr. Miedel

1    doesn't make any sense.

2            One thing is certain.  Those words do not prove

3    anything when it comes to showing beyond a reasonable doubt

4    that Earl Pierce was somehow involved in a conspiracy to murder

5    Jason Correa or aided in the murder of Jason Correa.  To say

6    otherwise invites complete, utter speculation, and the judge is

7    going to warn you not to do that.

8            Of course the other thing is, somebody else was

9    present for this supposed conversation; right?  Aubrey

10   Pemberton.  So what does Aubrey Pemberton say about that?  He

11   says something very different.  He says:  Okay, I was on

12   154th Street, not 155th Street, and I was there for hours

13   selling drugs, and I was with Crocker and Folks and T-Money and

14   Pierce was also there.  He says that Levi walked up to the

15   group and that Levi said something about he's got money on him.

16   Remember that?  So at that point he says that T-Money and

17   Pierce then walked towards 681 and go into 681 together and a

18   little while later he and Bernard Folks follow and go into the

19   building.  Pemberton says he doesn't really know what's going

20   on but he thought maybe there was going to be a robbery, he

21   wanted to be part of it.  Well, that is completely different,

22   right, than what Folks said.  This isn't about Folks and

23   T-Money hanging out together, just the two of them, and Pierce

24   coming up.  This is about a bunch of guys hanging out on

25   154th Street for hours, chilling out.  How do you reconcile

1    that?  And about Levi, who's not even on this video, coming up

2    to them to say something about a robbery, or about somebody

3    having some money on them.  Someone is not telling the truth

4    here.  They can't both be telling the truth.  They can both be

5    lying.

6            And, you know, Mr. Fee gave us a little example

7    yesterday about why discrepancies between somebody's testimony

8    and somebody else's testimony shouldn't matter to you; right?

9    Because what matters is the big thing.  He says remember the

10   day before the hurricane, the judge probably gave you the phone

11   number to take, and who was the court reporter?  Right?  And he

12   he's like, look, you're not going to remember that.  Why would

13   anybody remember that?  Really, you think that's an apt

14   comparison to what we're talking about here?

15           How about this?  What if you were sitting here in the

16   jury box and you suddenly saw the court reporter get up and

17   shoot somebody, okay?  I think you'd probably remember who it

18   was.  You'd probably be able to remember which court reporter

19   did that.

20           We're not asking Bernard Folks and Pemberton, these

21   guys, to tell us, well, what was the color of the car that was

22   parked in front of 681 Courtlandt?  We're asking them to be

23   truthful about important facts about a murder, and they're not

24   being truthful.

25           And of course what else is wrong with Pemberton's

story?  Well, of course it's the video, right, which we just

saw a minute ago.  And I invite you, when you go back to

deliberate, to look at these videos carefully.  Pemberton

wasn't hanging out on 154th Street for hours.  He was there

maybe two minutes.  Because before that we saw that he'd come

from up by Jackson.  And what about Levi?  We don't see Levi

anywhere near the building until he comes out of the park about

ten minutes after the shooting, and we know that because one of

the witnesses identified him coming out of the park about ten

minutes later.

         But most importantly, none of this, what Pemberton

said, proves anything about the conspiracy happening in

advance.

         And briefly, ladies and gentlemen, Parsons, the third

person who testified about something that happened in advance.

And, well, of course, not surprisingly, he again tells a

completely different story, because he says he's on 153rd

Street, moving down the block.  He says he's out there with

Bernard Folks, with T-Money, Pierce, Aubrey, and Levi, okay?

So, okay, in that sense he and Pemberton match up.  He says he

sees Ski Box and T-Money talking, and then the two of them walk

into 681 together, and he says no one else walked into the

building.  No one else.  Well, we know that's not true.  And

then he says he heard shots, and after he heard shots, he and

Levi went into the building together.  We know that's not true

1    either, because he was identified walking into the building

2    about 20 minutes after the shooting, alone, on the video.  So

3    once again, Mr. Parsons reveals himself not to only be a

4    sociopath but a pathological liar.  And that's who the

5    government puts up here as their star witness.

6            All right.  So that's the part that happened about --

7    on Courtlandt before the murder.

8            And what's the actual evidence?  Three different

9    stories, all contradicting each other on important, important

10   facts, and all contradicted, all three of them, totally

11   contradicted by the video.  So you might as well throw their

12   testimonies in the garbage because that's where they belong.

13           All right.  Moving into the lobby, and inside the

14   lobby, unfortunately -- and I wish there were, but

15   unfortunately there is no video inside the lobby.  Because if

16   we had one, I think we would know what really happened.  So

17   we'll have to make do.

18           Folks says that he went into the lobby and T-Money and

19   Pierce were there, and he says he heard some things about

20   Pierce saying something about, "I'll wait for you on the second

21   or third floor."  And he claims, by the way, it's only him --

22   only the three of them, T-Money, Pierce, and him.  Once again,

23   omitting, obviously, Pemberton, who was with him.  I'll get to

24   that in a moment.

25           But not at all what Pemberton says.  Pemberton says

that -- he says -- remember, he says T-Money and Pierce go into

the lobby and he and Folks stay behind, and then he tells

Folks, "Let's go into the building." They go into the

building, and then they're all talking, all four of them --

T-Money, Pierce, Folks, and Pemberton. In fact, Pemberton

thinks it's going to be a robbery and he asks -- remember he

asks T-Money, "Let me do it," and he claims, right, at that

point that Pierce said no, something about, if you're so tough,

you do it. That's what he says. And then he says he leaves

the building and a while later he hears shots.

        Now how can you possibly make sense of these two

versions in the lobby? Pemberton doesn't mention a word. Now

Pemberton says he's there and he doesn't mention a word about

Pierce supposedly saying, "Listen, I'll wait for you on the

second floor." Not there. He doesn't say it. He says

something totally different about this robbery thing; right?

So what do you make of that?

        Oddly enough, by the way, if you look at the video,

you never see Pemberton leaving the building. There's

different videos and they cover the entrances, and if you watch

them over the course of time, he claims he leaves the building,

but there's no -- there's no evidence he leaves the building.

So what happens there?

        I mean, look, the problem is, how can you trust really

any of these guys about what they're saying? They're wrong so

Cbr1mer2                    Summation - Mr. Miedel

1    much of the time; right?  They have such an incentive to lie.

2    And something I haven't even mentioned yet, they all were

3    basically high and drunk every hour of the day.  They can't

4    even remember the season that things took place.  Now -- but

5    even let's say for the sake of argument Pemberton is right

6    about what happened in the lobby; right?  And I'm not saying

7    that's true because he was spectacularly wrong about what

8    happened beforehand, but let's say he's right.  Even if he

9    says -- even if it's true, let's say, for example, Pierce said,

10   "You do it if you're so tough."  How does that make Pierce a

11   murderer?  How does it make him any different than Pemberton?

12   Pemberton actually wanted to do it.  Pemberton doesn't --

13   Pemberton doesn't get charged with the murder.  Yes, Pierce is

14   present in the lobby in this version.  So was Pemberton.  Mere

15   presence doesn't mean anything, and you're going to hear that

16   from the judge over and over again.  Being merely present,

17   without more, doesn't mean anything.  It's not a crime.  Now it

18   may not be pretty, it may not be nice, but it's not guilt of

19   murder.

20          That brings us to the last piece of the Correa murder,

21   which, as the government claims, is the final nail in the

22   coffin.  The passing, alleged passing of the gun from T-Money

23   to Pierce.  And what's the evidence of that?  Is there any

24   evidence of that beyond Folks?  No.  None whatsoever.  I mean,

25   obviously we know they had other witnesses, and speaking of

Cbr1mer2                    Summation - Mr. Miedel

which, ladies and gentlemen, it's in this little piece of it

that Folks seems to have slipped up a little bit. Because he

made a mistake. Folks claims, right, that the shooting took

place at the bottom of the stairs and right -- after the

shooting T-Money and him went upstairs to the second floor and

handed off the gun to Pierce. Now during cross-examination

Mr. Dinnerstein asked him:

         The only person who knows who shot Correa who is

alive, that's you, right?

         Me, and I don't know who T-Money told, so I'm not

sure.

         The only person who knows who shot Correa is you.

         And then he says, again, the only person who's alive

who was present when Correa was killed is you, isn't that

correct? The answer is yes.

         Now why is that important? Under Folks' version,

Pierce wouldn't -- Pierce would know, right, that T-Money

was -- that T-Money shot Correa. He would have heard it if he

was on the stairwell, he would have felt the hot gun that was

just used in a shooting. Folks didn't mention Pierce. He

said, "Just me and T-Money. I'm the only person who knows."

If Folks' version were actually true, he wouldn't have left

Pierce out of that answer. But he did leave him out, and

that's how you know Folks is lying. Little things like that,

seemingly unimportant at the time, but when people lie, it's

Cbr1mer2                    Summation - Mr. Miedel

1    precisely in those little details that they get caught up.

2           How else do we know that Folks is lying about this?

3    Well, remember Pemberton?  He said that a couple days after the

4    murder he talked to T-Money, and T-Money told him about the

5    murder.  He told him he shot the guy.  And what else did he

6    tell him?  He told him -- he told Pemberton that he, T-Money,

7    gave the gun to Folks and Folks took it out of the building.

8    Now why would T-Money lie about that?  He admitted to killing

9    someone.  Not only that, but he's talking to Aubrey Pemberton,

10   one of his closest friends, and not only one of his closest

11   friends but someone who quite literally saved his life just a

12   few days and weeks earlier when somebody tried to kill T-Money.

13   Why tell Pemberton that Folks brought up the gun if he didn't?

14   It makes no sense for him to lie under the circumstances.  He

15   has no life sentence hanging over his head.  But it does make

16   sense for Folks to lie about it, because he's stuck with a

17   murder rap and he's got to shift the blame away from himself;

18   right?  T-Money's dead.  Can't blame T-Money now.  Nobody else

19   there, except for Pemberton, but for some reason that we don't

20   understand, he thinks that, you know, ignore the fact that

21   Pemberton is there.  The only other person around is Pierce.

22   Remember I asked him a series of questions about this on

23   cross-examination and said:  So you met with the prosecutors

24   and you told them that you didn't have anything to do with the

25   murder and you didn't know about it in advance and you didn't

Cbr1mer2                    Summation - Mr. Miedel

1    know that T-Money had a gun; right?  You told them all that and

2    they were still going to charge you with murder.  That didn't

3    work.  So he was left with only one course of action,

4    substantial assistance against someone else, and that someone

5    else was Pierce.  Someone, by the way, ladies and gentlemen,

6    not in GFC, not in YG or OG or Mac Balla, not in Folks' gang,

7    someone he didn't care about.

8            That brings us to Maria Ortiz, who the government

9    claims is a big central witness against Earl Pierce.  When you

10   look at her testimony carefully, and objectively, you'll see

11   that her testimony means absolutely nothing on its own.  That

12   doesn't prove anything.  That's the government's attempt to

13   insinuate, to make suggestions, to have you assume things

14   instead of offering actual evidence.  And why do I say that?

15   Well, let's talk a little bit about Maria Ortiz.  She said two

16   things that the government say is important.

17           One, she says -- first she says that she sees Pierce

18   coming into the apartment shortly after the shots are fired;

19   right?  Obviously, of course.

20           Second, she claims that a couple of months later,

21   Mr. Pierce threatened to kill her if she told the police about

22   it.  Well, let's go through each one in turn, because if you

23   look at this carefully, it's not really what it's made up to

24   be.

25           First she comes into the apartment shortly after the

Cbr1mer2                    Summation - Mr. Miedel

1    shots are fired, and let me say that there are some -- let me

2    say -- before I go into that, let me say there's some problems

3    with Maria Ortiz; right?  First of all, she clearly doesn't

4    like Earl Pierce.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MR. MIEDEL:  She mentions several times how she and
her sister Wendy fought about him, and that relationship,
Wendy's and Earl Pierce's relationship, caused problems in the
family.

Secondly, her memory is problematic.  She doesn't
remember certain things she told the police.  She doesn't
remember what people said after the shooting.  She told
detectives one thing and told us another.  And she conveniently
remembers only what she considers the bad stuff for Earl
Pierce.

Let's get specific.  All right.  So she sees him
coming into the apartment.  Okay.  So what?  We know he's in
the building, we know he's around.  Okay.  But does she see or
feel or hear anything suspicious?  Of course the answer is no.
Remember such a funny little detail, she says she actually
patted him down when he came into the hallway.  Did she feel a
gun?  Does she see a gun?  Does she see anything that makes her
think, hmm, what's going on there?  No.

She sees him walk into Wendy's room, ask Wendy if she
wanted to eat.  Mr. Fee makes a big deal about that.  He says,
look, is that the behavior of somebody who just heard shots?
Maybe.  Maybe it is the behavior of somebody who hears shots
all the time in the Melrose Houses.  But the more important
question is, is that the behavior of somebody who just
committed a murder?

 1          And he doesn't go in the closet and stash something in

 2     the closet.  He doesn't go in the bed and put something under

 3     the bed, right.  And suddenly everyone realizes that Wendy's

 4     little nephew is outside, Justin, so she sends her brother

 5     Chuckie and Pierce out to go get him.  If you look at the

 6     video, and I don't have to time to show it to you now, but

 7     you'll see Pierce and Chuckie coming out and grabbing the

 8     little kid.

 9          Without Folks' testimony Maria Ortiz's story would be

10     totally innocuous.  Innocent.  Yes, Pierce is around.  He's

11     present near the scene of a murder.  Well, so are other people.

12     So is Pemberton.  Parsons.  But you will hear it again.  Mere

13     presence, merely being present, that's not enough for anything.

14          The second issue, ladies and gentlemen, is this

15     supposed threat that's made a couple of months later.

16     Government makes a big deal of that.  Why would Pierce threaten

17     Maria Ortiz if he didn't have anything to hide?  Again, we've

18     got the government asking you to make assumptions or inferences

19     that are not supported by the evidence.

20          Let's take a careful look at what she actually said.

21     What she actually did.  She said she got into an argument.

22     Okay.  An argument.  And she got into an argument because,

23     remember, she said Wendy -- she got into an argument because

24     Earl was upset because Wendy had told him that Maria was going

25     to the cops and blaming him or putting him somehow into this

CBR3MER3                          Summation - Mr. Miedel

1    murder.  And he gets into an argument with her and he says, as

2    he told her, he was like, he doesn't have anything to do with

3    anything.  He didn't know what I'm talking about.  Given that,

4    wouldn't that be pretty upsetting, pretty maddening, to have

5    your girlfriend's sister wrongly telling the police that you

6    had something to do with a murder?  So he gets mad and they

7    have heated words.  She claims he threatened to beat her up or

8    kill her.

9          Well, who knows what was actually said.  But let's

10   think about what she actually did in response.  Not much.  She

11   said afterwards, we had conversations after that.  And more

12   importantly, she stays in the apartment for another few months.

13   She's afraid?  She thinks that this is serious or that she's

14   scared of him or something like that?  Of course not.  She

15   stays in the apartment for months until she finally ends up

16   moving to Pennsylvania a few months later.  Not exactly the

17   action of someone who is afraid of Earl Pierce.

18         What we have is an argument about being falsely

19   accused.  And that's it.  What does it mean?  A whole lot of

20   nothing.  And I urge you to look at this carefully.

21         Anybody else talk about this?  Well, this Anthony

22   Crocker, Anthony Crocker said that he heard about the Correa

23   murder and heard that T-Money killed Correa alone.  No one else

24   was with him.  He also testified that after everyone is

25   arrested, right, he said Pierce told him that after T-Money

1    killed Correa, T-Money ran into Pierce's apartment with the

2    gun.  Now that's different than what Mr. Fee said yesterday

3    because Mr. Fee said that Pierce told him that he, Pierce, got

4    the gun from T-Money and put it in his apartment.  Suggesting

5    that Crocker was corroborating Bernard Folks.  That's not what

6    he said.  Let's look at the -- oh we don't have it.  We don't

7    have it so we will -- oh, right, I'm going to read it to you.

8    It's from page 3987.

9    "Q.  What, if anything, did Ski Box say about what T-Money did

10   after shooting Jason?

11   "A.  He ran to his apartment.

12   "Q.  To whose apartment?

13   "A.  To Ski Box.

14   "Q.  Did Ski Box say what happened at his apartment after

15   T-Money shot Jason?

16   "A.  That he left a gun there.  That's about it.

17   "Q.  Who left a gun?

18   "A.  T-Money.

19   "Q.  T-Money left a gun where?

20   "A.  At Ski Box's apartment."

21         Now, that is very different than what Folks testified

22   to.  Right.  On the one hand we have Pierce supposedly waiting

23   for the murder to be finished, taking the gun and running into

24   his apartment and stashing it.  And the other one is Pierce is

25   in his apartment and T-Money comes running in and says, yo,

 1    hide the gun for me.  Of course, Crocker's story here is also

 2    different from Maria Ortiz who didn't testify about T-Money

 3    coming to the apartment, so we have all different versions.

 4           Lastly we have Maurice Hagen, our jailhouse informant.

 5    What does he say about the Correa murder?  He says Mr. Pierce

 6    came back from court after being newly charged with this

 7    murder, and very upset, he felt wronged, he felt it was unfair

 8    he was being charged with a murder he didn't commit.  He was

 9    upset because he says the only thing he did was get rid of the

10    gun.  That's what Hagen's testimony is.

11           First of all, of course, going back to the question

12    is, you know, should we trust Hagen?  We already talked about

13    the general reasons he should not be believed.  He has nothing

14    to lose and everything to gain from, quote, air hustling his

15    way onto the Courtlandt Avenue case, right.  He's clever, he's

16    smart.  He knows what he has to do.  Not only that, his story

17    is once again contradicted by some of the other people.

18           And for sake of argument, let's just assume it's true.

19    And believe me, I'm only saying it for the sake of argument.

20    But what does getting rid of a gun mean?  When?  How?  That

21    could mean days later.  That could mean T-Money told his friend

22    Pierce this gun is hot, can you hide it for me.  Now, that's

23    not good.  That's probably a crime.  But it's not aiding and

24    abetting in a murder.

25           Ladies and gentlemen, what Earl Pierce is charged with

CBR3MER3                        Summation - Mr. Miedel

1    is aiding and abetting in the murder, and the government has to

2    prove that beyond a reasonable doubt.  You cannot aid a murder

3    after it happens.  That's something else.  So, I implore you,

4    please listen to the jury instructions on this very carefully.

5    If the government didn't prove that Mr. Pierce somehow

6    participated in the murder before it happened, counseling,

7    helping, opportuning, whatever it is the language is that

8    you'll hear, then he's not guilty.

9          Even if, even if -- I'm playing devil's advocate --

10   even if he got rid of the gun after the murder, he's not guilty

11   if he didn't do anything to help with the murder before it

12   happened.  All right.

13         That's the so-called evidence on the Correa murder.

14   Mr. Fee said the evidence was overwhelming, and I suppose if

15   you believe every word that Bernard Folks said, ignore

16   conveniently what Aubrey Pemberton and others said, ignore the

17   videotape, well, I grant him, perhaps he would be right.

18   But if you do your job, ladies and gentlemen, which is to

19   analyze the evidence carefully, compare the witnesses, compare

20   what they say to each other and to the videotape, and also

21   think about what's not there.  And it should be quite clear

22   that Earl Pierce did not participate in the murder of Jason

23   Correa and he should be found not guilty.

24         And as I said, the Correa murder is charged across

25   various different counts.  So if you find the government has

1    not proved beyond any reasonable doubt that Mr. Pierce is

2    guilty of agreeing to participate in this murder, and actually

3    aiding and abetting it, then you must find him not guilty of

4    count three, conspiracy to murder in aid of racketeering; count

5    four, murder in aid of racketeering; count 14, murder in

6    connection with the drug crime; count 17, use of a firearm

7    during a crime of violence.  All right.  I know I don't have

8    too much more time so let me move on.

9         The Tarean Joseph shooting on the night of

10   September 13, 2010.  Once again, Bernard Folks is in the middle

11   of this with a little backup support from Devin Parsons and

12   Anthony Crocker.  And again, Crocker comes in to clean up the

13   mess that's left by the contradicting evidence by the other

14   people by claiming that Pierce confessed to him while in jail.

15   And again, we lack any objective, hard, unassailable evidence.

16        All right.  So the first version comes from Folks.  By

17   the way, let me say at the outset, when Folks started to

18   cooperate, he knew that Pierce was charged with this shooting.

19   And he knew what he had to do because he knew he was there.

20   And he had to put somebody else in it.  And he had to provide

21   substantial assistance against someone else.  It couldn't just

22   be him.  Notice once again a non-GFC member takes the hit.

23   Right.

24        Folks said, oh, I didn't really do anything.  I barely

25   knew what was going on and I just shot at the end.  And Killa,

CBR3MER3                    Summation - Mr. Miedel

1  he didn't really do anything either.  But Pierce, Pierce

2  supposedly acts crazy and shoots Tarean Joseph in the head.  So

3  this is what Folks said happened.

4      He said that he is at Dante's apartment with Devin

5  Parsons, they're hanging out.  And in fact he's sleeping or

6  lying down.  And he gets a call from Meregildo asking him to

7  bring down the .40 caliber gun.  So he puts it in a shoebox and

8  he and Devin Parsons go downstairs.  He tries to give the bag

9  with the shoebox to Meregildo, Meregildo won't take it.  At

10  this point he says Devin Parsons leaves and goes home.  He says

11  that Folks -- that he and Meregildo then walk back into the

12  building, they ditch the sneaker box, and he puts the gun in

13  his waistband.  Now, he says he has no idea what's going on.

14  He has no idea what is happening or what if anything is

15  supposed to be happening, and he doesn't think much it because

16  he walks around with guns in his waistband all the time.

17      Then they go out of the building, and Meregildo takes

18  him to a cab parked out front with Pierce in it, and they drive

19  to Harlem.  They supposedly talk to -- well, Meregildo

20  supposedly talks to T-Money's uncle.  They get another cab and

21  they drive home, and Folks says I just thought I was going

22  home.  I live at 321.  And they see some people sitting on

23  benches, and at that point, you know, all hell breaks loose.

24  But he makes clear there was no plan to shoot or kill anyone.

25  He was just going along for a ride.

1              Even if that was true for a second.  Where is the

2    evidence that this was part of a racketeering enterprise?

3    Where is the conspiracy?  If anything, this seems like some

4    sort of spontaneous act of maybe personal revenge or something.

5    That's if it were true, but it's not.

6              And once again, Devin Parsons' version is totally

7    different.  He says that Pierce called him, not Meregildo.  He

8    says that he got the call while he was in his own house, not in

9    Dante Barber's house.  He says he goes downstairs, walks along

10   the path towards Dante Barber's house when he encounters Folks

11   on the pathway, and they both go up to Barber's house to get

12   the gun.

13             Odd.  That seems totally different than Folks who says

14   he's sleeping at Dante Barber's house.

15             They get the gun, he says they grab the gun, and they

16   go downstairs.  He gives the gun to Folks.  And he puts -- he

17   sees Pierce and Meregildo in the cab.  And then he, Devin

18   Parsons went home.  This is important.  He says about five to

19   seven minutes after he leaves these guys in the cab he hears

20   the shots.

21             Well, they can't both be right about that.  Because

22   one guy says he drives to Harlem and back.  And Devin Parsons

23   says there's shots five to seven minutes after he leaves them.

24   How are we supposed to know who is telling the truth, if

25   anyone?

1          So where does this leave us about this shooting?  How

2     can we trust beyond a reasonable doubt what happened here?

3     Well, ladies and gentlemen, what do we know?  We know there was

4     a shooting, okay, because we know that there were shells

5     recovered at the scene.  All right.  Fine.  We know that a guy

6     named Tarean Joseph was shot.  Now, did the government really

7     manage to connect Tarean Joseph to this shooting?  I'm not sure

8     they did, but let's say it was him.  Tarean Joseph got shot.

9     Of course, he would be in the best position to tell us what

10     happened, right.  But you know he didn't testify.  Still, we

11     get a clue as to what he might have said about this from his

12     medical records which are in evidence as Government's Exhibit

13     420.  This is what he told his doctors.  He was just walking

14     down the street and got shot.  Then, he also says he does not

15     know what happened.

16          According to Folks, Earl Pierce shoots Tarean Joseph

17     face to face.  Joseph tells his doctors he doesn't know what

18     happened.

19          Where does that leave us?  Well, again, we lack any

20     kind of objective evidence in the case.  We don't have any

21     video, we don't have any physical evidence.  A gun was

22     recovered, but there is no DNA or fingerprints or anything that

23     links it to anyone.

24          And by the way, let me just say something about that

25     gun, because there is something strange about this whole gun

1    case in this incident.  Folks testified that he had a .40

2    caliber, remember, and he says that Pierce had a 9-millimeter

3    gun.  And he says that after the shooting, they both ran away

4    and they both threw their guns into the same garbage can.

5    That's at page 690.  He says Ski Box threw his gun in the same

6    garbage can.

7            So, what happened to that 9-millimeter?  I mean, we

8    know somebody called 911, and said there is a guy who just

9    threw a gun in a garbage can, and soon the cops are swarming

10   the garbage can.  And they ultimately find a gun.  One gun.

11   The .40 caliber.  And remember Folks says he tried to get

12   somebody, a friend of his, I think it was Javon Jones, to try

13   to retrieve the gun from the garbage can.  And Jones said it's

14   too hot around here, there's too many cops around here, can't

15   do it.  So what happened to that supposed phantom 9-millimeter?

16   Are we certain there were two guns?  Detective Fox testified

17   that a 9-millimeter ammunition can be used in a .40 caliber

18   gun.  We know also that one of these guys at 321 started

19   shooting back.  We don't know what kind of gun he had.  Makes

20   you wonder.

21           So, in the end, the only evidence against Earl Pierce

22   on that shooting comes from two completely untrustworthy people

23   who contradict each other.  In fact, it's really just one,

24   because Parsons doesn't even claim to have seen what happened.

25           And the government brings in Anthony Crocker who says,

CBR3MER3                    Summation - Mr. Miedel

oh, by the way, Pierce told me he did it while we were locked

up together.  How convenient is that.  Unfortunately for the

government, there is a problem with Crocker's testimony.

Because the way Crocker tells it, Pierce said that he did the

shooting with the .40 caliber and then that he handed it off to

Folks.  That's on page 4011 to 4013 if you want to check that.

That story completely contradicts what Folks said, who said he

had the .40 and Pierce had the 9-millimeter.

        So, once again, the two central witnesses against Earl

Pierce on this matter completely contradict each other.  So

what are you left with?  You are left with the sense of I don't

really know what happened here.  If you're left with that

sense, you have more than a reasonable doubt.  And you must

vote not guilty.

        I'm getting close.  Narcotics conspiracy.  What is the

evidence that Earl Pierce sold drugs?  That he sold narcotics,

that he sold crack?  And that's only the first step of course,

because the real question is what is the evidence that he sold

crack with his co-defendants as part of a conspiracy that have

a joint goal?  That's the charge in this case.  That they

conspired to sell drugs together, and by together it means that

they shared profits, they shared suppliers or worked together

in some way towards the same goal.

        So let's start again with Bernard Folks.  He said he

was out there on the street.  He was selling crack for T-Money

 1  every day, or he's selling drugs for T-Money every day.  He saw

 2  Pemberton selling out there.  He saw Parsons selling out there,

 3  and he says he saw Pierce selling crack on Courtlandt Avenue.

 4  Remember the government tried to get him to say so you were

 5  selling with Pierce.  Right?  You were selling together?  And

 6  he wouldn't bite.  He said, essentially what he said was, well,

 7  we were standing on the same street at the same time selling

 8  drugs, but we weren't working together.  That's what he told me

 9  too.  And he said when I questioned him about it, we didn't

10  share product or profits.  I didn't work for him.

11          Is that a conspiracy?  Folks and the others claimed

12  that GFC members worked for T-Money, right.  That they got

13  their drugs from him, that they sold drugs for him, that they

14  kept 40 percent of the profits.  Nobody said they worked for

15  Pierce.  They didn't share profits with Pierce.  They didn't

16  share product with Pierce.  He didn't give them drugs to sell

17  and split the proceeds.  Mr. Fee seemed to pull out of thin air

18  this notion that the GFC guys were the foot soldiers for the

19  older guys and that they got direction from the older guys.

20  Really?  Is there any evidence at all of that in this case?

21          No one took direction from Earl Pierce.  Where is the

22  evidence that Earl Pierce is intimately involved in the drug

23  dealing enterprise?

24          And that doesn't even get us to the question of

25  whether Folks is telling the truth that Pierce was actually out

1    there selling crack.  First of all, does that even make sense?

2    P.S.A. 7 is right around the block.  200 officers are

3    patrolling this area.  Officers like the one who arrested

4    Hassen Brito, who set up observation points to look out for

5    people, right.  You heard that people got arrested for drugs.

6    Parsons got arrested for selling drugs, Crocker got arrested

7    for selling drugs, Villafranco got arrested for selling drugs

8    all during the summer of 2010.  Did you hear anyone say a word

9    about Pierce getting arrested, charged, convicted, anything for

10   the possession or sale of drugs in 2010, 2011, when he was

11   supposedly out there selling the stuff every single day?  No?

12   No.  Why?  Because he wasn't.

13          Of course as I mentioned before, the government has

14   not shown you a single bag of crack or marijuana or whatever

15   that's somehow linked to Earl Pierce.

16          Second, we talked about all this overwhelming evidence

17   against Earl Pierce on the drug conspiracy.  Mr. Fee seems to

18   have conveniently forgotten the testimony of Aubrey Pemberton.

19   Pemberton said he was literally out on Courtlandt Avenue every

20   single day selling drugs for T-Money, and he talked about all

21   the other people who were also out on Courtlandt.  And he says

22   that he never saw Earl Pierce selling drugs during the summer

23   of 2010.

24          2010 you saw him with T-Money, but you didn't see him

25   selling crack?  Answer:  Correct.

CBR3MER3                          Summation - Mr. Miedel

1          He's out there every day, but he never sees Pierce

2     selling.  Pemberton said, and this is from pages 1840 to 1842.

3     I don't expect you to read through this whole thing, but

4     basically he says that -- confirms once again that Earl Pierce

5     was not part of GFC or OGFC or Mac Balla, that he didn't

6     resupply any of them, that he didn't pay Pemberton or that he

7     saw anyone else paid by Pierce to sell drugs or commit crimes,

8     and he never saw him give anyone a gun.  That he never saw

9     Pierce go to a drug supplier.  He was very adamant about that.

10         What else was he adamant about?  He was very adamant

11    about the fact that he never saw Pierce and T-Money selling

12    drugs together.  Never saw them together to get a new supply of

13    drugs or marijuana, crack.  Never saw them collect money

14    together.  He's out there every single day.  He is a big-time

15    GFC guy.  He doesn't see any of that.

16         What do the other people say?  The other cooperators

17    say various things.  Parsons says Pierce sold on the street and

18    on two occasions somebody told Parsons to give the proceeds to

19    Pierce, but totally out of step with everybody else.  And

20    frankly, at this point I would hope that for all the reasons I

21    pointed out earlier, you simply take his testimony and throw it

22    into a mental trash can.

23         Who else?  Villafranco.  Well, Villafranco says Pierce

24    was selling on Courtlandt Avenue.  But he admitted that he

25    never saw or heard of Pierce giving drugs to any of the young

CBR3MER3                    Summation – Mr. Miedel

1    dudes that he talked about.  Taking money, giving money,

2    anything that would suggest that he was in some way in a

3    conspiracy with them.

4          What about Anthony Crocker?  Anthony Crocker was

5    T-Money's number one dealer, right.  He was, I mean, if anyone

6    sold a ton of drugs, it was Anthony Crocker, according to him.

7    And he probably had the best view of all who was doing what on

8    Courtlandt Avenue during the summer of 2010.  So what did he

9    say about Pierce and drugs?  He said Pierce did not sell for

10   T-Money.  That's what he said.  Yes, he sold on Courtlandt, but

11   did he not sell for T-Money.  That's on page 4326 of the

12   transcript.  Crocker was close to T-Money.  He cried when

13   T-Money died.  If anyone would have known if Pierce was

14   involved with T-Money's drug enterprise, it would have been

15   Crocker, and Crocker was clear.  Pierce did not sell for or

16   with T-Money.

17         Remember Crocker also told us a little story about how

18   one time 12, one of the GFC kids, got cut off by T-Money

19   because he owed him money, so T-Money refused to give 12 any

20   more drugs to sell.  And so what happened?  According to

21   Crocker, 12 goes to Pierce and says can I get drugs from you?

22   So, according to Crocker, Pierce gives 12 drugs.  And what does

23   that show you?  It shows that, if anything, Pierce was selling

24   for himself.  That he was doing his own thing.  That he didn't

25   care about what T-Money's business was about.  T-Money

CBR3MER3                    Summation - Mr. Miedel

disciplining his workers and whatever.  He couldn't care less,
because that was not his thing.  He was not in T-Money's band.

        Finally, Maria Ortiz claimed that she saw Pierce going
out and selling drugs, I guess and at one time he was with
T-Money.  Even if that were true, where is the evidence that
this constitutes a joint conspiracy?  You can have two friends,
right, who sell drugs independently of each other.  Pierce for
himself, T-Money for himself with the aid of the GFC kids.
Hanging out together.  That doesn't mean they are in the same
conspiracy.

        To riff off Mr. Fee's jazz band example, what if you
have two bands playing at the same venue, one after the other.
And the two drummers from the two bands get together afterwards
for a drink and share stories.  Does that mean they are in the
same band?  No.  Pierce was not in T-Money's band.

        Now, in order to prove count 13, which is the
narcotics conspiracy, the government must prove that Earl
Pierce was a member of the charged conspiracy.  Not of a
different conspiracy.  Not a conspiracy for himself with
whoever his supplier was.  Not a conspiracy with 12 for that
little interaction that they had.  But the charged conspiracy.
And the judge will instruct you on that, and I want you to
listen really carefully to his charge on what is called single
and multiple conspiracies.  Because he's going to tell you that
if you find that Earl Pierce sold drugs but not as part of the

1    GFC group conspiracy, charged conspiracy, if you think that he

2    was part of a different conspiracy, but not the charged one,

3    you must find him not guilty.  Listen to that instruction very

4    carefully.  All right.

5            Finally, briefly, the racketeering.  And the facts

6    here are very closely connected to the narcotics conspiracy so

7    I won't belabor it.  But, in this entire case, witness after

8    witness testified about GFC, OGFC.  Cooperator after cooperator

9    talked about those gangs and talked about their tattoos, as

10   I've mentioned.  They talk about the stuff they did together,

11   the going down to Maria Lopez and shooting people, right.  That

12   was all part of what it meant for them to be part of this gang.

13   This criminal enterprise.  Then they talked about T–Money and

14   they said, remember, that T–Money got out of jail and this is a

15   guy they got to know who was selling drugs and he convinced

16   them to sell for him, take 40-60 splits on the drugs that they

17   sold, get the product from him, sell it and then split the

18   proceeds.  That's what they all talked about.

19           Where was Earl Pierce in all of this?  He wasn't in

20   GFC.  We've talked about he didn't have tattoos.  He didn't

21   have T–Money's name inked all over his body.  And did you

22   notice that Earl Pierce was curiously absent from Mr. Fee's

23   narrative about what happened after September of 2010.  Even

24   though this supposed enterprise took place for another year,

25   supposedly.  Where was Earl Pierce?

1          In terms of the guns that were supposedly part of this

2   enterprise, Villafranco testified that no one besides Tay and

3   13 held guns for T-Money.  Obviously he didn't consider Pierce

4   as somebody who had anything to do with T-Money's guns.

5          Speaking of guns, Mr. Fee said over and over

6   Mr. Pierce's .380.  This was Mr. Pierce's .380.  This is

7   Pierce's .380.  As if it was some sort of gospel, some sort of

8   fact.  What is the evidence of that?  This is what we know

9   about the .380.  The silver and black .380.  We know it was

10  used in the Correa murder apparently by T-Money.  We know it

11  was used in the Ogarro murder, supposedly by Meregildo.  We

12  know it was found in Hassen Brito's apartment.  Is it found on

13  Earl Pierce?  Is it found in his apartment?  Is his DNA on it?

14  It's great that Detective Fox linked this gun to different

15  things, but how does it connect to Earl Pierce?  All we really

16  know about this gun is that it was apparently touched by GFC

17  people.  Pierce wasn't GFC.

18         So, take Mr. Fee's "this was Pierce's gun" as what it

19  is.  Argument, without evidence to back it up.

20         By the way, Villafranco testified that he once saw

21  Pierce with a .380.  What did he say about it?  It was small

22  and black.  Certainly doesn't describe the gun that the

23  government waved around.  That's on page 3506.

24         Finally, in terms of the racketeering enterprise, let

25  me just talk about Crocker.  Anthony Crocker.  Because I think

1    he summed it up best in his testimony and let's take a look at

2    that:

3    "Q.  And the racketeering enterprise that you pled guilty

4    stretched from 2010 to September '11.

5    "A.  Yes, right.

6    "Q.  The racketeering enterprise was OGFC, right?

7    "A.  Right."  Then there are a number of questions after that.

8    And then you get to:

9    "Q.  It was through your participation in the enterprise of

10   OGFC that you sold crack and marijuana?

11   "A.  Yes.

12   "Q.  It was through your enterprise of OGFC that you shot at

13   Maria Lopez?

14   "A.  Yes.

15   "Q.  And Earl Pierce wasn't OGFC and he wasn't GFC and he

16   wasn't Mac Balla, and he never gave you drugs, he never took

17   money from you and he didn't sell drugs for T-Money."

18          And that's supposed to be proof that Earl Pierce is

19   part of this racketeering enterprise?

20          Look at what happened after T-Money died.  Did Pierce

21   take over this business of his good friend?  Did GFC members

22   come to him to buy drugs?  Did he supply others with drugs and

23   take a split like T-Money did?  Did he participate in any of

24   the beefs with YG at Maria Lopez?  Was he in charge of

25   anything?

CBR3MER3                    Summation - Mr. Miedel

1            You remember what Parsons said?  He said he wasn't

2       planning to participate in any kind of shooting or anything

3       like that because the guy that paid him was no longer around,

4       he was dead.  He didn't say Pierce was going to pay him.  Or

5       Pierce was going to say, listen, you do what you have to do.

6       It didn't even cross his mind.  Why?  Because Pierce was never

7       part of any racketeering enterprise.

8            What has the government tried to do.  It has tried to

9       somehow find a way to put Earl Pierce in this.  It's tried to

10      broaden, expand this racketeering enterprise beyond what is

11      really charged.  The trial testimony simply has not backed up

12      the government's efforts.

13           Bringing Earl Pierce into this case was misguided to

14      begin with.  Because he was never part of any racketeering

15      enterprise.  If you agree, as I think you should after you look

16      at this evidence carefully, it should be clear that Earl Pierce

17      should be found not guilty of count one and count two

18      racketeering and racketeering conspiracy.

19           All right.  In closing, I just want to add a few more

20      thoughts.

21           THE COURT:  Mr. Miedel, you should begin to conclude

22      your summation.

23           MR. MIEDEL:  Yes.

24           I've spent a lot of time talking about cooperators.

25      And that's because that's the only evidence that there is in

this case against Earl Pierce.  And in the end you have to ask

yourselves, can you trust these people?  The judge is going to

define reasonable doubt for you.  In his jury instruction he's

going to define reasonable doubt.  And one way it will be

defined is a reasonable doubt is a doubt that would cause a

prudent person to hesitate to act in a matter of importance in

his or her own affairs.

So the question for you is this:  Would you hesitate

to act in an important matter even if Bernard Folks or Aubrey

Pemberton or Devin Parsons or Anthony Crocker told you it was

okay?  If they said trust me, leave your valuables with me,

they will be there when you come home.  Would you trust them?

If they said we'll babysit your children.  Don't worry.  They

will be fine.  Would you trust them?

Well, here you have another person's life in your

hands.  Literally.  Your decision determines the rest of Earl

Pierce's life.  Can you trust, can you really trust these

people on a decision as important and as fundamental as this?

Look, I'm sure you're thinking to yourselves the

government presented seven weeks' worth of testimony in this

case.  Exhibits, guns, drugs.  It's got to be worth something,

right?  You ask yourself, if Earl Pierce wasn't involved in all

of this, why is he sitting there?  Well, there are lots of

answers to that question.  Most beginning with the idea of

presence.  Mere presence.  He was present.  He was around.  He

1  grew up on Courtlandt Avenue.  He was there.  But as I said to

2  you before, merely present, being present is not a crime.

3  Knowing about crimes being committed is not a crime.

4          The government here made assumptions, right.  They

5  jumped to conclusions.  They grabbed everybody and put them

6  together into something and they tried to fit a square peg into

7  a round hole.  And the evidence in the end, the evidence

8  against Earl Pierce was weak.  Yes, there was seven weeks of

9  testimony, but it's not the quantity of the evidence, it's the

10 quality of the evidence that matters.

11         In this sense, evidence is like coffee, right.  If you

12 add weak coffee to weak coffee, it's still weak coffee.  It

13 doesn't get stronger just because you keep adding weak coffee.

14 The evidence here remains and was and remains weak.  And the

15 government has not proven Earl Pierce's guilt by competent

16 evidence beyond any reasonable doubt.  And therefore, ladies

17 and gentlemen, I'm hopeful and confident that you will do the

18 right thing in this case and find him not guilty of the 11

19 counts that he's charged with.

20         Now, I'm going to sit down now.  But I want to leave

21 you with one last thought.  Mr. Mysliwiec and I have lived and

22 breathed this case for months.  And we have carried what is an

23 awesome responsibility on our shoulders.  The responsibility

24 for another human being's life and future and freedom.  And

25 now, we have to relinquish that responsibility.  We have to

 1    hand it over to you.  And all I ask of you, please, be careful

 2    with it.  Thank you.

 3              THE COURT:  Members of the jury, we're going to take

 4    our luncheon recess at this time.  Lunches are again waiting

 5    for you in the jury room.  We're going to reconvene at

 6    1 o'clock and continue with closing arguments.  At that time

 7    you'll hear from Mr. Becker, then we'll take a short recess and

 8    then you will hear from Ms. Heller, because the government is

 9    entitled to a rebuttal since the burden is always on the

10    government and never on a defendant to prove guilt by competent

11    evidence beyond a reasonable doubt.

12              Keep an open mind.  Don't discuss the case during the

13    luncheon recess.  And we'll see you in about 45 minutes.

14    Please recess the jury.

15              (Jury excused)

16              THE COURT:  Are there any issues that counsel wish to

17    raise?  Anything from the government?

18              MR. FEE:  No, your Honor.

19              THE COURT:  All right.  Any issues with respect to

20    demonstratives or aids?

21              MR. BECKER:  I'm going to be doing an old-fashioned

22    summation.  I don't expect to have demonstratives.

23              MR. FEE:  I'm excited.  But we're going to hand out

24    Ms. Heller's, she has a couple of slides that are

25    demonstratives and -- just one, I'm sorry.  We'll hand them out

CBR3MER3

1    right now.

2            THE COURT:  All right.  Very well.  The defendants may

3    be escorted from the courtroom at this time.  Be ready to go at

4    1 o'clock.  Have a good lunch.

5            MR. FEE:  Thank you, your Honor.

6            (Recess)

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                          AFTERNOON SESSION

                              1:07 p.m.

            (In open court; jury present)

            THE COURT:  Good afternoon, members of the jury.

We'll continue now with the closing arguments.  At this time,

members of the jury, I ask that you give your undivided

attention to Gary Becker, Esq., as he delivers his closing

argument on behalf of the defendant Nolbert Miranda.

            MR. BECKER:  Thank you, Judge Pauley.

            Good afternoon, everyone.

            I've done this before, but I still get nervous every

time I do, and I guess I always will.

            As a criminal defense lawyer, people will sometimes

say to me, in social settings, "I have a question."  They say,

"How do you represent somebody when you know they're guilty?

What do you do?"  And that's a very common question, and I

finally figured out the answer.  The answer is, what's really

tough is when you represent somebody who you believe is not

guilty.  And I think that's why I'm so nervous, because I think

that if there's one thing the evidence in this case has made

clear, and the lack of evidence, is that whatever Nolbert

Miranda may have done, or didn't do, he didn't conspire to sell

drugs with the other three gentlemen who are charged in this

case; he didn't conspire to do that with T-Money, or any

conspiracy or agreement with the Courtlandt Avenue Crew, as the

Cbr1mer4                        Summation - Mr. Becker

government has dubbed it; he didn't agree or conspire to

violate the RICO statute by engaging in a pattern of

racketeering; and he didn't use or possess a firearm in

connection with the charged drug conspiracy.  Those are the

three charges against him.  And given all the evidence in this

case, and again, the lack of evidence, I respectfully submit

that the conclusion should be clear to you by now that

Mr. Miranda is not guilty of those charges.

Now just start by considering this.  A number of

lawyers have said, we've been here eight weeks, and there were

times, of course, when we were on break, but there's been a lot

of witnesses and a lot of testimony and a lot of evidence.  Can

any of you recall a speck of evidence that Nolbert Miranda ever

so much as met Joshua Meregildo, let alone made some agreement

with him to do something illegal?  I will tell you, I searched

the record and I didn't see it.  It's possible I missed it.

But if it was there, boy, oh, boy, it came and went.

Is there any evidence before you that Mr. Miranda made

any kind of criminal agreement or entered into some criminal

conspiracy with Melvin Colon?  I don't think there's any

evidence in the record they've ever met.

There is some evidence in the record that Mr. Miranda

knew Earl Pierce and that they may have been friends, and

that's it, about Earl Pierce and Mr. Miranda.  I think Mr. Fee

said to you yesterday that there was evidence that Mr. Miranda

1    and Mr. Pierce did things unlawfully.  The only evidence, I

2    believe, when you search the record, there's some testimony in

3    the case that there was a time when Mr. Miranda came over to --

4    to the apartment where Earl Pierce was and Mr. Miranda

5    allegedly sat down by himself, counted some money, and then

6    went out and said, I'm going out to do a deal, and the witness

7    was asked -- and this was not a cooperating witness, this was

8    one of the civilian witnesses.  The witness was asked, was he

9    going out to do this deal by himself or with somebody?  And she

10   said, no, by himself.

11           We have all been here a long time, and I know that the

12   people in the well of the courtroom are exhausted, and the

13   fact, though, is that Mr. Miranda has waited a long time to get

14   to this point, a long time to finally have you, the jury, be

15   the judge of his case, for him to be judged not by the

16   prosecutors, not by the Alcohol, Tobacco, and Firearms agents

17   in the back of the courtroom, not by anyone but by you, the

18   jury.  And other lawyers have spoken about how important the

19   jury is in this society, in this case.  It is one of the most

20   cherished institutions our country has ever had.  I've never

21   had the privilege to serve on a jury.  I've always wanted to.

22   But it goes back to the founding of our nation, and it holds a

23   very significant historical place in our nation.  Sometimes

24   friends will say to me -- I'll get a call, they'll say, "Gary,

25   I got a call for jury service.  I'd like to get out.  What do

Cbr1mer4                        Summation - Mr. Becker

you suggest I do?"  And boy, oh, boy, do they hear it from me

when they say that, because I say to them, "Shame on you.

Shame on you, wanting to get out of jury service."  It's the

highest calling that you can aspire to as a citizen.  And if a

loved one of yours, god forbid, was ever charged with a crime,

if you were accused by your government of committing a crime,

how would you feel if people's attitudes were, oh, I don't want

to serve on the jury?

            And I know that I speak for everyone in this case when

I thank you and tell you how much we admire how conscientious

and responsible you have been.  Judge Pauley's told you more

than once that you are a remarkable jury, and you are.  A lot

of us suffered hardship from Hurricane Sandy, and there were

delays, and you folks have been unwavering in your attention to

this case, and I've watched you, and I have seen the care with

which you've considered the witnesses.

            The last thing I want to say about your role as

jurors, Judge Pauley told you yesterday that after I finish

speaking that the government -- and I believe it will be

Ms. Heller -- will have the opportunity to speak with you, and

she will, and he said that she will get the last word.  He

meant that figuratively, but in reality it's not quite accurate

that the government will get the last word.  You will get the

last word.  This case will soon be in your hands, and when it's

in your hands, the 12 of you are going to come together and

Cbr1mer4                      Summation - Mr. Becker

1    you're going to figure out whether or not the government has

2    met its burden, and you're going to do so without interference

3    from anyone.  It's your decision.  It is an awesome

4    responsibility to sit in judgment of someone else.  And I

5    cannot tell you the admiration I have for the approach that you

6    have taken to this case.

7            Now several of the lawyers before me commented about

8    their view that your task here is extremely difficult.  And I

9    understood why anyone would say that.  Respectfully, when it

10   comes to the case of Nolbert Miranda, I don't really -- I don't

11   think your task is that difficult.  I think it's pretty

12   straightforward.  I don't think it's that complicated.

13   Yesterday Mr. Fee stood up and he began his summation by

14   talking about promises that the lawyers had made in opening

15   statements, and he suggested that the promises that were made

16   by the lawyers -- and he was talking about the defense

17   lawyers -- were not kept, and it's almost kind of like a

18   politician running for office and he makes promises, and then

19   you keep your fingers crossed and you vote and then you wait

20   and see what the evidence is and you hope you made the right

21   choice.  A jury trial is a little different.  Here you get to

22   see the evidence before you vote.  And so I welcome, and I

23   welcomed, Mr. Fee's invitation to you to consider the promises

24   that the defense lawyers made in this case, and I'd like to --

25   I think it's been since about October 2nd or 3rd or 4th,

Cbr1mer4                          Summation - Mr. Becker

1    some time since I last spoke to you personally.  I'd like to

2    remind you, if I could, what I believe were the promises that I

3    made to you when I stood before you seven or eight weeks ago.

4            I told you that Mr. Miranda was charged in just three

5    of the 22 counts of the indictment.  And you've come to see

6    that he is.

7            I told you that his name does not appear on the

8    indictment in any kind of substantive way until page 14.

9            I told you that when the government brought these

10   charges, they got it all wrong, that despite all the bluster of

11   the government's opening statement that Mr. Miranda and these

12   other defendants terrorized the neighborhood in which they

13   lived -- and that was the word that the government chose -- I

14   suggested to you that there was not a single allegation in this

15   case, let alone any evidence, that Mr. Miranda ever engaged in

16   a single act of violence towards anyone.  That's what I told

17   you.  And I would like to think -- I believe I'm right -- that

18   the evidence has borne that out.  Mr. Miranda is not charged in

19   this case with a single act of violence, and witness after

20   witness acknowledged on the witness stand that they had never

21   known Mr. Miranda to point a gun at another human being or to

22   engage in a single act of violence against anyone.

23           I told you -- I believe I promised you the evidence

24   would show that Mr. Miranda was not a member of any gang, or

25   any criminal enterprise, and lord knows we've heard a lot of

1    evidence about gangs in this case.  It took me about a month to

2    get all the initials straight.  I think I finally understand

3    them.  But the one thing that I know for sure is that you have

4    not heard a speck of evidence from anyone that Mr. Miranda was

5    a member of any gang.  And while Mr. Fee I think tried to

6    downplay the significance of that, what we know is that the

7    genesis of this case, according to the government's witnesses,

8    including I believe Agent Castillo, was that there came a time

9    when a man named T-Money, Terry Harrison, came out of prison,

10   and he recruited people to sell drugs for him, and they were by

11   and large GFC people.

12            Now I think there's been some evidence they weren't

13   all GFC people, but you know what occurred to me over this

14   weekend when I spent Thanksgiving thinking about this case was,

15   if you take a look at the witnesses and the testimony, I think

16   you will see that without exception, they're all Bloods.

17   T-Money was a Blood, Parsons was a Blood, and I'll go through

18   this in a little bit more detail.  And Bloods are a gang,

19   serious gang.  Not only are they a gang of Bloods, but they're

20   a set called Mac Ballas.  The Mac Ballas.  And I was trying to

21   think, what connects the witnesses in this case, and those are

22   the parties who are really guilty of being in this enterprise.

23   I was trying to find a common link, a common thread.  And with

24   a possible exception here -- but I don't think so -- I think

25   you'll find they were Bloods and that that's what this case

Cbr1mer4                    Summation - Mr. Becker

was, it was a Bloods case. And of course Mr. Miranda, no

evidence he's a Blood or GFC or OGFC or YG or any other gang

whatsoever.

          Now I also told you in my opening statement -- and I

didn't run from what I thought you would hear -- that you would

hear testimony that Mr. Miranda at times sold small quantities

of drugs on the street. I told you that. And I told you that

he was doing that in his own capacity, on his own. And I told

you that I thought the evidence would bear that out. And this

is also very different because most of us might think, well,

wait a minute, if a defense lawyer stands up in court and says

to the jury, you're going to hear evidence that his client sold

drugs, what kind of defense lawyer is that? I mean, you know,

crazy, right? No. Because as I believe Mr. Miedel said and

other lawyers, the charge in this case against Mr. Miranda is

not that he sold drugs in or about Courtlandt Avenue. That's

not the charge. The charge is that he conspired with T-Money

and T-Money's crew to do that, to work toward a common purpose,

a common goal, and the common goal, I think the overwhelming

evidence has shown, that the people who were part of this

conspiracy was to sell T-Money's drugs, make money for

themselves and enrich T-Money. And so unless you satisfy

yourselves that the government has proven to you beyond a

reasonable doubt that Mr. Miranda was part of that conspiracy,

then your oath requires you to find him not guilty of the drug

Cbr1mer4                    Summation - Mr. Becker

1    conspiracy charge.

2            Mr. Miedel made note of this.  When Judge Pauley gives

3    you his charge in this case, maybe later today or certainly, if

4    not today, tomorrow, he will tell you about something called

5    single conspiracy versus multiple conspiracy charge.

6    Essentially what that says is that in order to convict any of

7    these defendants, there has to be proof not that they did

8    something wrong, not that they even did something unlawful, not

9    that they sold drugs, but that they were guilty of the charges

10   in the indictment, which are very specific, and so I beg you

11   not to lose sight of that.

12           Now I also told you in my opening statement that by

13   and large the cooperators in this case were going to be people

14   who -- I think I used an expression you'll want to have to take

15   a shower after you hear them.  And I got to tell you, the

16   depravity and the grotesqueness, if that's a word, of some of

17   these witnesses stunned even me.  I ask you if you will for a

18   moment to try to put aside the majesty of this courtroom, the

19   beautiful courtroom with I guess walnut and the marble that's

20   in the corridors and the American flag and the judge and the

21   well-dressed lawyers.  I ask you to put aside that when you

22   consider these witnesses, these cooperators.  Because you saw

23   them in the setting that I just described.  You saw them up

24   there on the stand having been prepared, I think Devin Parsons

25   said two years.  He was prepared for two years.  He was

Cbr1mer4                        Summation - Mr. Becker

coached, in a sense, to tell the truth.  I don't know how many
of you have ever needed a coach to tell the truth.  But every
witness told you how much they met with the government to get
them ready.  Devin Parsons said it was to make him presentable.
Those were his words, to make him presentable.  He said he was
a wild man when he was on the street.

            But my point is this:  When you think about whether
these people are trustworthy, it's fair for you to say to
yourselves, in my mind's eye, think about them not sitting
there but let me think about them as I'm walking down the
street of New York City and a guy like Devin Parsons approaches
me, or Bernard Folks or Aubrey Pemberton or the others.  Am I
going to be one of their next victims?  One of their -- I think
he said 500, he committed 500 robberies.  Is one of these guys
carrying a shank in a sock that I should be on the lookout for?
You know, do they have a gun?  Am I going to be the next victim
that they're going to maybe laugh about, like Aubrey Pemberton
made a sick joke after he shot the Chinese delivery man, said,
"I guess these people won't get their Chinese food?"  The point
is not that they're bad people, although lord knows they're bad
people.  The point, as Mr. Miedel said, are these people
trustworthy?  Would you let them -- would you trust them to
walk your dog?  Would you trust them with anything?  If you
came to court this morning, as you always do, and by some
chance you were coming into the courthouse and who was coming

Cbr1mer4                          Summation - Mr. Becker

1    out but any one of these cooperators, and they recognized you

2    being on the jury and they said to you, "Oh, hey, I know you're

3    sitting in the trial with Judge Pauley's courtroom.  The reason

4    I'm leaving is because it turns out there's no trial today.

5    Court got put off today, you have to come back tomorrow,

6    Wednesday.  You don't have to come back today.  You can go

7    home."  Would any of you turn on your heel and go home?  Is

8    there a chance on this earth --

9              MS. HELLER:  Objection, your Honor.

10             THE COURT:  Overruled.

11             MR. BECKER:  Is there a chance on this earth that any

12   of you would turn and say, "Oh, well, Devin Parsons told me

13   there's no trial so I can go home"?  No.  You know what you

14   would do.  You'd say, "I'd better call Mr. Gosnell.  I'd better

15   e-mail the judge's deputy.  I'd better check out about this."

16   You would hesitate.  This is an important affair in your life.

17   You've made that clear.  You would hesitate.  And that's what a

18   reasonable doubt is -- when you hesitate before you act on a

19   matter of importance.

20             You need one reasonable doubt.  That's all you need to

21   acquit Mr. Miranda.  This case is filled with doubt.

22             So let's talk about now what the evidence in this case

23   has shown and what it has not shown with respect to

24   Mr. Miranda.  And I have -- I think there are certain themes

25   that I saw develop in this case, which I hope maybe you can

Cbr1mer4                        Summation - Mr. Becker

1    keep in mind as I go through some of this.  And I'm not going

2    to do a particularly exhaustive recounting because you heard

3    the evidence just like I did, and the 12 of you collectively

4    have better recollection and more intelligence than anybody

5    here, so I'm going to try to give you some of the highlights.

6    But some of the themes were as follows, as I see it:  The

7    government -- well, let me back up a bit.

8            We're not cooking spaghetti here.  This is not a case

9    where -- a situation where you throw something against the wall

10   and hopefully something sticks and you say, aha, aha.  So, you

11   know, if on one occasion one witness says that he heard T-Money

12   say to Nolbert Miranda, "Let's get a hundred grams," and

13   Nolbert Miranda doesn't say anything, which is what the

14   transcript will tell you, he didn't say anything, the

15   government says, aha, they were buying crack together.

16   Spaghetti on the wall.  So that's one theme.

17           Another theme is how I think you'll see that

18   witnesses, even when they're telling the truth, will embellish

19   and exaggerate, thinking about what they should say.  A witness

20   who says, "I was fifteen hours a day, seven days a week,

21   selling drugs," I'm sorry, do these people strike you as these

22   conscientious people who get up in the morning and, first

23   thing, I got to go to work?  "I saw PayDay on the street every

24   single day from 2009 till 2011," one witness said.  "I saw him

25   every day from 2009 to 2011," until I point out and he

Cbr1mer4                              Summation – Mr. Becker

acknowledges that on September 11th, 2010, Mr. Miranda was
shot, almost died, you heard, and that he never really saw him
again after that.  So it went from, "I saw him every day from
2009 to 2011," to, "Well, I guess it was September 2010."  To a
witness saying, "Yeah, we were all hanging out on the street
and we were selling drugs together," and then the government
puts up a so-called video, which is proof of their selling
drugs together, and Mr. Miranda is doing chin-ups or pull-ups.
And by the way, that is the only evidence, in terms of
photographs, videos, documentary evidence, that was collected
as part of the investigation in this case that has Mr. Miranda.
I'll have more to say about that.

        So let me talk first about a -- a little bit about
what there's no evidence about, because as Judge Pauley will
tell you, the lack of evidence is just as significant as
evidence in determining whether there's reasonable doubt.

        When you think about a gigantic drug conspiracy case,
investigated by federal agencies and the New York City Police
Department, you know the resources that were brought to bear on
this case, gigantic resources.  They brought in FBI agents,
they flew in someone from Facebook, from California, they do
whatever they can.

        And Agent Castillo and others told you that the
conspirators in this case kept in touch with one another.  They
kept in touch with one another through a variety of means.  One

Cbr1mer4                          Summation - Mr. Becker

1    was on the telephone.  They would text messages and they would

2    call each other.  The government put on an expert witness who

3    drew that very impressive analysis where he showed you how cell

4    sites overlapped and intertwined and interlocked.  And they

5    talked about how cooperators -- excuse me -- conspirators

6    conferred that way.  Did you hear one mention of a single phone

7    call, ever, in that testimony involving Mr. Miranda?  There's

8    not any evidence in this record that the government collected

9    showing a phone call or a text message to or from Nolbert

10   Miranda from anybody charged in this case, and Agent Castillo

11   candidly acknowledged when she testified that the government

12   had no evidence that Mr. Miranda ever even had a phone.

13          Facebook.  A lot of Facebook postings.  Postings,

14   people saying things, people putting up photos with guns and

15   carrying on, rowdy, sworn affidavits in this case from federal

16   agents in support of warrants that the targets of this

17   investigation were believed to be using Facebook to communicate

18   with each other, to tell each other where drugs were kept, to

19   tell each other where each person was.  Witness after witness

20   told you, never communicated with Mr. Miranda on Facebook.

21   Agent Castillo confirmed, government has no evidence

22   Mr. Miranda ever communicated with anybody on Facebook.  Didn't

23   have a Facebook account.  No evidence of it.

24          The government put into evidence directories, phone

25   directories, seized from people.  I believe they did it from

Cbr1mer4                           Summation - Mr. Becker

Mr. Colon, I believe Mr. Meregildo as well, where they showed

with one -- I think it was Dev Parsons, 23 names of people he

was in touch with, many of whom were identified as GFC members

and his co-conspirators.  You didn't see Mr. Miranda's name in

a single document in this case from -- that was uncovered as

part of that investigation.  No drug records, no ledgers,

nothing.  No photographs of him pointing fingers, doing

anything that he shouldn't be doing.  Only -- only image, in

fact the government put up yesterday, was him doing pull-ups,

because maybe, you know, he doesn't belong to a health club so

he does pull-ups to try to get some exercise.  But they

captured it on videotape and they go, "There it is."

          I'll tell you one -- couple of photos they did show.

You know the only photos in this case of Mr. Miranda that they

showed you?  Photos that they took of him after he was

arrested.  Remember?  Got a tattoo, it says PayDay.  He's got

another tattoo.  So what did they do?  Oh, and also face plate

number 4, number 4, Mr. Miranda, put him up.  That's what they

did.  They arrest him, they generate evidence and take

photographs of him, then they introduce the photos and they go,

aha, evidence, and they point to it and they have witnesses

point to it.  That's -- that's what they have.

          So who are these cooperators?  Let's talk a little bit

about them and what they had to say.  And I want to say this as

well.  Very important.  Mr. Fee said yesterday that the defense

Cbr1mer4                    Summation - Mr. Becker

1  lawyers in this case have no choice but to call the cooperators

2  liars.  That's what he said.  You'll see, they have no choice

3  but to call them liars.  That's all they can do.  Well, another

4  thing that makes this case so unusual for Mr. Miranda is that

5  whether you choose to believe these witnesses or disbelieve

6  them, or believe some and not believe something else, guess

7  what?  Either way, either way, he's not guilty.

8          Why is that?  Well, if you don't believe them and you

9  think they're all scoundrels and, you know, should get what's

10  coming to them, then obviously you're not going to find that

11  the government's met its burden.

12          But let's assume that you believe much of what they

13  had to say.  Did they tell you that Mr. Miranda was in a

14  conspiracy with T-Money and Melly to sell drugs?  Did they tell

15  you that Mr. Miranda shared profits with T-Money and got drugs

16  with T-Money?  Did they tell you that?  No.  And they also

17  didn't tell you, as Mr. Fee suggested to you yesterday, that

18  Mr. Miranda provided them with drugs to keep the operation

19  humming along.  No, what they told -- and I'll get to that.

20  What they told you, witness after witness, was that, yeah, it

21  looked to us like Miranda, Mr. Miranda was out on the street

22  selling, they really couldn't place a time.  The summer of 2010

23  was the number one hit in this case.  How many times in this

24  case did you hear summer of 2010?  I think part of the mantra,

25  the sort of code, was that when in doubt, you say summer of

1    2010.  But Mr. Miranda was identified as being out on the

2    street in the summer of 2010, selling drugs, and witness after

3    witness told you that as far as he could see, Mr. Miranda was

4    working for himself, was on his own.  Exactly as I had told you

5    in my opening.

6          So Bernard Folks.  Bernard Folks.  I'll try to be

7    concise, if I can.  He told you that he sold for T—Money, that

8    he had an arrangement with him, that he would get drugs from

9    T-Money, he would sell, and he would keep some of the money and

10   give it back to T-Money.  He told you that he never got a

11   single bag of drugs from Mr. Miranda.  He asked Mr. Miranda for

12   drugs and Mr. Miranda refused.  So if Mr. Miranda is somehow

13   part of the engine here that is supplying drugs, why would it

14   be that Mr. Folks, who was, you know, a number one seller,

15   never got any drugs from Mr. Miranda?  Well, the reason is, is

16   because, as he said —— and I believe this is at page 1099:

17         Was it your understanding that PayDay was on his own?

18         A.  Yes.

19         That he wasn't working with anybody.

20         Nah, not to my knowledge.

21         Mr. Folks told the government —— gave the government a

22   list of people who he understood, both from talking to them and

23   from his own observations, worked for or with T-Money.  And

24   those persons included Dev Parsons, Hump, 12, 13, Pemberton,

25   and others, but not Mr. Miranda.

1          Now the government tried to kind of blur the lines

2     here a little bit by saying:

3          Well, when you were out on the street selling, did you

4     see Mr. Miranda selling?

5          Yes.

6          Were you guys sort of together, close to each other?

7          Yes.

8          Suggesting, oh, that that must have meant that they

9     were working together.

10          And what did he say to you?

11          No, we sold on the street, but that was as if we were

12     standing -- we were standing around at the same time.

13          So remember, ladies and gentlemen, you're not guilty

14     of a conspiracy charged in this case because you might have

15     been in or around Courtlandt Avenue selling drugs. And just

16     like I'm kind of with you right now in the sense that I'm a few

17     feet away from you, you're serving your function and I'm

18     serving mine. And it's not a joint enterprise of any kind, as

19     they were suggesting.

20          So, I don't know. The government put on Bernard

21     Folks. Bernard Folks said that as far as he could see,

22     Mr. Miranda worked for himself, didn't have anything going --

23     he never saw him give drugs to anybody, he said, who he

24     conspired with. That's a reasonable doubt. That's a

25     reasonable doubt right there, one witness. If you believe

1   Mr. Folks, as the government wants you to, then that's a

2   reasonable doubt.

3           What did Pemberton tell you?  Pemberton told you that

4   he also got crack from T-Money, that T-Money would give him

5   certain number of bags at certain, you know -- at a time, he

6   would sell them, he would give T-Money back $180 and he would

7   keep $120.  It was an arrangement.  It was an agreement.  That

8   was the conspiracy.  The conspiracy that witness after witness

9   testified to was that T-Money provided the drugs on

10  consignment.  Every single time it was consignment.  That is,

11  here's the drugs, you go sell them, you give me back

12  60 percent, you keep 40 percent, or whatever the percentage

13  was.  That was the arrangement and everybody knew about it.

14          And Aubrey Pemberton was also asked about

15  Mr. Miranda's involvement or lack of involvement in that

16  agreement, in that conspiracy, and what did he say?  He was

17  asked:

18          Who got money -- who got crack from T-Money?

19          This is at page 1310, page 1310.

20          All of us except PayDay got our crack from T-Money.

21          All of us except PayDay got our crack from T-Money.

22  That's what the charged conspiracy is about.  It's about those

23  people getting crack from T-Money and to enrich T-Money and

24  themselves.

25          And then further on he's asked:

Cbr1mer4                    Summation – Mr. Becker

1      He wasn't getting crack from T—Money, right?

2      Right.

3      He wasn't supplying crack to T—Money, right?

4      Right.

5      I believe this is at 2020 and 2021.

6      You don't know where he was getting the crack that you

7  say you saw him selling, right?

8      No.

9      You never saw him give T—Money any money from the

10 sales of crack that you say you saw him selling, right?

11     No.

12     You never saw T—Money giving Mr. Miranda any money to

13 buy crack.

14     No.

15     And in fact, in all the time you were out on

16 Courtlandt Avenue, you only saw Mr. Miranda and T—Money

17 together or in close proximity a couple of times, right?

18     Right.

19     And you didn't have any knowledge and you still don't

20 have any knowledge that Mr. Miranda was working for T—Money or

21 anyone else, right?

22     Correct.

23     And as far as you knew, he was on his own?  Right ——

24 on his own, question mark.

25     A.  Correct.

1              As far as you knew, he worked for himself on his own.

2              Correct.

3              And Mr. Pemberton told you something else very

4    significant.  He told you that T-Money had a rule, and the rule

5    was, you can only sell for me.  That is, we have an

6    arrangement.  We have a criminal agreement.  I'm going to

7    supply you with drugs on a contingent basis and you are going

8    to sell them, and we're going to both profit.  I don't want you

9    getting drugs from somebody else and selling them.  And there

10   was some evidence that T-Money learned that it was reported to

11   him that Pemberton may have gotten money -- drugs from T-Money

12   [sic], and Pemberton told you that if he ever got drugs from

13   anyone other than T-Money, he would not tell T-Money.  That was

14   something he would keep from him.  So if there's any truth to

15   the allegation -- and I submit there's not, but if there's any

16   truth to the allegation that Mr. Miranda ever did a double-up

17   and did a favor for Aubrey Pemberton and gave him 20 bags of

18   crack for a hundred dollars rather than $200, that was not

19   something that T-Money was in on, it was not something he was

20   aware of, it was not something he agreed to, and in fact, it's

21   something he opposed and got mad about when he found out.

22             Devin Parsons.  He met for two years with the

23   government.  They tried to make him presentable.  And they did

24   a yeoman's effort.  They made a yeoman's effort.  But my, oh,

25   my.  A man who blurted out how he liked being the center of

Cbr1mer4                    Summation - Mr. Becker

1   attention and, you know, I'm not a psychiatrist and I don't

2   know if any of you are, but I don't know if that contributed to

3   his reign of terror, and let there be no mistake, he's a

4   terrorist.  He told you he spent his life terrorizing people.

5   That's what he does, terrorize.  But here's something that I

6   think really is all you need to know about him.  Whatever he

7   did or didn't do, he told you that when he got up in the

8   morning, he would start smoking marijuana, start drinking

9   Hennessey, start taking ecstasy pills, get so drunk that he

10  couldn't walk straight, so stoned, so affected by the ecstasy

11  that it affected his ability to remember things and he couldn't

12  walk straight.  So this is the witness that the government

13  brings to you, a man like that.  Now there is sort of a maxim

14  of the law that the government takes their witnesses as they

15  find them, and I think the judge may tell you that.  And that's

16  generally true.  And what that means is, the government can't

17  pull the pope from the Vatican City to give testimony.  They

18  take their witnesses as they find them.  That doesn't mean that

19  they have to put on any and every witness that comes their way

20  who might say things that supports their case.  They didn't

21  have to put on Dev Parsons.  They could have said: No, you've

22  gone too far.  You have forfeited your right to assist the

23  United States government in the prosecution of American

24  citizens who are presumed innocent.  You have forfeited your

25  rights to participate in that.

1              MR. BECKER:  By your reprehensible acts.  But, the

2    government, they want to win.  They want to win.  They want to

3    win.  And they were willing to work with him to overlook his

4    crimes, to overlook his lies.  Every time they met with him for

5    two years they said have you told us about all the guns, have

6    you told us about all the guns?  Yes, I've told you about all

7    the guns.  Remember, if you lie to us, we rip up the agreement.

8    And then a few days before he gave testimony in this case, they

9    said, you know, you didn't tell us about a shotgun that you

10   had.  Oh yeah, I forgot.

11             Did they rip up his agreement?  Did they rip up his

12   agreement when he sent Facebook postings?  Did they rip up his

13   agreement when he smoked pot in jail?  You are going to decide,

14   you are going to decide what that cooperation agreement means.

15   You've heard a lot about it.

16             Carlos Villafranco, he met with the government many

17   times.  They asked him to list the names of every person he

18   knew or believed worked for or with T-Money selling drugs.  He

19   listed a bunch of names, including Aubrey Pemberton, Capo, Dev,

20   Akon, 12, 13, Monster, 14, Tosh, Hump, Levi, Young Mel, Pookie

21   Dante, I think he may have listed another defendant in this

22   case.  But did he not name Nolbert Miranda.

23   "Q.  They wanted to know all the people you knew who worked

24   with T-Money, right?

25   "A.  Right.

"Q.  You certainly didn't say, PayDay?

"A.  Right."

He told you, this is in 3757, he has no knowledge where Mr. Miranda got his drugs from.  Whether or not he was sharing profits with anybody.  He certainly didn't know about Mr. Miranda ever getting drugs from anyone in GFC.  No knowledge that Mr. Miranda ever gave money to anyone in GFC.  Or anyone hanging out and chilling on the block, as he put it.

So, does the evidence so far, does it sound like the evidence supports Mr. Fee's claim yesterday that the evidence in this case showed you that Mr. Miranda gave GFC people and crew members drugs to keep the operation humming along?  Humming along.  Pemberton did say that on four or five occasions I believe he said Mr. Miranda, quote, did him a favor.  There are no witnesses to that.  We have nothing but Pemberton's word.  He can say anything.

But, let's just assume for argument's sake that that happened.  And I'm not suggesting it did, and I don't think you have proof beyond a reasonable doubt because a man like Aubrey Pemberton says it.  But, assume just for the moment that it's true.  So, if he gave him 20 bags four or five times as a favor, it was clearly done behind T-Money's back.  It was so that Pemberton could put some money in his own pocket.  Money that he would either keep for himself or spend.  Not money that went to T-Money as T-Money wanted.  He was double crossing

1    T-Money.  That's not guilt of this conspiracy.  That might be,

2    it might be, a separate multiple conspiracy between Mr. Miranda

3    and Mr. Pemberton, assuming it happened.  But that's a separate

4    conspiracy from the one that's charged in this case.

5            But let's assume it's true.  So he gave him 20 bags

6    four or five times.  Let's make it five times.  That's a

7    hundred bags.  If each bag contained approximately .05 grams of

8    crack, which is consistent with some testimony you heard in

9    this case, that would be 5 grams.  100 times .05 is 5 grams.

10   That kept this 24 hour a day seven days a week enterprise

11   humming?  5 grams.  5 grams.  28.5 grams is an ounce.  It's a

12   sixth of an ounce.  It was incidental.  It wasn't this

13   conspiracy.

14           Same with Mr. Villafranco -- excuse me, Mr. Crocker

15   who I'll get to in a minute, who I think also said that as

16   T-Money laid dead on the street and there is a phalanx of

17   police officers and the neighborhood's blocked off and there is

18   30 cops and a crowd and because, after all, T-Money has been

19   shot, I think he says he also got drugs from Mr. Miranda that

20   day.  And also if proven, and I suggest it wasn't, was

21   something between him and Miranda.  He told you that, and I'll

22   get to that in a minute, and that was also maybe a couple of

23   grams.

24           So, Crocker told you that he also gave the government

25   information about people who sold for T-Money.  And he said

1     that they had an arrangement with T-Money, again, a percentage

2     arrangement.  By the way, he said that it would be crazy to

3     just stand on Courtlandt Avenue on the sidewalk in broad

4     daylight selling drugs.  Do you remember what every witness in

5     this case, it was their mantra:  Yes, I was out on Courtlandt

6     selling.  As Mr. Miedel said, you have P.S.A. 7 a block away.

7     You have pole cameras on Courtlandt Avenue and they are just

8     standing around selling.  It's embellishment, it's exaggeration

9     to say this was going on like an open street bazaar.

10          But in any event, he acknowledged he never saw

11    Mr. Miranda and T-Money and anybody else within 2 or 3 feet of

12    each other selling drugs together.  He told you, Mr. Crocker

13    did, that he saw Mr. Miranda sell drugs and the bags were

14    yellow.  Yellow.  And I think we have other testimony in this

15    case about the bags being yellow.  That's significant.  Because

16    as we know, there is evidence in this case, testimony, that the

17    drugs that Mr. Harrison sold, that is T-Money, his people, they

18    were clear, or they were clear with a logo on them, I think it

19    was a dollar sign.  Clear, clear with a logo.  And I think it's

20    reasonable for you to conclude that people who worked together,

21    sell the same product, and they package it the same way.  And

22    T-Money's people generally packaged it that way.  We have

23    evidence that to the extent people saw Mr. Miranda selling

24    crack, the bags were yellow.

25          That's the evidence, pretty much, about Mr. Miranda

CBR3MER5                    Summation - Mr. Becker

1    and drugs and what these cooperators told you.  I think in

2    summary, what I've hopefully just conveyed is that to a man,

3    they told you that as best they can see he was working on his

4    own.  Most of them said they never got drugs from him.  Two of

5    them said on rare occasions they did.  But you know, they

6    talked amongst themselves, everybody knew who was selling.  How

7    else would they be able to get on the stand and say this one

8    sold, this one sold, this one sold, this one sold.

9            If what Mr. Miranda may have done with two of these

10   witnesses, I guess it's Pemberton and Crocker, if that was part

11   of this conspiracy, wouldn't everybody know it?  Wouldn't it be

12   going on in a more widespread way?  How many people were in

13   GFC?  How many people worked for T-Money?  Was it 20, was it

14   30?  This was isolated.  Isolated occurrences at best.

15           There's other ways that you know that Mr. Miranda was

16   not part of this drug conspiracy, and one of them that you

17   heard a fair amount of evidence about was he was always getting

18   shot.  Do you remember Bernard Folks, he was always getting

19   shot.  We know he was shot on September 11, 2010.  His aunt

20   Lillian Miranda Konate came in and took the stand and told you

21   how he was living with her at that time, and she heard gunshots

22   and she came out and he was lying there in a pool of blood and

23   she called the ambulance and he was taken away.  I believe

24   Crocker was said that he heard that Miranda almost died from

25   that attack.

1          He was shot in 2009, but here's why it's significant.

2     Here's why it's significant that he was shot multiple

3     occasions.  First of all, the conspiracy in this case is from I

4     guess the spring of 2010 until September of 2011.  Mr. Miranda

5     was shot on September 11, 2010, and there is not a shred of

6     evidence in this case that he ever again was seen on the street

7     selling drugs to anyone.  His aunt testified that she told him

8     get out of the neighborhood, I'm afraid they are going to come

9     and kill you.

10          And what Folks acknowledged, and I believe this is

11     page 1097, was that Miranda would get shot, Mr. Miranda would

12     get shot in different places.  He would get shot in Courtlandt

13     Avenue, and then he would move to Melrose.  Then he got shot

14     there and he moved to Maria Lopez.  Which is actually where he

15     lived and he got shot there.

16          What does this suggest to you?  It suggests to you, I

17     hope, and I think it should, that he was a guy that wasn't part

18     of any alliance, he wasn't part of any group, he wasn't part of

19     any gang, and he wasn't part of any conspiracy.  He was on his

20     own.  And he was getting shot at different places either

21     because he was caught in the crossfire of all the shootings

22     between GFC and YG, remember there was shootings at Maria Lopez

23     where he lived which is 2950 Park Avenue.  Or, he would say

24     maybe I can take up residence here and on the street and do

25     what I was doing, and he would get shot and go somewhere else.

CBR3MER5                    Summation - Mr. Becker

No other person in this case was there evidence like this

about.  A man who the government said in its opening terrorized

the neighborhood was himself the victim of attempted murders on

several occasions.

          So, it is important for you to, I hope, see the

significance of that.  Not because you should feel sympathy for

him or anything like that.  That's not appropriate and that's

not what I'm asking.  But because it shows, number one, that he

wasn't seen again after September 10, 2011, September 11, and

also the fact that he was shot in different places suggests

that he was on his own almost like a nomad.

          Just, his getting shot, and being in the hospital, and

being in different places, is further evidence for you that he

was not part of any gang and not part of any conspiracy to sell

drugs.

          Now, I want to talk about the so-called gun.  And in

my opening statement, I referred to it I think as a phantom

gun.  And the reason I called it a phantom gun, well, there

were lots of reasons, but most significantly, because I said

you would not hear -- you would not see the gun, you would not

hear any evidence that the gun was ever recovered, there was no

forensic evidence regarding that gun.  No proof of that gun

existed, other than the testimony of some of the cooperators in

this case.

          And here's what I think the evidence was about this,

1    and it was so paltry that I hope you'll conclude it's easily

2    dismissed.  First of all, this is a criminal organization that

3    had no shortage of guns.  I think we can agree that witness

4    after witness talked about 9s and .380s and .22s and .45s and

5    how they were kept at different people's apartments and there

6    were 10 or more of them and there were plenty of guns.  And

7    witness after witness told you that the guns were provided by

8    who?  By T-Money.  T-Money provided the guns.  And I think they

9    may have said on one occasion one of the defendants here

10   provided a gun.  But certainly not Mr. Miranda.  So, there was

11   no shortage of guns.

12        Folks said that GFC people had at least 10 guns.  9s,

13   .40s, .45s, .38s, .22s.  Pemberton said that he had guns in his

14   apartment, they all came from T-Money I believe.  Folks said

15   most of them came from T-Money.  Nobody said, there is no

16   evidence in this case that Mr. Miranda ever provided a gun to

17   this enterprise.  All right.

18        This is another thing that's very important for you to

19   understand.  I don't believe the evidence has shown at all that

20   Mr. Miranda ever possessed or used a gun.  But even if you were

21   to conclude, even if you were to conclude that he did at some

22   point have a gun, he's not charged with possession of a gun.

23   He's charged in count 22 with using or possessing a firearm in

24   furtherance of the narcotics conspiracy charged in count 13.

25   So, and again, I don't think the evidence comes close to

1    showing he had a gun, but if he had a gun because he was afraid

2    somebody was going to come and try to kill him, that's not

3    guilt under count 22.  Count 22 says he had to have possessed

4    or had the gun in connection with a drug conspiracy charged in

5    count 13.  And indeed, as I think one of my colleagues said, if

6    you conclude that the government has failed to prove that

7    Mr. Miranda is guilty of the charged drug conspiracy, count 13,

8    you don't even consider the gun charge.  It's over.  It's out.

9    Because the gun charge is not a gun charge like you might think

10   in New York State, if you possess a gun you go to jail, you see

11   it the subways.  No.  This is a gun charged in connection with

12   the charged drug conspiracy.

13          So what's the evidence on the gun.  Sometime between

14   January 2010 and September 2010, that's a 10-month period,

15   Devin Parsons said that Mr. Miranda, a man who had never before

16   been seen with a gun by law enforcement or anyone else, never

17   been found with a gun, never engaged in a single act of

18   violence in his whole life, told him that he had a new gun.

19   And he said take a walk with me back to Maria Lopez where I

20   live.  And I'm going to give it to you.  And they walked I

21   think he said three to five minutes, it's only a couple of

22   blocks, and Mr. Parsons testified that they went into the lobby

23   and Mr. Miranda went upstairs and came downstairs about a

24   minute later, and handed him a gun.  I guess he said it was a

25   black and silver 9-millimeter gun.

CBR3MER5                          Summation – Mr. Becker

1              Now, we know that that couldn't have happened.  How do

2    we know.  Putting aside because it came from the lips of Dev

3    Parsons.  Even if it came from anyone, how do we know that it

4    cannot be that Mr. Miranda walked back with Mr. Parsons to

5    Maria Lopez, went into the lobby, went up in the elevator to

6    where he lived, came down and handed him the gun?  We know it

7    from Exhibit 16.1 and 16.2, and 16.3, and the other photographs

8    that I offered in this case through Mr. Miranda's aunt Lillian

9    Miranda Konate.  What did she tell you?  What does the evidence

10   bear out?  It bears out that access to Mr. Miranda's apartment

11   is not through a lobby.  It's not up an elevator.  It's on the

12   first floor.  Street level.  First floor.  That's the door.

13   That's the only way to get in or out of that apartment.  That's

14   what she told you.  And she said that the way you get on that

15   sidewalk is by walking through a gate at the end of the

16   sidewalk.

17             So, look, the man was drunk, stoned, and perhaps

18   hallucinating on ecstasy and he imagined something.  But there

19   is no chance that what he says could have happened.

20             But his story doesn't get any better.  In fact, it

21   gets worse because now he says that Mr. Miranda gave him the

22   gun, by the way, apparently, in broad daylight.  Why he would

23   want to do that, a man who was never seen with a gun ever

24   suddenly is allegedly giving somebody a gun in broad daylight

25   and says walk it back the three to five minutes to your

1    apartment.  And then Mr. Parsons says two hours later

2    Mr. Miranda comes back and retrieves the gun, and on the fourth

3    floor, that's where Mr. Parsons says he is, in an apartment

4    building on the fourth floor.  What does Parson's imagination

5    add to this?  He saw from his apartment that Mr. Miranda went

6    down two flights of stairs on the fire stairs to the second

7    floor, where, what do you know, that's where Earl Pierce

8    apparently lived or was.  The implication being that

9    Mr. Miranda was with that gun, gave it to Mr. Pierce.

10           Now, some of us live in private homes, some of us live

11   in apartment buildings, some of us have lived in apartment

12   buildings.  If you're standing in the doorway to your

13   apartment, can you see down a hall, through a fire door, down

14   two flights of stairs to where somebody goes when they leave

15   your apartment and go to the stairs?  Even if you walk the

16   person to the stairs, the fourth floor stairs, you can't see it

17   because it's fire stairs, you can't see what's two flights

18   below you.  Again, there is no chance that happened and I

19   suggest to you it is entirely made up.

20           To be sure, the government also will point to, if they

21   have not already, evidence that Mr. Miranda when he was in

22   jail, again alone in a cell with one of their cooperators, with

23   nobody else around, a man who he hadn't seen in a year, I think

24   this was Mr. Folks said that I guess it was June 1st of this

25   year, that Mr. Miranda told him that somebody had asked him for

CBR3MER5                        Summation - Mr. Becker

1    a gun like he needed it.  And that Mr. Miranda gave him the

2    gun.  That weeks passed, he called to receive the gun back, and

3    the person denied his calls.  All right.

4            Now, Folks and Pemberton I believe and others were

5    together in jail, they saw discovery in this case as other

6    lawyers have told you, they knew there was an allegation

7    against Mr. Miranda involving a gun.  And so, I guess they had

8    an incentive to add something and say that Miranda said this.

9            It's quite remarkable.  In all the time anybody saw

10   him on the street, nobody ever saw him have a gun.  You heard

11   evidence that Mr. Miranda was arrested twice.  Once in

12   possession of 22 bags of drugs that was identified as crack,

13   and the second time with clear bags.  And he was searched each

14   time.  And each time that he was searched, they didn't find a

15   gun, they didn't find bullets, they didn't find any evidence of

16   a gun.

17           Mr. Miranda was arrested in this case I believe it was

18   November 10, 2011.  Agent Castillo told you that.  And she said

19   that he was searched.  They didn't find a gun, they didn't find

20   bullets, they didn't find a telephone, they didn't find any

21   evidence whatsoever that Mr. Miranda had ever possessed a gun.

22   The only evidence in this case that Mr. Miranda ever possessed

23   a gun is from the mouths of these cooperators.

24           Now, I want to talk a little bit more about guns.

25           You don't have them here?  No problem.

1      Something else struck me on Thanksgiving.  It's quite

2    a day.  Which had not struck me before.  I thought the

3    government might have the guns in the courtroom today.  But

4    witness after witness testified, oh, yeah, he had it in his

5    waistband, it was a 9-millimeter.  Oh, he was holding it, it

6    was a .22, .380, like these guys are world authorities on gun

7    calibers and the caliber of a gun.

8      So it occurred to me, how can these drunken, stoned

9    sociopaths just be able to say, oh, yeah, it was a 9, it was a

10   .380.  Well, again, we don't have the guns.  This Government

11   Exhibit 1500 which pictures a .380.  As you can see, it's black

12   and silver.  Okay.  And this is Government Exhibit 1501, which

13   pictures a .40.  As you can see, it's all black.  But, put the

14   color aside for a minute.  They look essentially the same, I

15   think.  But I wasn't sure.  And I went back and I checked the

16   record of this trial.  Because who were the only two people who

17   testified about guns in this case that bore credibility at all?

18   They would be the two agents from the bureau of Alcohol,

19   Tobacco & Firearms, right?  That's their profession.  They

20   study guns, they collect guns, they seize guns, they fire guns,

21   they own guns.  Right?  So it occurred to me how can these

22   miscreants identify a 9-millimeter gun by looking at it in the

23   dark on September 13 or whatever it was.  So I asked Agent

24   Collins on cross-examination.  This is page 5383.

25   "Q.  Are you familiar with what a 9-millimeter firearm looks

1   like?

2   "A.  You can't look at a firearm and tell what caliber it is,

3   other than the marking on the firearm.  You can make an

4   estimate based on the size of the barrel, and the opening of

5   the barrel."

6          Look, these witnesses are more than happy to make

7   estimates about, oh, I can look at a bag and say there's

8   two-tenths of a gram of drugs in it because it was a guess.

9   They can say it was a 9, it was a .380, it was a .45.

10          Given the testimony of Agent Collins, given your own

11   eyes, can you believe that anybody who testified for the

12   government, any of these cooperators could look at any gun and

13   say, oh, yeah, that was a 9-millimeter?  Or that was a .380?

14   Or was that something that they thought the government needed

15   for its case?  Something that would help the government?

16          Look, I want to be very clear about this and I assure

17   you you'll get no dispute from Ms. Heller in her rebuttal

18   summation.  The government did recover some 9-millimeter guns

19   in this case.  And they even recovered one I believe that was

20   black and silver.  I think it may have been Government Exhibit

21   500, I'm not sure.  But the government has not argued and they

22   will not argue, I promise you, that this so-called phantom gun

23   that Mr. Miranda allegedly possessed has ever been held in

24   their hands.  Has ever been seen by them.  Has ever been

25   photographed, has ever been found to have been purchased

anywhere.  There is no receipt.  There is no document.  There

is no photograph.  There is no gun.  It is a phantom gun.  It

exists only in the minds of these cooperators.  A couple of

them.  And that's it.

        So I suggest to you that even if you were to find that

Mr. Miranda was part of this drug conspiracy, which he wasn't.

Even if you were to find that he possessed -- excuse me, that

he was a member of the drug conspiracy.  You cannot find proof

beyond a reasonable doubt, proof that you can rely on, proof

that you can go home and for the rest of your lives say to

yourself when we sat in judgment of Nolbert Miranda in October

and November of 2012, and we were conscientious and we sat in

judgment, I know, I know, I remember, I didn't lose a minute of

sleep at night, that the government proved beyond a reasonable

doubt that Mr. Miranda, who had never been seen with a gun,

possessed a gun in furtherance of a drug conspiracy.

        The final charge against Mr. Miranda is actually count

two.  This is a charge that not only is Mr. Miranda not guilty

of, quite frankly I don't know how he was ever charged.  This

is a charge is called a RICO conspiracy.  Racketeer Influenced

Corrupt Organizations Act.  Short RICO.  And what it is in some

sense is not just a conspiracy of people working together to do

illegal things, which is what a regular conspiracy is, such as

a drug conspiracy charged in count 14.  No.  This is where

people work together in furtherance of the affairs of a

criminal enterprise.  A criminal organization that exists

independently of the members of the individuals.

So, it's not a question of did Mr. Miranda ever agree

with anybody that he would sell drugs or the person he made an

agreement with would sell drugs.  No.  That might be a drug

conspiracy.  Not the drug conspiracy charged in this case, but

that might be a drug conspiracy.  No.  There has to be an

agreement by Mr. Miranda, a meeting of the minds with someone

to violate the RICO statute.  That is, to engage in the affairs

of the criminal enterprise through a pattern of racketeering

activity.

Now, yesterday Mr. Fee told you all they have to do is

show two racketeering acts.  When Judge Pauley gives you your

instructions tomorrow, you will learn they have to do more than

that.  They have to show that the enterprise existed,

independent of Mr. Miranda that it existed, and he conspired to

join in its affairs.  The judge is going to tell you that.  And

he's going to tell you, I believe, that the government has to

prove that Mr. Miranda participated in some manner in the

overall affairs of the enterprise and objectives of the

conspiracy.  And that he did so with the intent that he or

another member of the conspiracy would commit two or more acts

of racketeering as part of a pattern of racketeering.

The RICO statute is very complex and most lawyers

don't have a good grasp of it.  I don't think most criminal

1    lawyers have a great grasp of it.  It was passed a long time

2    ago in connection with organized crime, but it is applicable --

3    it is not limited to prosecutions of organized crime.  It can

4    certainly be used in other types of cases.  But, it is complex,

5    it is onerous, and the government has a burden to prove many

6    things.  To prove the existence of an enterprise that

7    Mr. Miranda was aware of and intended to further.  Intended to

8    further.

9         When Mr. Miranda, the few times he may have sold drugs

10   to Mr. Crocker or Mr. Pemberton, the evidence is that was

11   taking money out of T-Money's pocket.  It was taking money out

12   of the enterprise.  It wasn't putting money into the

13   enterprise.  It wasn't keeping anything humming.  In fact, it

14   could have led to the engine stalling out.

15        And when Mr. Miranda was shot on September 11, 2010,

16   and never seen again selling drugs on Courtlandt Avenue area,

17   do you see any effect on the enterprise?  I mean, somebody else

18   stepped in, right?  And when Mr. Harrison, T-Money, even when

19   he was alive, when he said to people you can get your drugs

20   from me, but if I'm not around you can go to someone else,

21   remember it wasn't Mr. Miranda.

22        Look, I think the government would like you to believe

23   that just because -- the fact that Mr. Miranda sold drugs on

24   that block or in that area, that fact alone means he must be

25   guilty.  Because, after all, T-Money could be violent and

1    T-Money controlled the block.  And if Miranda was working

2    there, it must have been because he had T-Money's permission.

3    Somehow that made him part of the conspiracy.  Okay.

4           First of all, that's all wishful thinking.  That's all

5    speculation.  That's all, you know, that's the government

6    trying to, as someone said, take a square peg and make it fit

7    in a round hole.  But, it is not consistent with the evidence.

8    Because the evidence is that T-Money said, I think it was to

9    Crocker, if somebody's not on our team, I don't want him

10   selling here.  And then I asked him, and Mr. Miranda certainly

11   wasn't on their team -- or maybe Villafranco.  And he said no.

12   Mr. Miranda was not on T-Money's team.  Villafranco, who told

13   you he sold marijuana for himself and never worked for anybody,

14   sold it right on the block.  And T-Money's people didn't just

15   sell crack, they sold marijuana.  So Villafranco said he worked

16   for myself.  T-Money, he may not have liked it, but, you know,

17   I did it.

18          The government wants everything to be black and white.

19   Black and white works great when you are a prosecutor.  It

20   works great.  They get to make judgments about people and they

21   put them in one of two boxes:  They're guilty or they're not

22   guilty.  If they put him in the guilty box, all their evidence

23   has to fit together.  There has to be an explanation for

24   everything.

25          When the government opened, you heard a little bit

1    about Mr. Miranda and how he was part of this and the

2    government witnesses, their own witnesses said, no, he worked

3    on his own.  He didn't provide drugs to people other than the

4    couple of sporadic occasions.

5           So all of a sudden Mr. Miranda's role and in Mr. Fee's

6    summation morphed into he was one of the older guys keeping it

7    humming along.  Because what else could he say?  He couldn't

8    have said that every one of his witnesses lied when they said

9    Mr. Miranda worked for himself.  So, keep that in mind.

10   Please.  Keep that in mind.

11          These people are well intentioned.  I respect them and

12   admire them.  I told you that on day one.  They are human

13   beings and they worked really hard.  They want to win.  They

14   want to win.  But winning for the government is when justice is

15   done.  Winning is when justice is done.  It's not a conviction.

16   No matter what your verdict is in this case, so long as it is

17   the product of your careful and conscientious and thoughtful

18   consideration of the evidence and lack of evidence against

19   Mr. Miranda and these other defendants, no matter what that

20   judgment is, whether it be guilty or not guilty, that's a win

21   for the government.

22          The government represents us.  We, the people.  We,

23   the people.  That includes you, me, Mr. Miranda, everybody else

24   sitting here on trial.

25          I'm sure I left stuff out.  And when I sit down I'm

1   going to go like that.  Because it always seems to happen.

2   But, I hope I didn't leave too much out, and I hope that you

3   will consider what I've said and consider things I haven't

4   said.  I'm not running from the evidence in this case.

5           And I just remembered a critical point that I left

6   out.  Mr. Miranda took up Judge Pauley on his representation

7   and his statement to you that a defendant never has to testify

8   in his own behalf.  Because he's presumed innocent and the

9   burden of proof is always with the government.

10          But you know what?  Mr. Miranda has spoken to you.

11  He's spoken to you in two ways.  He's spoken to you by his not

12  guilty plea, which says I, Nolbert Miranda, an American citizen

13  of the United States, presumed innocent of every charge against

14  me, hereby deny each and every allegation against me.  I didn't

15  do it.  And if they're going to convict me, they have to prove

16  if beyond a reasonable doubt.  Okay.  That's how he's spoken to

17  you.

18          And he's spoken to you in another way.  He spoke to

19  you after he was arrested by Agent Castillo.  Do you remember

20  Agent Castillo told you that when she arrested Mr. Miranda in

21  Monticello, New York, she put him in the back seat of her car.

22  He was handcuffed behind his back and he made statements to

23  her.  Now, he didn't prepare with anybody for what he said.  He

24  didn't get coached to tell the truth.  He didn't meet for a

25  hundred hours over two years or longer.  He was handcuffed

behind his back and he had just been arrested and according to

the government, he made statements.

What did he say? He said a lot of things. He said he

had been selling in the Courtlandt area for years. He said he

was friends with T-Money. Terry Harrison. We haven't denied

that, and in fact we've acknowledged that he was seen selling

in Courtlandt Avenue. He said that GFC sold narcotics for

Terry Harrison. GFC. The gang. The criminal enterprise. The

Bloods. They sold. He told Agent Castillo that he did not

sell for T-Money, and he did not sell with T-Money. This is at

3424 of the transcript if you want to make a note.

Think about it. The man's just been arrested. He got

arrested unexpectedly. He was I think at a bus station. He

hasn't had time to meet with a lawyer, he hasn't been coached,

he hasn't been made presentable, he hasn't been cleaned up, he

hasn't reviewed discovery, he hasn't considered his options,

he's handcuffed behind his back and he made statements. And

boy, don't they ring true. Don't they ring true considering

the evidence you heard.

He did not sell for T-Money and did not sell with

T-Money. Has that been contradicted in this case by a single

witness? He said that GFC members were responsible for

shootings in the Melrose and Jackson Projects. Does that ring

true? Does that have the ring of truth? Have you heard

testimony about that? Have we disputed that? Has he run from

1    that?  He told her he was not a member of GFC or any gang.  He

2    was surprised he got charged in this case because it's GFC that

3    you want.  It's those people, not me.  He said, as I told you,

4    that he sells for himself.  He was surprised he was arrested in

5    this case because he was not GFC.  And he was surprised that he

6    was indicted with these people.  And by these people, he meant

7    the gentlemen here, and the other people named in the

8    indictment.  The Aubrey -- the Devin Parsons and the Bernard

9    Folks and Capo and all the other people that you heard about.

10   And they spoke specifically about him being shot several times.

11   How he was shot in 2009 after Agent Castillo had made an arrest

12   of lots of people.  And according to Agent Castillo, he said he

13   was shot because he wasn't indicted in that case.

14          So why would he maybe think that?  Well, you've got 50

15   people who were allegedly in a gang, a violent gang, and they

16   all get charged and he didn't.  He didn't because he had

17   nothing to do with them, like he had nothing to do with these

18   people.  He was perhaps afraid that or he thought that maybe

19   they thought he was snitching.  Maybe they thought he was

20   cooperating.  That's why he didn't get charged.  So he says I

21   got shot -- he thought he got shot 2009 because he wasn't

22   indicted in this case.  And then of course he confirmed that he

23   was shot on September 11, 2010.

24          That reminds me of another bit of evidence I wanted to

25   just address very, very briefly.  Folks said that when he was

1    in the pens with Mr. Miranda, Mr. Miranda told him that he had

2    loaned a gun to someone.  He didn't say he loaned it for any

3    criminal purposes or in connection with any drug conspiracy.  I

4    think you heard some other evidence about someone saying

5    Mr. Miranda saw a gun that he had supposedly provided and said

6    don't do anything with that gun.  Don't do anything with that

7    gun.  You remember?  What does that mean?  Does that mean use

8    it in connection with a drug conspiracy?

9         By the way, he's not charged with any violence.  He's

10   charged with possessing or using or carrying a gun in

11   connection with the narcotics conspiracy.  I want to be very

12   careful and clear about that.

13        But back to what Mr. Miranda said to Agent Castillo,

14   at least as Agent Castillo testified, I think every statement

15   he told you has been borne out by the evidence in this case.  I

16   really do.  Every statement.  He never ran from what he did.

17   He never, he didn't lie.  He didn't get caught in lies.  He

18   didn't embellish, he didn't fabricate, he didn't stretch the

19   truth.  He said what he did and he said what he didn't do.

20        I mean, he's been a remarkable client for me.  And I

21   really, really feel the burden of fighting for him.  He

22   shouldn't be in this case.  He doesn't belong in this case.

23   The government was allowed to charge him and they were allowed

24   to try him and they did.

25        Thank God we have a jury like you.  There are four

CBR3MER5                        Summation – Mr. Becker

1    trials here.  His trial is separate.  It is distinct.  This

2    isn't about whether you like me or like Mr. Dinnerstein or like

3    Mr. Fee.  This isn't a popularity contest.  This isn't a

4    personality contest.  This isn't about who you think is the

5    great lawyer and who you think is not the great lawyer.

6            I didn't put up any slides, you know, I did this the

7    old-fashioned way.  I've got to get with the program and start

8    putting up slides, but it's not about that.  It's not about

9    ego.  It's not about personality.

10           The decision that you make in this case you are going

11   to live with for the rest of your lives.  And Mr. Miranda is

12   going to live with for the rest of his life no matter what it

13   is.

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          MR. BECKER:  And I feel that this process in a way has

2     been cathartic because it has -- Mr. Miranda waited for a long

3     time to have the jury like you judge him.  And he's made no

4     excuses.  He hasn't minimized, he hasn't done anything other

5     than, you know, do what he did, and he's not guilty, and I ask

6     you, let him go home.

7          Thank you.

8          THE COURT:  Members of the jury, we're going to take a

9     brief recess and then you will hear the government's rebuttal.

10     The government's rebuttal will be 45 minutes.  And then we will

11     suspend for the rest of the afternoon and tomorrow I will

12     deliver my charge to you.  I'll tell you more about that at the

13     conclusion of today's proceedings.

14          Keep an open mind, come to no conclusions, and don't

15     discuss the case.

16          Please recess the jury.

17          THE CLERK:  Come to order.  Jury exiting.

18          (Jury excused)

19          THE COURT:  Are there any issues that counsel wish to

20     raise?

21          All right.  We'll take about 25 minutes.

22          (Recess)

23          (In open court; jury not present)

24          THE COURT:  Ms. Heller, are you ready to proceed?

25          MS. HELLER:  I am, your Honor.

1           THE COURT:  I'll ask you to begin to conclude when you

2      have five minutes, all right?  And then I'll give you one

3      minute.  I'll give you a one-minute.  All right?

4           Let's bring in the jury.

5           (Jury present)

6           THE COURT:  Members of the jury, at this time I ask

7      that you give your undivided attention to Assistant United

8      States Attorney Nola Heller as she delivers a brief rebuttal on

9      behalf of the government.

10           MS. HELLER:  Hi, everyone.  We are almost there.

11      We're almost done.

12           You've had a bunch of lawyers talking at you for two

13      days now, and I really do not want to prolong things

14      unnecessarily, but as you can see, I basically jumped out of my

15      seat because I have so many things that I want to say to you

16      here today.

17           Most importantly, we think it's important that when

18      you go back into that jury room, you're thinking about the

19      right things, and that's the facts and that's the evidence in

20      this case.  I suggest to you that much of what you heard from

21      the defense attorneys here, if not most of it, was designed

22      specifically to distract you, to mislead you, and to invite you

23      to speculate, but you know what, as good as, and as experienced

24      as these lawyers are, they're not magicians.  They cannot make

25      the evidence and they cannot make the facts disappear.

Cbr1mer6                    Summation Rebuttal - Ms. Heller

1           Now what I'm going to do here today is I'm going to

2    make some general points first, then I'm going to go through

3    some specific arguments that each counsel made, but sadly, I do

4    not have time to respond to each and every argument that was

5    raised.  I would really love to, but I don't have the time.  So

6    I'm just going to do the most important parts, and forgive me

7    if I skip around.

8           But first, Mr. Fee correctly predicted that counsel

9    would talk a lot about the government's cooperating witnesses,

10   call them all liars.  You heard more than six hours, close to

11   seven hours of that talk.

12          I'm going to make some points up front about the

13   cooperators.

14          So first, the defendants are guilty if you believe

15   them.  You have to think about why the defense attorneys spent

16   so long trying to convince you that the cooperators are lying.

17   As Mr. Miedel said, just throw all their testimony in the

18   garbage.  He said just throw it all out; right?  And of course,

19   as Mr. Fee said, the reason they did that is that they know,

20   right, if you believe the cooperators, it's over.  It's done.

21   We can all go home.  Their clients are guilty of all the

22   charges against them.

23          But how did they go about it, right, how did defense

24   counsel go about discrediting the cooperators?  They repeatedly

25   emphasized how bad the cooperators were, what terrible people

1     they were, committed terrible crimes.  Just two very brief

2     examples.  Mr. Becker, he reminded you of this comment, but it

3     really stuck in my head too.  He called the cooperators, in his

4     opening statement, some of the most vile human beings you have

5     ever been in the same room with.  He said you're going to feel

6     the need to take a shower when you see them and when you hear

7     them.  Today Mr. Miedel called them emotionally and morally

8     dead.  That's what he called them.  The point, these people,

9     they committed terrible crimes, so that's it, out the window.

10    You can't believe them.

11         Now there is no question that these people committed

12    terrible crimes.  We told you that at the beginning of the

13    trial.  And the cooperators, they told you that themselves,

14    right, when they got on the stand.  They didn't hide anything.

15    They told you about all the crimes they committed.  Remember

16    Folks and Parsons -- and Mr. Miedel talked about this too --

17    telling you how it felt to shoot people; right?  They said it.

18    They said, yeah, it felt good sometimes to shoot people.  Yeah.

19    Mr. Folks said, I wanted to kill those people.  That testimony,

20    that was hard to listen to for all of us.  Right?

21         But this is not a popularity contest.  This is not

22    about whether you'd have any of these men over for Thanksgiving

23    dinner.  It's scare tactics, ladies and gentlemen.

24         Remember what Mr. Miedel and Mr. Becker said?  Would

25    you lend Mr. Parsons your wallet?  Would you lend Mr. Parsons

your house key?  God forbid, would you let Mr. Parsons watch

your infant?  Okay.  Ladies and gentlemen, I got to tell you,

if you open up your door, call a babysitter and you see Devin

Parsons there and he says, "Hey, here I am, ready to babysit

your infant," call 911, ladies and gentlemen.  Call 911.  Okay.

This has nothing to do with whether Devin Parsons is going to

babysit your infant.  This has to do with whether you believe

his testimony on the witness stand.  It's faulty logic, ladies

and gentlemen.  It doesn't follow that because someone's

committed terrible crimes they can't be telling you the truth

about the crimes they committed and the people they committed

them with.

          Now how do you know that the cooperators are telling

the truth?  How can you assess whether they're telling the

truth?  Because you have to do that, obviously.  In this case

you have to do that.  We submit there are five main ways.

There's probably way more than five, but there's five main ways

that we're suggesting to you.

          The first is, think about their demeanor, how they

looked, how they sounded, how they acted on the stand.  Did

they avert their eyes?  Did they seem evasive?  Did they refuse

to answer questions about their criminal past?  No.  Each one

of them got up on that stand, they laid it all out for you.

They didn't hold anything back.  They told you about every

crime they'd ever committed -- crimes they're convicted of,

Cbr1mer6                    Summation Rebuttal - Ms. Heller

crimes they'd never even been caught for, crimes the government

never would have known about if they hadn't admitted them.

Remember -- and then they pled guilty to crimes that they

weren't charged with when they were arrested.  Devin Parsons

told you he was only arrested for one crack sale -- steering

one crack sale, not even making it.  He pled guilty to two

murders and a host of other shootings and other charges here.

        And why did he do that?  Why did he do it?  Because of

his cooperation agreement and the way the cooperation process

works.

        And that gets me to the next point, which is

motivation and incentive.  Now each cooperator told you about

how those agreements worked.  All those agreements, by the way,

the cooperation agreements, they're in evidence.  We put them

in evidence.  We want you to look at them.  Scrutinize them.

What they say is, if the defendants cooperate -- excuse me --

if the cooperators cooperate and they tell the truth, the

government will write them a 5K letter, send it to the judge,

and that gives the judge the power to give them a lower

sentence.  There's no promises, the government doesn't

recommend any specific sentence, and the sentencing is totally

up to the judge.  But if they lie, the agreement is ripped up,

and they'll likely end up spending the rest of their lives in

jail.

        Remember Maurice Hagen?  Remember when he was asked

Cbr1mer6                    Summation Rebuttal - Ms. Heller

about this about -- by Mr. Dinnerstein, that he would get

struck by lightning if he lied on the stand?  And what did

Mr. Hagen say?

         What do you believe will happen to you if you lie on

the stand today -- if you don't tell the truth on the stand

today?

         A.  I'll probably spend the rest of my life in prison,

he said.

         And that's the case with each one of the cooperating

witnesses.  They varied in how articulate they were in

explaining to you, but they all understood what they had to do.

They had to lay themselves bare to you.  They had to tell you

everything and anything that they knew, and that's what they

did.

         Now also, a lot of argument about self-interest.  The

government's witnesses were self-interested.  They looked out

for number one.  Yes, yes, they were.  That's the whole point.

The best way for them to take care of themselves here was to

tell the truth.  Telling a lie in this situation doesn't get

much more dangerous for these defendants when the government

fact checks everything that the cooperators are telling you.

         MR. MIEDEL:  Objection --

         THE COURT:  Overruled.

         MS. HELLER:  -- putting together maps of cell site

activity, examining ballistics evidence, examining more

1  evidence, testing for DNA, talking to civilian witnesses like

2  Maria Ortiz, Dikeem Hill, Brittany Brown.  Who would be crazy

3  enough to lie in a situation like that?  In that situation, you

4  don't have to be a good person.  You don't even have to believe

5  an oath to understand that your only option, the option that is

6  in your best interest, is to tell the truth.  Even a

7  criminal -- and these guys were criminals -- knows that.

8         So whether these defendants get their 5K letter is

9  another thing he told you, doesn't depend on whether the

10  defendants get convicted.  As long as they fulfill their

11  obligations and they tell the truth, they get the letter.  Why

12  would they lie when the downside is so severe, life in prison

13  essentially, and there's no upside?  They don't have to sink

14  the defendants to get a break.

15         Now a lot was said about substantial assistance by

16  defense attorneys.  Witnesses wouldn't get their 5K letters

17  unless they provided substantial assistance.  Again, Maurice

18  Hagen I think answered those questions most succinctly:

19         How did you believe that you can provide substantial

20  assistance to the government?

21         A.  Just by telling the things I know, telling the

22  things that I perceive to be the truth.

23         No obligation to put anyone away.  Just tell it like

24  it is and hope for the best.  That's what the agreements say.

25         Now when you think about the cooperators, think

1    about -- to get back to where I was -- what they said and what

2    they didn't say.  Did the cooperating witnesses blame

3    everything on the defendants and minimize their own conduct?

4    Did they do that?  Were they somehow trying to frame or sink

5    the defendants?  Absolutely not.  If anything, the opposite.

6         A few examples.  Bernard Folks.  If his goal was to

7    tell the best story to please the government, as the defense

8    attorney said, why wouldn't he have said that Earl Pierce

9    pulled the trigger and killed Jason Correa?  The only people

10   who could have contradicted him are dead; right?  If Folks'

11   goal was to do that, why not tell the story that way?  Or, hey,

12   why not say that Joshua Meregildo shot the .40-caliber and he

13   shot at Tarean Joseph, not himself.  That would have made him

14   less guilty and Meregildo more guilty.  Why not say that?  Why

15   not?  That was not the truth.  He was telling you the truth.

16   He was trying to be accurate, in every detail, because that's

17   what he knew he had to do under his agreement.

18        Pemberton, if his goal was to sink the defendants,

19   wouldn't he have accused Melvin Colon of shooting Jing Bao

20   Jiang and not said, no, it was me, it was me?  He wanted the

21   gun but I kept it?  Why would he say that?  Remember also he

22   said -- and Mr. Miedel reminded you, to be sure -- he'd never

23   seen Earl Pierce sell crack?  Would have been very easy to say

24   otherwise, if he thought he could have helped himself by lying.

25        The main point, if these defendants were lying to

1    frame the defendants, wouldn't they have done a better job?

2    Don't you think they would have made it a whole lot worse?

3    These witnesses didn't exaggerate, they didn't make things up

4    to frame the defendants.  They stuck to the truth instead.

5            Now several of the attorneys suggested to you that the

6    cooperators practiced their testimony to match, so that they

7    all would tell the same story that would please the government.

8    But you have to take this apart for one second, right, because

9    to believe that they all were lying about the same thing, you

10   have to believe that they got together in some sort of summit,

11   right, and that summit happened before Devin Parsons was

12   arrested, of course.  They had to all be together to figure out

13   what they were all going to say.  And they had to say at this

14   meeting, well, if we all get arrested by the Feds, here's what

15   we're going to do.  We're going to go in and talk to them,

16   we're going to admit to every crime we've ever committed,

17   including things we didn't think -- the government didn't even

18   know about, didn't charge us with, we're going to plead guilty

19   to dozens of crimes, including murders, shootings, then guess

20   what, we're going to testify at a trial against our best

21   friends, and then we'll -- let's hope it all works out.  Well,

22   clearly, that's not what anyone would have planned on.  No one

23   would have wanted to do that.  But that's exactly what they

24   each ended up doing, coming in, separately, and, separately,

25   telling the government what they knew and what the truth was,

Cbr1mer6                    Summation Rebuttal - Ms. Heller

1    and then accepting responsibility for and pleading guilty to

2    those crimes, because that's how cooperation works in the

3    federal system.  Any conspiracy frame theory is simply

4    impossible.

5          Now the fourth way you know they told the truth, this

6    one is a very simple point.  They gave you such detailed

7    testimony.  The type and level of detail, you can't make up.

8    Right?  If they had invented this whole drug business out of

9    whole cloth, the war between T-Money, O and Luchie, the YG/GFC

10   rivalry, shootings and murders, you'd have to be Stephen King

11   or some sort of best-selling novelist to make up a whole world

12   like this and keep it straight the way the cooperators did.

13         Finally -- I'm not going to spend a lot of time on

14   this point, Mr. Fee did it at length in the summation -- is

15   corroboration; right?  Think about how much or what the

16   cooperators said was consistent with and corroborated by all

17   the other evidence in this case.  And when the defense

18   attorneys say, all you have is the cooperators here, ladies and

19   gentlemen, remember, that's not right.  You have the

20   cooperators, and they -- first of all, they corroborate each

21   other, right, and second of all, they're corroborated by all

22   the other independent evidence and witnesses.  Physical

23   evidence, the guns, the 911 calls, the autopsies, the lay

24   witnesses, too many examples to discuss them all, but we will

25   get into some specifics.

1          Now the final point on cooperators -- and Mr. Miedel

2     predicted that I might argue this, and I'm going to do it,

3     absolutely, ladies and gentlemen -- the defense wants it both

4     ways.  They want you to believe the cooperators are all liars,

5     liars.  Right?  You can't believe them.  Throw them all in the

6     garbage.  But even Mr. Miedel, who told you to reject those

7     arguments, he did this.  They don't say the cooperators are

8     lying about everything.  No.  No, no.  Don't -- maybe don't

9     throw it all in the garbage.  A few things they want you to

10    listen to.  They want you to listen to, of course, when the

11    cooperators talked about their criminal history, about all the

12    crimes they committed, except for the crimes with the

13    defendants.  Pemberton, Villafranco, street robberies, how many

14    hours did we spend talking about those; right?  That is

15    something that they want you to believe, Parsons' shootings,

16    Hagen's time with the Bloods.  Listen to those, ladies and

17    gentlemen.  Believe that.  As long as the cooperators were

18    telling you about their own criminal past, they're magically

19    truth tellers.  It happened again and again, in another very

20    important way, the cooperators were truth tellers whenever they

21    said anything good about the defendants, or beneficial to their

22    defense.

23         Aubrey Pemberton told you he never saw Earl Pierce

24    sell drugs.  Mr. Miedel certainly told you about that one.  He

25    wanted you to throw his testimony in the trash, but not that

Cbr1mer6                    Summation Rebuttal - Ms. Heller

1    part.  Not that part.

2            Anthony Crocker and Villafranco, they didn't see

3    Miranda get crack from Harrison.  Mr. Becker, don't believe

4    that Anthony Crocker and Nolbert Miranda had any sort of drug

5    conspiracy going on.  They weren't involved in the same

6    conspiracy.  But do believe that Crocker didn't see Miranda get

7    crack from Harrison.

8            Folks never saw Meregildo get drugs.  Mr. Lee, believe

9    him, believe Mr. Folks on that, but don't believe Mr. Folks

10   heard a detailed confession from Joshua Meregildo on the murder

11   of Ogarro.  Believe that, don't believe that.

12           And Parsons, he told people he killed Ogarro because

13   of Aponte's personal beef.  Believe that, ladies and gentlemen,

14   believe that, but not one other word he said.

15           Defense counsel want you to pick and choose and

16   believe the cooperators about what sounds good for their

17   argument and discard the rest.  They want you to believe them

18   for -- only when it's about something that's a distraction from

19   their clients' guilt.  They can't have it both ways, ladies and

20   gentlemen.  The simple fact is that the cooperators told the

21   truth.  Some of the truth was hard to talk about, when it came

22   to their own criminal activities.  Some of the truth did not

23   help the government's case.  But that didn't matter to the

24   cooperators.  They told it how they knew it, as they were

25   obligated to do.

1              Now I will get to that.  One of the things that

2    happened during the numerous of the defense summations was that

3    several of the defense attorneys mischaracterized the evidence.

4    Now why did they do that?  I submit it was so that they could

5    make arguments that helped their clients, and when that

6    happens, we feel we have an obligation to correct the record

7    and what was being said, and as Judge Pauley reminded you at

8    the start of the trial and again today, only the testimony and

9    exhibits are evidence, not the arguments of counsel.  Don't be

10   misled by mischaracterizations of the record.

11             Let's talk about some of those.  Mr. Lee spent most of

12   his time yesterday going over the Ogarro crime scene in detail.

13   He told you he wouldn't have to call Parsons a liar, because

14   the evidence would show that.  But the evidence showed no such

15   thing.  Mr. Lee only got there by mischaracterizing the record

16   for you.  He took apart the transcript, he cited from it

17   selectively, he admitted what was convenient for him, and he

18   simply --

19             MR. LEE:  I object, your Honor.  Mischaracterization

20   and it's a personal attack.

21             THE COURT:  Sustained.

22             MS. HELLER:  Mr. Lee -- I'm going to get into

23   specifics -- argued that there was no testimony that Carrel

24   Ogarro was shot at from the front.  He said over and over and

25   over that it was only from behind.  That's belied by the

2            There's no -- the only thing that's blacked out here

3    is an objection that was sustained.  So other than that,

4    there's no ellipses, there's no underlining, there's no changes

5    to the testimony.  And there's two big blocks of text there.

6    And it's what Devin Parsons talked about what happened here.

7            Can you describe for the jury -- I'm looking on

8    page 2317.

9            He came through the path.  He was walking towards us.

10   We were standing there.  He stopped.  He asked us, he said,

11   what's up?  We said, what's up.  He put his hands, like, in the

12   back of his pants, like, I don't know if he was going to pull

13   out something.  I back up.  Killa pulled out the gun and fired.

14   He tried to run.  Killa fired again.  I fired.  And Killa fired

15   again and ran in the back door.  And I walked up to him, stood

16   over him, and fired five times.

17           Next page, line 14:

18           Killa pulled out the gun and Killa shot.  He tried to

19   run -- Killa shot again.

20           Both of those descriptions, that's where Devin Parsons

21   described the murder in narrative form, made clear that there

22   is a conversation going on.  And in the middle of those two

23   blocks, you talk -- I say, line 22:

24           Let's slow it down a little bit.

25           There's a conversation.  I'm not sure who spoke first.

Cbr1mer6                       Summation Rebuttal – Ms. Heller

1    What's up with his brother or something like that.  He said his

2    brother was good, they're standing there, they're face to face.

3    The first shot is fired and then -- then -- that is when Carrel

4    Ogarro turns to run.

5            So ladies and gentlemen, if you look at the actual

6    transcript, you'll see that what Mr. Lee spent about 30 or 35

7    minutes talking about is simply not right.

8            Let's talk about another argument.  That's just easier

9    to read, but we did it -- another argument.  Mr. Lee said:  We

10   know from what Detective Jonathan Fox said that when you shoot

11   a .380, the shell casing goes to the side.  And he says, the

12   location where the .380 shell casing was recovered establishes

13   where the shooter was.

14           But what did Detective Fox actually say?

15           "There's no scientific method for me to determine

16   where a person was standing based on where the cartridge

17   casings were recovered from."

18           MR. LEE:  I object to that mischaracterization.

19           THE COURT:  Overruled.

20           MR. LEE:  Selective transcript.

21           THE COURT:  Overruled.

22           MS. HELLER:  So ladies and gentlemen, the ballistics

23   expert himself contradicted what Mr. Lee said that he said.

24   And when you think about it, Mr. Lee's argument, just putting

25   aside this, doesn't make sense about the casing.  When you fire

1    a gun, in an outdoor setting, anything could happen to the

2    casing.  It could have been windy.  Those things are tiny.  You

3    can pick them up and look at them.  It doesn't mean anything

4    that the casing wasn't in exactly the same spot where Parsons

5    was.  It certainly doesn't mean that Mr. Meregildo is not

6    guilty of that murder, ladies and gentlemen.

7            There were other mischaracterizations as well, but I

8    don't have time to get into them now.

9            One thing, before we get to that -- actually, can we

10   make it blank for a second, Ms. Brady?  Can we make it blank?

11   All right.  We'll just stay on that one.

12           Now Mr. Meregildo suggested that Walter Aponte

13   committed the Ogarro murder with Parsons and not Meregildo.

14   But ask yourselves, did you hear one piece of actual evidence

15   that Walter Aponte shot Carrel Ogarro?  Not a shred.  That was

16   speculation.  Nothing but speculation, innuendo.  And ask

17   yourselves first, why would Devin Parsons lie and substitute

18   Aponte for Meregildo in his account of the murder?  There's no

19   reason.  You heard the time line.  Parsons was the first

20   cooperator.  He had no need to sink Meregildo in favor of

21   Aponte.  Agent Castillo said Aponte didn't start cooperating

22   until two months after Parsons was even arrested.  Parsons had

23   no reason to protect Aponte.  He had everything to lose.

24           What was the actual evidence that you heard?  You

25   heard from Parsons, Folks, and Brittany Brown that the shooters

Cbr1mer6                    Summation Rebuttal – Ms. Heller

1    were Meregildo and Parsons.  No one told you Aponte was the

2    shooter.  And you remember all the corroboration of Parsons'

3    firsthand account.  Ballistics, crime scene, first responders,

4    you saw the devastating cell site evidence that put

5    Mr. Meregildo at the scene of the crime with that significant

6    gap in texting and calling right at the time --

7              MR. LEE:  Object.  That's a misstatement of what the

8    evidence establishes.

9              THE COURT:  Overruled.

10             MS. HELLER:  I will take that opportunity.  Please, I

11   don't have time.  Take those records, look at the calling

12   records.  You'll see a constant pattern of calls back and

13   forth, back and forth, back and forth, and texts that

14   Meregildo's making, and all of a sudden, what happens between 5

15   and 6 a.m. when the murder is happening?  Two calls.  It's

16   unbelievable, ladies and gentlemen.

17             And remember, Mr. Lee did not even mention that cell

18   site evidence in his summation.  He didn't say one word about

19   it.  Of course he doesn't have the burden to do anything,

20   ladies and gentlemen, but I submit that the reason it wasn't

21   mentioned is because it's indisputable.  You can't say anything

22   about it.  Mr. Meregildo would have to be the unluckiest man in

23   the world if it happened to be that all this evidence pointed

24   to him being involved in that murder.  And the phone telling

25   you that he was involved in that murder, but, oh, the phone

Cbr1mer6                    Summation Rebuttal - Ms. Heller

1    only happened to be at the scene of the crime at the time of

2    the crime, going from his house before the murder, back to his

3    house after the murder, oh, but he was innocent.  He would have

4    to be the unluckiest man in the world.  And that's why Mr. Lee

5    didn't address it, ladies and gentlemen, we submit.

6            So on motive, did anyone tell you the legitimate

7    reason the murder happened was because some -- of some personal

8    dispute between Ogarro and Aponte?  No.  No one told you that

9    was the legitimate reason.  Parsons explained to you, he told

10   people that because he didn't want people to know the real

11   reason.  That makes perfect sense.  He didn't want to tell the

12   whole world he'd been hired as a hit man.

13           By the way, even if that were the motive -- let's just

14   say it was, but it wasn't -- it would still be a murder in aid

15   of racketeering because it was committed to protect a fellow

16   GFC member, Aponte.  But it wasn't the real reason, and Parsons

17   had no incentive to lie about that to you, or about anything.

18           Finally, the argument that Parsons somehow crafted his

19   account of the motive when he began meeting with the government

20   in order to make out the elements of the charged murders is

21   simply absurd.  Do you really think that Devin Parsons knew all

22   the elements of the various federal murder statutes when he was

23   arrested and started cooperating here?  That he said, oh, wait,

24   I'm not going to say it's personal gain anymore, I'm now going

25   to say it was for pecuniary reasons?  That makes no sense,

1    ladies and gentlemen, because it didn't happen.  All the facts

2    and the evidence point to the same conclusion.  Meregildo and

3    Parsons shot Ogarro on T-Money's orders because everyone

4    thought he was snitching.  Any other story has no basis in fact

5    or evidence.

6            Also, one more point.  Mr. Lee said:  Ladies and

7    gentlemen, I want somebody to place here one shred of evidence,

8    one shred, that Meregildo was involved in a conspiracy to sell

9    drugs.  Here I have some shreds.  I don't have time -- there

10   are a lot of shreds, ladies and gentlemen.  I don't have time

11   to reach them all, but look at the transcript pages, 4019,

12   Crocker, 1498, Pemberton.  The crack trafficking with

13   Meregildo.  And Pemberton, Villafranco, Parsons, those

14   transcript pages on marijuana trafficking with T-Money and

15   Meregildo.  There's plenty of evidence, ladies and gentlemen.

16           Now the conspiracy to murder members of the 321 crew.

17   Mr. Lee and Mr. Miedel each argued that Tarean Joseph -- the

18   Tarean Joseph shooting was not based on any conspiracy to

19   retaliate for T-Money's death.  It was just spontaneous and

20   unexpected, they called it.  Now it's a good example of picking

21   and choosing when they want you to believe cooperators and when

22   they don't.  It's obvious what happened here, ladies and

23   gentlemen.  T-Money dies; right?  Meregildo runs outside half

24   dressed to find -- they want to find out who is responsible.

25   They're distraught.  They find 321 people celebrating, they

Cbr1mer6                    Summation Rebuttal - Ms. Heller

know they're connected with Luchie, they decide they're

involved.  The day that it happens, Folks tells you that

Meregildo calls -- called him and Parsons tells you Pierce

called him.  They both asked for guns.  That's not an

inconsistency, ladies and gentlemen.  That shows you how much

they wanted guns.  They both made calls.  Get that gun down

here.  And they get -- they go to the car, they drive to

Harlem, they come back, they get out, they see the crew.

Transcript page 686, Pierce says, it's going to rain 40 days,

40 nights.  That's what Folks testified to.  And he starts

shooting with the 9.  And then Pierce, Meregildo yell to shoot,

shoot him, shoot him, they say, and he does.  Now Folks

testified that it all happened very quickly, spur of the

moment, but there's no doubt in his mind why it happened.

        And here are portions of the transcript, you can see

them, that defense counsel didn't want you to remember.  Folks

tells you his understanding of why this happened:  Stemmed from

the T-Money incident, with T-Money being killed.  That was

where the money came from, from the hit, from 321.

        Pemberton, who hears confessions from the defendants

after the shooting, hears the same thing.

        There's no requirement that a conspiracy last any

particular length of time.  Here, three people, armed with two

guns, agreed to shoot at the 321 crew, who they thought were

responsible for T-Money's death.  Then two of them shot the

1   man.  End of story.

2          Now what I'm going to try to do is address some things

3   about the Correa murder, as quickly as I can.

4          Now Mr. Pierce's attorney spent a good deal of time

5   arguing that the surveillance videos taken outside of

6   Courtlandt at the time of the murder means that Pierce can't be

7   guilty of the murder.  Means no such thing, ladies and

8   gentlemen.  Don't be distracted by that argument.  First of

9   all, there's no evidence on the record that the times stamped

10  on the video are correct, or correspond to the actual time of

11  the events.

12         So putting that aside, assuming they're true,

13  Mr. Miedel wants you to think that because the video shows

14  Pemberton and Folks walking from up Courtlandt Avenue, they

15  could not have actually heard what they said they heard, saw

16  what they said they saw.  He wants you to think that this video

17  shows Parsons walking to 681 alone and not with Levi, as he

18  remembered, he wasn't telling the truth, and what it all really

19  boiled down to, for him, Folks and Pemberton, they can't both

20  be telling the truth, so they must both be lying.

21         Of course they can both be telling the truth.  What

22  does all of this argument really mean?  What does it boil down

23  to?  The cooperators maybe didn't remember exactly where they

24  walked and went.  Now do you remember the way that you walked

25  to work on November 27th, 2010, two years ago?  And whether

Cbr1mer6                    Summation Rebuttal - Ms. Heller

1  you ran into one of your colleagues on the way to work?  Do you

2  remember what you had for lunch that day?  Probably not.  But

3  if on that day someone had confessed his involvement in a

4  murder to you, you'd better believe you would remember that.

5  And Mr. Miedel used the court reporter example.  I hate to keep

6  involving the court reporters, but he said, you'd remember if

7  the court reporter shot someone.  Of course you would.  That's

8  the whole point.  That's our point.  Right?  They don't

9  remember the little things about which way they walked and

10  when, but they do remember, right, Folks does remember hearing

11  Earl Pierce say:  My cousin's with him.  Let him live.  I'll be

12  waiting for you at the top of the stairs.  If you're Pemberton,

13  you remember offering to do it yourself, thinking it's a

14  robbery, and then finding out that it's a murder, and you'd

15  remember someone saying, why don't you do it?  Those are the

16  things that stick out.

17         Now, Ms. Brady, if you could put up 1410.

18         Mr. Miedel argued that once they get inside the lobby,

19  the accounts were so inconsistent, they couldn't both be true.

20  But that's belied by the record as well.

21         Mr. Pemberton:

22         Can you tell the jury what happened once you were

23  inside the lobby.

24         I was on the phone, and they went around like a little

25  corner.

Cbr1mer6                       Summation Rebuttal - Ms. Heller

1              Who went around the corner?

2              T-Money, Ski Box, and Akon.  They were arguing.  And I

3      went over there and I said, Let me do it.

4              He's on the phone.  He's not with them the whole time.

5      He doesn't hear everything that they're saying.

6              Thank you, Ms. Brady.

7              Ladies and gentlemen, it's completely possible that

8      the stories are consistent and Mr. -- Mr. Miedel, respectfully,

9      didn't appear to remember that portion of the transcript

10     because he argued that Pemberton was there the whole time so it

11     couldn't possibly have been true.  But even Mr. Miedel had

12     trouble remembering small details.  All right.  We all have

13     little gaps in our memories.  It doesn't mean we're lying and

14     it doesn't mean that these things didn't happen the way we know

15     that they did.

16             Here's what they were consistent on.  Pierce and

17     T-Money deep in conversation, Pierce and T-Money walk into the

18     building, Correa shot dead shortly afterwards.  It's clear what

19     happened.  Pierce came up with a plan, he lay in wait while

20     T-Money did the dirty work, then he collected the gun, his gun.

21     Don't be distracted by the little details.  Earl Pierce

22     planned, aided, and covered up the murder of Jason Correa.  End

23     of story.

24             Now Pierce and Miranda both want you to believe

25     there's no overarching drug conspiracy, there's no enterprise,

Cbr1mer6                    Summation Rebuttal - Ms. Heller

1    this is a loose confederation of independent crack sellers,

2    members of different gangs, nothing consistent here.

3              Now first, take a look at the indictment.  We never

4    said everyone was a member of the same gang.  Mr. Aravind never

5    told you that.  It's not charged that way.  We never even said

6    everyone got along with each other.  As Judge Pauley will

7    inspect -- will instruct you, I believe, you don't even have to

8    know every other member of the conspiracy.  Certainly you don't

9    have to like every other member of the drug crew or your gang

10   in order to agree to work together for a common purpose.  And

11   the common purpose of this crew was to sell drugs, make money,

12   commit acts of violence.  And not -- not all for T-Money,

13   ladies and gentlemen, as Mr. Becker had you believe.  For

14   themselves.  Everyone wanted to make money for themselves.

15   They were not out there out of the goodness of their own

16   hearts, making money for T-Money.  No.  They all wanted to get

17   together there on their exclusive turf and sell drugs and make

18   money.  That was their common purpose.  This is not T-Money's

19   band.  It's all their band.  They're all playing in the band

20   together.

21             Now Mr. Miranda helped T-Money get on his feet when he

22   got out on the jail.  You heard testimony that he gave him some

23   of his regular customers.  He told that to Folks, he told that

24   to Crocker.  He was there at the very start, he was there right

25   through the day T-Money died, selling alongside other GFC

Cbr1mer6                    Summation Rebuttal - Ms. Heller

1    members on T-Money's strip, supplying Pemberton, supplying

2    Crocker, sharing customers with Parsons.  Mr. Becker didn't

3    mention that.  Not surprising.  Devastating evidence of

4    conspiracy.

5          Pemberton.

6          Ms. Brady, if you could put up 1330.

7          Pemberton told you about overhearing Miranda and

8    T-Money discussing going in together on a purchase of a hundred

9    grams of crack:

10         Who did you hear say something about a hundred grams?

11         Oh, T-Money.

12         What did T-Money say about a hundred grams that day

13   during the conversation with PayDay?

14         They was going to get a hundred grams of crack.

15         Ladies and gentlemen, that's the ball game.  I mean,

16   the point is here not that PayDay was selling for T-Money.  No

17   one's telling you that.  It's that PayDay is on T-Money's

18   level.  They're both supplying GFC members on that block and,

19   in fact, going in for drugs together.

20         More drug evidence -- oh, Ms. Brady, if we could

21   switch back -- against Mr. Miranda.  And slides again.  That

22   will remind you about all the drug evidence against

23   Mr. Miranda.  And I don't have time to read them again.  You

24   can take down the page cites if you like.  But the sharing

25   customers, the being supplied by them, from all the

cooperators, selling crack with the others who are part of the

same crew.  That's the stuff of conspiracy.  And it shouldn't

come as a surprise that Folks and Villafranco had less specific

information on Miranda's crack sales.  To be sure they saw him

out there selling, they told you that, but remember Folks and

Villafranco, they sold marijuana, not crack, so they didn't

know whether he was supplying other GFC members.  That doesn't

make Miranda any less guilty of the conspiracy.

Now the same goes for Pierce.  Some of the

conspirators -- Pemberton, Villafranco -- didn't see him

selling crack or working with the other members of T-Money's

crew, but others sure did.  Remember -- remember Folks'

description that Mr. Fee quoted for you of Pierce and T-Money

dividing up the crack between them when a new shipment came in?

You heard the same thing from Parsons, who told you that he

gave his profits to Pierce, remember, when T-Money wasn't

around.  He also told you Pierce instructed him, shoot anyone,

shoot O or Luchie if they come to the block and they try and do

anything.

(Continued on next page)

1          MS. HELLER:  And don't forget Maria Ortiz saw Pierce

2    and T-Money counting money together in her kitchen.  Mr. Miedel

3    didn't mention that part of Maria Ortiz's testimony.

4          Now, the fact that several of the government's

5    witnesses didn't know for sure whether Earl Pierce or T-Money

6    were working together doesn't matter.  The people who did know,

7    saw it with their own eyes because it was true.

8          Okay.  How much time.  See how much more I can argue

9    to you.

10          I'm going to address some of Mr. Dinnerstein's

11    arguments very briefly.  He made a bunch of arguments about the

12    murder of Alston.  He argued there weren't two shooters, just

13    Parsons.  He argued the motive was really over Parson's

14    personal beef.  An independent act by this sociopath Parsons,

15    he said.  Parsons told you the way it happened, where it

16    happened, how it happened.  That testimony was corroborated by

17    so many pieces of evidence.

18          Just on the can't be two shooters argument.  No

19    witness told you that .40 couldn't be fired by two people.

20    Mr. Dinnerstein wants you to believe that is the case, but when

21    he had the ballistics expert and the two ATF agents on the

22    stand, he didn't ask them about that.  He just speculated about

23    it and instead he focused on what Mr. Hill and Mr. Villafranco

24    told you about hearing rapid shots.  The shots were fired

25    rapidly.  What does that even mean?  Nothing.  It doesn't mean

CBR3MER7                    Rebuttal - Ms. Heller

1    that the gun couldn't have been passed from Colon to Pemberton.

2    Excuse me.  Colon to Parsons.  Remember, Parsons testified that

3    he grabbed the gun from Colon.  Another incident of him not

4    minimizing, by the way.  He grabbed it and it happened fast.

5    No witness told you that Parsons did the shooting alone.  In

6    fact, every piece of evidence that came in showed you that

7    there were two shooters and those shooters were Parsons and

8    Colon.

9              THE COURT:  Ms. Heller, please begin to conclude your

10   remarks.

11             MS. HELLER:  Thank you.

12             All right.  A few briefly of Mr. Miranda's arguments.

13   The phantom gun.  The gun was not a phantom.  Devin Parsons

14   described it in detail.  17 shot 9, silver and black.

15   Mr. Folks told you about the gun and Mr. Pemberton told you

16   about the gun.  The gun was real.

17             Mr. Becker says Parsons' account can't have been true

18   because of the geography of the Maria Lopez Houses and

19   Ms. Kanote's apartment.  Dismiss that argument, ladies and

20   gentlemen.  Mr. Parsons never told you where Mr. Miranda went

21   within Maria Lopez.  He didn't say that Mr. Miranda said he was

22   going home to his apartment to get the gun.  He could have gone

23   anywhere in Maria Lopez to get that gun.  What we do know is he

24   asked Mr. Parsons to carry it for him.  And the two men later

25   dropped it off on the second floor of 681 Courtlandt, which is

CBR3MER7                         Rebuttal - Ms. Heller

1  where Earl Pierce lives.  That's how Pierce got the gun which

2  was used to shoot Tarean Joseph on September 13, 2010.

3          Mr. Becker argues because we don't have this gun or

4  because he doesn't believe the gun exists, that Miranda is not

5  guilty of the firearms charge.  That's not true.  All the

6  cooperators testified about the block guns that were stashed

7  all over Courtlandt Avenue, in the grass, in pizza boxes.  They

8  could be used for anyone's defense if they needed them.

9          Now, Mr. Miranda sold alongside these men, with these

10 men.  They all had access to these guns.  Mr. Miranda had

11 constructive possession over the guns in that way.  And Judge

12 Pauley will explain to you what that means.

13         One other -- oh, and one other argument about the gun.

14 Mr. Becker just told you that there is no evidence that

15 Mr. Miranda had ever seen a gun ever.  Or, sorry, had ever been

16 seen with a gun ever.  Remember, this is a man who actually had

17 a tattoo of two guns on his body.  So that argument doesn't

18 hold much water, ladies and gentlemen.

19         He also argued about Miranda being a shooting victim.

20 We submit that's completely irrelevant to the charged crimes.

21 And one thing to note, if you think back to the testimony of

22 Agent Castillo.  Mr. Miranda refused to tell her who shot him,

23 ladies and gentlemen.

24         Now, in a minute or two I have that remains -- okay,

25 before I get to my final conclusion, one point on the RICO

CBR3MER7                    Rebuttal - Ms. Heller

conspiracy for Mr. Miranda.  Not only do you have the fact that
he agreed that everyone that's part of this enterprise would
sell drugs together.  You also have that he lent his gun to
someone who used that gun to avenge the death of the crew's
leader, T-Money.  It's overwhelming evidence of his involvement
in that conspiracy.

         All right.  Two concluding points in the two minutes I
have.  During several of the defense summations, counsel went
through each piece of evidence the government had on a
particular crime and tried to discredit each individual piece
of evidence as proof of nothing.  Like taking a puzzle.  Let's
say the puzzle is a picture of an elephant.  Taking the piece
that has an eye on it and saying, this is just an eye, it's not
an elephant.  This is just a tail, that's not an elephant.
This is his toe, it's not an elephant.  You cannot do that with
each of the puzzle pieces, pull a piece out saying it's
nothing, put it down.  Mr. Miedel did a lot of that this
morning.

         Use your common sense.  You can't look at the evidence
in isolation.  Not the way the world works.  You have to put it
together, and you put it together, it is a puzzle, it is a
picture of an elephant, right.

         And here it is, the picture of the crimes that were
charged.  Dozens of pieces of corroboration for each charged
act.  They all fit together.

CBR3MER7                      Rebuttal - Ms. Heller

1          Now, it can be hard to judge someone else.  But I

2     expect the judge is going to instruct you, you have to decide

3     this case without bias or prejudice, and without sympathy.  You

4     have to apply the standard proof beyond a reasonable doubt.

5     That standard is the same standard that's always been applied

6     in every criminal case in the history of this country.  We've

7     met it here.

8          We ask you to consider the evidence and the facts.

9     That's all we've asked you to do from the beginning of the

10    case.  Do that when you go back in the jury room.  Don't be

11    distracted by the nonsense about the cooperators.  Check the

12    record.  Use your common sense.  Follow the judge's

13    instructions.  Don't reinvent the wheel.  The answers are all

14    there right in front of you.

15         If you do that, there is only one verdict that you can

16    return that's consistent with the evidence, and with the truth.

17    These defendants are guilty beyond a reasonable doubt of all

18    charges.  Thank you.

19         THE COURT:  Members of the jury, we've now concluded

20    closing arguments.  Tomorrow morning we're going to turn to the

21    final phase in any trial before your deliberations.  My charge

22    on the law.  That is my instructions on the law to you.  As

23    I've previously mentioned, my charge is lengthy.  In fact, my

24    charge is 137 pages.  I will provide copies of the charge to

25    you tomorrow morning to have in the jury box with you as I read

CBR3MER7

the charge to you.  You can read along with me, or not.  That's
entirely up to you.  But, you must pay attention to the
instructions as I deliver them to you here in open court.  I'll
also review with you a jury verdict form that we have prepared
to aid you in your deliberations in this case.

I expect that I will complete my charge and review of
the jury verdict sheet with you by around lunchtime so that
you'll retire to the jury room to either have lunch and then
begin deliberations, or deliberate while you're having lunch.
That will be entirely up to you.

But your first order of business when you retire
tomorrow to begin deliberations is to select one of your
members as your foreperson who will be responsible for
communicating with the Court by note regarding any matter.

So, for now, I want you to put these matters out of
your mind.  Relax.  It's been a long trial, certainly longer
than any of us anticipated.  But, I can assure you that all of
the attorneys involved in this case worked very hard to present
the case efficiently to you.  And listening as you have is
tiring.  So I'm sure you're all exhausted.  Get a good night's
sleep.  Tomorrow you will have your lunch in the jury room.

You will deliberate tomorrow until 5 o'clock unless
you choose to work later.  That will be a decision entirely up
to you.  In the end you will have as much time as you need to
deliberate on this case in order to reach a verdict with

CBR3MER7

1    respect to each of the 22 counts of the indictment as they are

2    charged against all or against some of the defendants.  That's

3    what lies ahead.

4            We're going to recess now.  Have a great evening and

5    safe trip home.  We'll see you all bright and early tomorrow at

6    10 o'clock and we'll get to work on the instructions of law.

7    Keep an open mind and come to no conclusions.  Don't discuss

8    the case.  Please recess the jury.

9            (Jury excused)

10            THE COURT:  Are there any issues that counsel wish to

11    raise?

12            MR. LEE:  Yes, I have something, your Honor.

13            THE COURT:  Go ahead, Mr. Lee.

14            MR. LEE:  Yes, your Honor, I believe in her rebuttal,

15    Ms. Nola crossed the boundary from legitimate argument to a

16    gross inaccurate misstatement of the testimony in this case

17    with regard to the cell site testimony.  And my request is

18    either to be given 5 to 10 minutes surrebuttal, or to have a

19    correction made either by the Court or by her.

20            Specifically, your Honor, she cited that the cell site

21    evidence put, and I'm paraphrasing, Mr. Meregildo at the scene

22    of the murder.  That flies in the face of the testimony.  I can

23    cite particular transcript pages right now from the Special

24    Agent Perry that said that that evidence can only -- it was not

25    triangulated.  It can only to an accuracy of about a half mile

CBR3MER7

1   radius to a mile indicate the location of a phone.  And her

2   statement is totally inaccurate, it is a misleading statement

3   of the testimony.

4        And, she made a big point that I did not comment on

5   it.  The reason I did not comment, even though I have now right

6   in my computer a fully prepared summation with regard to that

7   aspect of the evidence, that I can present in 5 to 10 minutes

8   to this jury, is that Mr. Fee actually on his summation did

9   correctly state the import of that evidence and I did not

10  comment on it in my summation.  He said that that cell site

11  evidence places, quote, the phone in the area, quote unquote.

12  I did not contest that.  That's consistent with the testimony

13  of Special Agent Perry.

14       But Ms. Heller's statement that it puts him at the

15  scene of the murder is an inaccurate, misleading, misstatement

16  of the testimony.  I should have an opportunity either to in 5

17  to 10 minutes correct that to the jury, or in some other manner

18  that your Honor thinks is appropriate to correct what is a

19  factual gross misstatement of the testimony by the government.

20       MS. HELLER:  Your Honor, we submit that it's argument.

21  I obviously had to speak very quickly and couldn't choose every

22  word as carefully as I wish I could.  I still think it's not

23  inaccurate to say he's at the scene of the crime.  Certainly

24  the maps put the scene of the crime and fanned the cell site

25  all around it.

CBR3MER7

1          But, we certainly oppose Mr. Lee's request for any

2     kind of instruction.  I cannot count the number of

3     mischaracterizations we believe were made by defense counsel.

4     We didn't have time to respond to all of them.  We just chose a

5     handful.  We could go on nearly for days and weeks if every

6     counsel is given the chance to respond to what they believe are

7     mischaracterizations of the record.  It is all on the record.

8     The jury can ask for any of the testimony if they want to see

9     it.

10         MR. LEE:  She cited that as particularly devastating,

11    damning piece of evidence that's incontestable.  And there is a

12    big difference in my mind if the government inartfully and

13    improperly selected a word, and the prejudice should not be

14    visited upon the shoulder of the defendant.  If she said at the

15    scene of the murder, as versus as Mr. Fee accurately recounted

16    and represented the testimony of Agent Perry in the area, a

17    half mile to a mile radius is not at the scene.  It's in the

18    area.  I think that's legitimate argument.  But to say at the

19    scene is a misstatement on the record before this jury, and

20    they should not be misled by that.

21         MS. HELLER:  It was argument.  Nine hours of records,

22    they all pointed to the same address.

23         THE COURT:  Well, I'm going to look at precisely what

24    Ms. Heller did say on that point.  It is argument at the end of

25    the day, Mr. Lee.  I'm going to give the jury an instruction as

CBR3MER7

1    I have several times during the course of these closing

2    arguments that argument is not evidence.  And the government,

3    Ms. Heller, also referred to where in the testimony this could

4    be found.  But I will look at it and consider it overnight.

5    I'll tell that you any application on behalf of the defendant

6    to give a surrebuttal is denied.  If there is going to be

7    anything, it's going to be a two sentence curative instruction

8    from the Court.

9           Now, any further applications?

10          MR. MIEDEL:  Yes, your Honor.  I just would like to

11   briefly expand on my objection which was to Ms. Heller's

12   surrebuttal which was -- rather, rebuttal, I'm sorry, which was

13   when she was vouching for the honesty or truthfulness of the

14   cooperators.  I think she went beyond fair comment by stating

15   that the government is fact checking everything that they say

16   and so therefore they have to be truthful.  That, that is an

17   extraordinary statement in terms of vouching, and in terms of

18   essentially placing the government sort of as a witness in this

19   case.  And what they do to verify that their witnesses are

20   being honest.  So I would ask for a curative instruction on

21   that.

22          MS. HELLER:  There were numerous arguments about

23   things we didn't do, why we didn't do them, and I didn't have a

24   chance to respond to those.  But, I cited specific things we

25   had done.  Gotten cell site evidence, talked to lay witnesses,

CBR3MER7

1    talked to ballistic experts.  It's witnesses we put on.

2         THE COURT:  It is an accurate statement of what the

3    government was doing, Mr. Miedel, which is why I overruled your

4    objection.  And so I deny your application for a curative

5    instruction.

6         MR. LEE:  Your Honor, just lastly, would your Honor

7    want me to e-mail you the testimony that I have already of

8    Agent Perry which I believe is accurate, and what Mr. Fee

9    represented, but it will allow your Honor to see it and why I

10   believe Ms. Heller's comments fly in the face of that

11   testimony.  I can e-mail those transcript portions to your

12   Honor if you wish.

13        THE COURT:  Go ahead and e-mail them.

14        MR. LEE:  Thank you, your Honor.

15        MS. HELLER:  We would say in closing we weren't

16   characterizing Agent Perry's testimony.  We were arguing the

17   facts.

18        THE COURT:  Just give me the page cites by e-mail.

19        MR. LEE:  Yes, your Honor.  I will do that.  Thank

20   you.

21        THE COURT:  Mr. Becker.

22        MR. BECKER:  Thank you, your Honor.  I am concerned

23   greatly that some of Ms. Heller's comments in her rebuttal

24   summation constituted an amendment of the indictment or

25   certainly a variance in their theory of proof against

CBR3MER7

1    Mr. Miranda.  And it devolved to Ms. Heller essentially saying

2    that if somebody was on the block selling drugs with anybody

3    then they're part of this whole enterprise and part of this

4    whole conspiracy.

5         It was just a few days ago that your Honor took note

6    of the fact that certainly wasn't what the charge was in this

7    case.  Just because somebody was selling drugs in the

8    Courtlandt Avenue area that they were part of this conspiracy.

9    Let alone part of the enterprise.  That was part of the reason

10   that I think your Honor ceded to the defendants' request to

11   give a multiple conspiracies charge.

12        Ms. Heller went even further I think in an improper

13   fashion by essentially saying -- not essentially saying, by

14   saying that Mr. Miranda along with T-Money were really the

15   principal members of this enterprise.  That they were the ones

16   who got it going and kept it going.  And it bears noting that

17   Mr. Miranda is not even charged in count one with being a

18   member of this enterprise.  He's not charged with a violation

19   of RICO.  And for the government to stand up now and urge to

20   the jury that the evidence shows that he was out there selling

21   and he was an integral part of this enterprise based on the

22   evidence, that's not what he was charged with, your Honor.

23        So, I'm not sure what the remedy is.  I am moving for

24   a mistrial because I want to assure that that motion is made.

25   But, if the Court is disinclined to grant that, I do think the

CBR3MER7

1    Court when it instructs the jury, it needs to tell the jury in

2    emphatic terms that Mr. Miranda is not even alleged to be a

3    member of this enterprise.  He's not charged.

4         I realize that the Court's current charge says three

5    people are charged in count one and we've addressed that.  But

6    there needs to be some corrective action taken so that the jury

7    is not confused.  The government's made a lot of arguments in

8    this case about that arguments by the defense or examinations

9    by the defense were confusing to the jury.  I can't think of

10   anything more confusing than to tell the jury that Mr. Miranda

11   is like the heart and soul of this criminal enterprise when

12   he's not even charged in that count.

13        And it also brings into focus the question what is the

14   conspiracy in this case?  I really, my whole summation was a

15   summation and my whole defense in this case was geared towards

16   maintaining credibility with this jury.  I made a decision

17   based on close consultation with Mr. Miranda that for me to

18   stand up and proffer a defense he had nothing to do with drugs

19   and it was all lies and Agent Castillo made up his post-arrest

20   statements was absurd and it wouldn't fly and it wasn't

21   consistent with the evidence.

22        What is consistent with the evidence is the arguments

23   I made.  It is the argument that he was an independent seller.

24   And that he wasn't part of this enterprise and/or conspiracy.

25   And it was supported by lots of testimony that I addressed in

CBR3MER7

1    my summation.  And for the government to tell the jury

2    disregard all of that, because count one never says you have to

3    be a member of GFC.  If you are selling drugs out on the

4    street, that's good enough.  For her to tell the jury that, and

5    for that to go uncorrected, is going to work a terrible

6    prejudice to Mr. Miranda.

7         And your jury charge, which I know and I can't tell

8    you how much I respect the care that you gave to it and the way

9    you heard from counsel.  All of our discussions about what

10   should be in the jury charge and all your Honor's rulings

11   predated what you just heard Ms. Heller tell this jury.  So

12   respectfully, it is not enough what's in there now.  There

13   needs to be a curative instruction at a minimum if not a

14   mistrial.  Correcting the impression that Ms. Heller gave.  And

15   making it clear to this jury what the conspiracy is and what

16   the enterprise is, and is not.

17        And then finally, this is on a separate point, when

18   Ms. Heller was arguing to the jury that they could find that

19   Mr. Miranda possessed all the guns that you heard about in the

20   testimony, because the judge will instruct you that anyone had

21   access to those guns, anyone involved, anyone who was selling

22   drugs had access to the guns and therefore Mr. Miranda did, and

23   that constitutes possession, the testimony was crystal clear

24   that people who worked for T-Money had access to the guns.

25   People who worked for T-Money had -- I read this record over

CBR3MER7

1    the Thanksgiving Day break.  And that's what I saw.

2              You know, it's interesting.  The government is

3    supposedly doing a rebuttal summation here to rebut what I

4    said, and yet they stand up with slides that they obviously

5    prepared before I even spoke addressing things that I didn't

6    say.  And putting up a slide of something T-Money says and

7    leaving out -- about the hundred grams and leaving out the next

8    line in the testimony is, well, what did you hear Miranda say?

9    Oh, I don't remember him saying anything.  You know.  That's

10   also in there.  They left that out.  That's a third point.

11             So I've got three points, your Honor.  I hope they're

12   clear.  One is the variance for the indictment for which there

13   should be a mistrial or at a minimum a curative instruction and

14   also a clear delineation to the jury in the Court's jury charge

15   as to what this conspiracy is and what it isn't.  It is not

16   just because you're selling drugs on Courtlandt Avenue.  And

17   the other arguments that I made as well, your Honor, which

18   should be considered by the Court.  And there should be

19   corrective action taken, thank you.

20             THE COURT:  Ms. Heller.

21             MS. HELLER:  A few things.  Mr. Becker didn't object

22   once in my summation.  But I'm not sure what he was listening

23   to.  I don't think I said what he is saying I said.  I

24   certainly never said Mr. Miranda was the heart and soul of the

25   conspiracy or the central figure.  I address a few of the

CBR3MER7

arguments at the end.  And I had transcript cites.  I had six

specific transcript cites on drugs.  And I had three specific

transcript cites on guns.  I tried to argue from the record,

although I didn't have time to read the quotes.  And we have

different views of what the evidence shows.  That is what

argument is for.

        I think the charge is absolutely clear.  There is no

constructive amendment.  I never mentioned count one at all in

the entire summation.  The only count I mentioned with

reference to Mr. Miranda was count two at the very end, and I

said here's how you know he's guilty of both the drug sales and

the gun possession.  The gun that was linked to kill, to avenge

the death of the leader of the enterprise.

        I just don't think there is any basis -- certainly not

for a mistrial, but for anything that Mr. Becker is asking for.

And as to his other arguments, it's, again, it's argument.  We

all disagree with each other's views of the evidence.  And

that's why what we are saying is not evidence.  The testimony

is.

        MR. BECKER:  Just so the record is entirely clear for

the Court.  The improper argument about Mr. Miranda suddenly

morphing into someone who kept this enterprise humming and was

an integral member of it, was made for the first time yesterday

by Mr. Fee.  And what I did, and I thought yesterday it was

objectionable, so what I did today was I tried to make very

CBR3MER7

1    clear what the conspiracy charge was and was not against

2    Mr. Miranda.  And I tried to be very faithful to it.  That he's

3    charged with conspiring with these people.  And I was very

4    careful about what I said and what I didn't say.  And so, I had

5    hoped that that would put it to rest.  But then Ms. Heller in

6    effect either resurrected or repeated and emphasized Mr. Fee's

7    improper arguments.  And the combined effect of both is, it

8    seems to me, to leave this jury with the misimpression of what

9    the charges are against this man and what they have to do to

10   find him guilty, and at a minimum it's going to lead to

11   confusion.  And it's improper.  So I ask again for the relief

12   that I requested a few moments ago.

13           THE COURT:  All right.  First, the defendant Miranda's

14   application for a mistrial is denied.  Second, I don't recall

15   hearing some of the things that you've described, Mr. Becker,

16   in Ms. Heller's sur-reply, but I will go back and look at the

17   transcript this evening.  And so if there is some further

18   instruction that's appropriate, I'll let you know tomorrow

19   morning after I've reviewed the transcript.

20           I do think that the charge tries to painstakingly

21   differentiate the various claims against the various

22   defendants.  And to that end, now that closing arguments are

23   complete, I want to share with you a flow chart that I have

24   prepared, because unfortunately as I commented earlier in this

25   trial, the way in which the indictment is framed is not the way

CBR3MER7

in which a case should be presented to a jury.  So, we're in
the awkward position of having the first two counts charged in
the indictment at the very end of the charge and the jury
verdict sheet, because as a matter of pure logic that's the
only way that you can get there.

        But, if I haven't said it before, I would certainly
suggest to the government in the future, especially with 13
superseders, that at some point, they think about how it would
actually be presented to a jury so that it could be sorted out.
Because this, in my view, is not the model for it.

        And none of you have really explained any of this in
the nearly 11 hours of closing arguments to the jury.  Nobody,
nobody even gave like a one-minute description of what a
conspiracy is.  Not one of you.  It's amazing.

        But several of you have cautioned the jury that they
can look forward to being overwhelmed tomorrow.  So, in an
effort to try to avoid having the jury overwhelmed, and because
so many people, perhaps even some of the jurors, get most of
their information through pictures and U.S.A. Today, I prepared
a series of appendices.  I'm going to distribute them now to
you.  We'll take a short recess so you can take a look at them.
And I'd like to discuss with you when we return whether these
will be appropriate to offer a further explanation or decision
tree to the jury as to what they have to do before they start
laboring through a 13-page jury verdict sheet which I'm going

CBR3MER7

1    to have a word count done on it so that I can just put it into

2    the record.

3           So, at this time I'm going to direct that the

4    defendants be escorted from the courtroom for a short recess.

5    We'll distribute this chart.  We'll take five minutes and we'll

6    come back.

7           (Defendants not present)

8           THE COURT:  I'm mindful that some of you have other

9    engagements.  I don't think this will take very long.  And I'm

10   looking to see what your view is as to whether or not this

11   would be helpful in the end.

12          I've prepared it for each defendant and I put them in

13   binders like the government.  At the very back of this document

14   that's being distributed are essentially four separate

15   appendices, one for each of the defendants in defendant order.

16   It would be what I would see as the decision tree that would be

17   used to give a picture with the charge.

18          So, for example, with respect to all the narcotics

19   related charges against each of the defendants, which is the

20   first page of the four different appendices, I would propose

21   distributing that to the jury and having the government put it

22   up on the screen at page 69 of the charge, after I've discussed

23   all of the narcotics offenses in the charge.  And, then, when

24   it comes to all of the racketeering and murder counts, I would

25   propose putting those for the defendants to whom those charges

CBR3MER7

 1   apply, I would propose publishing those and briefly discussing

 2   them with the jury after page 134 of the charge.

 3          So take a few minutes and we'll reconvene in five

 4   minutes.

 5          (Recess)

 6          THE COURT:  Let's bring out the defendants.

 7          (Defendants present)

 8          THE COURT:  All right.  I think first things first.

 9   My deputy reminds me during the recess that, Mr. Miedel, while

10   it was discussed this morning, I don't know that you have

11   withdrawn on the record the application that you made last

12   evening.

13          MR. MIEDEL:  You're right, that has not been withdrawn

14   on the record.  And I'll do so now.

15          THE COURT:  So the defendant Pierce withdraws the

16   application?

17          MR. MIEDEL:  Yes, he does.

18          THE COURT:  All right.  Thank you.  Now, with respect

19   to these charts.  Do counsel think this will be helpful?

20          MR. MIEDEL:  I'm sorry, your Honor.

21          THE COURT:  Or problematic?

22          MR. MIEDEL:  Can we go back one second.  I want to

23   make sure the record is clear what we're referring to, which is

24   that I believe yesterday morning I made an application about

25   the RICO charges.  And that application is the one that I'm

CBR3MER7

1    withdrawing at this point.

2                THE COURT:  Thank you.

3                MR. MIEDEL:  And your Honor, on this topic, if you

4    want to hear from me I think they're helpful.  I think this

5    would be helpful to us.  We do have one comment or concern

6    about the chart entitled acts of racketeering against Earl

7    Pierce.

8                THE COURT:  All right.  Hang on one second.  All

9    right, I'm there.

10               MR. MIEDEL:  The sort of concluding box on the far

11   right states that two or more racketeering acts if proved

12   consider count one.  I think there should be some sort of

13   corollary, which is if only one or no racketeering acts are

14   found, it means not guilty of count one.

15               MS. HELLER:  Your Honor, I think this starts to get at

16   our view which is that we think it may end up being more

17   confusing for the jury and duplicative of the verdict sheet,

18   but incomplete and needing things like what Mr. Miedel is

19   suggesting to make it the same as the verdict sheet.  What our

20   main concern is, is that some of the lines we think would need

21   "ands" in between them or "ors" in some cases to make clear.

22   Like, just for an example, I'm looking at the first page which

23   is narcotics related charges.

24               THE COURT:  You're back -- all right.

25               MS. HELLER:  Yes.  We just looked at the first page as

CBR3MER7

1    an example.  Where the far right row of columns, the bottom two

2    we think it would need to say consider count 15 and consider

3    count 22.  And then skipping ahead two pages to acts of

4    racketeering against Joshua Meregildo, for the left-hand column

5    we think it would need to say guilty of count five or guilty of

6    count six.

7                (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Cbr1mer8

1           THE COURT:  It's a visual aid.

2           MS. HELLER:  Right.  But your Honor, we think that it

3     could be even more confusing and that the verdict sheet spells

4     it out all in plain English, and then they might start to

5     compare this to the verdict sheet and try to reconcile them,

6     and it's another document to consider, and we just are

7     concerned that, you know, people are going to want to start

8     adding things or subtracting things and then we end up sort

9     of -- we were all happy with the verdict sheet, and now we have

10    another document that could end up confusing things.  That's

11    our concern.

12          And, you know, also, for -- for the narcotics-related

13    charges, where it says guilty and crack quantity of 280 grams

14    or more, there's no mention of lesser included quantities, and

15    maybe some defendants would want that.  It just sort of gets

16    into a number of cans of worms that, you know, might not be

17    worth it.  Of course in the end it's the court's decision, but

18    we're a little concerned that might lead to more confusion.

19          MR. BECKER:  Your Honor, I don't know how the court

20    wants to proceed, but if it please the court, I'd like to

21    respond to Ms. Heller's comments just now about the

22    narcotics-related flow chart, and I will confess I was reading

23    something, but there's only one piece of paper in these flow

24    charts that relates to Mr. Miranda.  It's the very last piece

25    of paper.  And I think Ms. Heller was saying that if the

Cbr1mer8

1    court's going to give this chart or use this chart, there

2    should be a reference to amounts less than 280; correct?  Okay.

3    I disagree with that.  I think it's very clear what the court

4    is saying in this chart is that so long as you find he

5    conspired in violation of law as charged in Count Thirteen,

6    then, as the court instructs, that he's guilty, but then you're

7    saying that's also true if you find that he conspired and the

8    quantity was 280 grams or more.

9             I have a different objection.  My objection is

10   consistent with the objection I lodged earlier, and I know the

11   court has rejected that, so I imagine the court might reject

12   this as well, but inasmuch as it's now on the flow chart, I

13   still would like to make it, and that is, it's my view that the

14   quantity amount, the 280 grams, is an element of the offense

15   that Count Thirteen charges and so the jury should not be

16   permitted to even consider Count Twenty-two unless they find

17   proof beyond a reasonable doubt that Mr. Miranda violated

18   (b)(1)(A), namely, conspiracy to distribute more than

19   280 grams.  Anything less than that, they should not be

20   considering Count Twenty-two because Count Thirteen charges

21   280 grams.  I understand the court rejected that with respect

22   to the lesser included argument that I made earlier, but I

23   restate it here.

24             THE COURT:  All right.

25             MR. BECKER:  Obviously you're going to deny it.

Cbr1mer8

1          THE COURT:  I'm consistent.  I try to be consistent,
2     so the argument is rejected.
3          MR. BECKER:  Yes, I understand.
4          THE COURT:  Mr. Lee or Mr. Dinnerstein, do you want to
5     weigh in on this?
6          MR. DINNERSTEIN:  Your Honor, I actually think it is
7     helpful to the jury.
8          I do have a comment about Mr. Miranda's flow chart,
9     and maybe I'm just missing what you're actually saying.  It
10    says if he's found guilty of Count Thirteen, you're supposed to
11    consider Count Twenty-two, and then there's another line that
12    says, if he's found guilty and the crack quantity is 280 grams
13    or more, you also consider Count Twenty-two.  So I'm not sure,
14    if the jury finds him guilty of less than 280 grams, will
15    they -- are they being asked to consider Count Twenty-two?
16    Because from the third portion, it sounds like they ought not.
17    So I'm not sure what that means.
18         And actually, as it applies to Mr. Colon, as to Count
19    Thirteen, you say, guilty, you consider Count Twenty-two, but
20    if it's guilty and more than 280 grams, you consider both
21    Counts Twenty-two and Count Sixteen.  There isn't a similar
22    circumstance with Mr. Miranda, so I'm not sure -- I mean,
23    there's no Count -- the equivalent to Count Sixteen for
24    Mr. Miranda.  Isn't that right?  It only makes reference to
25    Count Twenty-two.

Cbr1mer8

1          MR. BECKER:  Your Honor, Mr. Dinnerstein's comments, I

2     will confess, those have me a little perplexed about why the

3     280 is in there, and I say that obviously without waiving or

4     forfeiting the argument I made a moment ago, but given the

5     court's ruling that no quantity need be found in order for the

6     government -- in order for Mr. Miranda to be convicted of Count

7     Thirteen, to be, quote, found guilty, I'm not sure what the

8     court's reason was.  I'd certainly love to know because I might

9     endorse it, but it's not apparent to me.

10          THE COURT:  It makes a difference for the other

11     defendants in terms of the murders in furtherance of a drug

12     crime, and so maybe it should be omitted with respect to your

13     client.  I was only keeping it parallel, but it really only

14     bears on the co-defendants.

15          MR. BECKER:  Given the court's -- well, your Honor, I

16     don't want to speak rashly, and maybe we could -- I don't know

17     if anybody else has anything and we can come back to this.  I'd

18     like to give it a couple minutes of thought.

19          THE COURT:  We can think about it, okay?  I'm not

20     wedded to it.  I thought it might be helpful.  I didn't know

21     who might display something during summations.  I thought the

22     government might come up with some sort of treatment.  But they

23     didn't, and I decided I wasn't going to share what I was

24     thinking with any party --

25          MR. BECKER:  Your Honor, I did tell the jury --

Cbr1mer8

1          THE COURT:  -- prior to completion of closing

2     arguments.

3          MR. BECKER:  I did tell the jury in my summation, I

4     believe, that if they don't -- if they find him not guilty of

5     Count Thirteen, they don't even consider the gun count.  I do

6     recall telling them that.  So I, in principle, welcome this

7     flow chart.  The only issue is the one that I raised.  But I do

8     think it would be helpful.

9          MR. LEE:  Your Honor, in connection with the last

10    chart as to Meregildo, acts of racketeering --

11         THE COURT:  Let me just get it in front of me.

12         Go ahead.

13         MR. LEE:  That chart is different from the prior two

14    charts in that the prior two charts clearly -- the boxes

15    indicate, whether guilty or not guilty, what you should or

16    should not consider.  Now going back to the third chart, what

17    it has is the three racketeering acts and then it has three

18    lines going into the final box on the right.  So similar to

19    what Mr. Miedel was suggesting, perhaps some word that has

20    "only if two or more racketeering acts are proved," I think

21    that might make it clearer, or something like what Mr. Miedel

22    suggested.  A little bit different, that third box.

23         MR. MIEDEL:  Your Honor, aside from that question, at

24    least as far as Mr. Pierce is concerned, we really very

25    strongly think that these charts are going to be helpful,

Cbr1mer8

1    especially given the concern that I raised yesterday about the

2    possibility of inconsistent verdicts, which still remains, even

3    though technically I don't think I have a legal argument, which

4    is why I went through it, but I think the fear remains that

5    there's a possible inconsistency, and I think this chart

6    clarifies that, so we are strongly in favor of it.

7         MR. LEE:  Yes, and Meregildo is favor of the charts if

8    I didn't say it.

9         MS. HELLER:  Your Honor, I think we continue to be

10   opposed to it.  We think it's just another document that now is

11   going to -- there are differences between this and the verdict

12   sheet.  It's going to add confusion.

13        THE COURT:  I can put "and/or"s into the line.

14        MS. HELLER:  At a minimum I think that's necessary,

15   because the boxes say "and" and sometimes --

16        THE COURT:  I think the suggestion was an appropriate

17   one.

18        MS. HELLER:  But there are other things, you know, in

19   terms of -- the 280 grams finding isn't anywhere with respect

20   to the narcotics count.  It's only tied into the murder counts.

21   And so then you don't have the special findings on here.  I

22   mean, there are a lot of things that are on the verdict sheet

23   that are not on here, and then we're quibbling over language

24   and guilty and not guilty, and it just seems like it's a third

25   thing that the jury's going to have to have and weigh, you

Cbr1mer8

1    know, comparing three things in front of them, and it may end

2    up taking them longer.  I don't know.  At a minimum we think

3    the "ands" and "ors."

4         MR. MIEDEL:  Your Honor, I think Ms. Heller's concern

5    can be cured by an introductory statement by the court that

6    this is supposed to be an aid to the jury, it's not in place of

7    the verdict sheet, and that they can consider it that way.

8         THE COURT:  All right.  Look, I'm going to take your

9    suggestions overnight.  I'll make some changes.  I'm not going

10   to do it unless everybody is on board.  And I thought it would

11   be just helpful for those who get a picture in the same way

12   that the government thought that all of its ballistics evidence

13   was much more understandable when it was put up in a chart or

14   in a pictorial for the jury.  And we're dealing with a very

15   complicated indictment here, and I think only two counsel

16   mentioned that there were 22 counts charged in this case.  So I

17   don't want the jury to think that they're walking into a buzz

18   saw tomorrow, but it's all devolving upon the court to now

19   explain to the jury what all the theories are in the case, and

20   I can't even do it in a consecutive order because if I did, the

21   charge would be 250 pages long and the jury would tune me out,

22   and they'd be totally justified.

23         And if the government has any further suggestion on

24   these charts tonight, they can just send us something.  I don't

25   want to add to the confusion.  I want to try to dispel some

Cbr1mer8

1    confusion in the case.

2            Anything else this evening?

3            MR. BECKER:  Just quickly, your Honor was good enough

4    earlier to say that you would consider further my argument

5    about Miss Heller's comments regarding Mr. Miranda being

6    integral to the, you know, enterprise and the variance

7    argument.

8            THE COURT:  Yes.

9            MR. BECKER:  May I just respectfully request that the

10    court also consider Mr. Fee's comments yesterday, because

11    that's really, as I say, when it started, and I'm happy if --

12    as soon as I get home tonight, to send an e-mail to the court

13    with page references regarding that.  It's the same issue.  I

14    just --

15            THE COURT:  Send me --

16            MR. BECKER:  I will, your Honor.

17            THE COURT:  All right.

18            MR. BECKER:  And your Honor, is the court considering

19    going through the charge in one shot or will there be a break?

20    I don't know --

21            THE COURT:  There will have to be a break, I think,

22    because, between going through the charge and the verdict

23    sheet, it's probably going to take close to three hours, and

24    after an hour and a half or hour and three quarters, I'm going

25    to let the jury take a quick break.  The same reason that I

Cbr1mer8

1    don't allow closing arguments to go on for hours and hours.

2              MR. BECKER:  My question was a veiled way of making

3    the suggestion.

4              THE COURT:  No, fine.

5              MR. BECKER:  Thank you.  Thank you.

6              MR. DINNERSTEIN:  Your Honor, what's your suggestion

7    regarding the alternates?  Do you keep them around for a while

8    or --

9              THE COURT:  I will send them home after the jury

10   retires to begin its deliberations.  I'll ask juror number 13

11   to report to my chambers the following morning in the event

12   that we don't have all 12 jurors here, and I will keep both of

13   them instructed not to discuss the case with anyone in the

14   event that I need them.  As you're undoubtedly familiar, a year

15   and a half ago, after five days of deliberations in this very

16   courtroom, I needed to replace a juror, and it became

17   profoundly disappointing that there was another juror who was

18   subject to a problem who also could have been replaced, that no

19   one bothered to tell me about.

20             MR. BECKER:  Your Honor, just -- last thing.  I

21   apologize if I was not clear enough about making any arguments

22   during my summation about what a conspiracy is.  I do think

23   that I said to the jury it has to be a meeting of the minds.

24             THE COURT:  You did say that.  You did say a meeting

25   of the minds.

Cbr1mer8

1          MR. BECKER:  And I thought I said with a common goal

2     and venture.  I regret not having addressed it more, but I do

3     have a recollection of saying that.

4          THE COURT:  An illegal purpose?

5          MR. BECKER:  Did I say that?

6          THE COURT:  No.  I don't --

7          MR. BECKER:  You know what, okay, I thought I did, but

8     perhaps the court's recollection is better than mine.

9          Last thing.  I assume the court will permit the jury

10    to sit as long as it wants on Friday?  It's not a question of

11    breaking early; right?

12         THE COURT:  Yeah.  Yeah.

13         MR. BECKER:  Okay.

14         THE COURT:  Anything else?

15         MR. DINNERSTEIN:  I have to say I remember that I

16    punted on the issue of conspiracy.

17         MS. HELLER:  Your Honor, for us it ended up on the

18    cutting room floor, regrettably.

19         THE COURT:  There were lots of terms that were bandied

20    about, like "constructive possession."  I mean, if I'm sitting

21    there, I'm wondering, what is that all about?  Well, they're

22    going to learn it tomorrow morning.

23         All right.  Look, everybody's worked very hard, and

24    you're to be commended for all that.  We all get a little tired

25    in the afternoon.  If you have some other further thoughts on

Cbr1mer8

1    the flow chart idea, send them to me.  I'm not wedded to it,

2    all right?  And I'm not going to go forward with it if anybody

3    has a serious reservation, but if I don't go forward with it,

4    and a day and a half later the jury is sending me a note

5    showing me that they are in the Serbonian Bog, I'm going to say

6    that I told you so.  All right?

7             So have a good evening.  The defendants may be

8    escorted from the courtroom.

9             (Defendants excused)

10            THE COURT:  Have a good evening.  9:30 tomorrow.

11   9:30.

12            (Adjourned to November 28, 2012, at 9:30 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25