D9knmers                          Sentence

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 3   UNITED STATES OF AMERICA,
 4              v.                        11 CR 576 (WHP)
 5   JOSHUA MEREGILDO, MELVIN
     COLON, and EARL PIERCE,
 6
                   Defendants.
 7
     ------------------------------x
 8
     UNITED STATES OF AMERICA,
 9
                v.                        11 Cr. 758 (WHP)
10
     JOSHUA MEREGILDO,
11
                   Defendant.
12
     ------------------------------x
13
                                         New York, New York
14                                       September 20, 2013
                                         2:00 p.m.
15

16
     Before:
17
                    HON. WILLIAM H. PAULEY III,
18
                                         District Judge
19

20

21

22

23

24

25
```

D9knmers                          Sentence

APPEARANCES

PREET BHARARA
     United States Attorney for the
     Southern District of New York
NOLA HELLER
SANTOSH ARAVIND
     Assistant United States Attorneys

WINSTON LEE
     Attorneys for Defendant Meregildo

MITCHELL DINNERSTEIN
ANTHONY CECUTTI
     Attorneys for Defendant Colon

FLORIAN MIEDEL
AARON MYSLIWIEC
     Attorneys for Defendant Pierce

ALSO PRESENT:
Special Agent Patrick Collins, ATF

D9knmers                         Sentence

```
 1              (In open court)

 2              (Case called)

 3              THE DEPUTY CLERK:  United States of America v. Joshua

 4   Meregildo, Melvin Colon, and Earl Pierce, under indictment 11

 5   Cr. 576 and the United States of America v. Joshua Meregildo

 6   under 11 Cr. 758.

 7              Appearances for the government.

 8              MR. ARAVIND:  Good afternoon, your Honor, Santosh

 9   Aravind and Nola Heller for government.  With us at counsel

10   table is Special Agent Pat Collins with the ATF.

11              THE COURT:  Good afternoon.

12              MR. LEE:  For Joshua Meregildo, Winston Lee.

13   Good afternoon.

14              THE COURT:  Good afternoon.

15              MR. LEE:  Mr. Meregildo is seated in the jury box.

16              THE COURT:  Good afternoon, Mr. Lee.  And I note

17   Mr. Meregildo's presence.

18              MR. DINNERSTEIN:  Mitchell Dinnerstein and Anthony

19   Cecutti for Mr. Colon, who is sitting shackled in the jury box.

20              THE COURT:  Good afternoon, Mr. Dinnerstein.

21              And I note the presence of Mr. Colon.

22              MR. MIEDEL:  Good afternoon, your Honor.  Florian

23   Miedel and Aaron Mysliwiec for Earl Pierce.

24              THE COURT:  Good afternoon, Mr. Meidel, and I note the

25   presence of Mr. Pierce in the jury box.
```

D9knmers                         Sentence

1              These matters are on for sentencing.

2              Are the parties ready to proceed?

3              MR. ARAVIND:  Yes, your Honor.

4              MR. LEE:  Mr. Meregildo is, your Honor.

5              MR. DINNERSTEIN:  Yes, your Honor.

6              MR. MIEDEL:  Yes, your Honor.

7              THE COURT:  Mr. Lee, have you reviewed with your

8    client the presentence investigation report?

9              MR. LEE:  We have reviewed it, your Honor.

10             THE COURT:  All right.

11             Are there any factual matters in the report that you

12   believe warrant modification or correction?

13             MR. LEE:  Judge, other than the issues that have been

14   outlined by the Court that are open at this point, we do not.

15             THE COURT:  All right.  I will be addressing those

16   shortly.

17             In fact, let me explain to counsel how we are going to

18   proceed today.

19             First, I'm going to address any presentence factual

20   issues in the reports; and, based upon the parties'

21   submissions, that only relates to Mr. Pierce.

22             Then I am going to deliver to you my guidelines

23   calculations based upon the order that I submitted earlier, and

24   the submissions that I have received from all the parties in

25   response to that order.

D9knmers                        Sentence

1          Thereafter, if any victim wishes to address the Court,
2   I will hear from them.
3          Then I will hear remarks from each of the defense
4   counsel concerning their clients, followed by remarks from the
5   government's table.
6          Finally, I will hear from any defendant who wishes to
7   address the Court before sentence is imposed.
8          Then we will take a very short break and thereafter I
9   will pronounce sentence.
10          So, Mr. Dinnerstein, are there any factual matters set
11   forth in the report for Mr. Colon that you believe warrant
12   modification or correction?
13          MR. DINNERSTEIN:  No, your Honor, just the letter that
14   I previously sent to the Court after your order.
15          THE COURT:  Very well.
16          Finally Mr. Miedel.
17          MR. MIEDEL:  Yes, your Honor.  I had submitted an
18   objection letter to the probation department which I attached
19   to my sentencing submission to you.
20          THE COURT:  I am prepared to rule on those factual
21   matters.
22          MR. MIEDEL:  OK.
23          THE COURT:  First, in paragraph 52, Mr. Pierce objects
24   to being referred to as a "lieutenant" as well as the notion
25   that he ran the organization with Mr. Harrison.

D9knmers                    Sentence

1          This Court agrees with Mr. Pierce's objection and,

2     accordingly will be modifying paragraph 52 to begin, "Harrison

3     ran a narcotics trafficking organization and racketeering

4     enterprise which Mr. Pierce was an associate of that sold" and

5     go on from there.

6          Second, Mr. Pierce objects in paragraph 53 to the

7     conclusion that "GFC members" were "selling for Harrison and

8     Pierce."

9          This Court finds that objection is also founded and

10    will adopt the revision proposed by Mr. Pierce's counsel,

11    namely, that GFC members selling for the enterprise, and then

12    the language in the report will continue from there.

13          Finally, Mr. Pierce objects to certain statements in

14    paragraph 60 of the presentence report, specifically, to the

15    conclusion that on or about July 25, 2010, Pierce and others

16    intentionally and knowingly murdered and aided and abetted the

17    murder of Jason Correa.  Because he was acquitted of this

18    conduct at trial, Pierce is correct about that as well.

19    Accordingly, I am modifying paragraph 60, and it will read as

20    follows:  On or about July 25, 2010, in the Southern District

21    of New York, members of the racketeering enterprise referred to

22    in the indictment as the Courtlandt Avenue Crew intentionally

23    and knowingly murdered and aided and abetted the murder of

24    Jason Correa in the vicinity of 681 Courtlandt Avenue, Bronx,

25    New York, in violation of New York Penal Law, Sections 20.00

D9knmers                         Sentence

and 125.25, in that, with the intent to cause the death of

Correa one of the members of the Courtlandt Avenue Crew caused

the death of Correa.  Pierce was charged with this murder, but

was acquitted on this count at trial.  However, he was

convicted of conspiring to murder rival narcotics dealers,

including Jason Correa -- in furtherance of the racketeering

enterprise.  And the result of that conspiracy was the

intentional murder of Jason Correa.

          Are there any other factual matters that remain

unresolved?

          MR. MIEDEL:  No, your Honor.  Are you going to direct

the probation department to reissue a report?

          THE COURT:  I am.

          MR. MIEDEL:  OK.  Thank you.

          THE COURT:  I am, for reasons that will become clear

when I deliver my guidelines calculations to the parties.

          Turning to the guidelines issues, in this Court's

preliminary guidelines calculation, it attributed 8.4 kilograms

of crack cocaine to each defendant for the narcotics-related

offense.  To be sure, 8.4 kilograms was not seized from the

defendants or any of the conspirators.  But in the absence of a

drug seizure, the district court "must approximate the quantity

of the controlled substance."  See U.S.S.G. Section 2D1.1,

Application Note 12, using a preponderance of the evidence

standard, United States v. Prince, 110 F.3d 921, at 925 (2d

D9knmers                        Sentence

1  Cir. 1997) (citing United States v. Moore, 54 F.3d 92 at 101

2  (2d Cir. 1995).  In making that approximation, this Court may

3  "rely on any information it knows about."  United States v.

4  Jones, 30 F.3d 276 at 286, (2d Cir. 1994).

5        In this Court's view, the trial evidence established

6  that from approximately March 2010 through September 2011, each

7  of these defendants was involved in a large-scale narcotics

8  conspiracy.  Under the guidelines each of these defendants is

9  held responsible for their own acts as well as the reasonably

10  foreseeable acts of their coconspirators.  See U.S.S.G. Section

11  1B1.3(a)(1) and (2).  Members of the conspiracy sold drugs

12  every day on Courtlandt Avenue, and the aggregate quantity of

13  drugs sold is staggering.  The most prolific crack sellers were

14  Pemberton, Crocker and Parsons, and that group alone sold more

15  than 280 grams of crack per month.  Over the life of the

16  conspiracy, the amount of crack sold by those conspirators

17  alone exceeds five kilograms.  There were more than a dozen

18  regular crack sellers for the organization, and even by the

19  most conservative of estimates the total crack cocaine sales by

20  all the conspirators over the 18-month period charged in the

21  indictment exceeded 8.4 kilograms.

22        While each conspirator did not sell crack in such

23  quantities, there's more than a preponderance of the evidence

24  that the operation sold on a continual basis during that

25  18-month period, and that the total amount that was reasonably

D9knmers                    Sentence

foreseeable to each defendant far exceeds 8.4 kilograms.  That

yields the highest base offense level under the guidelines for

a narcotics conspiracy, offense level 38 pursuant to

2D1.1(c)(1).

        The trial evidence also established that the

conspiracy possessed and sold a quantity of marijuana

approximately equivalent to four kilograms, but that quantity

has no effect on the overall guidelines calculation because it

merely added to the crack cocaine quantity.  See Section 2D1.1,

Application Note 8(B).  Four kilograms of marijuana is

equivalent to only 1.12 grams of crack cocaine.  See Section

2D1.1, Application Note 8(D).

        Turning to the role enhancements pursuant to Section

3B1.1, a four-level increase is appropriate for a defendant if

he was an organizer or leader of a criminal activity that

involved five or more participants or was otherwise expense

extensive.  The trial evidence established that the narcotics

conspiracy and racketeering enterprise was an extensive, long

running operation that involved more than five participants.

And following the death of the former leader of the enterprise,

Terry Harrison, both Mr. Meregildo and Mr. Colon were leaders

of the enterprise and the narcotics conspiracy itself.

Accordingly, each of them receives a four-offense level role

enhancement pursuant to Section 3B1.1(a) for the group that

includes the narcotics conspiracy.

D9knmers                          Sentence

1              Earl Pierce was not the leader of the racketeering

2      enterprise or the narcotics conspiracy.  But he also was not a

3      mere worker or employee -- he stood in for the then leader of

4      the enterprise and collected narcotics proceeds on his behalf.

5      He planned and took part in violent acts in furtherance of the

6      conspiracies, and he directed others in those activities.

7      Accordingly, Mr. Pierce deserves a role enhancement.  In its

8      September 17, order this Court indicated that a two-level role

9      enhancement would apply.  But that subsection, that is,

10     3B1.1(c), cannot apply here because the conspiracy was

11     extensive and involved five or more participants, which

12     triggers Section 3B1.1(a), not 3B1.1(c).  To ensure that

13     Mr. Pierce's guideline calculation appropriately reflects his

14     role as a manager or supervisor, but not a leader of a criminal

15     activity that involved five or more participants and was

16     otherwise extensive, this Court applies a three-offense level

17     enhancement pursuant to Section 3B1.1(b).

18              With respect to Mr. Meregildo's robbery conspiracy in

19     accord with his plea agreement, the separate robbery conspiracy

20     case, this Court will apply a two-offense level role

21     enhancement to the groups in that case.

22              With respect to the other racketeering offenses, this

23     Court declines the government's request to apply role

24     enhancements.

25              Now, turning to the involvement of a minor in a

D9knmers                          Sentence

narcotics conspiracy, Section 2D1.1(b)(14)(B)(i) provides for a
two-offense level enhancement to a defendant who knowingly
involved an individual who was less than 18 years in the
offense.  Numerous minors were members of the enterprise,
including Bernard Folks, Enrique and Hassan Brito, Anthony
Crocker and Dante Barber, and each of the trial defendants knew
that at least one of these minors was involved in the narcotics
conspiracy.  Accordingly, each of the defendants receives a
two-offense level enhancement pursuant to Section
2D1.1(b)(14)(B)(i).  Mr. Colon contends that his criminal
history points should be four because his 2007 first degree
robbery conviction is misclassified.  That conviction, he
argues, is not an adult conviction because he received a
youthful offender adjudication.  That argument is without
merit.

          A sentencing Court may assign criminal history points
to a past conviction even when it has been vacated and deemed a
youthful offender adjudication under New York law.  United
States v. Driskell, 277 F.3d 150 at 154 (2d Cir. 2002).  See
also United States v. Jackson, 504 F.3d 250, (2d Cir. 2007).
Here, as in Driskell, Mr. Colon was convicted in the New York
State Supreme Court, not family Court, in accord with New York
Criminal Procedure Law Section 720.20.  His conviction was then
replaced by a youthful offender adjudication.  Mr. Colon also
received an adult sentence of between one and three years,

serving more than 18 months of that sentence and at least a
portion of that sentence was served in an adult facility.
Accordingly, pursuant to Sections 4A1.1(a), 4A1.2(d)(1), and
4A1.2(e)(1), three criminal history points are assigned to this
conviction.

Turning now to Mr. Colon's objection to this Court's
preliminary guidelines calculation for his Group Two offenses,
that group includes all of the offenses related to Racketeering
Act Five, including Count One, racketeering; Count Two,
racketeering conspiracy; Count Eleven, conspiracy to murder
members of the Maria Lopez Crew, in aid of racketeering, and
Count Twelve, assault of Jing Bao Jiang in aid of racketeering.
These crimes are grouped together pursuant to Sections 3D1.2(a)
and (c).

The guideline covering this offense is Section 2A1.5
because the underlying offense involved a conspiracy to commit
murder.  However, Section 2A1.5(c)(2) cross-references Section
2A2.1 if the offense "resulted in an attempted murder or
assault with intent to commit murder."  Under Section 2A2.1,
the base offense level is 33 if "the object of the offense
would have constituted first degree murder."  Here, the offense
includes both the conspiracy to commit murder and the
substantive offense of assault with intent to commit murder.
Without question the object of the conspiracy to commit murder
was to commit first degree murder.  Colon and Pemberton and

D9knmers                         Sentence

other enterprise members went to the Maria Lopez houses with

the specific intent to kill their rivals.  And after they saw

their rivals, Pemberton tried to achieve the conspiracy's

objective by shooting at them.  But he missed and hit Jing Bao

Jiang instead.  Accordingly, pursuant to Section 2A2.1(a)(1),

the base offense level is 33.

         That leaves open the question of what, if any,

specific offense characteristics apply.  Under Section

2A2.1(b)(1) an enhancement from between two and four levels is

appropriate depending upon the severity of injury to the

victim, provided that the victim at least sustained serious

bodily injury.

         Serious bodily injury means "injury involving extreme

physical pain or the protracted impairment of a function of a

bodily member organ or mental facility or requiring medical

intervention such as surgery, hospitalization, or physical

rehabilitation."  Section 1B1.1, Application Note 1(L).  Mr.

Jiang testified that he was shot in the leg, lost feeling to

it, was taken by ambulance to the hospital for surgery, where

he stayed two or three days for recovery, could not walk for a

time, and continues to have numbness in his leg.  Similar but

less serious injuries meet this standard, See, e.g., United

States v. Moore, 997 F.2d 30 at 37, (5th Cir. 1993).  There the

Fifth Circuit found that a gunshot wound to the leg described

as extremely painful, treated without surgery in the emergency

D9knmers                    Sentence

room and requiring less strenuous activity by the victim was

serious bodily injury.

     To be a permanent or life threatening bodily injury

means "injury involving a substantial risk of death or loss or

substantial impairment of the function of a bodily member,

organ, or mental faculty that is likely to be permanent."

Here, although Mr.Jiang continues to have numbness in his leg.

There was no evidence that this condition will not resolve

itself in the future.  According, this Court finds that

Mr.Jiang's injury is more than a serious bodily injury, but

less than a permanent or life-threatening injury.  That results

in a three-level enhancement pursuant to Section

2A2.1(b)(1)(C).

     Turning finally to Mr. Pierce's objection to this

Court's preliminary guidelines calculation for his Group Two

offenses, that group includes all of the offenses related to

Racketeering Act Four, including Count One, racketeering; Count

Two, racketeering conspiracy; and Count Ten, assault and

attempted murder of Tarean Joseph in aid of racketeering.

These crimes are grouped together pursuant to Sections 3D1.2(a)

and (c).

     The guideline covering this offense is Section 2A2.1.

Pursuant to Section 2A2.1(a)(1), the base offense level is 33.

Because the object of the offense would have constituted first

degree murder, as this Court observed earlier, under Section

D9knmers                           Sentence

2A2.1(b)(1), an enhancement between two and four levels is

appropriate depending on the severity of the injury to the

victim, provided that the victim at least sustained serious

bodily injury.  This Court agrees with Mr. Pierce that only a

two-offense level enhancement pursuant to Section 2A2.1(a) is

appropriate because the evidence established only that

Mr. Joseph sustained a serious bodily injury.

            Now, Counts One and Two of indictment 11 Cr. 576

against Mr. Meregildo are violations of Section 1962(c) and

(d), which are covered by Section 2E1.1, which in turn refers

to the guideline of the underlying offense.  Application Note 1

of Section 2E1.1 instructs that the sentencing court should

treat each underlying offense as a separate count of

conviction.

            Pursuant to Section 3D1.2(a), all counts that "involve

the same victim and the same act or transaction . . . shall be

grouped together into a single group.  Accordingly, Group One

includes all the crimes associated with Racketeering Act Two.

That is, Count One, racketeering; Count Two, racketeering

conspiracy; Count Five, conspiracy to murder Carrel Ogarro in

aid of racketeering; Count Six, murder of Carrel Ogarro in aid

of racketeering; Count Fifteen, murder of Carrel Ogarro in

connection with a drug crime; and Count Eighteen, use of a

firearm in furtherance of the murder of Carrel Ogarro.

            Because the underlying offense involves first degree

D9knmers                        Sentence

murder, the applicable guideline is Section 2A1.1, which

results in a base offense level of 43.  There are no specific

offense characteristics, so the total Group One offense level

is 43.

        Group Two for Mr. Meregildo includes all the crimes

associated with Racketeering Act Six.  That is, Count One,

racketeering; Count Two, the racketeering conspiracy; Count

Thirteen, the narcotics conspiracy.  Because the underlying

offense involves a violation of Section 841(b)(1)(A), the

applicable guideline is Section 2D1.1.  Because the offense

involved more than 8.4 kilograms of cocaine base, the base

offense level is 38.  Mr. Meregildo was an organizer or leader

in the racketeering enterprise that involved more than five

participants and was extensive, so a four-level aggravating

role enhancement is appropriate under Section 3B1.1(a).

Because Mr. Meregildo received a role enhancement under Section

3B1.1 and knowingly involved an individual less than 18 years

of age, a further two-level enhancement applies pursuant to

Section 2D1.1(b)(14)(B)(i), so the total Group Two offense

level is 44.

        Now, Count One of indictment 11 Cr. 758 against

Mr. Meregildo is a violation of 18U.S.C. Section 371, which is

covered by Section 2X1.1.  Pursuant to Section 2X1.1(a), the

base offense level is the base offense level from the guideline

for the substantive offense, plus any adjustment from the

D9knmers                         Sentence

guideline for any intended offense conduct that can be

established with reasonable certainty.  The underlying offenses

are three bank robberies and three attempted bank robberies in

violation of Section 2113(a).  Those offenses covered by

Section 2B3.1.

According to Section 2B3.1(a) the base offense level

is 20.  Because the property of a financial institution was

taken for each robbery or was the object of the offense for

each attempted robbery, a two-level enhancement applies

pursuant to Section 2B3.1(b)(1).

Having reviewed the new PSR and the submissions of

counsel, this Court also finds that Mr. Meregildo was an

organizer and leader in these offenses, so a two-level

enhancement applies pursuant to Section 3B1.1(c).  However,

this Court declines to give any other enhancement.  Thus, the

total offense level for the robbery conspiracy is 24.  Because

each robbery or attempted robbery involved separate victims,

the underlying offenses cannot be grouped.  Thus there are six

groups associated with Count One, each with a total offense

level of 24.

Group Three incorporates the robbery conspiracy and

the February 10, 2011 robbery of a Chase Bank on First Avenue

in Manhattan.

Group Four incorporates the robbery conspiracy and the

February 14, 2011 robbery of the Hudson Valley Bank, located on

D9knmers                    Sentence

1    Allerton Avenue in the Bronx.

2              Group Five includes the robbery conspiracy and the

3    February 15, 2011, attempted robbery of a Bank of America on

4    west 145th Street in Manhattan.

5              Group Six incorporates the robbery conspiracy and the

6    February 16, 2011, attempted robbery of a Chase Manhattan bank

7    on Castle Hill Avenue in the Bronx.

8              Group Seven includes the robbery conspiracy and the

9    February 18, 2011, attempted robbery of a Chase Bank on Eighth

10   Avenue in Manhattan.

11             And Group Eight incorporates the robbery conspiracy

12   and the February 21, 2011, robbery of a Chase Manhattan bank

13   located at on 125th Street in Manhattan.

14             So each of those groups carries an offense level of

15   24.

16             To calculate the combined adjusted offense level,

17   Section 3D1.4 directs the Court to increase the highest group

18   offense level by certain prescribed amounts.  To make the

19   determination, the group with the highest offense level is

20   counted as one unit as well as any group offense level within

21   four levels.  See Section 3D1.4(a).  Any group with an offense

22   level that is nine or more levels less serious than the highest

23   group is disregarded.Groups One and Two are counted as one unit

24   each and Groups Three through Eight are therefore disregarded.

25   That totals two units, which results in a two-level increase in

D9knmers                    Sentence

the highest group offense level.  Thus, Mr. Meregildo's

combined adjusted offense level is 46.

Now, this Court recognizes that Mr. Meregildo pled

guilty to the robbery conspiracy.  However, because of the

grouping analysis, which is solely driven by the

racketeering-related offenses, there is a reduction for

acceptance of responsibility.

Mr. Meregildo's criminal history category as reported

in the probation report is correct.  He has a total of seven

points, and therefore Criminal History Category of IV.  Two

points for his robbery in the first degree, two points for his

assault in the first degree, two points for his attempted

possession of a loaded firearm in the second degree, and one

point for unlawful possession of marijuana.

With a total offense level of 46 and a Criminal

History Category of IV, Mr. Meregildo's guideline range is life

in prison.

In addition, Count Twenty-two provides for a 60-month

mandatory consecutive term.

Turning to Mr. Colon's guideline calculation, Counts

One and Two are violations of 1962(c) and (d), which as I've

said are covered by Section 2E1.1.

Application Note 1 instructs that the sentencing Court

should treat each underlying offense as a separate count of

conviction.  Pursuant to Section 3D1.2(a) all counts that

D9knmers                    Sentence

involve the same victim and the same act or transaction shall

be grouped together in a single count.

          Accordingly, Group One includes all the crimes

associated with Racketeering Act Three, that is, Count One,

racketeering; Count Two, the racketeering conspiracy; Count

Seven, the conspiracy to murder Delquan Alston in aid of

racketeering; Count Eight, the murder of Delquan Alston in aid

of racketeering; Count Sixteen the murder of Delquan Alston in

connection with the drug crime; and Count Nineteen, the use of

a firearm in furtherance of the murder of Delquan Alston.

Because the underlying offense involves first degree murder,

the applicable guideline is 2A1.1, which results in a base

offense level of 43.  There are no specific offense

characteristics, so the total offense level for Group One is

43.

          Group Two includes all the crimes associated with

Racketeering Act Five.  That is, Count One, racketeering; Count

Two, the racketeering conspiracy; Count Eleven, the conspiracy

to murder members of the Maria Lopez Crew in aid of

racketeering; and Count Twelve, the assault of Jing Bao Jiang

in aid of racketeering.  Because the underlying offense

involved a conspiracy to commit murder, it's covered by Section

2A1.5.  However, pursuant to the Section 2A1.5(c)(2), because

the offense resulted in an assault with intent to commit

murder, the applicable guideline is Section 2A2.1.  Because the

D9knmers                         Sentence

object of the offense would have constituted first degree

murder, the base offense level is 33 pursuant to 2A2.1(a)(1).

And because the victim Jing Bao Jiang suffered serious injury,

that's more than serious bodily injuries but less than

permanent bodily injury, a three-level increase applies.  So

the total offense level for Group Two 36.

Group Three includes all of the crimes associated with

Racketeering Act Six, that is, Count One, racketeering; Count

Two, the racketeering conspiracy, Count Thirteen, the narcotics

conspiracy.  Because the underlying offense involves a

violation of 841(b)(1)(A), the applicable guideline is 2D.1.1.

Because the offense involved more than 8.4 kilograms of cocaine

base, the base offense level is 38.  Mr. Colon was an organizer

or leader in the racketeering enterprise that involved more

than five participants and was extensive.  And so a four-level

aggravating role enhancement applies pursuant to Section

3B1.1(a).  Because Mr. Colon received a role enhancement under

3B1.1 and knowingly involved an individual less than 18 years

of age in the offense, a two-level enhancement applies pursuant

to Section 2D1.1(b)(14)(B)(i).  So the total Group Three

offense level is 44.

To calculate the combined adjusted offense level, this

Court is required to increase the highest group offense level

by certain prescribed amounts.  To make that determination, the

group with the highest offense level is counted as one unit as

D9knmers                        Sentence

well as any group offense level within four levels.  Any group

with an offense level that's more than four but less than nine

levels less serious than the highest group is counted as half

of the unit, Section 3D1.4(b).  Groups One and Three are

counted as one unit each, and Group Two is counted as one-half

unit.  That totals two and a half units which results in a

three-level increase to the highest group offense level.

            Thus, Mr. Colon's combined adjusted offense level is

47, and there's no adjustment for acceptance.  His criminal

history category is III.  He has five points, three points for

robbery in the first degree, and two points for committing

offense while serving a criminal justice sentence.  Thus, his

guideline range for total offense level of 47 with criminal

history category III is life in prison.

            In addition, there are statutory mandatory minimums of

120 months as a consecutive term on Count Twenty-One and 300?

Months mandatory consecutive term on Count Twenty-Two.

            Finally, turning to Mr. Earl Pierce, Counts One and

Two are, as I said, violations of Sections 1962(c) and (d),

which are covered by Section 2E1.1.

            Application Note 1 instructs the sentencing Court to

treat each underlying offense as a separate count, and pursuant

to Section 3B1.2(a) all counts involving the same victim and

the same act or transaction shall be grouped together into a

single count.

D9knmers                    Sentence

Accordingly Group One includes all the crimes associated with Racketeering Act One.  That is, Count One, racketeering; Count Two, racketeering conspiracy, and Count Three, conspiracy to murder members of the Melrose Organization in aid of racketeering.

Because the underlying offense involved a conspiracy to commit murder, it's covered by 2A1.5.  Pursuant to 2A1.5(c)(1), because the offense resulted in the death of a victim, the applicable guideline is Section 2A1.1.  Pierce's acquittal on the substantive murder count makes no difference as to whether this guideline applies because he was convicted of the very conspiracy that resulted in the murder of Jason Correa.  Thus, because the underlying offense involves first degree murder, the applicable guideline is Section 2A1.1.  That results in a base offense level of 43.  There are no specific offense characteristics, so the Group One offense level for Mr. Pierce is 43.

Group Two includes all of the crimes associated with Racketeering Act Four.  That is, Count One, racketeering; Count Two, the racketeering conspiracy; and Count Ten, the assault and attempted murder of Tarean Joseph in aid of racketeering. The guideline covering this offense is Section 2A2.1.  Pursuant to that guideline, the base offense level is 33 because the object of the offense could have constituted first degree murder.  As this Court observed earlier, an enhancement between

D9knmers                        Sentence

two and four levels is appropriate depending on the severity of
the injury to the victim.  This Court agrees with Mr. Pierce
that only a two-offense level enhancement under 2A2.1(a) is
appropriate because the evidence is only that Mr. Joseph
sustained a serious bodily injury.  So the total Group Two
offense level for Mr. Pierce is 35.

        Group Three includes all of the crimes associated with
Racketeering Act Six.  That is, Count One, racketeering, Count
Two, the racketeering conspiracy; and Count Thirteen, the
narcotics conspiracy.  Because the underlying offense was a
violation of 841(b)(1)(a), the applicable guideline is 2D1.1.
Because the offense involved more than 8.4 kilograms of cocaine
base, the base offense level is 38.

        This Court indicated in its September 17 order that
its preliminary guidelines calculation for Mr. Pierce included
a two-level role enhancement pursuant to Section 3B1.1(c), but
having read the submissions of counsel, this Court revises that
preliminary calculation as follows:  For this offense,
Mr. Pierce was a manager or supervisor, but not an organizer or
leader.  And the offense involved more than five participants
and was extensive.  And so a three-level aggravating role
enhancement applies pursuant to Section 3B1.1(b).  Because
Mr. Colon received a role enhancement under Section 3B1.1 and
he knowingly involved an individual less than 18 years of age
in the offense, a two-level enhancement applies pursuant to

D9knmers                        Sentence

Section 2D1.1(b)(14)(B)(i), so the total Group Three offense level is 43.

Here again, to calculate the combined adjusted offense level, this Court applies the multiple count protocol under Section 3D1.4.

And so Group One had an offense level of 43, Group Three had an offense level of 43.  Each of those groups is counted as one unit, and Group Two, which had an offense level of 35, is counted as a half unit.  That totals two and a half units, which results in a three-level increase to the highest group offense level.  Thus, Mr. Pierce's combined adjusted offense level is 46.

Mr. Pierce has a very extensive criminal history.  He is a Criminal History Category VI, and he is a career offender.

He has three points for the criminal sale of a controlled substance, one point for the criminal possession of marijuana, one point for the criminal sale of marijuana, three points for the criminal sale of a controlled substance, two points for resisting arrest, one point for criminal possession of marijuana, and one point for menacing.

With a total offense level of 46 and a Criminal History Category of VI, Mr. Pierce's guideline range is life in prison.

In addition there are statutory additions.  On Count Twenty there's a mandatory 120-month consecutive term, and on

D9knmers                              Sentence

1    Count Twenty-Two a mandatory 300-month consecutive term.

2            This constitutes the Court's guidelines determinations

3    with respect to each of the defendants.

4            So at this time, are there any victims who wish to

5    address the Court?

6            MR. ARAVIND:  Yes, your Honor.  There are at least two

7    victims that I believe want to address the Court.

8            The first is Ms. Iris Perez.  She has asked I believe

9    someone else to read.

10           Your Honor, if it's OK I'll read her letter and then

11   Mr. Correa's daughter would like to speak.

12           THE COURT:  Ms. Perez is present here in court?

13           MR. ARAVIND:  She's here in court in the third row.

14           THE COURT:  All right.

15           MR. ARAVIND:  Your Honor, this is a letter from Iris

16   Perez, Jason Correa's mother.

17           "This is just so surreal to me.  I will never be able

18   to live my life the same without my son Jason.  I can't call

19   him to make sure that he's OK, or ask him what time he's coming

20   home.  I can no longer hear his voice when he walks through the

21   door asking Where's my mom?

22           "I feel like I'm living in a nightmare.  There are not

23   days that go by that I don't think of my son.  When I am alone

24   I wonder is he OK.  Why can't I hear his voice.  Why can't I

25   see my son anymore.  Then I remember that this kid I treated as

D9knmers                          Sentence

my own, Earl, set my son Jason up to be killed.  This kid that

I gave a home, food, clothes and sneakers to really did this to

my son.  I remember like it was yesterday when my son was

killed.  Jason and I spoke a week before and I told him to stay

away from Courtlandt Avenue because I didn't think it was safe

and he told me, Ma, I'll be OK.  Earl gave me a handshake.

He's my friend.

"The day he was killed he told me he would be right

back, and I kept calling him to come home, but he told me he

was tired and asked if I could go pick him up.  I was on my way

out to go pick up my son and I get the call that he was killed

in the building.

"Can you imagine what a mother could feel losing a

child.  It is a feeling that I could never imagine until it

happened to me.  There are days that I want to take my own life

just to be with my son and be sure he's OK.  There are days I

stay without air because I cry and cry, wishing I can see my

son, but nothing brings him back.

"I close my eyes thinking he'll be with me and he's

not.  My father, my family will never be the same without

Jason.  He was the man figure in our home.  He was a father to

a beautiful little girl.  He was the one everyone looked up to

and looked forward to being with.  Now we don't have that

thanks to Earl.

"I wish so many bad things on Earl for doing this to

1    my son, but I know it is in the Court's hands.  He is a cruel

2    human being that I should never have accepted in my home when

3    he had nothing or no one the time his only brother shot him in

4    the leg.  Now he left me with nothing because my son is gone.

5    He deserves to spend the rest of his life locked up in prison

6    and pay for what he's done.  I hope that the Courts could put

7    themselves in my shoes and feel what myself and our family

8    feel.  We feel betrayed, sad, lost, confused.

9           "There are so many things we feel and can't even put

10   into words.  There is not a day that goes by that my heart

11   doesn't feel pain more than anything.  I want my son and I

12   can't see hear or touch him anymore.

13          I beg for justice, so that my son can rest in peace

14   and my family can have closure knowing that the persons

15   involved in his murder will pay for the crime they committed."

16          Now, your Honor, we have a second impact statement

17   it's from Jaliyah Perez.

18          MS. PEREZ:  When my father was taken out of my life I

19   was devastated.  I couldn't believe it.  I cried all day, all

20   night.  When my father was removed from my life I felt like

21   they removed half of my heart.  There aren't enough words in

22   the world that can describe how I feel.

23          I was only eight years old when my father passed away.

24   And hurts my heart to hear all my friends talking about their

25   father and I'm not.  He had a family who loved him, a daughter

D9knmers                    Sentence

who thought she would have him for a long time, but I guess

not.  I really love my father.  I wish I still had him today

but I don't.  I miss calling him Daddy, and I miss him and have

many memories.

        MR. ARAVIND:  Your Honor, those were the two victim

impact statements.

        I am not sure if there's anyone else that has entered

the courtroom that wants to give a statement, but those are the

two we have heard of before.

        THE COURT:  This Court received certain letters in

addition to the statements that have been read or given in

court.

        Is there anyone else who wishes to make speak on

behalf of a victim.

        Seeing no one coming to the podium, I would like to

turn to defense counsel to hear their remarks.

        MR. LEE:  Your Honor, first, speaking to your Honor's

ruling on the guidelines determination, the defense has always

maintained that the crimes charged against Mr. Meregildo were

based almost exclusively upon the testimony of people who come

from a similar environment who have had similar backgrounds to

Mr. Meregildo and who were themselves charged with committing

acts of violence and crime equal or greater in number than

Mr. Meregildo himself.

        Also, the defense always maintained that there was

 1    nothing in the evidence that independently corroborated the

 2    testimony of these cooperating witnesses.  I think your Honor

 3    yourself stated that or touched upon that in your ruling.

 4             There was actually nothing that the government could

 5    produce independent of these cooperators, who to your Honor, to

 6    the jury admitted that they were liars, admitted that they had

 7    a self-interest, they had something to gain here.

 8             Now, to be sure, I understand your Honor's ruling, but

 9    it should be clear that these enhancements are not supported by

10    the jury verdict as far as Count Two is concerned.  There's

11    nothing in their verdict that speaks to or supports a

12    determination that Mr. Meregildo was any sort a leader or as to

13    the quantity of drugs.

14             I think, even with a low threshold requirement of a

15    preponderance of evidence, I don't believe this Court should

16    find that these admitted liars, people who themselves had so

17    much to gain for false, fabricated, embellished testimony

18    should be the basis upon enhancing his guidelines.

19             That being said, of course, your Honor, I know that

20    Mr. Meregildo's conviction under Count Six requires your Honor

21    to sentence him to a term of life imprisonment without a

22    possibility of parole.

23             Mr. Meregildo's wife is here in court.  His

24    two-year-old son, or perhaps two and a half years old now, is

25    not present in court.  Ms. Meregildo has been here almost

D9knmers                          Sentence

consistently at every proceeding during the entire trial, many

times with Mr. Meregildo's son.  They visit him unfailingly at

the jail.  I have been in touch with them during the entirety

of this case.

His mother has always been in touch with me and other

members of his family.  They care very much about him.  I

touched upon Mr. Meregildo's background in my sentencing

submission to give you, your Honor, some insight as to where

Mr. Meregildo himself comes from and the losses that he himself

has suffered.  I also touched upon some efforts in his young

life to overcome the consequences of the environment he was

born into.

In that regard his story is sad, and in that regard he

is a failure.  But the failures greatly outnumber the successes

of people escaping that environment.

That being said, your Honor, my client's perspective

as a 20-year-old is limited.  I don't know what he can know as

a 20-year-old about what the future will look like or hold when

he spends probably the rest of his life in jail, but I am sure

his feelings are genuine now for his family and his desire to

try to maintain contact with his son and his family.

So the one thing I do ask of the Court, balancing not

only Mr. Meregildo's individual characteristics and background,

look to the future what he may be able to, how he might change,

how his perspective might change, and that one of the only

D9knmers                          Sentence

1   things he has is his family.

2           They are not affluent people.  They do not have

3   resources to travel.  If they had to buy airplane tickets, that

4   would pretty effectively deprive him of visits from his family.

5           So, to the extent that it does not run contrary to the

6   BOP's independent determinations, I do ask the Court to make a

7   recommendation that Mr. Meregildo be designated to serve his

8   sentence at a facility, the closest possible and at least

9   within driving distance of his family here in the New York City

10  area.

11          At least in that regard, I think Mr. Meregildo and any

12  human being deserves to have the chance to try to maintain that

13  bond with his family.

14          Thank you, your Honor.

15          THE COURT:  Thank you, Mr. Lee.

16          Mr. Dinnerstein.

17          MR. DINNERSTEIN:  Thank you, your Honor.

18          For today, your Honor, I have the really sad task of

19  standing near a 21-year-old who will be told fairly soon that

20  he will spend the rest of his life in jail.

21          No matter what he does from this day onward, no matter

22  how he grows up, no matter whether or not he is rehabilitated,

23  he will simply remain behind bars for the rest of his life.

24          He has, and he understands this, that he has no hope

25  of ever being released from prison.

D9knmers                          Sentence

1              What drives that reality is the conviction for the

2    murder of Delquan Alston that was based upon the word of a

3    person named Devon Parsons, a true psychopath.  Parsons' trial

4    testimony conflicted with every bit of forensic evidence that

5    was presented in this courtroom.

6              I know, your Honor, that this Court uses language very

7    carefully, and when addressing the Rule 29 motion that was made

8    by me, this Court used the term that parson' testimony was "not

9    incredible."  Based upon that standard of review, not

10   incredible, Melvin must now face a mandatory life sentence.

11             The government in its sentencing memorandum -- and

12   there was not one word about Melvin's history or background,

13   argues that such a sentence, a life sentence for this

14   21-year-old is justice.

15             I have to say they're wrong.  Melvin's background is

16   one of deprivation, it's one of loss, loss of family to death

17   or to mental illness, loss of friends to street violence.  He

18   was born in a place that was not one of his own making, that is

19   violent, it is drug infested.  It's going to remain that way

20   after Melvin serves this sentence.

21             He was told also at 18 years old that he couldn't live

22   with his mother, who is probably the one person who most cared

23   about him.

24             The government now says warehouse him forever.  I

25   don't think that's justice, your Honor, but it is the reality.

1          A byproduct of our prison is to strip people of any

2    sense of personal identity, to strip people of a sense of

3    dignity.  Melvin is a number, 66076054, he stands now in this

4    courtroom shackled, which frankly troubles me, your Honor.  He

5    sat through a trial for two months where he was not once

6    shackled, even though at some point there was some discussion

7    about that.

8          The Court looked at him and realized that was

9    unnecessary and that they made a determination that he could

10   sit in a courtroom and act respectfully of this Court process.

11         For two months, your Honor, you didn't ever hear a

12   peep from him.  He never demonstrated disrespect to this court

13   system.  He never demonstrated any sort of disrespect either to

14   the prosecutor or to me.  But today he's being shackled.

15         During that trial he was woken up every morning at 5

16   o'clock in the morning so that he could get here on time, and

17   he got here on time.  And he was returned to the Metropolitan

18   Detention Center across the river usually after eight or nine

19   p.m.

20         He never complained about it.  He just simply did it,

21   and in this courtroom he treated this process, this system with

22   a great deal, I believe, of respect.

23         Apparently, for the rest of his life he is now going

24   to be shackled, he's going to be in a cage, he's going to be

25   treated as if he's subhuman.

He's now in a segregated housing unit.  He is denied
visits from his family, phone calls.  He receives shabby
medical treatment, where he has open sores that don't get
treated.

The government steals his mail and reads it, and they
find something in the mail that they feel is necessary to give
to the Court because he shows loyalty and friendship, and that
somehow is a sin.  He tries to maintain a sense of dignity when
the system, the prison system tries to break him of that.  The
government wants to demonize him.  Maybe that's why he's being
shackled now and he's angry.

He's 21 years old and he's going to now be serving a
horrendous punishment.  Often people who do the judging are
born with silver spoons in their mouths.  Frankly, Melvin
wasn't born with any spoon at all.  He had to dig for
everything that he was going to get in this world.  He had to
fight for it.

No one gave him anything other than loss and
disappointment.  Now, clearly, he handled that pressure badly.
He's made a ton of mistakes and now the government for the
first time seems to have an interest in him, in punishing him.
Maybe someday it would have been better if someone reached out
and gave him a helping hand.

But now there are enormous resources that are going to
be used to punish, not to help.

D9knmers                          Sentence

1          What's the lesson of all this, your Honor?  For

2   Melvin, I don't know what it is.  He's going to be disposed of.

3   He's going to be warehoused forever.

4          But I have another question.  Why do I say to his

5   younger brother who is here in court, 17 years old?  He's

6   trying to do good, goes to school every day, is given a school

7   uniform to help build maybe dignity and respect in yourself.

8          He's never been arrested before.  Of course, because

9   he lives in the South Bronx and maybe because he's

10  African-American, he gets stopped all the time, or often by

11  police officers in these stop and frisks.

12         Even today what he learns is that there are people who

13  are representatives of the government who distrust him.  And

14  what, more importantly than what I say to him, does the symbol

15  of influence and power say to him.  What do you say to him?

16         Can you provide him with some hope that he can have a

17  decent future, a different future from his brother, who never

18  had anyone who looked out for him?

19         I don't know what to say, your Honor.  I really simply

20  don't.

21         One thing, your Honor -- and I'm going to be done

22  soon -- Melvin and I want to thank this Court for treating both

23  of us throughout the trial with a great deal of respect and

24  with dignity.  You treated my client like a human being.  When

25  questions were initially brought up about shackling or about

D9knmers                          Sentence

treating him or demonizing him by suggesting he is simply going
to be violent, you got involved and you prevented it from
happening.

I thank you for that.  I believe Melvin thanks you for
that.  I've got nothing really else to say other than we thank
you for the way you conducted this trial.  You did it in an
appropriate spirit.  I may not have agreed with every one of
your rulings, but that is our separate roles in this.

But I wish somehow that Melvin Colon, who is now going
to get a life sentence, can hear and that you can hear that he
had value, he had intelligence.  And now, sadly, it is all
wasted.

Thank you, your Honor.

THE COURT:  Thank you, Mr. Dinnerstein.

Mr. Miedel.

MR. MIEDEL:  Your Honor, even if you wanted to, you do
not have the power to give Joshua Meregildo or Melvin Colon any
other sentence than a term of life.

But Earl Pierce is different.  You have the power, you
have the authority, and you have the ability to exercise some
modicum of mercy, to offer a man a tiny speck of hope.

You have the power to say to Earl Pierce, You will
spend most of the rest of your life in prison, you will not see
your kids grow up, you will probably not see your mother or
your aunt again on the outside, but if you behave yourself in

D9knmers                          Sentence

prison, if you stay healthy and out of harm's way, you will

someday, a very, very long time from now, you will have the

chance to leave that prison see what is left of your family and

try to enjoy whatever small amount of time you have left.

You, your Honor, have the power to offer hope if you

choose to exercise it.  Your Honor, that is all it is.  It's

hope.  Because no one in this courtroom can accurately predict

what will happen to any of us over the next 45 years.  That is

particularly impossible to predict in the prison context, where

medical services are poor and healthy living is difficult.  And

violence is prevalent.

We don't know what is going to happen.  But I guess

the question for you, your Honor, is whether Earl Pierce

deserves to have some hope.  Whether what he's been convicted

of, what the allegations were that he had supposedly did, if

those are so egregious, so condemned by society, so worthy of

the ultimate punishment except for death, that he needs to be

robbed of even that tiny glimmer of hope.

I just want to reiterate what we are talking about

here.  We are talking about, on the one hand, life in prison, a

life that could very well end up for years in a prison hospital

ward at taxpayers' expense at the end of Earl Pierce's life.

Or, on the other hand, at least 45 years in prison.

45 years, that is not a slap on the wrist.  That is not a

lenient sentence.  That is not even a harsh sentence by most

people's standards.  That is a sentence that is longer than

almost all countries in this world give to their worst

murderers.  That is a sentence that is 20 years longer than the

maximum sentence for murder in New York, 25 years to life,

where, even if he were not released in 25 years, he would have

the opportunity to make his case with the parole board ten

times.

So does Earl Pierce deserve a sentence that is even

harsher, more brutal, and more severe than that, a sentence

that absent the death penalty is or should be reserved for the

worst of the worst?

Your Honor, Earl Pierce was convicted of being part of

a street crew, selling drugs, holding guns, involved in the

shooting and attempted murder of a rival, agreeing with others

that maybe rival drug dealers should be killed.

To be sure, your Honor, that is terrible conduct by

any standard.  That is conduct to be condemned by society and

worthy of severe punishment.  There is no question about that.

That is conduct for which punishment must deter

conduct by the individual and have a deterrent effect on

others.  All that is clear.

But let us not forget that Earl Pierce did not

participate in any of the random shootings others in this case

were accused of.  He did not participate in the extraordinary

spate of robberies that some of the cooperators admitted to.

D9knmers                        Sentence

Perhaps most importantly, your Honor, he was found not guilty by the jury in this case of the one killing of which he was accused.

That says something.  He wasn't acquitted because of some technical or because the jury was misinformed or misled.  He was acquitted because the evidence wasn't there, because he didn't participate in that murder.  He was acquitted, I presume, because the videos that we had demonstrated beyond any doubt that all the cooperators who testified about the Jason Correa killing could not be believed, that they lied or were wrong.

So, your Honor, in the end the question remains, is 45 years in prison enough, enough for what Earl Pierce is convicted of?

I know that I come at this from a very different perspective than the folks at that table and perhaps from you as well.  But how can the answer to that question not be yes?  45 years is enough.

We have spent much of the last few days and even in this proceeding focused on the guidelines, and I understand that the Court must determine what the correct and applicable guideline is before deciding what a just and reasonable sentence should be.

But the guidelines are a mechanical, cold, and in this case extremely blunt tool being applied to the question of

D9knmers                        Sentence

1    whether you throw a person's life away or you allow him the

2    possibility of some hope.

3          This is not about a calculation, whether the

4    guidelines should be 37 to 46 months, or 51 to 63 months.  This

5    is about likely to die in prison or definitely dying in prison.

6          There are numerous places in these guidelines where

7    the logic of the guidelines or the underlying guidelines could

8    be unpacked.

9          For example, how much sense does it make to have the

10   RICO guideline be life because of the conspiracy to murder when

11   the substantive act Count Three has a mandatory maximum

12   sentence of ten years, and Mr. Pierce was acquitted of the

13   substantive murder.

14         But there really is no point, in my view, to spend

15   much time with the guidelines.  Yes, the guidelines recommend

16   life.  The guidelines would also recommend life for Charles

17   Manson or Adolph Hitler.

18         In the end the guidelines at this end of the

19   guidelines chart, at that end, they provide little guidance to

20   you or to anyone to distinguish between a Charles Manson and an

21   Earl Pierce.

22         But the guidelines don't determine a reasonable and

23   just sentence, you do.

24         The overriding sentencing principle is not the

25   guidelines, but it is the introductory statement to 18 U.S.C.

D9knmers                    Sentence

1   3553(a), impose a sentence sufficient but not greater than

2   necessary.

3           So we arrive again at the question, does Earl Pierce

4   deserve a glimmer of hope, the hope of the possibility of

5   release someday, or does he deserve simply the certainty of

6   despair?

7           I have not devoted much time in my sentencing

8   submission or now to who Earl Pierce is or has been.  Because

9   the reality is I don't see how it matters.  Whoever he is now,

10  he will be a vastly different person when he is in his late

11  60s.

12          Even if he makes no effort at all at self-improvement

13  he is than unlikely to be a risk to anyone, he is unlikely to

14  sell drugs, shoot at people or do any of the things that he was

15  accused of doing.  The one thing I would like to point out,

16  your Honor, is, it is a small piece of information in the PSR.

17          In almost two years of incarceration at MDC, Earl

18  Pierce has not had a single disciplinary infraction.  That's no

19  small feat at the MDC, and frankly it's a rarity for defendants

20  charged in these gang RICO-type cases.

21          It bodes will I think.  It bodes well that he has the

22  capacity to become a different person while incarcerated, to

23  learn, to think, to reflect on his life.

24          But, your Honor, I would think there has to be a

25  reason to do that.  A reason to think that following the rules,

D9knmers                        Sentence

avoiding violence, fulfilling your potential is worth it, an

incentive to be a good inmate.  And that reason, that reason is

the hope that I have been talking about.

        Your Honor, I have never been in the position before

of asking a judge to impose a 45-year sentence as a best-case

scenario, where I have pleaded simply for the possibility, the

possibility that my client will someday be released, most

likely well after I'm no longer alive.

        But I'm asking you, your Honor, I'm urging you with

all the sincerity that I have, do not throw Earl Pierce's life

away completely.  Allow him to live his life with the hope

that, if things go right, if he holds up his end of the

bargain, someday he will leave that prison alive.

        Thank you.

        THE COURT:  Thank you, Mr. Miedel.

        Mr. Aravind, does the government wish to be heard?

        MS. HELLER:  Your Honor, I will speak for government.

        THE COURT:  Fine, Ms. Heller.

        Would you take the podium, please.

        MS. HELLER:  Yes, your Honor.

        THE COURT:  Thank you.

        MS. HELLER:  Your Honor, today is a very sad day.

It's a sad day first and foremost for the victims' families.

It is a sad day for all of these defendants.

        The government is not going to say very much about

D9knmers                        Sentence

Mr. Meregildo or Mr. Colon because, as their attorneys have
said and as the Court well knows, they face mandatory life
sentences here.

        The government's hope is only that as the defendants
serve their sentences that they fall away from the ongoing gang
activity that we have observed since the conclusion of the
trial.

        We felt it important that your Honor know that this is
still happening, and it is our hope that it concludes as the
years pass.

        As for Mr. Pierce, your Honor, the government does
believe that a life sentence is appropriate for him.
Mr. Pierce was older, is older than Mr. Colon and
Mr. Meregildo.  He should have known better than to do what he
did.


        He had an extensive criminal history going into this
criminal conspiracy.  He is a career offender.  He has used up
his chances.  He is a serious danger to society.  He destroyed
a family, as we saw here today.

        By the grace of God, he did not destroy a second
family.  However, Tarean Joseph was shot I believe five or six
times in the chest.  Somehow he survived, but it was by the
grace of God that he did, or else Mr. Pierce could have stood
here being held responsible for two murders.

1            I am not going to relitigate the case, but it's simply

2     a mischaracterization of the jury's verdict for Mr. Miedel to

3     say that Earl Pierce did not participate in the murder of Jason

4     Correa.  He was found guilty of participating in a conspiracy

5     that led directly to Mr. Correa's murder.

6            Mr. Pierce set up Mr. Correa to be murdered.  He lay

7     in wait while the murder happened.  He collected the murder

8     weapon after the murder was concluded.

9            He was about as involved in the murder as one could be

10    without having pulled the trigger.  Mr. Pierce needs to come to

11    account for that murder here today.  He needs to come to

12    account for his role in the shooting of Tarean Joseph.  He

13    needs to come to account for his extensive involvement in the

14    drug conspiracy that took place here and for the havoc that was

15    wreaked upon his community and the people who lived there.

16            Forty-five years is an extraordinarily long time.  No

17    one can ever stand here and tell you that it isn't.

18            But, your Honor, Congress makes the laws.  We simply

19    enforce them, your Honor imposes a sentence.  A 45-year

20    sentence would not account at all for Mr. Pierce's role in the

21    criminal conspiracy to murder Jason Correa or the shooting of

22    Tarean Joseph, that conspiracy.

23            What the 45 years would account for would be the

24    narcotics conspiracy and two firearms charges.  So if your

25    Honor were to impose a 45-year sentence and no other sentence,

D9knmers                        Sentence

1    you would essentially be nullifying the jury's verdict on all

2    of the other charges.

3            The government doesn't think that is appropriate.

4    That's not what Congress had in mind, and that's not what the

5    guidelines say.

6            So, for all those reasons, your Honor, we believe life

7    sentences are appropriate for each of these three defendants.

8            THE COURT:  Thank you, Ms. Heller.

9            Mr. Lee, does your client wish to address the Court?

10            MR. LEE:  May I just have a moment, your Honor.

11            THE COURT:  Certainly.

12            (Counsel conferred with the defendant)

13            MR. LEE:  Your Honor, against my advice, I have spoken

14    to my client about the fact that I will be filing an appeal on

15    his behalf of all convictions and sentencing.  I am afraid of

16    the ramifications of his statement, but Mr. Meregildo insists

17    against my advice to make a statement.

18            Would your Honor indulge me and allow me to stand

19    beside him as he makes the statement in case I may have to

20    answer a question or say something to him.

21            THE COURT:  I will permit you to stand next to him,

22    yes.

23            MR. LEE:  Thank you, your Honor.

24            Your Honor, is it possible to have a microphone placed

25    in front of Mr. Meregildo?  Is that electrically or

D9knmers                    Sentence

1    mechanically possible at this time?  If not, he will speak loud

2    enough.

3              THE COURT:  We have a microphone.

4              MR. LEE:  Thank you, your Honor.

5              THE COURT:  Yes.  That's fine.

6              DEFENDANT MEREGILDO:  For months --

7              THE COURT:  You have to hold the microphone a little

8    closer.

9              DEFENDANT MEREGILDO:  For months I sit in my cell

10   every day.  I go through the trial transcripts every night to

11   this day, and I try to convict myself for that murder that took

12   place.  But for some reason I can't.  And everybody who took

13   that stand sat there and lied.  Everybody.  I know what

14   happened that night, and I wasn't involved.

15             After that day, that detective -- where he at?

16   Harris, he tried to arrest me and get me to cooperate with him,

17   and I wouldn't because I told him I wasn't involved in it.

18             I feel that the jury didn't make the right decision,

19   and now I am being taken away from my family, from my son.  But

20   the fight is not over.  I will appeal and I will be back home

21   with my family.

22             I love you.

23             MR. LEE:  On behalf of Mr. Meregildo, thank you, your

24   Honor.

25             THE COURT:  Mr. Dinnerstein, does your client --

D9knmers                          Sentence

1          MR. DINNERSTEIN:  I anticipate that my client will

2    make a statement.

3          DEFENDANT COLON:  I just want to apologize to my

4    family.  I love you all.  I'm going to keep fighting my case.

5    Don't count me out.  And to my brothers understand I love you

6    guys as well.  Just keep the communication.

7          As far as the government, I just want to let them know

8    that they can't judge what they don't understand.  Like, where

9    I'm from, everything ain't go -- like I wasn't put in a

10   predicament to where I could succeed in life.  I feel I'm still

11   pleading my innocence in front of the Court.  I'm going to

12   appeal, and I will be home eventfully, hopefully.

13         And justice is not served locking up generation after

14   generation of black and Latino men.  People will only do what

15   they put themselves into because of the simple fact of the

16   situation impresses.

17         But, like I said, I love you all, and I'm going to

18   continue to fight my case and I'm also asking the judge, my

19   lawyer forgot to ask you for a recommendation that I stay close

20   to home so I can receive visits from my family.

21         That is all.

22         THE COURT:  All right.  Thank you, Mr. Colon.

23         I don't think your lawyer forgot.

24         DEFENDANT COLON:  He --

25         THE COURT:  Lawyers typically make that request after

D9knmers                       Sentence

1  sentence is imposed.

2         DEFENDANT COLON:  All right.  Pardon me, your Honor.

3         THE COURT:  It's fine.

4         Mr. Miedel.

5         MR. DINNERSTEIN:  I'll take the heat, your Honor.

6         MR. MIEDEL:  Yes, I believe my client wishes to make a

7  statement.

8         DEFENDANT PIERCE:  I would like to say sorry to my

9  sister, my babe moms, and all that, what I put them through.

10 But I'm innocent.

11        THE COURT:  Thank you, Mr. Pierce.  You may be seated.

12        At this time, we are going to take a short recess.

13 Everyone is to remain seated until the defendants are escorted

14 from the courtroom.  We will take a ten-minute recess.

15        Please remain seated.

16        (Recess)

17        THE COURT:  Mr. Aravind, I understand you have

18 something further to report to the Court.

19        MR. ARAVIND:  Yes, your Honor.  We were just advised

20 that another member of the one of the victim's families is

21 here.  She just came in as the Court was giving some remarks

22 earlier.  She would like to give a statement, your Honor.  It's

23 Ms. Leanne Alston, who is Delquan Alston's stepmother.

24        THE COURT:  Very well.

25        She may approach the podium.

D9knmers                         Sentence

1          THE COURT:  Please state your full name for the court

2    reporter.

3          MS. ALSTON:  My name is Leanne Alston, and I'm

4    Delquan's stepmother.  I just would like to say that Delquan

5    was the sweetest guy that I have known.  He came from the same

6    streets that you guys came from, and he didn't go around

7    shooting people.  You guys, you stood up here and said you were

8    sorry to your family but you didn't say you were sorry to us.

9          DEFENDANT COLON:  I'm innocent.

10          MS. ALSTON:  But we are still going through it.  But

11    you said sorry to them, but you couldn't say sorry to us.  That

12    hurts.  I just wanted to say how could you say that to them but

13    not to us.

14          I won't let my husband come up and here speak to you.

15    I'm sorry.  I can't talk anymore.  He's just sitting up there

16    like I'm innocent and swinging in his chair.  He's not sorry.

17    He's going to do this again and again.

18          THE COURT:  Thank you, Ms. Alston.

19          Is there any other victim in the courtroom who wishes

20    to be heard?

21          Do any counsel wish to make any further statements

22    before the counsel imposes sentence?

23          Oh, I'm sorry.

24          MR. ALSTON:  I'm Jaron Alston Delquan's father.

25    Melvin, I watched you raise up with my son from sixth grade.

D9knmers                            Sentence

1    What happened, brother?

2              DEFENDANT COLON:  I ain't kill your son.

3              MR. ALSTON:  You didn't kill my son.

4              DEFENDANT COLON:  Not at all.

5              MR. ALSTON:  You got what you wanted.  You got what

6    you wanted.  He's dead.  He ain't going to prison.  He's dead.

7    His oxygen stopped.  That's like, you know -- I wish you the

8    best, man.

9              THE COURT:  Is there anyone else in the courtroom who

10   wishes to address the Court?

11             Does any counsel wish to be heard further before the

12   Court imposes sentence?

13             MR. LEE:  No, your Honor.

14             MR. DINNERSTEIN:  I do, your Honor.

15             Your Honor, of course, my heart goes out to the Alston

16   family, so does Melvin's.  Melvin didn't kill Mr. Alston, and

17   when the government brings in Devon Parsons to be sentenced

18   before your Honor, I wonder whether they are going to ask the

19   Alston family to show up then.

20             THE COURT:  Mr. Miedel, do you wish to address the

21   Court further?

22             MR. MIEDEL:  No.  Thank you, your Honor.

23             THE COURT:  Anything further from the government?

24             MR. ARAVIND:  No, your Honor.

25             THE COURT:  This case represents the government's

D9knmers                        Sentence

latest installment in a protracted effort to liberate a Bronx

community from warring drug gangs.

        The Courtlandt Avenue Crew was a violent racketeering

enterprise that included GFC gang members.  This violent

enterprise flooded the Melrose and Jackson houses with crack

cocaine and marijuana.  Enterprise members considered those

housing projects their turf and defended their territory by

engaging in indiscriminate acts of mayhem, murdering drug and

gang rivals, shooting at buildings, and injuring innocent

civilians.

        They waged a campaign of terror.  This Court presided

over a lengthy trial where the wreckage left behind by these

defendants' criminal acts was exposed for everyone in the

courtroom to see.

        Surviving victims testified about the sheer terror

they experienced when all they were trying to do was go about

their everyday business.

        Lives were changed forever, and others were simply

snuffed out by the defendants and their coconspirators.  The

damage to society of the enterprise's actions cannot be

overstated.

        Their drug dealing affected countless mothers,

fathers, and children.  Their shootings terrified the entire

community, and their murders extinguished the potential that

their victims had to contribute to society.

D9knmers                        Sentence

1           This Court has heard from a number of family members

2    today including Jaliyah, a young girl who misses her father.

3           The Court's received letters from friend and

4    relatives.  They brim with profound sadness and loss, loss of a

5    son, loss of a brother, and loss of a father.

6           Mr. Correa's mother, Iris Perez, wrote, as Mr. Aravind

7    read in Court, that she can no longer hear his voice when he

8    walks through the door and not a day goes by when she doesn't

9    think of her son.  And Mrs. Perez points out that she took

10   Mr. Pierce into her home when he had no place to go and gave

11   him food, clothing and shelter.

12          Mr. Correa's sister asks how can her niece grow up to

13   value friendship knowing her dad was set up to be murdered by

14   someone she knew as his best friend.  That question, of course,

15   has no answer.

16          These heartfelt expressions of grief both in letters

17   and in Court today are undoubtedly emblematic of many others

18   that will not be communicated to the Court for any number of

19   reasons.

20          Today this courtroom is filled with raw emotion and

21   profound sadness because of the many families destroyed by the

22   defendants' brutal and violent acts, and that includes families

23   of victims and the defendants' own families who are here

24   grieving today.  The crimes for which these defendants have

25   been convicted by a jury in this district, including murder,

D9knmers                     Sentence

conspiracy to murder, racketeering, drug dealing, assaults and
attempted murders, are senseless.

        If only the clock could be turned back.  But that's
beyond the power of any of us.  This Court is left with the
somber duty of meting out just punishments for these heinous
crimes, and this Court understands that none of what it does
today can undo the damage done by these defendants.  But what
the Court does today is what the rule of law requires.

        Now, the defendant Joshua Meregildo comes before this
Court having been convicted of the most serious crimes
imaginable:  Murder, racketeering, drug dealing, firearms
offenses and bank robbery.

        The nature and circumstances of these offenses and the
characteristics of the defendant require the imposition of
serious punishment to reflect the gravity of the offenses, to
promote respect for the law, and in the end to provide just
punishment.

        There is a compelling need for general deterrence of
this kind of conduct and a paramount need to protect the
public.

        Mr. Meregildo's behavior during his current
incarceration also demonstrates that he's not yet interested in
rehabilitation.  While in jail he threatens and interferes with
staff and refuses to follow the rules.

        Because of the specific nature of the crimes for which

D9knmers                          Sentence

 1   Mr. Meregildo stands convicted, he's forfeited his right to

 2   walk free among a civilized society.

 3          The sad thing is Mr. Meregildo wasn't raised to be a

 4   murderer.  His mother tried as hard as she could to provide for

 5   him.  She work as a bus driver.  She provided a loving

 6   environment, and allowed him to pursue his dreams of playing

 7   basketball.

 8          And he demonstrated athletic prowess on the courts.

 9   He was recruited by a prep school in Connecticut, and he could

10   have escaped the violence surrounding him.  But Mr. Meregildo

11   was attracted to a different lifestyle, the false glamour of

12   guns and drugs, and those things pulled him away from a

13   constructive and law-abiding life.

14          At trial, Mr. Meregildo's attorney argued to the jury

15   that it was Mr. Meregildo's prowess on the basketball court,

16   especially his jump shot, that earned him the nickname Killa,

17   and perhaps that's true.

18          But his 2007 conviction for firearm possession on a

19   basketball court suggests to this Court that basketball was

20   just a hobby and being a gangster was his profession.

21          On July 31, 2010, Mr. Meregildo truly earned his

22   nickname, together with Devon Parsons and Walter Aponte, he

23   stalked Carrel Ogarro and waited for the opportune moment to

24   kill him.

25          When that moment arrived, Mr. Meregildo pulled out a

D9knmers                          Sentence

.380 pistol and tried to pick him off from a distance.  But he
had the safety on and the gun didn't fire, so he waited.  And
when the opportunity presented itself again, he took out his
.380 and started blast away ending, Carrel Ogarro's life.
Mr. Meregildo murdered Mr. Ogarro for money and because he
believed Mr. Ogarro was a snitch and a threat to
Mr. Meregildo's racketeering enterprise.

From the spring of 2010 through September 2011,
Mr. Meregildo sold crack cocaine and marijuana, ran the
enterprise for a time, and engaged in various acts of
indiscriminate violence, including murder.

He also robbed banks.  Since his incarceration, he's
doubled down on his past decisions, replacing his leadership
position in the Courtlandt Avenue crew with a leadership
position in the Macbala Bloods, another violent gang.

He hasn't shown any remorse or demonstrated yet a
desire to rehabilitate himself.  The sad thing is that he's
entirely capable of better things.  He's bright, and he could
have had a future, but he's forsaken it all.

This Court can only hope that at some point
Mr. Meregildo changes and tries to realize the good potential
that I believe is within him.

Melvin Colon also comes before this Court having been
convicted of the most serious crimes imaginable:  Murder,
racketeering, drug dealing, firearms possession and assault.

D9knmers                           Sentence

                The nature and circumstances of these offenses and the

characteristics of Mr. Colon require the imposition of very

serious punishment to reflect the gravity of the offenses,

promote respect for the law and provide for just punishment.

And, of course, there is a compelling need for general

deterrence of this kind of conduct and a paramount need to

protect the public.

                Because of the specific nature of these offenses,

Mr. Colon has also forfeited his right to walk free among a

civilized society.

                Now, Mr. Colon wasn't raised to be a murderer either.

While Mr. Colon lived at home, his mother provided a loving

environment.  He's also bright, and he too excelled at playing

basketball.

                In 2007, following his robbery conviction, he was

incarcerated in a juvenile facility for a significant period of

time.  Even then his mother and family stood by his side.

During that incarceration, Mr. Colon's counselors reported that

"Melvin is an intelligent young man who should know no

boundaries."

                But Mr. Colon did not respond to his family's love or

to the structure of a juvenile detention facility or to the

efforts of his counselors.  Instead, Mr. Colon rationalized his

criminal behavior because that was what was expected in his

neighborhood and continued his attraction to gang life.

D9knmers                    Sentence

In 2008 one of his counselors observed that Mr. Colon showed no remorse for his past criminal behavior and that he expressed his intentions to repeat his criminal conduct, but just do it smarter so that he could avoid apprehension.

The counselor concluded by noting that Mr. Colon appeared to engage in criminal conduct solely for "thrill seeking and status."

Another report on Mr. Colon in 2010 noted that he wanted to transfer to an adult detention facility as soon as possible and that if he stayed at the juvenile facility he would cause a lot more trouble. He admitted that he was instrumental in orchestrating a group disturbance at Goshen and had no reservations about assaulting other residents.

Ultimately, Mr. Clone was released from an adult facility and returned home. Unfortunately, but predictably, he immediately returned to his criminal ways, unleashing his violence on those who lived in his neighborhood.

It is no surprise that his family had no moral suasion over him, because, as the counselor in 2010 noted, Mr. Colon "saw himself as an adult and in that regard did not feel obligated to defer any of his personal and social decision making to their wishes or counsel."

Mr. Colon's behavior during his current incarceration demonstrates that he's not yet decided to choose a path toward rehabilitation. While in jail, he assaults staff and inmates,

1    uses drugs, and sets off false alarms, among other things.

2    This Court truly hopes that Mr. Colon matures and comes to

3    realize that there is more to life than a gang.

4           Just two years ago, on September 8, 2011, Mr. Colon

5    Aubrey Pemberton and other racketeering members set out to

6    exact revenge on a rival street gang, the YGs.  Earlier in the

7    day Messrs. Colon and Pemberton felt threatened by YG gang

8    members, and in their warped thinking Messrs. Colon and

9    Pemberton believed they had to respond with a show of force.

10          So, armed with a nine-millimeter pistol, they went to

11   the Maria Lopez houses looking for YG gang members to kill.

12   And when they found potential targets, Mr. Colon told

13   Mr. Pemberton to shoot them.

14          When Mr. Pemberton opened fire, he missed his intended

15   targets, but struck Mr. Jing Bao Jiang, an innocent delivery

16   man who was only trying to deliver some Chinese food.

17          Mr. Colon posted on Facebook about this episode,

18   making it clear that he wanted the world to know that he stood

19   up to the YGs and didn't care what the collateral damage was.

20          Three years ago, on August 27, 2010, Mr. Colon

21   demonstrated how cold and calculating he is.  The then leader

22   of the racketeering enterprise Terry Harrison, who was also

23   known as T-Money had offered to pay Mr. Colon and Devon Parsons

24   to eliminate someone Mr. Harrison viewed as a threat to the

25   enterprise, Delquan Alston.

D9knmers                              Sentence

1              At that time, Mr. Alston was targeted because he had

2    been selling inferior narcotics which threatened the

3    enterprise's drug business.

4              So Mr. Colon and Mr. Parsons met up with Mr. Alston on

5    that warm summer night.  Like good friends, Mr. Colon and

6    Mr. Parsons talked and laughed with Mr. Alston, flirted with

7    women, and drank with him into the early hours of the following

8    morning.

9              But all of that was just an act, because Mr. Colon and

10   Mr. Parsons knew why they had met up with Mr. Alston.  At some

11   point during that long night together Mr. Alston quipped that

12   he needed money when the conversation turned to discussing a

13   bounty that was on T-Money's head.

14             After the girls left and they all smoked some

15   marijuana, Mr. Alston stepped off the walkway to relieve

16   himself by the side of the building.  While Mr. Alston was

17   urinating with his back to Messrs. Colon and Parsons, Mr. Colon

18   shot him in the head and he and Mr. Parsons emptied the

19   40-caliber murder weapon into Mr. Alston's body.

20             Far from showing any remorse for this execution,

21   Mr. Colon laughed it off as he and others were gathered around

22   a computer at MDC looking at the trial discovery in this case.

23             Mr. Colon joked to other inmates that "out of all

24   places we shot this guy in the dick."

25             Such a statement reveals the same lack of remorse

D9knmers                          Sentence

observed by his juvenile counselors five years ago and an

obsession with his gangster persona.

In his sentencing submission Mr. Colon asks this Court

to think about whether Facebook is the real Melvin, and he

suggests, like the screenplay of a recent movie, that if the

Court pulled back the Facebook curtain and looked at the real

Mr. Colon, he would see a good and decent young man.

But in real life, Mr. Colon is a murderer and a

gangster and a drug dealer, and there's no difference between

the Colon on Facebook and the Colon in this courtroom.  He too

has forfeited his right to walk among civilized society.

Finally, Earl Pierce comes before this Court having

been convicted of extremely serious crimes:  Conspiracy to

commit murder, which resulted in a death, attempted murder,

racketeering, drug dealing and firearms offenses.

The nature and circumstances of these offenses and

Mr. Pierce's characteristics require the imposition of serious

punishment to reflect the gravity of the offenses and promote

respect for the law and to provide for a just punishment.  His

offenses were violent and protracted.  He conspired to murder

others engaged in gun battles on the street and sold drugs for

the enterprise, and he was old enough and mature enough and

smart enough to have chosen a different path, like his brothers

and sisters did.  But he didn't.

So there is, here again, a compelling need for general

D9knmers                          Sentence

deterrence of this kind of conduct and a paramount need to

protect the public from Mr. Pierce.

    For his entire adult life he sold drugs, possessed and

used firearms and engaged in violence.  Time after time he was

arrested and incarcerated, and time after time he was released

and immediately returned to committing crimes.  Prison did not

deter him.  In fact, his criminal activity escalated.

    While he might, as his counsel argues, age out of

committing future crimes, the only reliable indicator of what

Mr. Pierce's future portends is what he's done in the past.

That past shows that he is a violent and dangerous individual.

    Mr. Pierce was an associate of the racketeering

enterprise and dedicated to its cause.

    On July 25, 2010, Pierce and T-Money learned that

Jason Correa, an associate of a rival drug crew, were inside a

building on their turf, so they decided to kill him.  T-Money

took Pierce's gun and Bernard Folks, another racketeering

member, and they waited in a stairwell for Mr. Correa.  T-Money

walked up to Mr. Correa and shot him three times.  And when he

heard Mr. Correa rasping for breath, he snuffed out his life

with a few more gunshots.

    Mr. Pierce did not pull the trigger, but he conspired

with T-Money to kill Mr. Correa, a rival narcotics dealer.

T-Money used Mr. Pierce's gun, and Mr. Pierce spirited the gun

away and hid it after the murder was done.

D9knmers                    Sentence

1          When those shots rang out, building residents threw

2     themselves on the floor closed their doors and tried to protect

3     their children.  But Mr. Pierce was cool, calm and collected.

4     For T-Money and Mr. Pierce, it was mission accomplished.

5          And when a building resident dared to speak to the

6     police about what she had seen and heard, Mr. Pierce labeled

7     her a snitch and threatened to kill her.  That courageous woman

8     knew exactly what Mr. Pierce was capable of, but nevertheless

9     testified at trial, and this Court commends her.

10          To the members of the Courtlandt Avenue Crew,

11    including Mr. Pierce, murdering rivals or shooting at them was

12    commonplace.

13          And in September 2010, that violent conduct resulted

14    in the retaliatory killing of T-Money by drug rivals.  The

15    murder of T-Money catapulted Mr. Meregildo and Mr. Colon to the

16    top of the racketeering enterprise, and it also led to

17    Mr. Pierce's attempt to retaliate against the group he believed

18    was responsible for T-Money's death.

19          Three years ago, on September 13, 2010, Pierce, armed

20    with a nine-millimeter pistol, went with other racketeering

21    members to kill their rivals.  When Pierce found his intended

22    targets, he opened fire and hit Tarean Joseph several times.

23          As Mr. Pierce later boasted to other enterprise

24    members, he was on his way to finish the job when another rival

25    came out of the building and shot at him.  Not thinking about

D9knmers                         Sentence

the collateral consequences, Mr. Pierce and his rival engaged

in a shootout on a public street where any number of innocent

people could have been shot or killed.  Thankfully, no one was.

Looking at the 3553(a) factors, Mr. Pierce is old

enough and mature enough to have chosen a different path.  He's

experienced with the criminal justice system, racking up 11

prior convictions, including two drug felonies, and served

lengthy prison sentences.

But it hasn't slowed him down.  Taken alone, each of

his crimes is heinous, but viewed together they demonstrate

that at this moment he is a clear and present danger to

civilized society.

Unlike Messrs. Meregildo and Colon, Mr. Pierce was

acquitted of the crime of murder in furtherance of the

racketeering enterprise, allowing this Court to exercise its

informed discretion in fashioning a sentence.

Mr. Pierce's guideline range of 46 is off the

sentencing guideline chart and appropriately reflects the

gravity of his crimes.  Among his coconspirators he stands

alone as a career offender, with the maximum Criminal History

Category of VI under the guidelines.

Aside from his coconspirators here, Mr. Pierce's

conduct was more serious than every other defendant in this

case except one, Kevin Pinero.  Mr. Pinero pleaded guilty to

the murder of William Shaw, another victim of the racketeering

enterprise, as well as to racketeering and conspiracy to commit

murder.

Because Mr. Pinero accepted responsibility for his

acts, his total offense level was 40 and his Criminal History

Category was IV.  So Mr. Pinero's guideline range was 360 to

life that was to be followed by a mandatory consecutive

sentence of 360 months.  After weighing the 3553(a) factors

this Court sentenced Mr. Pinero to a total of 430 months' in

prison.

Mr. Pierce did not murder Mr. Correa, but Mr. Correa

is dead as a result of Mr. Pierce's participation in the

conspiracy to murder rivals.  Mr. Pierce personally shot

Mr. Joseph and was on his way to finish the job when he got

into a gun battle on the streets and was in the hierarchy of

the racketeering enterprise that indiscriminately waged a

campaign of terror on the community.

His total offense level is six levels higher than

Mr. Pinero's, resulting in a guideline range of life in prison,

and as a career offender with the highest criminal history

category available.  This Court makes these observations about

Mr. Pinero in recognition of its responsibility under the

3553(a) factors to avoid sentencing disparities.

So, viewing all of the 3553(a) factors in conjunction

with the advisory guidelines, in the case of Mr. Pierce this

Court believes that a sentence within the guideline range is

D9knmers                        Sentence

1    more than is necessary to ensure that the ends of justice are

2    served in this case.

3            So it's against this very sad backdrop that this Court

4    is prepared to impose sentence on each of these defendants.

5            The crimes here are heinous, and each of them poses an

6    extraordinary danger.

7            Mr. Meregildo, I would ask you to stand, sir, and I

8    will a impose sentence at this time.

9            Mr. Meregildo, it's my judgment, sir, that you be

10   sentenced to a term of life imprisonment on Counts One, Two,

11   Six, Thirteen, Fifteen, and Eighteen, and that you be sentenced

12   to a term of 120 months concurrently on Count Five, and that

13   you be sentenced to 60 months consecutive to all of these

14   sentences on Count Twenty-Two.

15           In addition, although it is just an exercise, I'm

16   imposing supervised release of five years on Counts One, Two,

17   Thirteen, Fifteen, Eighteen and Twenty-two for indictment 11

18   Cr. 576; three years on Count Five for indictment 11 Cr. 576

19   and three years on Count One for indictment 11 Cr. 758, all to

20   run concurrent, with one another.

21           I am also sentencing you on 11 Cr. 758 to 60 months

22   concurrent with any other sentence, except Count Twenty-Two of

23   11 Cr. 576, and imposing an order of restitution in the amount

24   of $3,750.  Given that you are going to be incarcerated for the

25   rest of your life, I am not going to impose any interest on the

D9knmers                      Sentence

1   restitution payment.  I am also imposing mandatory special

2   assessments of $800 on 11 Cr. 576 and $100 on 11 Cr. 758.

3          With respect to the supervised release, you will be

4   subject to all of the standard conditions of supervised release

5   and the special condition that you submit your person,

6   residence, place of business, vehicle or any other premises

7   under your control to a search on the basis that your probation

8   officer has a reasonable belief that contraband or other

9   evidence of a violation of the conditions of release can be

10  found.  That search can be conducted at a reasonable time and

11  in a reasonable manner, and your failure to submit to such a

12  search may be grounds for revocation.

13         This, Mr. Meregildo, constitutes the sentence of this

14  Court.

15         You may be seated, sir.

16         THE COURT:  Mr. Colon, I would ask sir that you stand.

17         Mr. Colon, it is my judgment, sir, that you be

18  sentenced to a term of life in prison on Counts One, Two,

19  Eight, Thirteen, and Sixteen.  Further, that you be sentenced

20  to 120 months of imprisonment on Counts Seven and Eleven and

21  240 months of imprisonment on Count Twelve, all to be served

22  concurrent with your life imprisonment.  And I sentence you to

23  120 months consecutive to life on Count Twenty-One and 300

24  months consecutive to life on Count Twenty-Two.

25         As with Mr. Meregildo, I am imposing a term of

D9knmers                          Sentence

supervised release of five years on Counts One, Two, Eight,

Thirteen, Fifteen, Sixteen, Twenty-One and Twenty-Two, and

three years on Counts Seven Eleven and Twelve, all to run

concurrent with each other and all subject to the standard

conditions and the special condition that you submit to a

search at any time as I have outlined with Mr. Meregildo.

I am also imposing a total of $1,000 special

assessment on you, $100 on each count.

This constitutes the sentence of this Court,

Mr. Colon.

You may be seated.

Finally, Mr. Pierce, I would ask that you stand.

Mr. Pierce, in this case, I have the ability to

exercise some discretion, and I truly hope that you will be a

different person as you grow older.

I am sentencing you, sir, to a total sentence of 600

months of imprisonment.  I'm sentencing you on Counts One, Two,

Ten, and Thirteen to 180 months of imprisonment and on Count

Three to 120 months of imprisonment, all those sentences to be

concurrent, to be followed by a 120-month consecutive sentence

on Count Twenty, and a 300-month consecutive sentence on Count

Twenty-Two, for a total sentence of 600 months of imprisonment.

I'm going to impose a term of supervised release on

you, specifically, five years on Counts One, Two, Thirteen,

Twenty and Twenty-Two and three years on Counts Three and Ten,

D9knmers                          Sentence

1    all to run concurrent to one another.

2            I impose all of the standard conditions of supervised

3    release and the following special conditions:

4            First, that you submit your person, residence, place

5    of business, vehicle or any other premises under your control

6    to a search on the basis that your probation officer has a

7    reasonable belief that contraband or other evidence of a

8    violation of the conditions of your release may be found.  That

9    search can be conducted in a reasonable time and in a

10   reasonable manner, and your failure to submit to such a search

11   may be grounds for revocation.

12           So, upon your release from prison, you are to notify

13   any other residents of the premises where you reside that those

14   premises may be subject to search pursuant to this condition.

15           In addition, I'm going to require you to participate

16   in a treatment program for drug and alcohol upon your release,

17   to include testing, and I will require you to share in the

18   expense of that program based on your ability to pay or the

19   availability of third-party payments.

20           Finally, I'm going to impose the mandatory special

21   assessment of $700 on you, $100 on each count of conviction.

22   This, Mr. Pierce, constitutes the sentence of this Court.

23           You may be seated.

24           I advise each of you gentlemen that each of you have

25   the right to appeal.  I advise you further that if you cannot

D9knmers                         Sentence

1    afford counsel, counsel will be provided to you free of cost.

2              Each of you have had splendid lawyers representing you

3    throughout this matter, from the very first day before me

4    through the trial and sentencing.  Each of them has done an

5    outstanding job in their submissions, and I am confident that

6    they will advise you further regarding your appellate rights.

7              With respect to the requests on behalf of Messrs.

8    Meregildo and Colon to be housed at facilities as close to the

9    New York Metropolitan Area as possible, I will make that

10   recommendation.

11             But, gentlemen, you need to understand that it is all

12   up to the Bureau of Prisons, and it must be consistent with

13   your security classification.  And to the extent that you

14   continue your gang affiliations, the possibility of that

15   request being fulfilled by the Bureau of Prisons becomes more

16   and more remote.

17             Are there any further applications?

18             MR. MIEDEL:  Your Honor, I have the same request for

19   Mr. Pierce.

20             THE COURT:  I will include that recommendation.

21             MR. MIEDEL:  Thank you.

22             THE COURT:  I know I jumped the gun.

23             Are there any further applications at this time?

24             MR. ARAVIND:  The government would move to dismiss the

25   underlying indictments, your Honor.

1            THE COURT:  The government's application is granted.

2            Anything further, Mr. Lee?

3            MR. LEE:  Nothing, your Honor.  Thank you.

4            THE COURT:  Mr. Dinnerstein?

5            MR. DINNERSTEIN:  Nothing, your Honor.

6            MR. MIEDEL:  Your Honor, I would just the indulgence

7   of the marshals to be able to speak to my client for two

8   minutes in the back.  We were not allowed to speak to them

9   earlier downstairs.  I need to explain to him what the sentence

10  means for two minutes.

11           THE COURT:  There is a large number of people here.

12  You will go downstairs, and I am sure you will be able to see

13  him briefly down there.  There's too much going on here in the

14  courtroom.

15           This matter is concluded.  Everyone is to remain

16  seated until the defendants are escorted from the courtroom.

17           (Adjourned)

18

19

20

21

22

23

24

25